## BEFORE THE PERSONNEL BOARD
## STATE OF NEW MEXICO

**IN THE MATTER OF**
**JOHN P. VIGIL,**

Appellant,

v.

**Docket No. 15-079**

**NEW MEXICO DEPARTMENT**
**OF HEALTH,**

Appellee.

FILED

MAR 0 4 2019

NM STATE PERSONNEL BOARD

## RECOMMENDED DECISION

### Jessica B. Cooper, Administrative Law Judge

Joe M. Romero, Jr.                                    Attorney for Appellant
Romero & Winder, P.C.
1905 Lomas Blvd. NW
Albuquerque, New Mexico 87104

Jesse Tremaine, Assistant General Counsel             Attorney for Appellee
Office of the General Counsel
New Mexico Department of Health
P.O. Box 26110
Santa Fe, NM 87502-6110

## I. STATEMENT OF THE CASE

Appellant John Vigil was dismissed from his position as a Psychiatric Technician-Supervisor ("Psych Tech Supervisor" or "PTS") with the Community Based Services/Assisted Living Facility Unit of the New Mexico Behavioral Health Institute ("BHI") within the New Mexico Department of Health ("DOH" or "Department"), effective October 21, 2015. (Stip. 2; Ex. 15.) He was dismissed for numerous policy violations, including possession of patient medications and illegal possession of controlled substances, failure to follow proper

1

Exhibit 1

documentation of wastage, failure to follow proper disposition of a controlled substance and unusable non-controlled products, failure to submit Medication Incident Report forms as required, failure to comply with the Clothing Allowance Policy, and negligence in the workplace. (Ex. 15.)

JURISDICTION

At the time of his dismissal, Mr. Vigil was a classified employee of DOH with a right of appeal to the State Personnel Board of New Mexico ("Board"), pursuant to NMSA 1978, Section 10-9-18(A) (2009) and 1.7.11.13(C)(4)(a) and 1.7.12.8(A) NMAC. (Stip. 3; *see also* Stip. 1.) Appellant filed his Notice of Appeal on November 19, 2015, within the 30-day appeal period provided by law. The Board, therefore, has jurisdiction over the subject matter and the parties herein, pursuant to NMSA 1978, Section 10-9-18 (2009) and 1.7.12.8(A)-(B) NMAC. (Stips. 1, 4.)

NOTICE OF FINAL ACTION

The *Notice of Final Action-Dismissal* ("NFA"), dated October 20, 2015, sets out the factual basis for Mr. Vigil's dismissal, as follows:

> On May 29, 2015, an anonymous letter was sent to Charles Jaramillo, Chief Operations Officer, Richard Vigil, Human Resources Deputy Director and Rose Contreras, Director of Standards and Compliance alleging exploitation of residents at the Community Based Services/Assisted Living Facility (CBS/ALF). The letter stated alleged [sic] that you had bottles of patient medications locked in your desk, including Ativan and narcotics. The letter also alleged you had patient funds in your desk.
>
> On June 3, 2015, a search was conducted by the Executive Nurse Administrator Frances Tweed, Internal Review Director Antonio Coca and Security Director Joe Chavez. The search of your work area and desk found cash, prescription medication bottles for two (2) patients with patients' names as well as small plastic cups with loose pills/tablets identified by Ms. Tweed as Risperidone and Clonazepam (.5 mg). Law Enforcement was contacted on June 5, 2015, and an investigation by the San Miguel County Sheriff's Department (SMC-SO) was conducted. Thirty-four (34) additional patient-related items were found which included fourteen (14) bank envelopes marked with patient initials containing money and receipts, one orange envelope containing $635.00, a "play" $20.00 bill, pill bottles, loose pills and antibiotics. All items were confiscated at the time.

2

On June 19, 2015, a second anonymous letter was sent to Ms. Tweed alleging that you had three additional lockers at the Mesa and El Paso Cottages containing pills. Ms. Tweed contacted SMC-SO and a search was conducted. The search of a locker with your name on it, located on the Mesa Cottage, found additional medications, two (2) of which were Schedule 2 narcotics: Hydrocodone 5 mg tablets and Hydrocodone 7.5 mg tablets. Additional over the counter medications were found: Ibuprofen, Indomethacin, Colchicine and Clindamycin. There were 9 Hydrocodone 5 mg tablets and 2 Hydrocodone 7.5 mg tablets. You were subsequently charged with Possession of a Controlled Substance – Hydrocodone, a fourth degree felony under New Mexico state law.

The search proceeded to the El Paso Cottage. In a locker containing mail with your name on it, three (3) prescription medications (Risperidone 1 mg, Risperidone 2 mg and Benzotropine .5 mg) were found for two (2) separate patients. These were determined to be expired patient medications.
(Appx. A; Ex. 15.)

Based on these factual allegations, the NFA also alleges that Mr. Vigil violated BHI's

Disposal of Unusable Products Policy (NMBHI PHM 060), BHI's Controlled Substance

Administration Records Policy (NMBHI PHM 042), BHI's Incident Reporting and Notification

Policy (NMBHI SCD 001), BHI's Clothing Allowance Policy (NMHBI CBS/RES 148), DOH's

Drug and Alcohol-Free Workplace Policy (HR 08:120), DOH's Disciplinary Action Policy (HR

08.10), and DOH's Code of Conduct (HR 015). The specific policy provisions cited in the NFA

and/or referenced at Hearing as violated by Mr. Vigil, or otherwise critical to understanding

those provisions, include:

### BHI Disposal of Unusable Products Policy (NMBHI PHM 060)
...
APPLICABILITY
This policy applies to all employees of the New Mexico Behavioral Health Institute at Las Vegas (NMHBI).

DEFINITIONS
UNUSABLE PRODUCTS:
A.  Unusable products and devices include those that are:
    1.  Expired (outdated).
    ...
    7.  Otherwise unsuitable for administration or use (e.g., questionable integrity, effectiveness, and stability)

...

POLICY

The policy of NMBHI is that unusable products shall be handled and disposed of properly and comply with all legal requirements.

...

PROCEDURES

I.  RETURN OF UNUSABLE PRODUCTS TO THE PHARMACY

    A. Unusable products shall not be distributed or administered. Pharmacy, nursing, and other personnel who discover unusable products shall return them to the pharmacy for proper disposition. If the drug is an unusable controlled substance sealed in its original packaging, it will be returned to the pharmacy for proper disposition. If the drug is an unusable controlled substance that is no longer sealed in its original packaging, the nurse will use a Cactus Smart Sink to dispose of the medication.

    B. Any contraband found on any unit must be forwarded to Pharmacy for destruction.

      ...

III. RETURN OF UNUSABLE PRODUCTS TO THE SOURCE OF SUPPLY

    A. Unusable products shall be segregated and held until able to return.

    (Exs. 5, 15.)

## BHI Controlled Substance Administration Records Policy (NMBHI PHM 042)

...

APPLICABILITY

This policy applies to all employees of the New Mexico Behavioral Health Institute at Las Vegas (NMHBI).

...

PROCEDURE

...

V.  Responsible Staff: Nursing

    A. Documentation of Wastage and Destruction

      1. Documentation of the disposition of a portion of a controlled substance remaining in an ampule, vial, syringe or unused [sic] must be documented and shall be made on the next available line of the Controlled Substance Administration Record (CSAR). A licensed person must witness and co-sign for all wastage and destruction.

      2. Documentation should include: P/C/R name, reason for wastage (ie 'dropped on floor', 'patient refused', etc.) and disposition of wastage (ie 'flushed', 'washed down sink', returned to the pharmacy, etc.)

      (Exs. 6, 15.)

4

## BHI Incident Reporting and Notification Policy (NMBHI SCD 001)

...

APPLICABILITY

This policy applies to all employees of the New Mexico Behavioral Health Institute at Las Vegas (NMBHI).

...

DEFINITIONS

...

INCIDENT – INTERNAL

Any event that is inconsistent with desired outcomes or the routine operations of [BHI] involving clients-patients-residents, staff, visitors, students.  These events include, but are not limited to, conflicts/assaultive behavior, complaint, ER visits, falls, HIPAA deviations, hospitalization, injury, damage, deaths, loss, harm, deviation from policy or regulations, rule violations, threats, elopement/escape/unexpected absence, equipment malfunction, safety hazards or the probability of imminent harm to [BHI], its clients-patients-residents, residents and property.

...

PROCEDURES

...

IV.  Specific incidents will be reported on specialized forms, these include the following:

...

    I.  MEDICATION INCIDENT REPORT FORM – For all documentation of medication incidents, errors, occurrences, etc. staff must complete the NMBHI Medication Incident Report form. (Exs. 7, 15.)

## BHI Clothing Allowance Policy (NMBHI CBS/RES 148)

...

APPLICABILITY

This policy applies to all employees of the New Mexico Behavioral Health Institute at Las Vegas (NMBHI).

...

POLICY

The policy of the NMBHI is that the Community Based Services Division will provide a clothing allowance of $150.00 for winter and spring purchases for each resident of the ARCF.  At no time will client funds be commingled, therefore, Financial Management will issue one check at a time in the amount of $150.00.  When receipts or unused funds are returned to Financial Management another check will be issued for another ARCF resident.

...

PROTOCOL

1.  Staff are expected to comply with the protocol listed below and it must be accomplished within an eight (8) hour shift.

a. Primary Psychiatric Technician (PPT) and Supervisor will be responsible for completing a Clothing Inventory list for the resident in order to identify the clothing needs of the resident.

b. Request for a $150.00 check from Financial Management to be completed by Supervisor.

c. PPT received $150.00 check from Financial Management.

d. PPT with client (unless client refuses) travels to bank to cash check.

e. PPT and client (unless client refuses) purchase identified clothing at local store.

f. PPT and Supervisor verify what has been purchased against receipt(s).

g. PPT delivers original receipts(s) to NMBHI Financial Management Department along with any money left over....
(Exs. 8, 15.)

## DOH Drug and Alcohol-Free Workplace Policy (HR 08:120)

...

II. Applicability
This policy applies to all employees of the Department...

...

IV. Procedure

A. General Provisions

...

3. Employees are prohibited from bringing alcohol or illegal drugs onto Department property at any time. Employees who use, possess, or distribute alcohol or illegal drugs while on duty or on Department property will be subject to disciplinary action, including dismissal.

4. Nothing in this policy shall be considered as limiting the Department's right to take administrative or disciplinary action, up to and including dismissal, for employee/workforce involvement with illegal drugs or alcohol not specifically addressed in this policy.

...

K. Sanctions

...

9. Employees who, while on duty, consume or possess drugs or any controlled substance without a valid prescription shall be dismissed and reported to the local law enforcement agency.
(Exs. 4, 15.)

## DOH Disciplinary Action Policy (HR 08:10)

...

II. Definitions:

...

N. **Negligence:** Failing through action or omission to exercise reasonable care in particular circumstances or in making a decision in the course of their employment which negatively impacts operations or results in liability to the Department.

...

III. Policy

...

    B.  Offenses

       ...

       3.  Group 3 Offenses
           **Note:** Offenses in this group are sufficiently serious that even a single occurrence may result in suspension, demotion or dismissal.  Group 3 offenses include, but are not limited to, the following:
           ...
           f.  Conduct occurring on or off the job that is related to job performance and is of such nature that to allow the employee to continue in the assigned position could constitute negligence in regard to the Department's duties to the public, other State employees, or individuals served by the Department;
           ...
           l.  Use and/or possession of alcohol and/or unlawful controlled substances while on work premises or assigned work site...;
           ...
           bb.  Violations of any DOH policy, State Personnel Rule, or other applicable or governing rules and regulations and federal or state laws relevant to DOH employee behavior or performance requirements. (Exs. 2, 15.)

## DOH Code of Conduct (HR 08.28)

...

III.  Policy:

    A.  General Provisions

        a.  Employees shall comply with all federal, state, county and local laws and regulations.
        b.  Employees shall behave in a manner that promotes public confidence in the integrity and impartiality of the State.
           (Exs. 3, 15)

## New Mexico BHI at Las Vegas CBS Custodial Procedures Manual (revised 4/25/12)

I.  DRUG POLICY

...

    E.  Medication Storage

       ...

       6.  Medications no longer in use unwanted, outdated, or adulterated will be placed in a quarantine area in the locked medication cabinet and held for destruction by the consulting pharmacist.
          (Exs. 25(B), 26.)

PROCEDURAL POSTURE

- This matter was initially set for hearing on March 31, 2016.
- Appellant Vigil had criminal charges brought against him stemming from the same underlying facts as his dismissal from employment. (Exs. C-2 – C-4.)
- On February 25, 2016, the parties submitted a stipulated motion, representing that Mr. Vigil's criminal case was set for trial on July 12, 2016, and requesting that the Board hearing be continued to after Mr. Vigil's criminal case was concluded. Assigned Administrative Law Judge Jessica B. Cooper ("ALJ") granted the continuance and reset the merits hearing for September 7, 2016.
- On August 22, 2016, Appellant Vigil submitted an unopposed motion, representing that his criminal case was now set for jury trial beginning October 25, 2016, and again requesting that this matter be continued to after his criminal case had concluded. The ALJ again granted the continuance and reset the merits hearing for December 7, 2016.
- On November 3, 2016, the parties submitted a stipulated motion, representing that Mr. Vigil's October 25, 2016 trial resulted in a mistrial and would likely be set for retrial, and again requesting that the matter be continued to after his criminal case concluded. The ALJ granted the continuance and directed the Department to notify the Adjudication Division when Mr. Vigil's criminal case was finalized.
- Mr. Vigil's second jury trial went forward on November 14 and 15, 2017, and he was acquitted of all charges. (Ex. C-5.)
- On January 3, 2018, in response to an inquiry from Adjudication, Mr. Vigil's then counsel confirmed he had been acquitted of all charges and was ready to proceed with the Board hearing. The ALJ reset the merits hearing for March 29, 2018.
- On March 9, 2018, Appellant Vigil submitted an unopposed motion requesting that the merits hearing be continued a minimum of 60 days to allow the relevant portions of the related criminal case proceedings to be obtained and transcribed. The ALJ granted the continuance and reset the merits hearing for July 18, 2018.
- This matter came for hearing before the ALJ on July 18-20, 2018, at the State Personnel Office, 2600 Cerrillos Road, Room 103, Santa Fe, NM ("Hearing").
- At the request of the Department, the record in this matter was held open until July 24, 2018, to allow the submission of a single document as rebuttal evidence.
- Appellant Vigil filed his *Opening Brief ("Written Closing Argument")* and *Requested Findings of Fact and Conclusions of Law* on September 20, 2018. The Department's *Closing Argument, Requested Findings of Fact, and Requested Conclusions of Law* were received shortly after close of business on September 20, 2018, and therefore filed on September 21, 2018.

8

## II.   ISSUES ON APPEAL

    A.  Was there just cause for Mr. Vigil's discipline?
    B.  Was the discipline of dismissal appropriate?

## III.  SUMMARY OF DECISION

    A.  Yes.  The Department proved by a preponderance of the evidence that Mr. Vigil improperly stored expired patient medication in his desk cabinet and cubby locker; failed to complete Medication Incident Reports on that improper storage and on his discovery of expired medication in ALF residents' active medication bins, and improperly handled clothing allowance change by storing it in his unlocked desk drawer.  This misconduct is inconsistent with Mr. Vigil's obligations to DOH and BHI; is a violation of BHI's Disposal of Unusable Products Policy, BHI's Incident Reporting and Notification Policy, and DOH's Disciplinary Action Policy and its Code of Conduct; and is just cause for his discipline.

    B.  No.  The Department proved by a preponderance of the evidence only a limited number of allegations against Mr. Vigil and his one instance of prior discipline, a Letter of Reprimand, was for misconduct of an entirely different nature.  Dismissal was not a reasonable discipline in this instance.  For Mr. Vigil's proven misconduct, a 30-day suspension is more appropriate.

The ALJ, having examined the record, reviewed the exhibits, heard the testimony of the witnesses, and considered the arguments of the parties in this matter, does hereby make the following Summary of Evidence, Recommended Findings of Fact, Recommended Conclusions of Law, and Recommended Decision.

In this Recommended Decision, locations are in New Mexico and the year is 2015 where not indicated.  Stipulation citations ("Stip. __") are to the undisputed facts agreed to by the parties in their February 19, 2016 Stipulated Pre-Hearing Order ("SPHO") and/or at Hearing, and entered into the record at Hearing (Stips. 1-4).  (Appx. B, ALJ Exhibit 1.)  Exhibit citations ("Ex.__") are to the parties' 41 exhibits admitted into the record in this matter.  (Appx. C; Exs. 1-8, 10-12, 14-24, 25(A)-25(B), 26, C-1 – C-5, D-E, G-H, I-1 – I-3, J-M.)

## IV.    RELEVANT PRINCIPLES

JUST CAUSE

Employees in New Mexico's classified service can only be disciplined for just cause.

(1.7.11.10 NMAC.)  Just cause is defined at 1.7.11.10(A) NMAC as "any behavior relating to the

employee's work that is inconsistent with the employee's obligation to the agency."  Further, just

cause includes, but is not limited to:

> inefficiency; incompetency; misconduct; negligence; insubordination;
> performance which continues to be unsatisfactory after the employee
> has been given a reasonable opportunity to correct it; absence without
> leave; any reasons prescribed in 1.7.8 NMAC; failure to comply with
> any provisions of these Rules; falsifying official records and/or
> documents such as employment applications, or conviction of a felony
> or misdemeanor when the provisions of the *Criminal Offender
> Employment Act NMSA 1978, Sections 28-2-1 to 28-2-6 apply.*
> (1.7.11.10(B) NMAC.)

To prove just cause, the Department has to show not only that there was employee

misconduct, but also that the level of discipline was appropriate in light of that misconduct.

(*Gallegos v. New Mexico State Corrections Dep't*, 1992-NMCA-013, ¶¶19, 22, 115 N.M. 797.)

The first prong focuses on the nature of the employee's misconduct; the second on the

reasonableness of the Department's disciplinary action.  (Id. at ¶19.)

BURDEN OF PROOF

Administrative practice generally follows the judicial model of placing the burden of

proof on the party alleging the affirmative.  (Ernest Gellhorn and Ronald M. Levin,

Administrative Law and Process, 5th ed. 2006; *Wallace v. Wanek*, 1970-NMCA-049, ¶9, 81

N.M. 478.)  Typically, this "burden of persuasion is met by the familiar civil case standard of 'a

preponderance of the evidence.'" (Administrative Law and Process, 5th ed. 2006.)  In the current

proceeding, this means that DOH, the party alleging a rightful basis for imposing discipline on

Mr. Vigil, bears the burden of proving by a preponderance of the evidence that it had just cause to dismiss him. *(Matter of Termination of Boespflug*, 1992-NMCA-138, ¶¶24-25, 114 N.M. 771 (J. Donnelly Special Concurrence); 1.7.12.18(D) NMAC; *Archuleta v. Santa Fe Police Dept. ex rel. City of Santa Fe*, 2005-NMSC-006, ¶5, 137 N.M. 161.)

## PREPONDERANCE OF THE EVIDENCE STANDARD

"Preponderance of the evidence" simply means the greater weight of the evidence. (*Campbell v. Campbell*, 1957-NMSC-001, ¶24, 62 N.M. 330.)  To prove by the greater weight of the evidence means to establish that something is more likely true than not true.  (*Santa Fe Public Schools v. Romero*, 2001-NMCA-103, ¶18, 131 N.M. 383 (citing Uniform Jury Instruction (UJI) 13-304 NMRA).)  A party is said to have established its case by a preponderance of the evidence when the evidence tips the scales in favor of the party upon whom the burden of proof rests, even if it barely tips them.  (*Lumpkins v. McPhee*, 1955-NMSC-052, ¶35, 59 N.M. 442.)

## EVIDENCE RELEVANT TO THE STATED ALLEGATIONS ONLY

The NFA and the Notice of Contemplated Action ("NCA") are an integral part of Appellant's due process in this matter, as they provide notice of the just cause basis for the discipline imposed upon him and the allegations which the Department needs to prove at Hearing.  The ALJ may only consider evidence relevant to those allegations against Appellant included in both the NFA and the NCA or set forth as contested issues in the parties' SPHO. (1.7.12.18(L) NMAC.)

## HEARSAY

As the rules of evidence are not strictly adhered to in administrative hearings, hearsay evidence may be considered.  (1.7.12.18(G) NMAC.)  However, the legal residuum rule requires

that the Board's decisions be supported by some evidence that would be admissible in a court of law. (Id.; *Bransford v. State Taxation and Revenue Dept., Motor Vehicle Division*, 1998-NMCA-077, ¶18, 960 P. 2d 827.) That is, hearsay cannot be the sole evidentiary basis underlying a Board finding or decision.

## PROGRESSIVE DISCIPLINE

Progressive discipline should be used by an agency whenever appropriate to "correct [employee] performance or behavior that is below acceptable standards, or contrary to the [Department's] legitimate interests." (1.7.11.8(A)-(B) NMAC.) While progressive discipline need not be used in all cases, the instances in which New Mexico courts have upheld dismissals in the absence of progressive discipline are those where the employee has engaged in serious misconduct that does not have to be tolerated by an employer and justifies immediate dismissal. (*Selmeczki v. N.M. Dept. of Corrections*, 2006-NMCA-024, ¶ 20, 139 N.M. 122; *Martinez v. N.M. State Eng'r Office*; 2000-NMCA-74, ¶ 42, 129 N.M. 413.)

## V.  SUMMARY OF THE EVIDENCE AND ANALYSIS

## WITNESSES WHO TESTIFIED UNDER OATH

The Department called eight witnesses for its case-in-chief. Appellant performed direct examinations of a number of the Department's witnesses at the same time as his cross-examination for purposes of efficiency and to avoid calling them to the stand twice.

> i.  **FRANCES TWEED,** current Executive Director Administrator, former Executive Nurse Administrator, BHI:
> At the time relevant to this appeal, Ms. Tweed was BHI's Executive Nurse Administrator. In that capacity, Ms. Tweed had clinical supervision over the Director of Nursing ("DON") of CBS, who, in turn, had clinical supervision over the Psych Tech supervisors and staff at the ALF Unit. Ms. Tweed, therefore, was in Mr. Vigil's clinical chain of command. Ms. Tweed testified: all medication must be stored in a locked medication room ("medroom") in a locked medication cart ("medcart"); expired medication should be stored in the medcart; it is never appropriate to store expired medication outside of the medroom and medcart; in response to an anonymous letter claiming Mr. Vigil had patient medication and funds in his office desk, Ms.

Tweed participated in a search of Mr. Vigil's desk in early June 2015; Mr. Vigil's office in El Paso Cottage was locked and a key was required to enter it; Mr. Vigil's desk cabinet had an additional lock; there was enough play in Mr. Vigil's locked desk cabinet doors to peek inside; after removing the lock from the desk cabinet, bottles of two patients' expired prescription Risperidone, a tablet of Clonazepam in a paper medication cup, and some Southwest Capital Bank envelopes were found inside; Ms. Tweed completed an incident report alleging possible patient exploitation and, in consultation with her Administrator and DOH's Human Resources Bureau ("HRB"), contacted law enforcement; in response to a second anonymous letter claiming Mr. Vigil had additional medication in one of his work lockers, Ms. Tweed participated in a search of Mr. Vigil's lockers; the first locker searched was a big blue one with Mr. Vigil's name on it; after removing the lock from that blue locker, a Centrum Silver bottle containing a mixture of pills, including Hydrocodone, was found inside; several other cubby lockers believed to be Mr. Vigil's were searched; after removing the lock from one of these cubby lockers, additional expired patient prescription medications and a magazine labeled with Mr. Vigil's name were found inside; Ms. Tweed contacted law enforcement again; any Psych Tech staff that worked at the ALF was required to take an initial training and an annual training on how to store medication; and Mr. Vigil had kept the expired patient medication segregated and secured in his locked office, but his actions were not in keeping with policy. (Tweed.)

## ii.  **CATHY ARAGON,** former DON for Out-patient Services/CBS, BHI:

As DON for CBS, Ms. Aragon was Mr. Vigil's clinical supervisor for most of his time working at the ALF Unit. Ms. Aragon retired on May 1, 2015, however, and was no longer working at BHI during the specific events underlying this appeal. Ms. Aragon testified that: Mr. Vigil worked on dayshift with Manuel Valdez before replacing Mr. Valdez as dayshift supervisor; Ms. Aragon herself was responsible for training ALF Psych Tech staff in storage of medication; Ms. Aragon personally trained Mr. Vigil to place expired medication in the bottom drawer of the medcart; Mr. Vigil was also trained on that practice through the initial training module he was required to take when he started with ALF and through his annual training re-certifications; before expired medications were placed in the bottom drawer of the medcart, they were supposed to be placed in a plastic bag and "for disposal" written on the bag; it was not appropriate for expired medication to be locked in Mr. Vigil's desk cabinet or work locker; although Mr. Vigil stored the expired medications in a secure, segregated location, it was not the proper place; Mr. Vigil told Ms. Aragon that he was planning to return the expired medications to the pharmacy, but was ill and then on vacation; so long as the expired medication was properly stored in the bottom of the medcart to prevent re-dispensing, there was no particular timeline for it to be returned to or retrieved by the pharmacy; there was no requirement for Psych Tech staff to complete a Medication Incident Report when removing and storing expired medication; the medcarts locked and had a top drawer for narcotics, individual patient drawers/bins for each patient's active medication in the middle, and two drawers on the bottom, one for extra medications and the other for expired/discontinued medications; ALF residents are assessed to make sure they have the ability to self-administer their medications with assistance; when it was time for medication in the ALF Unit, Psych Tech staff would pull one patient's bin out of the medcart at a time, take it to the counter at the nurses' station, assist the patient with the administration of the medication, then return the patient's bin to the medcart; only staff can access the medcart, not residents; it was difficult for ALF Unit dayshift staff to be responsible for the clothing allowance process because an "overwhelming amount of time" was spent on patient appointments during the day. (Aragon.)

   iii.  **DARLENE MARTINEZ,** current Finance Director, former Deputy Finance Director, BHI:

      At the time relevant to this appeal, Ms. Martinez was the Deputy Finance Director for BHI. Ms. Martinez testified that: she was familiar with the clothing allowance policy for the Long-Term Care and Adult Psychiatric Division units, but not with the Clothing Allowance Policy for CBS; she was unaware the CBS Clothing Allowance Policy required disbursements in increments of $150 per resident; in Spring 2015, the BHI Finance Cashier disbursed the combined clothing allowances for all ALF residents in two bulk checks, one for $900 on May 4 and the other for $1200 on May 7; the Finance Cashier's decision to issue the clothing allowances in two bulk checks was not in compliance with Policy; standard operating procedure is to issue separate checks for each client; it is Ms. Martinez' understanding that prior to Spring 2015, the Finance Department always issued separate $150 checks; Mr. Vigil's separating the bulk funds into $150 portions, and placing each $150 portion in its own envelope, was best practices for keeping the clients' funds separate; Ms. Martinez was unaware that the CBS Clothing Allowance Policy required the unused funds/receipts to be returned within an eight-hour shift; under the policies Ms. Martinez was familiar with, the expectation was that disbursed clothing allowance funds would be returned to the Finance Department the next business day; Ms. Martinez is aware that the shopping often did not occur within one day due to operational needs, patients' medical appointments, short staffing, etc.; if staff failed to complete the shopping in one day, it was the responsibility of the Unit to contact the Finance Cashier and inform her the shopping did not take place; Ms. Martinez has no evidence that this occurred or did not occur in this case, as the Finance Cashier did not report anything to upper management; if unused clothing allowance funds/receipts were not returned to the Finance Department, it was also the responsibility of the Finance Cashier to contact the Unit to follow-up on the outstanding funds and document the contact; the Finance Cashier claimed she contacted the ALF Unit in this instance, but could not identify any specific ALF staff member contacted or produce logs or other documentation reflecting the contact; Ms. Martinez is unaware of Mr. Vigil ever being warned that his failure to return unused clothing allowance funds/receipts within a business day was a violation of Policy; in Spring 2015, safes were available for the storing of unused clothing allowance funds, but no safes were located in the ALF Unit, and the clothing allowance policies Ms. Martinez was familiar with did not clearly direct staff on how unused clothing allowance funds should be stored; it is BHI's responsibility to ensure that residents' monies are kept safe; there are security concerns with storing unused clothing allowance funds in personal areas; the $2100 of clothing allowance funds disbursed to the ALF Unit in Spring 2015 was never returned to the Finance Department because it was held for investigation; and there is no indication that the funds were stolen or misappropriated. (Martinez.)

   iv.  **JEANNE MOORE,** current RN Supervisor, former RN-A, CBS:

      Ms. Moore did not begin her position as RN Supervisor of CBS until December 2016, after the events at issue in this appeal. As RN Supervisor, she now supervises the Psych Tech Supervisors on the ALF Unit. At the time relevant to this appeal, however, she did not have supervisory capacity over Mr. Vigil or other ALF staff. Rather, in May/June 2015, due to the retirement of CBS DON Cathy Aragon, Ms. Moore was tasked with assisting the ALF Unit solely with direct patient care in emergencies. If ALF residents had accidents or injuries, she would go assess them. Ms. Moore's office was not on the BHI campus, but at the CBS offices across town, and she would go to the ALF Unit only as needed. Ms. Moore testified that she was unaware of how expired medication was handled in the ALF Unit in 2015, except that ALF staff took care of

it themselves; in her time as RN Supervisor, Ms. Moore has not encountered an expired medication in the ALF Unit; and there is no incident report requirement strictly for returning expired patient medications to the pharmacy, though it "[a]ll depends on the situation." (Moore.)

    v.  **DAN SMITH,** Director of Pharmacy and Consultant Pharmacist, BHI:

        When examined as part of the Department's case-in-chief, Mr. Smith testified that: "custodial facility" is the designation the Board of Pharmacy uses to identify an entity authorized to take possession of patients' medications and then administer them to those patients; the ALF Unit is such a custodial facility; custodial facilities like ALF are required to store medications under lock and key in a designated area; the expectation is that expired medications will be kept under lock and key in the medroom; Mr. Smith never witnessed that expectation be communicated directly to ALF staff; there is an ALF-specific policy, the BHI custodial procedures manual, which covers that expectation; ALF staff are required to review and acknowledge the BHI custodial procedures manual annually; in keeping with Board of Pharmacy regulation, the manual was kept in the ALF facility; the relevant part of that manual states "Medications no longer in use unwanted, outdated, or adulterated will be placed in a quarantine area in the locked medication cabinet and held for destruction by the consultant pharmacist;" the relevant part of that manual remained unchanged from 2012 through 2017; Mr. Smith could not say whether or not Mr. Vigil ever saw, read, or acknowledged the BHI custodial procedures manual; if ALF staff failed to acknowledge the manual, it would have come to Mr. Smith's attention; it never came to Mr. Smith's attention that staff failed to acknowledge the manual in 2015, but Mr. Smith also had no record of Mr. Vigil's acknowledgment of the manual from 2015 or earlier; BHI's Disposal of Unusable Products Policy does not specify exactly where expired medication is to be stored or when it has to be returned to the pharmacy; the "segregated and held" provision of the Disposal of Unusable Products Policy means expired medications should be stored in the medcart or medroom; there should be a medcart drawer where expired medications can be kept segregated from the patient's current medications; Mr. Smith and/or his pharmacy staff perform quarterly inspections of the ALF Units; if Mr. Smith found expired Risperidol in a prescription bottle stored in a locked cabinet outside the medroom, he would simply give staff direction to put it back in the designated area where it should be; and Mr. Smith confirmed that Mr. Vigil had a prescription for Hydrocodone from 2007 through 2011. (Smith.)

    vi.  **CORINNE DOMINGUEZ,** former Director, CBS, BHI:

        As BHI's Director of CBS, Ms. Dominguez had administrative supervision over Appellant Vigil at the time relevant to this appeal. She retired from BHI on April 30, 2016. Although Ms. Dominguez signed both Mr. Vigil's NCA and his NFA, she had little recollection of the specifics leading to his dismissal. Ms. Dominguez testified telephonically that: she signed off on Mr. Vigil's NFA, but she was not involved in the internal investigation into the allegations against him and the decision to dismiss him was made in consultation with and deference to Frances Tweed and Human Resources ("HR"); she remembered only that the basis for his dismissal "involved meds and involved some money;" both the medroom and the medcart lock; it was inappropriate and against policy to store expired medication in a locked desk, personal locker, or anywhere outside of the medroom; she would have expected her employees not to put themselves in "jeopardy" by handling expired medication improperly; if she had learned Mr. Vigil or his predecessor, Mr. Valdez, had a practice of storing expired medication in their desks, she would have filed an incident report; Ms. Dominguez had no recollection of any specific place

within the medcart where expired medications were supposed to have been stored; she "probably" wrote the Clothing Allowance Policy; she did not recall that the Clothing Allowance Policy required funds to be returned within an 8-hour shift, but would have expected her staff to follow Policy; she would have expected unused clothing allowance funds to be returned to Financial Management rather than be "stored" by staff; and Financial Management had a safe in BHI's Adult Psychiatric Division area where unused funds could be securely stored. (Dominguez.)

 vii. **JOSEPH CHAVEZ,** Director of Security and Communications, BHI:

  As Director of Security and Communications at the time relevant to this appeal, Mr. Chavez was involved in the relevant search of Mr. Vigil's office desk. Mr. Chavez testified that: he first became aware of the situation when he was advised an anonymous letter had been sent to the facility suggesting items belonging to patients were being stored in Mr. Vigil's work desk area; Mr. Chavez was sent to Mr. Vigil's office to see if his desk was locked; after unlocking the office door and entering the office, Mr. Chavez observed that Mr. Vigil's desk cabinet was locked with a combination lock; Mr. Chavez returned to the office later with Frances Tweed and Antonio Coca to perform a search of Mr. Vigil's desk; even with the combination lock on Mr. Vigil's desk cabinet, Mr. Chavez could pull the cabinet open enough to see prescription medication bottles inside; Mr. Chavez could read the name on one of the prescription medication bottles and was told it was the name of an ALF resident; he cut the combination lock off Mr. Vigil's desk with a bolt cutter; a photograph was taken of Mr. Chavez cutting the lock; found inside the desk cabinet were "some" prescription bottles and a little paper cup for dispensing medication with a pill inside it; Mr. Chavez also found Southwest Capital Bank envelopes in Mr. Vigil's desk drawer; Mr. Chavez took the majority of the photographs showing what was found during the search of Mr. Vigil's desk area;  Security Officer Louann Gonzales was involved with the later search of Mr. Vigil's lockers; Mr. Chavez believed he was involved in searching only one of Mr. Vigil's lockers, but his memory was unclear as to which one; that particular locker contained no client prescription medications or money. (Chavez; Ex. 22.)

 viii. **PETER SCHAEFER,** Internal Review Investigator, BHI:

  On June 4, Mr. Schaefer was assigned to investigate allegations of patient exploitation against Mr. Vigil. Mr. Schaefer also participated in the search of Mr. Vigil's personal lockers on June 19 with Ms. Tweed and Security Officer Louann Gonzales. Mr. Schaefer testified that: a blue, gym-style locker with Mr. Vigil's name or initials on it contained a set of keys and a Centrum Silver bottle; the Centrum Silver bottle contained some pills identified by other people, primarily Ms. Tweed, as Hydrocodone; a small, cubby locker with a yellow-trimmed lock was found to contain a piece of mail with Mr. Vigil's name on it and three expired medication bottles from two separate clients; the June 3 search of Mr. Vigil's desk area, which Mr. Schaefer did not participate in, turned up two patient medication bottles and a pill dispensing cup containing a single pill; the fact that the anonymous letter specifically alleged Mr. Vigil had an Ativan in his desk suggests whoever sent the letter had looked in his cabinet; when Mr. Schaefer pulled on Mr. Vigil's locked desk cabinet, there was about three inches of play and he could see right into it; and according to the Sheriff's Office's Return and Inventory, the envelopes confiscated from Mr. Vigil's desk had initials on them and contained cash and receipts. In his investigation, Mr. Schaefer interviewed numerous people, including Appellant John Vigil, Cathy Aragon, Jeanne Moore, Darlene Martinez, Finance Cashier Evelyn Edmunson, ALF evening shift PTS Jesse Montoya, ALF graveyard shift PTS Tina Gurule, ALF staff member Yvette Ortega,  and multiple

other ALF PT staff members.  Mr. Schaefer also reviewed Ms. Tweed's incident reports alleging potential exploitation by Mr. Vigil, statements provided by Frances Tweed and Louann Gonzales, the Sheriff's Office's warrant application Return and Inventory, BHI policies and internal documents related to the clothing allowance process, BHI's Finance Department's disbursal ledger, Mr. Vigil's 2015 Psych Tech re-certification test, and Mr. Vigil's annual Skills and Knowledge Checklists.  During the investigation, Mr. Vigil reported to Mr. Schaefer that he stored the expired patient medication in his desk cabinet for resident safety, he had not gotten around to returning the expired medication to the pharmacy because he got ill and then went on vacation, and he had not completed the clothing allowance shopping because he was short staffed.  Mr. Vigil also reported to Mr. Schaefer that the Hydrocodone in the big, blue locker was not his; the three patient prescription medications found in his cubby locker were not placed there by him; and he suspected he had been set up.  There was no evidence that any of the disbursed clothing allowance money was missing.  The patients whose prescription medications were found in Mr. Vigil's desk cabinet and cubby locker had vital signs within normal limits and Medication Administration Records ("MARs") in order, indicating no medication errors and that they had received all their required medications.  In his June 30 Report of Investigation ("Investigative Report"), Mr. Schaefer was unable to conclude that Mr. Vigil had engaged in any patient exploitation, but rather concluded that Mr. Vigil violated State statutes and BHI policies with his handling of medication and client money.  (Schaefer; Ex. 16.)

In addition, Appellant called these three witnesses for his case-in-chief.

ix.  **MANUEL VALDEZ,** Former Dayshift Psych Tech Supervisor, Arches Unit (ALF was formerly known as the Adult Residential Community Housing Program or Arches Program), BHI:

Mr. Valdez retired from BHI on February 28, 2013, and worked as the dayshift PTS of the Arches Unit his last 3.5 years there.  He was dayshift PTS while Mr. Vigil was evening shift PTS.  When Mr. Valdez announced his plans to retire, Mr. Vigil applied for his position.  Mr. Valdez testified that: Mr. Vigil had already periodically assisted him on dayshift; prior to Mr. Valdez' retirement, Mr. Vigil spent additional time working dayshift with Mr. Valdez to learn the responsibilities of the position, a couple of times a week, every week for a month; in the 3.5 years he was dayshift PTS, Mr. Valdez received residents' individual clothing allowance checks from the Finance Department all at one time; competing tasks and responsibilities made it impossible to do all the residents' shopping in one business day; it would take up to two weeks to complete the clothing allowance process for all the residents; Mr. Valdez would store the clothing allowance funds and receipts in his locked office desk, in separate envelopes for separate residents; only when the shopping was complete would Mr. Valdez return the clothing allowance receipts and any remaining funds to the Finance Department; this was Mr. Valdez's practice for the entire time he was dayshift supervisor; Mr. Valdez was never told he was handling the clothing allowance process improperly; when it was time for medication in the Unit, Psych Tech staff would remove each resident's medication bin from the medcart, sit it on the counter of the nurses' station, call each resident one by one, assist the resident with the administration of the medication, observe the resident taking the medication, indicate in the MAR that the medication was administered, and return the bin to the medcart; as dayshift supervisor, if Mr. Valdez found expired medications, he would store them in his locked desk or in a locked filing cabinet in the supervisors' office; he did this to prevent medication errors and

ensure the safety of the residents; when Mr. Valdez placed expired medication in his office during dayshift, he would pass that information along to the oncoming evening shift supervisor; Mr. Valdez might hold expired medication in his locked desk or filing cabinet for up to two weeks before returning it to the pharmacy; Mr. Valdez was never taught or trained to put expired medications in the bottom drawer of the medcart, and he was never told that his practice of storing them in his office was wrong; Mr. Valdez learned his practices from his own dayshift supervisor predecessor and a former evening supervisor; Mr. Vigil was aware of Mr. Valdez' practices concerning the clothing allowance process and the handling of expired patient medications. (Valdez.)

      x.  **APPELLANT JOHN VIGIL,** Former Psych Tech Supervisor, BHI:

      Mr. Vigil testified that: prior to the incidents underlying this appeal, he had conflicts with ALF graveyard shift PTS Tina Gurule and ALF graveyard staff; he believes these ongoing conflicts resulted in the current allegations being brought against him; prior to the incidents underlying this appeal, Mr. Vigil was finding expired and discontinued medications in the ALF medcart; Mr. Vigil met with CBS Director Corinne Dominguez and told her PTS Gurule was not doing her job looking after the residents, he was finding expired and discontinued medications in the medcart, and the next time he found such medications he was going to segregate and hold them to show Ms. Dominguez; on June 1, Mr. Vigil found two more expired medications in two patients' active medication bins, called Director Dominguez to let her know he found more and was holding them in his desk cabinet until they had a chance to meet again, called the treatment guardians of the two residents to whom the expired medications belonged to let them know he was removing and holding the medications, placed the two expired medications in his desk cabinet, and left to see a doctor because he was feeling sick; Mr. Vigil was on leave for some period of time after that; staff sometimes placed expired medications in the bottom of the medcart; Mr. Vigil did not believe it was safe to place expired medications in the bottom drawer of the medcart because the residents' extra medications were also stored there and there was a chance staff would inadvertently administer the expired medications to the residents; it had happened before that staff moved expired medications out of the bottom drawer of the medcart and into the patients' active medication bins; at the time relevant to this appeal, there were five new, inexperienced Psych Techs working on the ALF Unit; about a month prior to the incidents underlying this appeal, there was an incident where an ALF PT staff member removed the wrong medication packet from the medcart and administered the wrong medication to a resident; if staff placed expired medications in the bottom of the medcart, Mr. Vigil would remove them from the medcart entirely; the safety of the residents is of the utmost importance; Mr. Vigil learned the responsibilities of being an ALF PTS first from his evening shift PTS predecessor, Connie Solano, and then from his day shift PTS predecessor, Manuel Valdez; PTS Connie Solano told him *not* to place expired medications in the medcart because they might accidentally be administered to the residents; it was the common practice of these supervisors to remove expired medications from the medcart completely; Mr. Vigil learned to place expired meds in his desk cabinet by observing Manuel Valdez; Mr. Vigil believes PTS Tina Gurule knew Mr. Vigil stored expired medications in his desk cabinet because that was his common practice and they shared an office; Mr. Vigil was unaware there was any "play" in the doors of his locked desk cabinet; CBS DON Aragon never told Mr. Vigil to place expired medications in the bottom drawer of the medcart; Mr. Vigil never saw the BHI Pharmacy policy and procedures manual prior to Hearing; Mr. Vigil did not place and was unaware the Clonazepam tablet was in his desk cabinet; he would never have placed a loose, unidentified pill

18

in his desk cabinet; if you find a loose, unidentified pill or lose a pill, you need to complete an incident report right away; the medications found in the Centrum Silver bottle in Mr. Vigil's big, blue, gym-style locker were all his medications; Mr. Vigil had prescriptions for the Hydrocodone that was found; the cubby locker with the yellow-trimmed lock was his, but he did not place the three expired patient prescriptions in that cubby locker and believes that someone planted them there; in 2015, Mr. Vigil received the ALF clothing allowance funds in two bulk checks; he had the checks cashed and placed the money in separate envelopes in $150 increments, one for each resident; it was Mr. Vigil's understanding that he was supposed to try and complete the clothing allowance shopping when he could and as soon as possible; Mr. Vigil was only partway through the clothing allowance shopping at the time of the incidents underlying this appeal; Mr. Vigil intended to return all the clothing allowance change and receipts to the Finance Department at one time, once all the shopping was completed; Mr. Vigil kept the envelopes with the unused $150 clothing allowances in his locked desk cabinet and the envelopes with the clothing allowance change and receipts in his unlocked desk drawer; Mr. Vigil was not familiar with BHI's Clothing Allowance Policy; Mr. Vigil's practice concerning storing clothing allowance funds in his locked desk cabinet was a practice he was taught and trained on by Manuel Valdez; and Mr. Vigil was arrested at work, near Frances Tweed's office, "in full view of everybody." (Vigil.)

xi.  **SUSAN SWAN,** Conservator and Treatment Guardian of BHI ALF
Resident G.T.:
Ms. Swan testified telephonically that: Mr. Vigil was her main point of contact at the ALF concerning Resident G.T.'s treatments and medications; there was a time when G.T.'s medication was adjusted to get her to the proper dosage; when G.T. was prescribed new medication, Mr. Vigil expressed concern to Ms. Swan about what to do with the old medication the resident no longer needed and should not take; Ms. Swan and Mr. Vigil agreed it was a good idea to get rid of the old medication so there would not be any confusion or possible medication error. (Swan.)

The Department also called two witnesses during the August 30, 2018 hearing on its

motion to admit rebuttal Exhibit 26 ("Motion Hearing").

xii.  **DAN SMITH,** Director of Pharmacy/Consultant Pharmacist, BHI:
Mr. Smith became BHI Director of Pharmacy in 2014 and BHI Consultant Pharmacist in late 2014 or early 2015. At the Motion Hearing, Mr. Smith testified that: he located Exhibit 26 – a copy of the BHI Pharmacy policy and procedures manual (revised as of 4/25/12) with an acknowledgment page bearing Mr. Vigil's 5/1/13 signature – at Department counsel's request, after testifying in the Department's case-in-chief; Mr. Smith found Exhibit 26 in a binder in a cardboard box in the building where the ALF patients were being housed; the binder was in a cardboard box because the ALF patients were being moved to another building and all the necessary policies and reference materials had to be moved with them; Exhibit 26 is a true and accurate copy of the BHI Pharmacy policy and procedures manual in effect in 2013; in 2013, this manual was not a typical BHI policy, but a requirement of the Board of Pharmacy for BHI employees; through at least 2013, this manual was titled only "New Mexico Behavioral Health Institute at Las Vegas Community Based Services Custodial Procedures Manual," was largely a verbatim copy of the Custodial Procedures Manual template available to the public on the New

Mexico Regulation and Licensing Department's ("RLD's") website, and was approved as policy and essentially rubber-stamped by BHI's Pharmacy & Therapeutics Committee; after Mr. Smith became BHI Director of Pharmacy and Consultant Pharmacist, he revised the manual, the manual began to be approved in a hospital-wide administrative process, and it was assigned a policy acronym and number, PHM 096; Mr. Smith initially emailed an unacknowledged copy of the manual (revised as of 4/25/12) to Department counsel within the week prior to Hearing; and the Board of Pharmacy requires employees of the ALF to review and sign the manual.  (Smith.)

> xiii.  **MONICA RUIZ-MARQUEZ**, current Pharmacist, former Consultant Pharmacist, BHI:
>
> Ms. Ruiz-Marquez was BHI Consultant Pharmacist for the ALF Units in 2013. At the Motion Hearing, Ms. Ruiz-Marquez testified that: Exhibit 26 is a true and accurate copy of the New Mexico Behavioral Health Institute at Las Vegas Community Based Services Custodial Procedures Manual in place in 2013; the acknowledgment page at the end of the manual was part of it at the time; there were two ALF Units in 2013, and each Unit had a copy of the manual in a "Pharmacist Consultant" binder on a cabinet shelf in the medication area; in 2013, it was Ms. Ruiz-Marquez's job to communicate directly with ALF staff about the manual; she mainly spoke to the Psych Tech Supervisor to ensure that the manual had been reviewed, understood, and signed by staff; she remembers talking to Mr. Vigil about the manual; when she did her reviews and quarterly inspections of the ALF Units in 2013, the binders containing the manual were there; the manual changed after Mr. Smith became BHI Director of Pharmacy; and it was Mr. Smith who located the acknowledged manual submitted as Exhibit 26.  (Ruiz-Marquez.)

EXHIBITS

The Department presented 26 documentary exhibits at Hearing (Exs. 1-24, 25(A)-25(B)).

Of those 26 exhibits: the Department withdrew two (Exs. 9, 13); 22 were admitted into the

record without objection (Exs. 1-7, 10-12, 14-15, 17-24, 25(A)-25(B)); and two were admitted

over objection (Exs. 8, 16.)  The Department presented one additional documentary exhibit while

the record was held open post-Hearing, which was also admitted over objection (Ex. 26).  (Appx.

C.)

Appellant presented 22 documentary exhibits at Hearing (Exs. A(1)-A(4), B(1)-B(2), C(1)-

C(5), D-H, I(1)-I(3), J-L).  Of those 22 exhibits: seven were rejected (Exs. A(1)-A(4), B(1)-B(2),

F); 13 were entered into the record without objection (Exs. C(1)-C(5), D-E, G-H, I(1)-I(2), J-K);

and two were entered into the record over objection (Exs. I-3, L). Appellant presented one

additional documentary exhibit while the record was held open post-Hearing, which was also admitted over objection. (Ex. M).  (Appx. C.)

For purposes of a complete record, Appellant objected to:

- <u>Exhibit 8</u>.  Appellant objected to Exhibit 8 – two versions of the BHI Clothing Allowance Policy (CBS/RES 148) cited in the NFA, one revised in 2008 and the other in 2017 – as the later version of the Policy was not in effect at the time of the incidents relevant to this appeal.  The Department stipulated that the earlier version was controlling here, and that the later version was included only because it was largely similar to the earlier one and easier to read.  As there was no question about the relevance of the earlier Policy to the allegations at issue, and with the understanding that the later version was merely for clarification purposes, Exhibit 8 was entered into the record over objection.

- <u>Exhibit 16</u>.  Appellant objected to Exhibit 16 – Investigator Peter Schaefer's Investigative Report (#15-06-06) concerning allegations of exploitation against Appellant Vigil – on grounds of hearsay.  As hearsay is admissible in this administrative proceeding, subject to the legal residuum rule, Exhibit 16 was entered into the record over objection.  (1.7.12.18(G) NMAC.)  Appellant's objection was noted, however, and goes to the weight the ALJ will give the evidence.

- <u>Exhibit 26</u>.
    Addressing Appellant's objections to Exhibit 26 requires some background information first.
    Just one day before Hearing, on July 17, 2018, Department counsel emailed Appellant a copy of the *New Mexico Behavioral Health Institute at Las Vegas Community Based Services Custodial Procedures Manual*, revised as of 4/25/12 ("Manual").  (Ex. M; Motion Hearing; Hearing, *generally*.)  Board of Pharmacy ("BOP") Rules require this type of policy and procedures manual be prepared by the consultant pharmacist of licensed custodial care facilities, like BHI's ALF Units, to aid in personnel training, among other things. (16.19.11.8(B)(1) and (B)(1)(c) NMAC; 1.7.12.18(J) NMAC.)  BOP Rules also require that a copy of the policy and procedures manual be kept at each facility location and be read and initialed by all personnel responsible for the procurement, administration or control of patient medication. (16.19.11.8(B)(2) NMAC; 1.7.12.18(J) NMAC; *see also* Smith.)
    At Hearing, a copy of the Manual was entered into the record without objection as Exhibit 25(B).  Of significance to the current appeal, the Manual includes a provision requiring outdated patient medications to be placed "in a quarantine area in the locked medication cabinet."  (Ex. 25(B), Section I(E)(6).)  The last page of the Manual/Exhibit 25(B) was a blank acknowledgment page, containing no actual acknowledgments.  (Ex. 25(B).)  And Appellant Vigil testified that he had never seen the Manual prior to Hearing.  (Vigil.)

At the end of Hearing, the Department requested permission to proffer one rebuttal exhibit post-Hearing, specifically a copy of the same Manual, but with Mr. Vigil's acknowledgment of it. (Hearing, *generally*.)  Finding that the proposed rebuttal exhibit would be relevant, the ALJ granted the request and held the record open until 5:00 p.m., July 24, 2018, to allow the Department to offer its rebuttal exhibit by motion, which it did timely ("Motion"). (Appx. D.)  Appellant Vigil was permitted a response to the Motion, which he timely submitted on July 31, 2018 ("Response"). (Id.)  The record was then re-opened for the Motion Hearing held on August 30, 2018.

Accordingly, Department's Exhibit 26 is a copy of the same Manual, but with an acknowledgment page bearing Mr. Vigil's 5/1/13 signature ("Acknowledgment Page" or, altogether, "Acknowledged Manual"). (Ex. 26.)

Both in his Response and at the Motion Hearing, Appellant Vigil objected to Exhibit 26 on the grounds that the Acknowledgment Page and the Manual lack trustworthiness and reliability.

*Acknowledgment Page*

Mr. Vigil claimed that "the acknowledgment page is a fabrication insofar as it claims to be an acknowledgment of Mr. Vigil's having reviewed said Manual." (Response.)  In support of this claim, Appellant specifically pointed out:

1) Unlike other acknowledgment pages, the Acknowledgment Page does not identify the policy/manual being acknowledged (*compare* Exs. 2-4, 10 *to* Ex. 26; Response; Motion Hearing, *generally*; Smith);

2) Despite the BOP Rule requiring "all personnel responsible for the procurement, administration or control of the patient's medication" to read and initial the Manual, the Acknowledgment Page contains only five signatures, rather than the signatures of all 23 employees Mr. Vigil claims met that criteria at the time (Ex. 26; Response; Motion Hearing, *generally*); and

3) Despite this case pending for three years and Appellant's broad discovery requests, the Department did not produce the Acknowledgment Page until four days after Hearing.  (Motion; Response; Motion Hearing, *generally*.)  At the Motion Hearing, Appellant's counsel argued that this was part of a pattern of the Department's withholding discovery. (Motion Hearing, *generally*.)

*Manual*

Mr. Vigil's attorney also expressed concerns about the authenticity of the Manual altogether, even suggesting that maybe it did not actually exist at the relevant time. (Motion Hearing, *generally*.)  In support of this claim, Appellant's counsel pointed out:

4) Unlike other BHI policies, the Manual is assigned no policy acronym or number (*compare* Ex. 26 *to* Ex. 5 ("PHM 060") and Ex. 6 ("PHM 042"); *see also* Smith);

5) The metadata from the *un*acknowledged copy of the Manual (Ex. 25(B)) emailed by the Department to Appellant the day before Hearing showed a date and time that the document was modified, suggesting, Appellant argued, that the Department altered the document (Ex. M; Motion Hearing); and

6) The importance the Department placed on the Manual at Hearing and in its Motion is belied by the fact that the Manual was not specifically referenced in the NCA, any other policies, or any other acknowledgments found in Appellant's personnel file (Smith; *see, e.g.*, Exs. 2-3, 5-6, 10, 12).

Having given the matter due consideration, Appellant's arguments are not persuasive:

1) It is true that the Acknowledgment Page looks different from the other policy acknowledgments in the record and fails to identify precisely what is being acknowledged. (Smith; *compare* Exs. 2-4, 10 *to* Ex. 26.) But the other acknowledgments in the record are DOH acknowledgment forms for DOH policies, while, as Appellant's own counsel pointed out, the Manual is based on a template provided by the BOP. (Motion Hearing, *generally*.) BHI Consultant Pharmacist Smith confirmed this. (Smith.) And the ALJ takes administrative notice that the BOP's Model Custodial Drug Policy & Procedure Manual template currently available to the public on RLD's website includes an acknowledgment page very similar to the one in the Manual, with no specific identification of what is being acknowledged. (1.7.12.18(J) NMAC; http://www.rld.state.nm.us/uploads/files/ Custodial%20Procedures%20Manual%20and%20Pharmacist%20Agreement. pdf.) The nonspecific Acknowledgment Page, therefore, appears to be the result of a nonspecific template rather than Department falsification. Moreover, former BHI Consultant Pharmacist Monica Ruiz-Marquez confirmed that the nonspecific Acknowledgment Page was part of the Manual in 2013. (Ruiz-Marquez.) This was further confirmed by the same nonspecific acknowledgment page being part of the *un*acknowledged copy of the Manual provided at Hearing. (Ex. 25(B).) The preponderance of the evidence, therefore, is that the nonspecific Acknowledgment Page was the actual Acknowledgment Page to the Manual.

2) There is no corroborating evidence that there were 23 employees responsible for the procurement, administration or control of patient medication in the ALF Units at the time at issue. (Hearing, *generally*.) Additionally, there is no evidence that all relevant staff would have signed the same Acknowledgment Page in any event, as BHI's two ALF Units each had their own copy of the Manual, each with its own acknowledgment page. (Smith; Marquez-Ruiz.) Most importantly, even if other ALF employees failed to acknowledge the Manual as required, that does not change the fact that Mr. Vigil *did* acknowledge the Manual. (Ex. 26.)

3) Department counsel fully conceded that Exhibit 26 was not disclosed during discovery, but denied that the Department was "hiding the ball." (Motion Hearing, *generally*.) Department counsel explained that he simply did not know the *un*acknowledged Manual existed until late in the discovery process, and it is clear that he did not know the Acknowledged Manual existed until after Hearing. (Hearing and Motion Hearing, *generally*; *see also* Smith.)

4) It is true that, unlike other BHI policies, the Manual is assigned no policy acronym or number. (Smith; Exs. 25(B), 26.) At the time at issue, however,

the Manual was not a typical BHI policy. Rather, it was a requirement of the BOP for BHI employees and was approved as policy by BHI's Pharmacy & Therapeutics Committee, not by overall BHI administration. (Smith.) As explained by Consultant Pharmacist Smith, through at least 2013, the procedures manual was largely a verbatim copy of the template available on RLD's website, reviewed and essentially rubber-stamped by the Pharmacy & Therapeutics Committee, and its only title was the "New Mexico Behavioral Health Institute at Las Vegas Community Based Services Custodial Procedures Manual." (Id.) It was only later, after Mr. Smith became the Director of Pharmacy and Consultant Pharmacist and revised the procedures manual, that it began to be approved in a hospital-wide administrative process and became identified with the policy acronym and number PHM 096. (Id.) More importantly, the earlier lack of policy acronym and number notwithstanding, Consultant Pharmacist Smith and former Consultant Pharmacist Ruiz-Marquez both testified that the Manual existed in 2013 as it appears in Exhibit 26. (Id.; Ruiz-Marquez.) The ALJ found their testimony credible.

5) Department counsel represented that he saved the *un*acknowledged Manual (Ex. 25(B)) as a .pdf before emailing it to Appellant on July 17, 2018. (Motion Hearing.) The ALJ takes administrative notice that when a Word document is saved as a .pdf, the metadata indicates the .pdf was both created and modified at nearly, if not precisely, the same time.[1] (1.7.12.18(J) NMAC.) In the metadata provided by Appellant, for example, the .pdf creation date and time and the .pdf modification date and time *are exactly the same*. (Ex. M.) In short, the indication of "modified" in the .pdf metadata is insufficient proof that the Department altered the content of the document in any way, rather than simply saved it in .pdf format. Moreover, it is hard to imagine exactly what alterations Appellant is accusing the Department of making, since, again, the relevant content of the Manual – the provision requiring outdated patient medications to be placed "in a quarantine area in the locked medication cabinet" – is identical to the content of RLD's procedures manual template.

6) It is also true that the Manual was not specifically referenced in other DOH or BHI policies in the record, in any of Mr. Vigil's various acknowledgments in the record, nor in the NCA (or the NFA). (Smith; *see*, *e.g.*, Exs. 2-3, 5-6, 10, 12, 15; Hearing, *generally*.) But lack of policy coordination on DOH's and BHI's part does not mean the Manual is inauthentic. Again, BHI Consultant Pharmacist Smith and former BHI Consultant Pharmacist Ruiz-Marquez both testified that the Manual existed in 2013 as it appears in Exhibit 26. (Smith; Ruiz-Marquez.) In addition, the Department's failure to cite the Manual in the NFA as a policy Mr. Vigil violated does not mean that evidence about the Manual's existence and Mr. Vigil's acknowledgment of it are irrelevant. To the contrary, the Acknowledged Manual is relevant both as it directly rebuts Mr. Vigil's testimony that he had never seen the Manual before and as it

---

[1] This can be seen by taking any Word document, saving it as a .pdf, and then examining the metadata of the .pdf: With the .pdf open, choose File > Properties, click the Description tab, click the Additional Metadata button, select Advanced from the list on the left, and then click the + button next to XMP Core Properties.

indicates Mr. Vigil was on notice that expired patient medications were to be kept locked in a separate area of the medication cabinet.

The Department's Motion for the admission of Exhibit 26 was, therefore, granted, and Exhibit 26 was entered into the record over objection. (NMRA, Rule 11-401; 1.7.12.18(H), (L) NMAC.)

The Department objected to:

- Exhibits A-1–A-4 and B-1–B-2. The Department objected to Exhibits A and B and all their subparts – four positive employee evaluations, one letter of commendation, and one letter of recommendation for Mr. Vigil, all from prior to the incidents at issue here – on grounds of relevance. The Department's objections were sustained. These documents concerning Mr. Vigil's earlier work performance at BHI and elsewhere are irrelevant to the allegations of misconduct now at issue against him. Exhibits A and B simply fail to make it more or less likely that in late May/early June 2015 Mr. Vigil improperly possessed patient medications, illegally possessed controlled substances, failed to follow proper documentation of wastage procedure, failed to follow proper disposition of a controlled substance and unusable non-controlled products procedure, failed to submit Medication Incident Reports required, failed to comply with BHI's Clothing Allowance Policy, or engaged in workplace negligence. Exhibits A and B were, therefore, rejected on relevance grounds. (NMRA, Rule 11-401; 1.7.12.18(H), (L) NMAC.)

- Exhibit F. The Department objected to Exhibit F – the case detail sheet for a lawsuit brought by Mr. Vigil's common-law partner of 20-plus years, Patricia Vigil, against BHI in 2012 and disposed of May 14, 2015 – on grounds of relevance. The Department's objection was sustained here as well. Mr. Vigil argued that Exhibit F supports the idea that his dismissal was retaliatory and pretextual. Under Board Rule 1.7.12.18(L), however, the ALJ shall admit evidence relevant only to those allegations included in both the NCA and the NFA or included as contested issues set forth in the SPHO. Because Mr. Vigil did not include retaliation and pretext as contested issues in the SPHO, the hearing officer is now precluded from taking evidence on those arguments. (1.7.12.18(L) NMAC.) Similarly, Mr. Vigil failed to include any mention of retaliation or pretext in his Notice of Appeal. (Appx. E.) Exhibit F was, therefore, rejected on relevance grounds. (NMRA, Rule 11-401; 1.7.12.18(H), (L) NMAC.)

- Exhibit I-3. The Department objected to Exhibit I-3 – the first page of the same Division of Health Improvement report the Department proffered as Exhibit 13 and then withdrew – on grounds of relevance. The ALJ agrees that Exhibit I-3 does not make the allegations against Mr. Vigil more or less likely. Nevertheless, as Appellant's counsel voiced his suspicions that a Department witness might have fraudulently altered the Exhibit 13 the Department first proffered and claimed he might pursue the matter further, Exhibit I-3 was admitted into the record over objection to preserve the issue.

25

- Exhibit L. The Department objected to Exhibit L – an April 27 Incident Report concerning ALF staff member Jimmy Lopez' removing the wrong medication packet from the medcart and administering the wrong medication to an ALF resident – on grounds of relevance. Appellant argued, and the ALJ agreed, that Exhibit L was evidence of a medication error made by ALF staff when medications in the medcart were commingled. It is, therefore, relevant to Mr. Vigil's defensive claim that he removed the expired medications from the medcart to ensure patient safety and avoid residents inadvertently receiving old medication. Exhibit L was entered into the record over objection. (NMRA, Rule 11-401; 1.7.12.18(H), (L) NMAC.)

- Exhibit M. The Department objected to Exhibit M – the metadata from the .pdf of the Manual emailed by Department counsel to Appellant's counsel (Ex. 25(B)) – on grounds of relevance and that it went beyond the scope of Hearing. The ALJ agrees that Exhibit M does not make the allegations against Mr. Vigil more or less likely. The ALJ also does not believe Exhibit M is evidence that the Department altered the content of the Manual in any way, since an indication of "modified" appears in the metadata whenever a Word document is saved as a .pdf. Nevertheless, as Appellant's counsel expressed his suspicion that Department counsel fraudulently manufactured the Manual, Exhibit M was admitted into the record over objection to preserve the issue.

## APPELLANT'S RECEIPT AND UNDERSTANDING OF THE POLICIES REFERENCED IN THE NFA

On June 6, 2007, Mr. Vigil signed an acknowledgment of DOH's Code of Conduct (HR 015). (Exs. 3, 10.) By his signature, Mr. Vigil acknowledged that he received, read, understood, and would follow that Code. (Id.)

On September 24, 2013, and again on January 9, 2014, Mr. Vigil signed acknowledgments of DOH's Drug and Alcohol-Free Workplace Policy (HR 08:120). (Exs. 4, 10.) By his signature, Mr. Vigil acknowledged that it was his responsibility to read, understand, and comply with that Policy; that if he had questions about the Policy he would consult with his supervisor or HR staff members; and that violations of the Policy may result in disciplinary action up to and including dismissal. (Id.)

On October 31, 2014, Mr. Vigil signed an acknowledgment of DOH's Disciplinary Action Policy (HR 08:10). (Exs. 2, 10.) By his signature, Mr. Vigil again acknowledged that it was his responsibility to read, understand, and comply with that Policy; that if he had questions about the Policy he would consult with his supervisor or HR staff members; and that violation of the Policy may result in disciplinary action up to and including dismissal. (Id.)

The Department presented no specific acknowledgment by Mr. Vigil of BHI's Disposal of Unusable Products Policy (PHM 060). (Hearing, *generally*.) But Mr. Vigil testified that he was familiar with this Policy at the time he was working. (Vigil.) Also, on March 19, 2015, Mr. Vigil signed his Psych Tech Annual Review, which indicates that he reviewed BHI policies in general in December 2014. (Ex. 20.) In addition, this Policy appears to be a BHI Pharmacy policy, given its "PHM" identifier, and on December 12, 2014, Mr. Vigil signed his Skills & Knowledge Checklist indicating he had reviewed the Pharmacy policies relevant to Psych Techs. (Vigil; Exs. 11, 16; *see also* Aragon.)

The Department presented no specific acknowledgment by Mr. Vigil of BHI's Controlled Substance Administration Records Policy (PHM 042). (Hearing, *generally*.) As another BHI Pharmacy policy, this was also seemingly covered by both the Psych Tech Annual Review signed by Mr. Vigil on March 19, 2015, indicating that he reviewed all BHI policies in general in December 2014 (Ex. 20) and by the Skills & Knowledge checklist signed by Mr. Vigil on December 12, 2014, indicating he had reviewed the Pharmacy policies relevant to Psych Techs (Exs. 11, 16; *see also* Aragon).

The Department presented no acknowledgment by Mr. Vigil of BHI's Incident Reporting and Notification Policy (SCD 001), but the same Psych Tech Annual Review signed by Mr. Vigil

27

on March 19, 2015, indicated he reviewed all BHI policies in December 2014 and had an education session on Incident Reporting policies on December 17, 2014. (Ex. 20; Hearing, *generally*.)

Finally, the Department presented no acknowledgment by Mr. Vigil of BHI's Clothing Allowance Policy (CBS/RES 148). (*See* Vigil; Hearing, *generally*). And Mr. Vigil reported both at Hearing and during his investigative interview that he was not familiar with it. (Vigil; Ex. 16.) But again, the Psych Tech Annual Review signed by Mr. Vigil on March 19, 2015, indicated he reviewed all BHI policies in general in December 2014. (Ex. 20.)

## NCA, ORAL RESPONSE MEETING, AND NFA

The NCA proposing Mr. Vigil's dismissal was dated October 2, and served on him that same day.[2] (Exs. 12, 15.) Mr. Vigil was given the opportunity to respond to the allegations in his NCA either orally or in writing. (Ex. 12.) Mr. Vigil requested and was granted an Oral Response Meeting ("ORM"), which was held on October 15. (Ex. 15.) The Department considered the information provided by Mr. Vigil at his ORM, but found no reason to reduce the proposed disciplinary action. (Id.) The NFA disciplining Mr. Vigil was dated October 20 and dismissed him effective October 21. (Id.; Stip. 2.)

## APPELLANT'S JOB HISTORY, TRAINING, AND DUTIES

Mr. Vigil was first hired by BHI in 1999 and began working on BHI's ALF Unit in November 2009. (Vigil; Aragon.) His first position at the ALF Unit was Psych Tech–Operational on the evening shift (3-11 pm). (Id.) After approximately two years, his supervisor, Connie Solano, retired, and Mr. Vigil became the Psych Tech Supervisor for evenings. (Id.) Then, in or around early 2013, the PTS on dayshift, Manuel Valdez, announced his plans to retire. (Valdez.) Mr. Vigil had already spent time periodically assisting Mr. Valdez on dayshift, and applied for the

---

[2] Witnesses indicated in writing on the NCA itself that Mr. Vigil refused to sign the NCA when it was presented on October 2. (Ex. 12.)

dayshift (7am - 3pm) supervisor job. (Id.; Vigil.) Prior to Mr. Valdez' departure, Mr. Vigil spent additional time working on dayshift with Mr. Valdez to learn the responsibilities of the position. (Id.; Aragon.) According to Mr. Valdez, Mr. Vigil worked the day shift with him a couple of times a week, every week, for a month before he left. (Valdez.) Mr. Vigil became the dayshift Psych Tech Supervisor and held that position at the time of the incidents underlying this appeal. (Vigil; Tweed; Aragon; Ex. 16.)

As dayshift Psych Tech Supervisor for ALF, Mr. Vigil was responsible for supervising ALF Unit staff; making staff schedules; keeping track of staff's time and leave; ordering equipment, food, and other supplies for the Unit; ordering residents' medication on a monthly basis; keeping daily progress notes; making appointments for the residents; taking residents to their appointments out in the community; taking residents shopping; assisting residents with their medication; and generally making sure the needs of all the residents were met. (Vigil; Valdez; Hearing, *generally*.)

In his position as Psych Tech Supervisor, Mr. Vigil had two immediate supervisors: CBS Director Corinne Dominguez and CBS Director of Nursing Cathy Aragon. CBS Director Corinne Dominguez was Mr. Vigil's administrative supervisor, overseeing the personnel aspects of his employment. (Tweed; Aragon; Dominguez; *see also* Valdez.) Ms. Dominguez, in turn, considered then Executive Nurse Administrator Frances Tweed to be her boss. (Dominguez.) CBS Director of Nursing Cathy Aragon was Mr. Vigil's clinical supervisor, overseeing him for purposes of patient care and medication issues. (Id.; Tweed; Aragon.) Ms. Aragon, in turn, was primarily and administratively supervised by Ms. Dominguez, but also clinically supervised by Executive Nurse Administrator Tweed. (Tweed.)

It should be noted that by the time relevant to this appeal – late May/early June 2015 – Ms. Aragon had retired. (Vigil; Aragon; *see also*, Tweed.) Her last day of work was April 30, 2015. (Aragon.)  With Ms. Aragon's departure, CBS RN-A Jeanne Moore was tasked with handling patient care for the ALF Unit, but she had no supervisory authority over Mr. Vigil or other ALF staff.  (Moore; *see also* Tweed, Ex. 16.)  So Mr. Vigil effectively had no permanent clinical supervisor at the time of the incidents at issue here. (Vigil; Moore; *see also* Tweed.)  No new CBS DON was hired for at least a year after Ms. Aragon's retirement.  (Moore.)

ALF UNIT

As an assisted living facility, the ALF Unit is part of BHI's CBS (Community Based Services) and an out-patient program.  (Tweed; Valdez.)  The ALF Unit is located on the BHI campus.  (Tweed; Ex. 16.)  Although ALF residents live on BHI premises, they are considered out-patients. (Aragon; Moore; Smith.)

At the time relevant to this appeal, the ALF Unit consisted of two cottages located next to each other, El Paso and Mesa. (Tweed; Aragon; Chavez; Ex. I-1; *see also* Valdez.)

Residents of the ALF Unit are expected to know their medication requirements and to be able to self-administer their medications.  (Tweed; Aragon; Moore.)  Psych Tech staff at the ALF are not trained to administer medication, but to ***assist*** in the residents' ***self-administration*** of their medications.  (Tweed; *see also* Valdez; Ex. K.)  For example, Psych Tech staff can retrieve medication for patients, hand medication bottles to patients, and help patients open medication bottles, but the patients are supposed to take the medication on their own.  (Tweed; Aragon; Moore; *see also* Valdez.)  ALF residents have to go through an assessment process to ensure they are competent to self-administer their medications.  (Aragon; *see also* Tweed.)

Under BOP rules, the ALF Unit is designated a custodial care facility. (Smith.) According to BHI Consultant Pharmacist Dan Smith, a custodial care facility is an entity authorized to take possession of patients' medications and then administer them to those patients. (Id.) As a custodial care facility, the ALF Unit has to comply with BOP policy. (Id; Aragon; Hearing, *generally.*)

MEDROOM, MEDCART, AND ASSISTING WITH MEDICATION ADMINISTRATION

Every unit within BHI has a medroom where patient medication is stored. (Tweed.) The El Paso and Mesa Cottages each had their own locked medroom within their respective nurses' stations. (Id.; Dominguez.) Within each locked medroom is a medcart that locks as well. (Id.; Vigil; Aragon; Smith.)

PT staff have access to the medroom and the medcart, but the residents do not. (Aragon.)

Each medcart is a metal cart on wheels with multiple drawers. (Id.) It has a locked top drawer for patients' narcotics/controlled medications. (Id.; Vigil.) Below the narcotics drawer are the patients' individual drawers/bins, marked with their initials/names, where patients' active, non-controlled medications are stored. (Id.; Tweed; Valdez.) Below the patient bins, at the very bottom of the medcart, were two drawers, one for extra medication and one for expired or discontinued medications. (Aragon.) The bottom drawer for expired or discontinued medications is not labeled in any way and does not have its own, separate lock. (Id.; Vigil.)

When it is time for resident medications, PT staff assists the residents one at a time. (Valdez.) The PT staff or supervisor removes the resident's bin from the medcart, takes it to the counter of the nurses' station, assists with the administration of the resident's medication, observes the resident taking his medication, indicates the medication was administered in the MAR, and then returns the bin to the medcart. (Id.)

CONFLICTS WITH GRAVEYARD STAFF

Prior to the incidents at issue, Mr. Vigil claims to have developed conflicts with ALF graveyard staff and ALF graveyard PTS Tina Gurule.  At Hearing, during his investigative interview, and in a complaint he wrote to HR, Mr. Vigil expressed his suspicion that these ongoing conflicts resulted in the allegations currently against him here, and that several of his co-workers were trying to get him fired.  (Vigil; Schaefer; Exs. 16, 17.)  According to Mr. Vigil, some of the conflict-causing events include:

- An incident that started when ALF resident H.G. slipped and fell in the bathroom around 3am. The resident claims she called for help, but graveyard staff did not hear her, and Mr. Vigil found her on the bathroom floor when he arrived at 6:30-7:00am.  Mr. Vigil completed an incident report and expressed concern to CBS Director Dominguez that graveyard staff were watching the ALF Unit television or sleeping and not paying attention to the residents.  Mr. Vigil suggested that the ALF television room be closed between 11pm and 6am, for the safety of the residents.  Director Dominguez issued a memorandum implementing the change.  According to Mr. Vigil, this change made graveyard staff unhappy with him, and they started talking behind his back. (Vigil; Ex. 17.)

- Also, on or around the morning of February 23, Mr. Vigil arrived to find ALF graveyard staff member Yvette Ortega asleep. He reported this to Ms. Ortega's supervisor, ALF PTS Tina Gurule, and to CBS Director Corinne Dominguez. (Id.; Ex. 21.)

- About a month later, Mr. Vigil arrived at the ALF Unit one morning and found only graveyard staff member Ms. Ortega present at the El Paso Cottage nurses' station. He asked Ms. Ortega where her graveyard co-worker Miranda was, and Ms. Ortega said at the other Unit.  Mr. Vigil went to Mesa Cottage, but did not find Miranda there.  When he returned to El Paso, Miranda was sitting next to Ms. Ortega.  Mr. Vigil asked Miranda where she had been, and she said in the laundry room.  Mr. Vigil noticed that the laundry room was empty, and the clothes dryer cold.  Then, in a vacant room uninhabited by any ALF resident, Mr. Vigil found a bed made up with pillows and a depression in the middle, as if someone had been lying there.  Mr. Vigil reported what he found to CBS DON Cathy Aragon, along with his suspicion that graveyard staff members were taking turns sleeping. (Vigil; Ex. 17.)

- A couple of weeks later, Mr. Vigil claims he was confronted by PTS Tina Gurule in front of staff about the allegation that her staff was using a bed in El Paso Cottage to sleep.  Ms. Gurule allegedly said to Mr. Vigil in a loud voice, "This is ridiculous." (Id.)

- On May 27, Mr. Vigil received a Letter of Reprimand for unprofessional conduct alleging that, when he found Ms. Ortega sleeping on February 23, he had yelled, "What the f**k

are you doing? I don't know who the f**k you think you are. I have caught you [sleeping] over four times. I would not have hired you." (Ex. 21.) Mr. Vigil claims the alleged witnesses to this event were PTS Tina Gurule and graveyard staff member Miranda. (Vigil; Ex. 17.) Mr. Vigil could not believe he received this Letter of Reprimand. (Id.) He testified that the alleged interaction did not really occur, that he said no bad words to her. Rather, he claims he said "in a nice way" something along the lines of, "If you were the employer, you would not appreciate it if you were paying someone to work for you and the person was sleeping," and suggested to Ms. Ortega that if she was getting tired, to go move around, check on the other Unit, talk to people, and then come back. Mr. Vigil suspects that ALF graveyard shift supervisor Tina Gurule "coerced" Ms. Ortega to file an incident report against him claiming that he yelled bad words at her. (Id.)

- In addition, Mr. Vigil reported he was finding expired and discontinued medications in the medcart that should not have been there. He repeatedly asked graveyard PTS Tina Gurule to check or have her staff check at the beginning of each month to make sure the medications in the ALF Unit were consistent with the MARs, and to deal with any expired or discontinued medications found on the Unit, but they never did and never retrieved the bottles. (Vigil; Schaefer; Ex. 16.) PTS Tina Gurule was also found asleep on shift by staff member Pauline Lucero, who reported it to HR. Mr. Vigil claims he requested and was granted a meeting with CBS Director Corrine Dominguez to discuss the medication situation and how PTS Gurule was not doing her job looking after the residents, but that Ms. Gurule did not show up. (Vigil.)

At Hearing, during his investigative interview, and in his complaint to HR, Mr. Vigil reported that ALF staff member Pauline Lucero told him Ms. Gurule began going around and asking staff to make false allegations and file incident reports on him, so that he would be removed from his PTS position. (Id.; Exs. 16, 17.) Possibly in keeping with Ms. Lucero's warning, evening shift PTS Jesse Montoya reported that when he started working at the ALF Units on April 27, he immediately began hearing rumors about John Vigil taking medications and money from clients, from several staff members at different times. (Ex. 16.) Mr. Montoya also stated, however, that he had not personally witnessed any inappropriate behavior by Mr. Vigil. (Id.)

SUPERVISORS' OFFICE

Mr. Vigil and the two other ALF Psych Tech Supervisors shared one room in El Paso Cottage as an office ("Supervisors' Office"). (Id.; Chavez; Schaefer.) Each of the three shift supervisors had his/her own desk in the Supervisors' Office, and the door to the Supervisors'

33

Office locked.   (Tweed; Chavez.)   At the time relevant to this appeal, Mr. Vigil shared the Supervisors' Office with evening shift PTS Jesse Montoya and graveyard shift PTS Tina Gurule. (Vigil; Ex. 16.)

PRIOR DISCIPLINE

Mr. Vigil was disciplined once prior to his dismissal.  As described above, on May 27, Mr. Vigil received a Letter of Reprimand ("LOR") for unprofessional conduct.  (Exs. 15, 21; *supra*, pp. 32-33.)  Specifically, the LOR reprimanded him for yelling at and using bad language towards ALF staff member Yvette Ortega when he caught her sleeping. (Ex. 21.)  Both in the rebuttal he submitted that same day, a complaint he later made to HR, and at Hearing, Mr. Vigil claimed that the allegations in the LOR were not true.  (Vigil; Exs. 17, J.)   Nevertheless, as the LOR was not rescinded, it stands as an instance of prior discipline against Mr. Vigil.  (Hearing, *generally*.)

However, the allegations in the LOR (unprofessional interaction with co-worker) are wholly unrelated to those allegations against him in the present matter (illegal possession of controlled substances and improper possession and handling of patient medications and funds). So while the LOR was discipline previously imposed upon Mr. Vigil, it does not serve as progressive discipline for the misconduct alleged here.

ANONYMOUS LETTERS AND CORROBORATING SEARCHES OF DESK AND LOCKERS

On or around May 29, 2015, an anonymous letter was sent via BHI inter office mail, one copy each to BHI C.O.O. Charles Jaramillo, BHI Assistant Director of HR Richard Vigil, and BHI Standards and Compliance Director Rose Contreras. (Ex. 16; *see also* Tweed.) The letter stated:

> I was told and everybody knows that superviser john vigil has a lot of bottels of the patients meds in his desk, and some are ativans and narcotics locked away. Also hundreds of dollars of there money to. John vigil is the psych tech superviser at the arches. We will send to HR patient avocate and investegations. You cannot tell him how you found out cuase he will know who send this letter.
> (Ex. 16.)

In response to this letter and at the direction of DOH's HRB, on June 3, Executive Nurse Administrator Frances Tweed, Internal Review Director Antonio Coca, and Security Director Joe Chavez conducted a search of Mr. Vigil's office desk area in El Paso Cottage. (Id.; Tweed; Chavez; Schaefer.) Mr. Vigil was out of the office on leave at the time. (Vigil; Tweed; Ex. 16.)

With Mr. Chavez having located the key that would unlock the office door, the search party was able to enter Mr. Vigil's office (the Supervisors' Office). (Chavez; *see also* Tweed.) The cabinet over Mr. Vigil's desk was secured with its own combination lock (Ex. 22-2), but even with the lock attached there was enough play in the cabinet doors for Mr. Chavez to pull them open and confirm that prescription medication bottles belonging to ALF patients were among the contents. (Tweed; Chavez; Schaefer; Exs. 16, 22-2.) Mr. Chavez then cut the lock to open the desk cabinet completely. (Tweed; Chavez; Exs. 16, 22-2.) Mr. Chavez was also primarily responsible for taking photographs of the cabinet's contents that day. (Tweed; Chavez; Ex. 16.)

Found in Mr. Vigil's desk cabinet, in relevant part, were:

- two prescription bottles of Risperidone pills for two BHI patients, both of which were expired;
- a small paper medication cup with a single tablet of Clonazepam inside; and
- some Southwest Capital Bank money envelopes.

(Id.; Schaefer; Exs. 22-3 – 22-6; *concur* Exs. 18, C-1, G-1 – G-2.)

Also of significance, the search party found additional Southwest Capital Bank envelopes in one of Mr. Vigil's unlocked desk drawers. (Chavez; Exs. 22-1; *see also* Tweed; *concur* Exs. 18, C-1, G-3 – G-4.) At the time, the members of the search party did not realize that the bank envelopes contained clothing allowance funds, change, and receipts, but the anonymous letter had claimed Mr. Vigil's had patients' money in his desk.[3] (Tweed; Chavez; Ex. 16.)

Later on June 3, Executive Nurse Administrator Tweed submitted two incident reports alleging exploitation by Mr. Vigil of the two ALF residents whose prescription medications were found in his desk cabinet. (Tweed; Ex. 16.)

Uncertain if a crime had been committed, Ms. Tweed consulted with then BHI Administrator, Troy Jones, and again with HRB, and was advised to contact the State Police, which she did. (Tweed; *see also* Chavez.)  As State Police officers were in training that morning, the San Miguel County Sheriff's Office ultimately responded to Ms. Tweed's call. (Tweed; Ex. 16.) On June 5, Undersheriff Anthony Madrid and Deputy Sean Armijo searched Mr. Vigil's desk and surrounding workspace. (Exs. 16, C-1 – C-2.) The officers seized the single tablet of Clonazepam

---

[3] A separate, orange envelope containing $635 was also found in Mr. Vigil's desk cabinet. (Exs. 15, 16, 18.) But this money appears to have belonged to Mr. Vigil. (Ex. 16.)

in the paper cup,[4] along with a "substantial amount of money possibly belonging to NMBHI patients." (Ex. C-2.)

On June 19, a second anonymous letter was sent via inter office mail, one copy each to Ms. Tweed, Mr. Jaramillo, and Mr. Richard Vigil. (Tweed; Ex. 16.) The second letter stated:

> John paul vigil has 2 lokers in mesa and el paso unit 1 in mesa has a combination and 1 in el paso has a yellow lock. I no the 1 in el paso has pills. He uses.
> (Ex. 16.)

In response to the second letter, Ms. Tweed consulted with HRB again and was advised to perform a second search. (Tweed.) Ms. Tweed also consulted with DOH's Office of General Counsel, which agreed she should again contact the Sheriff's Office. (Ex. 16.) Undersheriff Madrid met with Ms. Tweed that same day and looked at the lockers. (Id.; Ex. C-2.) It was decided that BHI would proceed with its own investigation and contact the Sheriff's Office if anything of interest was found. (Ex. 16.)

Ms. Tweed, Security Officer Luann Gonzales, and Investigator Peter Schaefer then conducted a search of the referenced lockers, starting at approximately 1:45pm. (Id.; Tweed; Chavez; Schaefer.)

The first locker searched was a blue, full-sized, gym-style locker with Mr. Vigil's name on it, located in one of the ALF cottages. (Vigil; Tweed; Schaefer; Exs. 16, 22-30; see also Exs. C-2, H-1.) Again, a combination lock first had to be cut off the locker. (Schaefer; Ex. 16.)

---

[4] At the time it was confiscated, the Sherriff's Office believed the single tablet in the medication dispensing cup was "Ativan, a scheduled narcotic." (Ex. C-2.) According to the Sheriff's State of New Mexico Incident Report, Ms. Tweed advised the officers that the single tablet in the paper cup was "possibly Ativan," and she had "researched the pills descriptors and found it to be Ativan." (Ex. C-1.) But at Hearing, Ms. Tweed suggested the officers had misunderstood her, that she had looked up the tablet's descriptors on a pharmacology website and identified it as Clonazepam, but had also explained to the officers Ativan and Clonazepam were basically the same medication, except one was short-acting and the other long-acting. (Tweed; see also Ex. 16.) She pointed out that the confusion might have arisen from the fact that the anonymous letter specifically mentioned Ativan. (Id.; see also Ex. 16.)

Found in Mr. Vigil's blue, gym-style locker, in relevant part, were:

- A Centrum Silver vitamin bottle containing multiple loose, unlabeled medications, identified as:
    - 9 tablets of Hydrocodone/Acetaminophen 5 mg/500 mg,
    - 2 tablets of Hydrocodone/Acetaminophen 7.5 mg/500 mg,
    - Ibuprofen,
    - Indomethacin,
    - Colchicine, and
    - Clindamycin; and
- An unidentified set of locker keys.

(Id.; Vigil; Tweed; Exs. 22-10 – 22-17; *concur* Exs. C-2, H-2 – H-4.)

The loose tablets were identified by Ms. Tweed and Ms. Gonzales using a pharmaceutical identification app. (Schaefer; Ex. 16; *see also* Tweed.) Ms. Gonzales took pictures of the blue locker's contents. (Tweed; Exs. 16, 22-10 – 22-18.)

The search then moved on to the second ALF cottage. Based on the description in the second anonymous letter, two cubby lockers with yellow-trimmed locks were identified as lockers of interest. (Schaefer; Exs. 16, 22-19 – 22-26.) Ms. Gonzales photographed the cubby lockers, cut their locks open, and then photographed their contents as well. (Id.)

Found in one yellow-locked cubby locker were:

- A magazine with Mr. Vigil's name and address on the address label; and
- Three expired prescription medications belonging to two BHI patients:
    - One prescription bottle of Risperidone 1 mg (issued 7/31/14);
    - One prescription bottle of Risperidone 2 mg (issued 6/16/14); and
    - One prescription bottle of Benztropine 0.5 mg (issued 8/17/14).

(Tweed; Schaefer; Exs. 16, 22-19 – 22-24.) [5]

---

[5] Both the Investigative Report and Department counsel referred to the cubby locker containing the three patient prescription medication bottles as locker #4 (Ex. 16; Schaefer-Direct), but none of the three cubby lockers photographed in Exhibit 22 appears to be a #4. (Exs. 22-23, 22-26, 22-29.) The cubby locker that contained the three prescription bottles looks like locker #1 to the ALJ. (Exs. 22-19, 22-23, 22-24.) The number of the locker is of little importance, however, given the contents found and Mr. Vigil's confirmation that the locker in question was his. (Vigil; Tweed; Schaefer; Exs. 16, 22-19, 22-22, 22-24.)

The other yellow-locked cubby locker contained personal items of Mr. Vigil's, but no medication or money. (Exs. 16, 22-25 – 22-26.) The locker keys found in Mr. Vigil's blue gym locker then opened a third cubby locker, Locker #10, back at the first ALF cottage. (Tweed; Schaefer; Exs. 16, 22-27 – 22-29; *see also* Chavez.) Locker #10 contained personal items belonging to Mr. Vigil, including a copy of his photo ID on a Defensive Driving certificate, but no medication or money. (Schaefer; Exs. 16, 22-28.) The search of the four lockers was complete by 2:30pm. (Ex. 16.)

There is some confusion in the record as to which ALF cottage contained each of the lockers searched that day.[6] (*Compare* Vigil, Tweed, Schaefer; Chavez; Ex. 16, *and* Ex. C-2.) But that is not important, since Mr. Vigil confirmed that the lockers described above were his (Vigil; Ex. 16), and there is a consensus on the contents of the lockers at issue. (Tweed; Schaefer; Exs. 16, 22-10 – 22-24; *see also* Exs. H-2 – H-4.)

---

[6] For example:
- The second anonymous letter claimed Mr. Vigil's locker with the yellow lock containing "pills" was in El Paso Cottage (Ex. 16);
- In the Affidavit for Arrest for Mr. Vigil, Officer Madrid wrote that Mr. Vigil's big, blue locker containing Hydrocodone was in El Paso Cottage (C-2);
- In the statement Ms. Tweed provided for purposes of BHI's internal investigation, she recalled that the blue locker containing Hydrocodone was in Mesa Cottage and the yellow-locked cubby locker containing the three expired prescription pill bottles was in El Paso Cottage (Schaefer; Ex. 16);
- At Hearing, Ms. Tweed testified that the big, blue locker containing Hydrocodone was in Mesa Cottage, and was uncertain if the yellow-locked cubby locker containing the expired prescription patient medications was in Mesa or El Paso Cottage (Tweed);
- In his Investigative Report, Investigator Schaefer gave conflicting reports indicating the big, blue locker containing Hydrocodone and the cubby locker containing expired patient prescriptions were both alternately in El Paso Cottage and in Mesa Cottage (Ex. 16);
- At Hearing, Investigator Schaefer gave conflicting reports, first indicating confidence that the big, blue locker containing Hydrocodone was in El Paso Cottage, but then also stating it was in Mesa Cottage; he also indicated that the cubby locker containing expired patient prescriptions was in Mesa Cottage (Schaefer); and
- At Hearing, Mr. Vigil agreed with his attorney's statement that his big, blue locker containing the Hydrocodone was in Mesa Cottage, but even he was uncertain where the yellow-locked cubby locker containing the three expired prescription patient medications was, though he leaned toward El Paso Cottage (Vigil).

Later on June 19, after consulting with HRB, Ms. Tweed contacted law enforcement and relayed the new findings to Undersheriff Madrid. (Tweed; Exs. 16, C-2.) Ms. Tweed also prepared another Incident Report, again alleging possible patient exploitation by Mr. Vigil. (Ex. 16.)

On June 26, Undersheriff Madrid and Investigator/Deputy Antoine Whitfield conducted a search of Mr. Vigil's blue locker and seized the 11 Hydrocodone pills for evidentiary purposes. (Ex. C-2; *see also* Tweed.)

INTERNAL INVESTIGATION

As Mr. Vigil was found to be in possession of patient medications, Ms. Tweed's incident reports alleged possible exploitation. (Tweed; Ex. 16.) Patient exploitation was, therefore, also the focus of the BHI internal investigation conducted by Investigator Peter Schaefer. (Ex. 16; *see also* Tweed.)

But no exploitation was found. (Schaefer; Ex. 16.) After finding patient prescription medications first in Mr. Vigil's desk cabinet and then his cubby locker, Ms. Tweed promptly had those patients and their medical records examined. (Id.; Tweed.) The patients were all found to be stable, with vital signs within normal limits and MARs in order, indicating they had received their medication as required with no medication errors. (Id.)

Similarly, in the course of his investigation, Investigator Schaefer determined that the Southwest Capital Bank envelopes contained clothing allowance funds, change, and receipts. (Ex. 16.) But no formal audit or reconciliation could be completed on those funds and receipts found in Mr. Vigil's desk, as they were confiscated by law enforcement for evidentiary purposes. (Id.; Schaefer; Ex. E.)

As a result, Investigator Schaefer was not able to conclude that Mr. Vigil engaged in the exploitation of any ALF residents. (Schaefer; Ex. 16.) He did conclude, however, that Mr. Vigil

was in violation of State Statutes and NMBHI Policies on the handling of medication and client monies. (Id.)

In keeping with this, in her Manager Investigation Follow-Up Form, CBS Director Corinne Dominguez wrote: "The investigation concluded that Mr. Vigil was storing medications in various lockers within the Unit. This is clearly a policy violation. Money was also found but reconciliation of clothing funds has not been concluded." (Exs. 16, E.)

ARREST AND CHARGES

The San Miguel County Sheriff's Office arrested Mr. Vigil on July 8, on charges of Possession of a Controlled Substance (felony) and Possession of a Controlled Substance (misdemeanor – possession of a controlled substance NOT listed in 30-31-23(E) as felony possession). (Exs. 16, C-2 – C-3.)

BHI was well aware that Mr. Vigil was arrested on July 8, as his arrest occurred on BHI premises. Ms. Tweed had called Mr. Vigil to come see her, and he was then arrested right near her office. (Vigil, Tweed.) It appears that Ms. Tweed also immediately informed Internal Review Director Antonio Coca when the arrest occurred. (Ex. 16.) According to Mr. Vigil, he was arrested "at work, right there on the spot… in full view of everybody." (Vigil.) BHI not only knew about Mr. Vigil's arrest at the time it decided to discipline him, but the fact of his arrest and charge figured prominently in Mr. Vigil's October 2 NCA and his October 20 NFA. (Exs. 12, 15.) Both state: "You were subsequently charged with Possession of a Controlled Substance – Hydrocodone, a fourth degree felony under New Mexico state law." (Id.)

## ALLEGATIONS

Before analyzing the allegations in the NFA, it is worth emphasizing that there are no allegations against Mr. Vigil of patient exploitation, medication diversion, working while drug-impaired, or theft or misappropriation of patient funds. (Ex. 15.) Rather, the NFA focuses entirely on Mr. Vigil's alleged *improper possession and handling* of controlled and non-controlled patient and non-patient medications and patient funds. (Id.)

## No Violation of Drug and Alcohol-Free Workplace Policy

The NFA alleges that Mr. Vigil violated the DOH Drug and Alcohol-Free Workplace Policy. (Id.) The ALJ disagrees.

The provisions of the Drug and Alcohol-Free Workplace Policy cited in the NFA state:

> IV. Procedure
>    A. General Provisions
>       ...
>       3. ...Employees who use, possess, or distribute alcohol or illegal drugs while on duty or on Department property will be subject to disciplinary action, including dismissal.
>       4. Nothing in this policy shall be considered as limiting the Department's right to take administrative or disciplinary action... for employee/workforce involvement with illegal drugs or alcohol not specifically addressed in this policy.
>          ...
>    K. Sanctions
>       ...
>       9. Employees who, while on duty, consume or possess drugs or any controlled substance without a valid prescription shall be dismissed and reported to the local law enforcement agency.
>          (Ex. 4, Drug and Alcohol-Free Workplace Policy, Procedure Sections A(3)-(4), K(9).)

The Policy also defines "Illegal Drug" as:

> Marijuana (without a valid patient identification card), cocaine, opiates, phencyclidicne [sic] PCP, amphetamines, any metabolite of these drugs, or any non-prescription substance containing one or more of these drugs.
> (Ex. 4, Drug and Alcohol-Free Workplace Policy, Definitions Section.)

42

To accurately analyze whether or not Mr. Vigil violated this Policy, it is critical to first determine whether any of the medications found in Mr. Vigil's work area and personal lockers were controlled substances or "illegal drugs" under the Policy. This information was not clearly provided at Hearing. (Hearing, *generally*.) The ALJ therefore took administrative notice of information publicly available on the Mayo Clinic, MedlinePlus, and U.S. Department of Justice websites to compile the following list describing the medications found in Mr. Vigil's desk and lockers.[7] (https://mayoclinic.org/drugs-supplements; https://medlineplus.gov/druginformation.html; https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf; 1.7.12.18(J) NMAC.)

*Expired patient prescription medications found in desk cabinet and cubby locker*

Benztropine is an anticholinergic medication used to treat Parkinson's disease and side effects of certain psychiatric medications.
It is available only with a doctor's prescription.
It is not a controlled substance under the Controlled Substances Act ("CSA"). (*See also* Tweed.)

Risperidone is an atypical antipsychotic medication prescribed to treat certain mental/mood disorders. (*Concur* Tweed.)
It is available only with a doctor's prescription. (Id.)
It is not a controlled substance under the CSA. (Id.; *Concur* Aragon.)

*Loose tablet found in desk cabinet*

Clonazepam is a benzodiazepine (a central nervous system depressant, but not an opiate), used to treat anxiety and seizures. (*Concur* Tweed.)
It is available only with a doctor's prescription.
It is a Schedule IV controlled substance under the CSA. (*See also* Vigil, Tweed, Ex. 16.)

---

[7] To the extent DOH objects to this administrative notice, the result would be the same if the information was excluded. The burden was on the Department to prove a violation of the Policy by a preponderance of the evidence, and it failed to do so. (Hearing, *generally*.)

*Pills and tablets found in Centrum Silver bottle in blue locker*

<u>Clindamycin</u> is an antibiotic prescribed to treat bacterial infections. (*Concur* Vigil, Tweed.)
It is available only with a doctor's prescription.
It is not a controlled substance under the CSA.

<u>Colchicine</u> is a medication used to treat gout and gouty arthritis. (*Concur* Tweed.)
It is available only with a doctor's prescription.
It is not a controlled substance under the CSA.

<u>Hydrocodone/Acetaminophen</u> is a combination medication used to relieve pain severe enough to require opioid treatment.
   <u>Acetaminophen</u> is a pain reliever and fever reducer.
   It is available over-the-counter.
   It is not a controlled substance under the CSA.
   <u>Hydrocodone</u> is a narcotic analgesic and an opioid.
   It is available only with a doctor's prescription and under a restricted distribution program.
   It is a Schedule II controlled substance under the CSA. (Ex. 16; *see also* Vigil, Ex. C-2.)

<u>Ibuprofen</u> is a non-steroidal anti-inflammatory drug ("NSAID") used to treat pain and relieve symptoms of arthritis.
It is available over-the-counter.
It is not a controlled substance under the CSA.

<u>Indomethacin</u> is a NSAID used to treat pain and relieve symptoms of arthritis.
It is available only with a doctor's prescription.
It is not a controlled substance under the CSA.

As shown, only Hydrocodone and Clonazepam are controlled substances under the CSA. And the only medication found in Mr. Vigil's desk and lockers that qualifies as an "illegal drug" under the Drug and Alcohol-Free Workplace Policy is Hydrocodone, the single opioid on the list.[8]

---

[8] It should be noted that Hydrocodone is technically an opioid, not an opiate.

Possession of Hydrocodone Not Illegal

But Mr. Vigil's possession of Hydrocodone was still not a violation of this Policy. This is because Mr. Vigil had prescriptions for the Hydrocodone. (Vigil; *Concur*, Tweed, Smith, Schaefer.) Mr. Vigil received prescriptions for Hydrocodone/Acetaminophen 5 mg/500 mg on October 21, 2010, and August 28, 2011. (Ex. D.) He also received prescriptions for Hydrocodone/ Acetaminophen 7.5 mg/500 mg on April 11, 2007, February 22, 2010, and January 23, 2011. (Id.)

Mr. Vigil testified that he was prescribed the Hydrocodone years earlier during a period of time when he had several medical procedures, including nose surgery and his wisdom teeth removed. (Vigil.) He explained that he knew he had been given "something for pain," but did not recall that it was Hydrocodone. (Id.) So during the BHI investigation, when Investigator Schaefer asked him about the Hydrocodone in his locker, Mr. Vigil was uncertain and confused. (Id.) Compounding his confusion, Investigator Schaefer did not show Mr. Vigil any pictures of the Centrum Silver bottle or the pills found inside to provide him with visual triggers to help him remember. (Id.) So Mr. Vigil was answering the Investigator's questions "blind" and told him what he believed at that point in time, that the medications found in his locker were all his personal medications, except the Hydrocodone, which was not his. (Id.; Schaefer; Ex. 16.) Mr. Vigil explained that it was not until after his interview with Investigator Schaefer that his wife reminded him he had earlier been prescribed Hydrocodone. (Vigil.)

Mr. Vigil was not entirely sure why he had the Hydrocodone in his locker the day it was found. He explained that when he went on vacation, he had a habit of placing all his medications in his Centrum Silver vitamin bottle, for safekeeping. (Id.) And he surmised that he must have come straight to work after a trip he took years earlier, put the Centrum Silver bottle holding his medications in his locker, and forgot about it. (Id.) Consistent with that, all the medications

found in the Centrum Silver bottle were Mr. Vigil's personal medications, which were either available over-the-counter or he had prescriptions for in the 2007-2011 timeframe.[9]  (Id.; Ex. D; see also Ex. 22-14; supra, p. 44.)

DOH's Drug and Alcohol-Free Workplace Policy defines "Prescription drug" as "a drug duly prescribed by a licensed medical professional legally authorized to prescribe drugs."  (Ex. 4, Drug and Alcohol-Free Workplace Policy, Definitions Section.)

Although the Policy does not specifically reconcile its "Illegal Drug" and "Prescription drug" definitions, the only logical and internally consistent interpretation is that if a drug is legally prescribed, it cannot constitute an illegal drug under the Policy.  Mr. Vigil had prescription Hydrocodone in his blue locker, not illegal Hydrocodone.

And there is nothing in DOH's Drug and Alcohol-Free Workplace Policy that prohibits an employee from keeping his personal prescription Hydrocodone locked in his personal work locker.  (Ex. 4, Drug and Alcohol-Free Workplace Policy.)   To the contrary, the Policy states, "Employees who, while on duty, consume or possess drugs or any controlled substance without a valid prescription shall be dismissed and reported to the local law enforcement agency."  (Ex. 4, Drug and Alcohol-Free Workplace Policy, Procedures Section K(9), emphasis supplied.)  Ms. Tweed concurred, testifying that there was no policy she could point to prohibiting Mr. Vigil from holding his prescription Hydrocodone in his work locker.  (Tweed.)

To be sure, DOH's Drug and Alcohol-Free Workplace Policy is not only concerned with employees possessing illegal drugs.  It is also concerned with employees working under the

---

[9] Clindamycin is the only prescription medication found in the Centrum Silver bottle that was not on the list of Mr. Vigil's prescriptions provided at Hearing. (Ex. D; supra, pp. 38, 44.) Mr. Vigil claimed, however, that he was given the Clindamycin when he had his wisdom teeth removed, to prevent infection. (Vigil.) Additionally, a Clindamycin prescription bottle was in the same blue locker as the Centrum Silver vitamin bottle. (Exs. 22-14, 22-18.) So there is no real question that Mr. Vigil had a Clindamycin prescription.

influence of any drugs, including prescription medications, which may impair the employee's functioning. (Ex. 4, Drug and Alcohol-Free Workplace Policy, Policy Section.) But there is no allegation in the NFA suggesting Mr. Vigil was under the influence of Hydrocodone or otherwise drug-impaired while on duty at BHI. (Tweed; Ex. 15; Hearing, *generally*.)

In sum, the preponderance of the evidence is that Mr. Vigil had one over-the counter medication and numerous personal prescription medications, including Hydrocodone/ Acetaminophen, in his blue, work locker. This was no violation of the DOH Drug and Alcohol-Free Workplace Policy.

### No Improper Possession of Clonazepam

The analysis concerning the Clonazepam found in Mr. Vigil's desk cabinet is completely different. Clonazepam is not an opiate and does not otherwise meet the definition of "illegal drug" under the Policy. (*Supra*, pp. 42-44.) It is, however, a controlled substance under the CSA. (Id.) So while the provisions of the Drug and Alcohol-Free Workplace Policy concerning illegal drugs do not apply, the provision cited in the NFA concerning controlled substances does. (*Supra*, p. 42; Ex. 4, Drug and Alcohol-Free Workplace Policy, Procedure Section K(9).) Again, that provision essentially states that employees who "possess... controlled substances without a valid prescription shall be dismissed and reported to the local law enforcement agency." (Id.) And Mr. Vigil made no claim that he had a prescription for the Clonazepam. (Hearing, *generally*.)

Nevertheless, the Clonazepam found in Mr. Vigil's desk cabinet was still not a violation of this Policy. First, the Clonazepam was patient medication, and it was Mr. Vigil's job to work with patient medications. Second, and more importantly, Mr. Vigil did not know about or place the Clonazepam in his desk cabinet, and he cannot reasonably be held accountable for possessing