something he did not knowingly possess. The evidence supporting these points is explored in greater detail below. *Infra*, pp. 49, 50-52, 78.)

### No Violation of Controlled Substance Administration Records Policy

The NFA also alleges that Mr. Vigil violated BHI's Controlled Substance Administration Records Policy. (Ex. 15.) Specifically, it alleges that Mr. Vigil failed to properly document the disposition and destruction of a controlled substance. (Id.; Ex. 6, Controlled Substance Administration Records Policy, Procedure Section V(A).) The ALJ disagrees.[10]

As a reminder, only Hydrocodone and Clonazepam are controlled substances under the CSA. (*Supra*, pp. 43-33; https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf; 1.7.12.18(J) NMAC.)

#### Policy Applies to Patient Medications Only

A fair reading of the Controlled Substance Administration Records Policy shows that it instructs the way BHI staff need to document the controlled medications of *patients'*. For example, the Policy requires all entries into the actual CSAR to include: "1. Time of administration to the patient...; 2. Patient's last name and first name...; 3. Quantity of drug administered and/or wasted..." (Ex. 6, Controlled Substance Administration Records Policy, Procedure Section I(B)(1)-(3).)

As the Hydrocodone was Mr. Vigil's personal prescription medication, and not medication being administered to ALF residents, Mr. Vigil had no obligation to keep track of it in the ALF's CSAR. (Id.) The allegation that Mr. Vigil violated the Controlled Substance Administration

---

[10] It is worth pointing out that the stated purpose of BHI's Controlled Substance Administration Records Policy is to outline a procedure for proper administration, documentation, and daily accountability of controlled substances "in all *in-patient* care areas." (Ex. 6, Controlled Substance Administration Records Policy, Purpose Section, emphasis supplied.) Since Mr. Vigil worked at the ALF, which is exclusively *out-patient*, it is unclear whether this Policy even applies to his work with patients in the ALF Unit. (Tweed; Aragon; Moore; Smith; Valdez; Ex. 16.) However, Appellant did not raise this issue at Hearing. (Hearing, *generally*.)

Records Policy, therefore, can only pertain to his handling of the single Clonazepam tablet found in his desk cabinet.

As mentioned, Appellant Vigil made no claim that the Clonazepam was his personal prescription medication. (Hearing, *generally*.)  On the contrary, there was ample circumstantial evidence suggesting the Clonazepam tablet was patient medication, including: the fact that the tablet was found in the ALF Unit (Tweed; Schaefer; Ex. 16); Mr. Vigil's testimony that, as a general matter, some ALF residents used Clonazepam (Vigil); the fact that the tablet was found in the type of paper cup typically used to dispense medication to patients (Tweed; Chavez; Schaefer; Exs. 16, 22-6, G-2), and Mr. Vigil's testimony that the tablet was not his, despite being found in his desk cabinet (Vigil).  Stronger evidence would have been helpful – for example, CSARs or other documentation showing that ALF residents were prescribed Clonazepam at the particular time at issue or, better yet, showing that a particular ALF resident was missing a Clonazepam tablet at the relevant time.  Nevertheless, circumstantial evidence alone can amount to a preponderance of the evidence. (*Reid v. Brown*, 1952-NMSC-014, ¶5, 56 N.M. 65.)  And that is the case here. Particularly as neither party provided evidence disputing the idea, the preponderance of the evidence is that the Clonazepam tablet was patient medication.

The remaining question then is whether Mr. Vigil failed to properly document the disposition/destruction of the Clonazepam tablet in the CSAR.  The specific portion of the Controlled Substance Administration Records Policy cited in the NFA as violated by Mr. Vigil is as follows:

> PROCEDURE
> …
>
>   VI. Responsible Staff: Nursing
>     a.   Documentation of Wastage and Destruction
>       1.   Documentation of the disposition of a portion of a controlled substance remaining in an ampule, vial, syringe or unused must

be documented and shall be made on the next available line of the Controlled Substance Administration Record (CSAR). A licensed person must witness and co-sign for all wastage and destruction.

2. Documentation should include: P/C/R [(patient/client/resident)] name, reason for wastage (ie 'dropped on floor', 'patient refused', etc.) and disposition of wastage (ie 'flushed', 'washed down sink', returned to pharmacy, etc.)
(Ex. 6, Controlled Substance Administration Records Policy, Procedure Sections V(A)(1)-(2).)

### No Evidence from Department of Failure to Document

The Department provided no evidence supporting its allegation that Mr. Vigil failed to document the disposition/destruction of the Clonazepam tablet. (Hearing, *generally*.) No CSAR was provided showing, for example, a lack of explanatory documentation for a missing or wasted Clonazepam tablet. (Id.) No CSARs were provided showing an overall lack of explanatory documentation on patients' Clonazepam records during the relevant time either. (Id.) In fact, no CSARs were provided at all. (Id.)

### Appellant Denied Knowledge of Clonazepam

Ironically, it was Mr. Vigil himself who effectively confirmed he did not document the Clonazepam tablet. He did this when he testified that he did not place the Clonazepam tablet in his office desk altogether and does not know how it got there. (Vigil; Ex. 16.) Determining whether or not Mr. Vigil violated the Controlled Substance Administration Records Policy therefore boils down to a credibility issue. If Mr. Vigil's claim is credible, and he did not know about the Clonazepam tablet, he cannot reasonably have been expected to document its disposal/destruction.

#### *Credibility*

Weighing against Mr. Vigil's claim that he did not know about the Clonazepam in his desk cabinet is the inescapable fact that the tablet was actually found in his ostensibly locked

desk cabinet.  (Tweed; Chavez; Schaefer; Exs. 16, 22-3, 22-6.)  But there are numerous factors weighing in favor of Mr. Vigil's claim as well.

First, Mr. Vigil testified that he would never have simply placed an unidentified pill in his desk cabinet.  (Vigil.)  He explained that if he found an unidentified, loose pill, it was an "emergency" and he would have completed an incident report "right away," called CBS Director Corinne Dominguez or the nurse, and called the pharmacy. (Id.) Mr. Vigil stressed the importance of this procedure. For example, he described an earlier occurrence, when an unidentified "pill" was unexpectedly left for him on top of his desk. (Id.) Mr. Vigil claims he called a meeting with housekeeping and janitorial staff to tell them not to do that, to follow procedure and complete an incident report instead and give the pill to his staff for return to the pharmacy.  When it was ultimately determined that the "pill" was more like a Tic-Tac, and not medication at all, Mr. Vigil was relieved. (Id.) Along similar lines, he also described an incident where ALF PT staff member Jimmy Lopez lost a pill and had to complete an incident report about it. (Id.)

Mr. Vigil's testimony about the importance of immediately reporting an unidentified, found pill; his relief when the "pill" left for him not in accordance with procedure was determined not to be medication; and Jimmy Lopez's incident report about losing a pill all credibly support his claim that he would never have left an unidentified, found pill just sitting inside his desk cabinet.

Mr. Vigil's claim that he did not know about the Clonazepam tablet in his desk cabinet is further bolstered by the fact that he readily admitted to putting the two expired patient prescription medication bottles in his desk cabinet. (Id.; *infra*, p. 54.) Presumably, had he placed a patient's loose pill in his desk cabinet, he would have taken responsibility for that as well.

Mr. Vigil's credibility on this point is also enhanced by the circumstances at the time the Clonazepam was found in his office desk cabinet: Mr. Vigil was not getting along with the ALF graveyard shift supervisor, with whom he shared his office (Vigil); the allegations against Mr. Vigil began with an anonymous letter written by someone familiar with his office desk and specifying his desk contained "ativans and narcotics" (Ex. 16; *see also* Schaefer); and there was enough play in the locked doors of Mr. Vigil's desk cabinet for someone to place a small object inside. (Chavez; Schaefer; Ex. 16; *see also* Tweed). Under this set of circumstances, it is plausible that someone placed the Clonazepam tablet in Mr. Vigil's desk cabinet and then reported it in an effort to get him in trouble.

Finally, the assigned ALJ found Mr. Vigil's earnest, sincere testimony that he knew nothing about the Clonazepam tablet credible as a general matter.

After significant consideration of the evidence in the record, the ALJ finds that the Department has *not* shown it is more likely than not that Mr. Vigil knew about the Clonazepam in his desk. As the Department failed to prove by a preponderance of the evidence that Mr. Vigil knew about the Clonazepam tablet in his desk, Mr. Vigil cannot have been expected to have documented it in the CSAR. There was no violation of the Controlled Substance Administration Records Policy here.

**Violation of the Disposal of Unusable Products Policy**

The NFA also alleges that Mr. Vigil violated BHI's Disposal of Unusable Products Policy. (Ex. 15.) Specifically, it states, "you failed to follow procedures for the destruction of unusable non-controlled products and failed to follow procedures for the destruction and/or disposition of an unusable controlled substance." (Id.) The ALJ does not agree that Mr. Vigil failed to follow procedures concerning unusable *controlled* substances. The ALJ agrees that Mr. Vigil violated

the Disposal of Unusable Products Policy by failing to follow procedures concerning unusable *non-controlled* substances, but also finds that mitigating factors lessen the seriousness of the violation.

The specific portions of the Disposal of Unusable Products Policy cited in the NFA or referenced at Hearing as violated by Mr. Vigil are as follows:

> POLICY
> The policy of the NMBHI is that unusable products shall be handled and disposed of properly and comply with all legal requirements.
> ...
> PROCEDURES
> I.     RETURN OF UNUSABLE PRODUCTS TO THE PHARMACY
>      A.     Unusable products shall not be distributed or administered. Pharmacy, nursing, and other personnel who discover unusable products shall return them to the pharmacy for proper disposition. If the drug is an unusable controlled substance sealed in its original packaging, it will be returned to pharmacy for proper disposition. If the drug is an unusable controlled substance that is no longer sealed in its original packaging, the nurse will use a Cactus Smart Sink to dispose of the medication.
>      B.     Any contraband found on any unit must be forwarded to Pharmacy for destruction.
>         ...
> III.     RETURN OF UNUSABLE PRODUCTS TO THE SOURCE OF SUPPLY
>      A.     Unusable products shall be segregated and held until able to return.
> (Ex. 5, Disposal of Unusable Products Policy, Policy Section and Procedures Sections I(A)-(B) and III(A).)

The Policy also defines "unusable products" to include expired (outdated) medications. (Ex. 5, Disposal of Unusable Products Policy, Definition Section A(1); *see also* Tweed, Aragon, Smith.)

Unusable ***Controlled*** Products

Again, the only controlled substances found in Mr. Vigil's desk and lockers were Hydrocodone and Clonazepam. (*Supra*, pp. 36, 38, 43-44.) Again, the Disposal of Unusable Products Policy controls the way BHI staff dispose of ***patients'*** unusable medications. (Ex. 5.) As the Hydrocodone was Mr. Vigil's personal prescription medication, and not a patient's medication,

Mr. Vigil had no obligation to dispose of or destroy the Hydrocodone according to the Policy in any event. (Id.; *supra*, pp. 45-47.)  And again, as Mr. Vigil's testimony was credible and the Department failed to prove by a preponderance of the evidence that he knew about the Clonazepam tablet in his desk cabinet (*supra*, pp. 50-52), Mr. Vigil cannot have been expected to dispose of or destroy that tablet according to the Disposal of Unusable Products Policy.  Mr. Vigil did not fail to properly dispose of or destroy any unusable *controlled* products here.

Unusable ***Non-Controlled*** Products

Also found in Mr. Vigil's possession were the following *non-controlled* substances:

- Loose tablets/pills of clindamycin, colchicine, ibuprofen, and indomethacin (in the Centrum Silver bottle in his blue locker).
- Two bottles of patient prescription Risperidone (in his desk cabinet), and
- Three bottles of patient prescription medication, two of Risperidone and one of Benzotropine (in his cubby locker).
  (*Supra*, p. 38.)

### *Mr. Vigil's Four Personal Medications*

Like the Hydrocodone, the Clindamycin, Colchicine, Ibuprofen, and Indomethacin were all Mr. Vigil's personal medications, either prescription or over-the-counter, not patient medication. (Vigil; Ex. D.)  Mr. Vigil therefore had no obligation to dispose of or destroy any of them either pursuant to the Disposal of Unusable Products Policy.  (Ex. 5.)

### *Two Expired Patient Prescription Medications in Desk Cabinet*

Mr. Vigil readily admits to placing the two expired patient prescription medications in his desk cabinet. (Vigil; Ex. 16.) He testified that he found those expired prescriptions in two patients' active medication bins, and removed the bottles from the medcart entirely in order to protect the patients' safety and avoid any possibility of expired medications being administered to the patients. (Vigil.) Mr. Vigil's testimony that to him resident safety is of the utmost importance was credible.  (Id.)

54

Again, the Disposal of Unusable Products Policy instructs: unusable products "shall be segregated and held until able to [be returned]" to the pharmacy for proper disposition. (Ex. 5, PHM 060, Disposal of Unusable Products Policy, Procedures Sections I(A) and III(A); *see also* Aragon.) It does not specify exactly *where* expired medications should be held, nor *when* they should be returned to the pharmacy. (Id.; *see also* Tweed, Smith.)

### *Segregated and Held*

Mr. Vigil argued that, in keeping with the Policy, he segregated and held the expired medications in a safe, secure location – in his locked desk cabinet in his locked office. (*Concur* Tweed, Aragon.) He also claimed that he intended to return the expired medications to the pharmacy, but held onto them for an extended period in this case because he needed to meet with his supervisor, CBS Director Corinne Dominguez, about the expired medications first. (Vigil; Schaefer; Ex. 16; *see also* Aragon.)

The Department argued that segregating and holding expired medications in a desk cabinet was improper, that Mr. Vigil should have placed the expired medications in the bottom drawer of an ALF medcart instead. (Hearing, *generally.*) In support of its argument, the Department presented evidence to try and establish that the "segregated and held" provision of the Disposal of Unusable Products Policy actually means stored in the bottom drawer of the medcart and that Mr. Vigil knew as much. Most of the Department's evidence on this point was not convincing, but critical parts of it were.

### *Tweed*

Executive Administrator Tweed testified that as a general matter, all medication has to be stored behind locked doors, in a locked medroom, in a locked medcart. (Tweed.) She also testified that it would never be appropriate to store expired medication outside

of the medroom and medcart.  (Id.)  She explained that in BHI's in-patient areas, which she is more familiar with, expired drugs are stowed in the bottom bin of the medcarts. (Id.)  She was also clear, however, that she did not know precisely what the procedure was on the out-patient side – that is, she did not know exactly where medications were to be stored in the ALF medcart.  (Id.)

### Aragon

Former DON of CBS Cathy Aragon was responsible for training ALF staff on storage of medications.  (Aragon.)  Ms. Aragon testified that it would never be appropriate to hold expired patient medications in a desk or personal locker.  (Id.)  Rather, she confirmed that expired patient medications should be kept in the bottom drawer of the medcart until they can be returned to or retrieved by the pharmacy.  (Id.)  She also testified that Mr. Vigil was trained on that practice by her personally, through the initial training module he was required to take when he started at the ALF, and through his annual training re-certifications.  (Id.; *see also* Tweed.)

First, regarding personal instruction, when Ms. Aragon was asked how she specifically communicated to Mr. Vigil that the designated area for discontinued and expired meds was the bottom drawer of the medcart, she responded, "I trained them.  I went into the Unit and trained them… I trained any supervisor that was there." (Aragon.)  Mr. Vigil denied that Ms. Aragon ever personally instructed him to put expired or other unusable medication in the bottom drawer of the medcart.  (Vigil.)  He claimed that had he ever been directed to do so, he would have requested a meeting with CBS Director Dominguez to say that was a dangerous practice, counter to the safety of the residents.  (Id.)  It is worth noting that Mr. Vigil's predecessor in the ALF dayshift supervisor position, Mr. Valdez, also testified Ms. Aragon gave him no express training or guidance that there was a designated drawer in the medcart for expired medications.  (Valdez.)

56

Second, Ms. Aragon testified that, as part of the initial ALF training module, Mr. Vigil would have received a reference packet with all the information he needed to know. (Aragon.) That packet was not only intended to assist with the initial certification process, but would have been given to Mr. Vigil to keep and use for future reference. (Id.)  Mr. Vigil did not dispute receiving the packet in 2009 at the time of his initial certification. (Hearing, *generally*.)  No copy of Mr. Vigil's initial training module or the referenced information packet was provided at Hearing, but Ms. Aragon claimed to have parts of the packet in her possession while on the witness stand and read into the record language from the packet stating that the facility had to: "provide a designated storage area for medications that are not used, medications that have been recalled, and medications that have been changed, until Consulting Pharmacist can properly dispose of them." (Aragon.)

Third, Ms. Aragon explained that Mr. Vigil's annual re-certification process consisted of reviewing an informational DVD and then taking a test. (Id.)  No copy of the training DVD Mr. Vigil would have reviewed each year was provided at Hearing. (Hearing, *generally*.)  Copies of Mr. Vigil's re-certification tests for 2011-2015 were provided, but those tests do *not* indicate Mr. Vigil was trained to put expired medication in the bottom drawer of the medcart.  (Ex. 23.)  The most relevant questions on those re-certification tests, which are identical from year to year (Aragon), are questions 24, 37, 49, and 44.

> Question 24 presents the statement: "It doesn't matter where you store a medication that you are holding for the consulting pharmacist," and asks the test-taker whether it is true or false. (Ex. 23; *see also* Ex. 16.)
> On every one of his tests, Mr. Vigil correctly marked 'false,' indicating that the storage location *does* matter.  (Tweed; Aragon; Ex. 23; *see also*, Ex. 16.)   But this gives no indication of where the correct storage location is. (Ex. 23.)  Indeed, Question 24 leaves open the possibility that what matters about the storage location is that it be safe and segregated, not that it be any place specific.

Question 37 presents the statement: "Put containers that still have medication in them back into the storage unit," and asks the test-taker whether it is something you can do or can't do. (Id.)

On every test, Mr. Vigil correctly answered 'can.' (Id.; Tweed.)   But just because medication *can* be put in the storage unit does not necessarily mean that it *must* be put in the storage unit.   Also, although Ms. Tweed testified that Question 37 pertained to expired medications (Tweed), as seen below, the entire series of can/can't questions on the test appears to address how staff should handle active patient medications, not expired ones:

| | | | |
|---|---|---|---|
| 31. | Help residents take their medication if they can't take it on their own. | CAN | CAN'T |
| 32. | Decide if a resident should take a medication. | CAN | CAN'T |
| 33. | Take medications to residents. | CAN | CAN'T |
| 34. | Leave the drug storage unit unlocked if you can stay close by it and see it. | CAN | CAN'T |
| 35. | Use medications intended for one resident for another resident. | CAN | CAN'T |
| 36. | Prepare the medications before it is time to help residents take them. | CAN | CAN'T |
| 37. | Put containers that still have medication in them back into the storage unit. | CAN | CAN'T |
| 38. | Remove all medications for all residents at once. | CAN | CAN'T |
| 39. | Force a resident to take a medication. | CAN | CAN'T |
| 40. | Change the amount of medication to be taken. | CAN | CAN'T |

(*E.g.*, Ex. 23-6.)

In other words, taken in context, Question 37 appears to be asking if unfinished *active* medications can be put back into the medication storage unit.

Question 49 presents the idea "Storing medications," and asks the test-taker to match that idea with the appropriate description. (Ex. 23.)

In each of his tests, Mr. Vigil correctly matched "Storing medications" with "Putting medications in a locked compartment or in a refrigerator." (Id.; Tweed.)   It is interesting that the correct answer here calls for medication to be stored in a "locked compartment," rather than in the drug "storage unit" mentioned elsewhere in the test. (*E.g.*, Ex. 23, Questions 29, 34, 37, and 46 (matching answer E).)   It gives no indication that expired medications need to be placed in the medroom or the medcart in particular.

In keeping with this, Mr. Vigil's dayshift supervisor predecessor, Manuel Valdez, testified that the training he got from the "med tech test" was that expired medication "needs to be in a locked area – didn't say any specific area, just a locked area." (Valdez.)

And, finally, Question 44 is an essay question that asks the test-taker: "What should you do if a medication is changed or discontinued?"

A discontinued medication refers to a medication that a patient stops taking because it has been supplanted with a new prescription by the prescribing physician. (*See* Tweed, Aragon.) Since expired medications and discontinued medications are both examples of medications that should no longer be used by patients, the parties seemed to agree that the storage location for both types of unusable medications would be the same. (*See* Aragon, Ex. 5; Hearing, *generally*.)

Because Question 44 is an essay question, Mr. Vigil's answers were slightly different each year, and included ideas such as: "notify nurse/staff," "let nurse and pharmacy know," hold med for the consultant pharm." (Aragon; Exs. 23-7, 23-15, 23-39; *see also* Ex. 16.)   Mr. Vigil's answers never indicated that discontinued medications should be placed in the bottom drawer of the medcart, and yet his answers were still considered correct. (Aragon;

Ex. 23.)  Ms. Aragon, who graded Mr. Vigil's re-certification tests, explained that she considered his answers correct, even if they were only partial answers, so long as they were not wrong. (Aragon.)  But on his 2013 re-certification test, Mr. Vigil's answer to Question 44 started with, "***Remove med from medcart***," and he apparently got credited with a correct answer here as well.  (Ex. 23-23, emphasis added; *see also* Aragon.)

This contradicts Ms. Aragon's testimony about the annual re-certification tests and calls into question whether those tests truly made it clear to Mr. Vigil that expired medication was to be stored in the bottom drawer of the medcart.

*Smith*

BHI Consultant Pharmacist Dan Smith explained that the ALF Units, like any other custodial care facilities, are required by the BOP to store all medication in a designated area under lock and key. (Smith.)  He also confirmed that the expectation is expired medications will be kept under lock and key in the medroom. (Id.)  Mr. Smith therefore agreed that the "segregated and held" provision of the Disposal of Unusable Products Policy means storage in the medcart or medroom. (Id.)  Mr. Smith had not personally witnessed this expectation be communicated directly to Mr. Vigil, but he testified that it was covered by the Manual (the NMBHI at Las Vegas CBD Custodial Procedures Manual), which all ALF staff are required to review and sign for annually.  (Id.)

*The Manual*

Finally, the Department presented a copy of the Manual, revised as of 4/25/12. (Ex. 25(B).)  The Manual specifically states: "Medications no longer in use, unwanted, outdated, or adulterated will be placed in a quarantine area in the locked medication cabinet and held for destruction by the consultant pharmacist."  (Smith; Ex. 25(B), NMBHI at Las Vegas CBS Custodial Procedures Manual, Drug Policy Section E(1)(6).)  At Hearing, Mr. Vigil testified that he had never seen the Manual before. (Vigil.)  But former Consultant Pharmacist Monica Ruiz-

Marquez testified that she communicated with Mr. Vigil about the Manual in or around 2013. (Ruiz-Marquez.)  And more importantly, Department's Rebuttal Exhibit 26 is an acknowledged version of the Manual, containing Mr. Vigil's May 1, 2013 signature.  (Ex. 26; *supra*, pp. 21-25.) At worst, this challenges Mr. Vigil's credibility concerning his knowledge of the Manual; at best, he acknowledged the Manual without actually reading or reviewing it.

Either way, it is reasonable for the Department to rely on Mr. Vigil's acknowledgment of the Manual as an indicator that he knew or should have known its provisions.  The Manual is, by far, the Department's strongest evidence that the "segregated and held" provision in the BHI Disposal of Unusable Products Policy means stored in a separate area in the locked medcart. (Exs. 25(B), 26.)  And the Acknowledged Manual is the Department's strongest evidence that Mr. Vigil was on notice of that procedure.  (Ex. 26.)

It should also be noted that Mr. Vigil himself testified that ALF staff would put expired medications into the bottom drawer of the medcart.  (Vigil.)  This suggests to the ALJ that at least some ALF line staff members understood what they were expected to do with expired medications.

Weighing all the relevant evidence, the ALJ finds that Mr. Vigil knew or should have known expired medication was to be segregated and stored in a locked medication cabinet until he was able to return it to the pharmacy.  The Department, therefore, proved by a preponderance of the evidence that Mr. Vigil's decision to store expired patient prescription medications in his desk instead was not the proper way to "segregate and hold," and was a violation of the Manual and the Disposal of Unusable Products Policy.

### Timeline to Return to Pharmacy

For summary of evidence purposes, the Department failed to prove there was any timeline for returning expired medications to the pharmacy.  Again, BHI's Disposal of

Unusable Products Policy says "[u]nusable products shall be segregated and held *until able to return*" (emphasis supplied). (Ex. 5, Disposal of Unusable Products Policy, Procedures Section III(A); *see also* Tweed, Aragon; Smith.)  And no additional policy language, testimony, or other evidence was provided at Hearing to indicate a time limit.  (Hearing, *generally*.)

Ms. Aragon essentially testified that, as long as the expired medication was held in the bottom drawer of the medcart so it would not be re-dispensed, it did not matter when it was returned to or retrieved by the pharmacy. (Aragon.)  And Mr. Vigil's ALF dayshift supervisor predecessor, Mr. Valdez, testified that he had kept expired medication segregated for as long as two weeks. (Valdez.)  So there is no evidence that Mr. Vigil violated any time limit by storing the expired medication for an extended period of time.

### Mitigating Factors

While the Department proved by a preponderance of the evidence that Mr. Vigil violated the Disposal of Unusable Products Policy by storing expired patient medications in his desk cabinet, there are numerous mitigating factors that lessen Mr. Vigil's culpability here.

First, Mr. Vigil removed expired medications from the medcart *for the safety of the residents*.  (Vigil; Schaefer; Ex. 16; *see also* Swan.)  Mr. Vigil explained,

> [T]he motto of the State Hospital is that it be there for the care, safety, and welfare of the client.  And I was there for the care, safety of the patient.  That's putting them in harm by leaving that medication in there... The safety of the patients to me is the most important thing there is on those Units... All I was doing was my job... [M]y priority is the patients.  The patients come first.  That's what we were taught in this campus....
> (Vigil.)

Mr. Vigil testified that he was afraid staff would inadvertently administer to the residents any expired medication that was left in the medcart.  (Id.; *see also* Valdez.)  And Mr. Vigil provided evidence that his fear of staff giving residents the wrong medication was real.  He explained that,

61

in the past, staff members had placed expired medications in the bottom drawer of the medcart, and then staff who were not paying attention had moved the expired medications from the bottom drawer back into the patients' active medication bins:

> [W]hat was going to happen, and had happened in the past, is that other staff would come in, and they're doing their thing here, and they go and open the drawer and they pull out the medication and they don't really look… Nobody kind of reads the label. They see the name and they kind of see that it's a benzotropine 10 mg, but they don't look at the date… And you're going to have them administering the expired meds to the resident. And I'd go in and I'd find the expired meds inside the [active] bin, all over again….
> (Vigil.)

He also pointed out that, at the time at issue, there were five new Psych Techs on the Unit, all very inexperienced. (Id.) And he described an incident where ALF PT staff member Jimmy Lopez removed the wrong medication packet from the medcart and administered the wrong medication to a resident just a month before the incidents at issue here. (Id.; Ex. L.)

Mr. Vigil also explained that the bottom drawer of the medcart already housed extra patient medication. (Vigil.) And placing both extra and expired medications in the same drawer seemed like a recipe for medication errors. (Id.) Ms. Aragon suggested that expired medication would be separately identifiable, explaining that expired medication was to be placed in a plastic bag and 'for disposal' written on the bag prior to being placed in the bottom drawer. (Aragon; Ex. 16.) She also testified that there were actually two, separate drawers at the bottom of the ALF medcarts, one for extra medications and the other for expired or discontinued patient medications. (Aragon.) But Mr. Vigil testified that the extra medication and the expired medication were both placed in similar plastic bags and would have all been mixed together in the bottom drawer. (Vigil.)

The ALJ finds that Mr. Vigil's concerns were reasonable. Interestingly, his concerns were in keeping with another provision of BHI's own Disposal of Unusable Products Policy:

62

PHARMACY STORAGE OF UNUSABLE PRODUCTS

A.  The pharmacy shall store unusable products in specially designated areas to prevent
their distribution or administration and dispose of safely.  They shall not be returned
to active pharmacy or patient stocks.
(Ex. 5, Disposal of Unusable Products Policy, Procedures Section II(A).)

Although this particular Policy provision is not at issue in this case, as it is geared more toward

pharmacy personnel than Psych Techs, like Mr. Vigil (*see* Smith), it certainly suggests that it is

not best practices to store unusable medications and extra stock medications together.

Mr. Vigil's consistent, sincere reports and testimony that his priority was the safety of the

residents and that he removed expired medication from the medcart to ensure the residents' safety

are credible.  (Vigil; Ex. 16; *see also* Schaefer, Swan, Ex. 17.)  The ALJ finds that Mr. Vigil

removed the two expired medications at issue here from the medcart to safeguard the ALF

residents.

Second, Mr. Vigil had the two expired medications in a ***secure location***.  As mentioned,

he stored them in his locked desk cabinet in his locked office. (*Supra*, pp. 33-35; *concur* Tweed,

Aragon.)  Mr. Vigil did not know there was play in his locked desk cabinet doors.  (Vigil.)  But

even with that vulnerability, Mr. Vigil's storing the medications in his *locked office* was still an

effective way to segregate and hold the medications somewhere they would not be re-dispensed to

the residents and the residents could not access them.  So while it might not have been BHI's

preferred location, it was a sufficiently secure location.  Indeed, as Mr. Vigil pointed out, other

than the medcart, his desk cabinet was the only other locked cabinet he had.  (Id.)

Third, Mr. Vigil was ***following the practice established by his predecessors***.  When Mr.

Vigil removed expired medications from the medcart and stored them in his locked desk cabinet,

he was following the practice established by his day shift PTS predecessor, Manuel Valdez, as

well as his evening shift PTS predecessor, Connie Solano. (Id.; Valdez.)  Mr. Vigil claims that he

learned to place expired meds in his desk cabinet by observing and working with these other supervisors. (Vigil.) He testified, "That's what I was taught to do. I wasn't taught that it was wrong. Wasn't aware that it was wrong. And I didn't think it was wrong." (Id.)

According to Mr. Vigil, Ms. Solano specifically instructed him *not* to put expired medications in the medcart because some staff member would come along and administer them. (Id.) And former PTS Valdez explained that it was his "job as a supervisor to make sure that the residents don't get what they're not supposed to be taking." (Valdez.) Mr. Valdez confirmed that it had been his practice to remove expired medications from the medcart entirely and store them either in his locked desk or a locked filing cabinet in the Supervisors' Office, before returning them to the pharmacy. (Id.) He went on:

> [T]hings happen and there are med errors, which means that somebody would get somebody else's med. So not going to say that happened all the time, but it happens… And so in order for me to do my best to assure the safety of the residents, you can only do so much, but that was one of the practices that I did… This is an extra step I'm going to take to make that somebody doesn't get sick or die….
> (Id.)

Mr. Valdez also testified that he learned this practice from his own dayshift supervisor predecessor and a previous evening shift supervisor, and that he was never taught anything different or told he was doing anything wrong. (Id.)

Mr. Valdez confirmed that, prior to his retirement, Mr. Vigil worked with him on dayshift to assist and learn the responsibilities of the position. (Id.) Mr. Valdez also testified that if he placed expired medications in his desk cabinet during dayshift, he would make sure to tell the oncoming evening shift supervisor. (Id.) As Mr. Vigil was evening shift supervisor for some of the time Mr. Valdez was dayshift supervisor, it is likely that Mr. Valdez conveyed his practice to Mr. Vigil in this way as well.

So whatever the Disposal of Unusable Products Policy and the Manual stated, the practice in place at the time Mr. Vigil became PTS was for the PTS to lock expired meds in his desk cabinet until they could be returned to the BHI Pharmacy.  And Mr. Vigil appears to have been simply following that practice.

Fourth, Mr. Vigil's *supervisor knew* he was holding on to the expired medication.  In this particular instance, Mr. Vigil told his administrative supervisor, CBS Director Corinne Dominguez, he would hold onto the expired prescriptions until they could meet again.

As already described, Mr. Vigil had earlier requested and been granted a meeting with Ms. Dominguez.  (Vigil; *supra*, p. 33.)  At that meeting, he discussed with Ms. Dominguez that PTS Tina Gurule was not doing her job looking after the residents and that he was finding expired and discontinued medications in the medcart.  (Id.)  Mr. Vigil claims he told Ms. Dominguez that next time he found an expired medication he was going to segregate and hold it to show her.  (Vigil.)

On June 1, Mr. Vigil found more expired meds in two patients' active medication bins.  (Id.)  Mr. Vigil testified that he called Director Dominguez, spoke to her directly and let her know he had more expired medications to show her when she had time to meet again, and also let her know he was not feeling well and was leaving to go see the doctor.  (Id.)  He claims he also told Ms. Dominguez that he was putting the expired medications in his desk cabinet in his office.  (Id.)

Ms. Dominguez was called as a witness at Hearing, and offered no testimony disputing Mr. Vigil's claim of telling her he would hold onto the expired medications until they could meet.  (*See* Dominguez.)  She did, however, testify that it would never be appropriate for a PTS to store medications in a locked cabinet in his office.  (Dominguez.)

The preponderance of the evidence, therefore, is that Mr. Vigil was holding these particular expired prescription bottles with Ms. Dominguez's knowledge.  That is not to say Ms. Dominguez

knew he was holding them in his locked desk cabinet, but she did know he was holding onto them to show her before returning them to the pharmacist. (Vigil.) Given that his supervisor condoned his holding onto the expired medication for an extended period of time and given his concerns about leaving expired medication in the medcart, storing the expired medication in his locked desk in his locked office seems like a reasonable decision.

In sum, the Department proved by a preponderance of the evidence that Mr. Vigil violated the Disposal of Unusable Products Policy by storing expired patient medications in his desk cabinet. And Mr. Vigil's violation of Policy is misconduct. However, the fact that Mr. Vigil: 1) removed the two expired medications from the medcart to protect ALF residents, 2) securely stored the two expired medications in his desk cabinet in his locked office, 3) was trained by his predecessors to store expired medications in his desk cabinet, and 4) told his supervisor he would hold onto the expired medications until they could meet significantly lessen the seriousness of his violation.

### *Three Expired Patient Prescriptions in Cubby Locker*

One would expect the analysis of the three expired patient prescriptions found in Mr. Vigil's cubby locker to be the same as of the two expired patient prescription medications found in his desk cabinet. But there is one critical difference: Mr. Vigil claims that he did not put the expired medications in his cubby locker. (Vigil; Schaefer; Ex. 16.) He agrees that the locker was his, but suspects that someone else planted the three expired medications in it. (Id.; Ex. 17.)

On one hand, Mr. Vigil's suspicion is somewhat plausible, given that: 1) he readily admitted to putting the other two expired patient prescription medications in his desk cabinet and presumably would have taken responsibility for also putting expired medications in his cubby locker, if he had done so in a similar effort to ensure resident safety (*see* Vigil); and 2) he had not

been getting along with ALF graveyard shift staff or graveyard supervisor Tina Gurule (Vigil; *supra*, pp. 32-33), and the second anonymous letter making allegations against him was written by someone familiar enough with his habits and personal areas to know he had a cubby locker with a "yellow lock" (Ex. 16; *supra*, p. 37).

But on the other hand, the fact that Mr. Vigil deliberately removed expired medications from the medcart and stored them in other secure areas of BHI on other occasions suggests he did the same thing here. (Vigil.) It is also undisputed that these three expired medications were found in a cubby locker securely locked with Mr. Vigil's personal lock. (Id.; Schaefer; Exs. 16, 22-22, 22-24; *see also* Ex. 22-23.) At Hearing, Mr. Vigil pointed out that he kept the key to that yellow lock on his key ring and would leave his keys at the front of ALF for extended periods of time, and went on to suggest that someone who wanted to harm him could have taken his keys and placed the expired medications in his locker. (Vigil.) Alternatively, he theorized that someone could have used a bolt cutter to remove his yellow-trimmed lock, place the expired medications in his locker, and then put an identical replacement lock on his locker. (Id.) While of course these ideas are possible, they seem farfetched.

What is known is that three bottles of expired patient medication were discovered in Mr. Vigil's locked cubby locker. Under these circumstances, the ALJ finds it is more likely than not that Mr. Vigil knew or should have known those expired medications were being stored there.

So here again, the Department proved by a preponderance of the evidence that Mr. Vigil violated the Disposal of Unusable Products Policy and the Manual by storing expired patient medications somewhere other than in the bottom drawer of the medcart. (Ex. 5.) Again, Mr. Vigil's violation of Policy is misconduct. However, again, there are mitigating factors that lessen the seriousness of Mr. Vigil's violation – namely that Mr. Vigil learned from his predecessor not

to leave expired medications in the medcart, and that the three expired medications were securely stored in Mr. Vigil's locked cubby locker where patients could not access them.

**Violation of Incident Reporting and Notification Policy**

The NFA also alleges that Mr. Vigil violated BHI's Incident Reporting and Notification Policy. (Ex. 15.)  Specifically, it alleges that Mr. Vigil failed to complete Medication Incident Reports.  (Id.)  The ALJ agrees, but again finds that mitigating factors lessen the severity of the violation.

The purpose of BHI's Incident Reporting and Notification Policy is "to establish a consistent, uniform, organization-wide process for the reporting requirements for all incidents at NMBHI."  (Ex. 7, Incident Reporting and Notification Policy, Purpose Section.)  The Policy applies to all BHI employees. (Ex. 7, Incident Reporting and Notification Policy, Applicability Section.) The specific portion of the Incident Reporting and Notification Policy cited in the NFA as violated by Mr. Vigil is as follows:

> PROCEDURES
> IV.  Specific incidents will be reported on specialized forms, these include the following:
> ...
> I.  MEDICATION INCIDENT REPORT FORM – For all documentation of medication incidents, errors, occurrences, etc. staff must complete the NMBHI Medication Incident Report form.
> (Ex. 15; Ex. 7, Procedures Section IV(I).)

There is minimal evidence in the record of precisely what constitutes a "medication incident, error, or occurrence."  The Policy itself, however, defines "Incident-Internal" as:

> Any event that is inconsistent with desired outcomes or the routine operations of the [BHI] involving clients-patients-residents, staff…. These events include, but are not limited to… deviation from policy or regulations, rule violations… safety hazards or the probability of imminent harm to [BHI], its clients-patients-residents, residents and property.
> (Ex. 7, Incident Reporting and Notification Policy, Definitions Section.)

68

Taken together, the referenced purpose, applicability, procedure, and definition suggest that BHI employees are required to complete a Medication Incident Report Form when there is a medication-related deviation from policy, as well as when there is a medication-related safety hazard for BHI patients.

Hydrocodone and Clonazepam

Again, there was no policy prohibiting Mr. Vigil from storing his personal prescription Hydrocodone in his personal locker (Tweed; *supra*, p. 46). In addition, the Hydrocodone was securely locked in his blue locker, inaccessible to ALF residents (Schaefer; Exs. 16, 22-18, H-1; *see also* Ex. 22-30; *supra*, p. 37). There would, therefore, have been no reason for Mr. Vigil complete a Medication Incident Report about the Hydrocodone.

And again, the Department failed to prove by a preponderance of the evidence that Mr. Vigil knew about the single Clonazepam tablet in his desk cabinet (*supra*, pp. 50-52). Mr. Vigil, therefore, cannot reasonably have been expected to complete a Medication Incident Report about the Clonazepam tablet either.

Expired Medications

What remains then are the two expired patient medications Mr. Vigil placed in his desk cabinet (Vigil) and the three expired patient medications he knew or should have known were in his cubby locker (*supra*, pp. 66-68).

*Medication-Related Deviation from Policy*

On cross-examination, both former DON of CBS Cathy Aragon and CBS RN Supervisor Jeanne Moore testified that there is no requirement for PT staff to complete a Medication Incident Report when they simply remove and store expired patient medication. (Aragon; Moore.) But they meant that no Medication Incident Report was necessary when expired

patient medication was removed and stored *according to policy*, which was not the case here. Former CBS Director Dominguez, on the other hand, testified that if she had learned Mr. Vigil (or Mr. Valdez) was storing expired medication in his desk or work locker, she would have filed an incident report. (Dominguez.)

The Department proved by a preponderance of the evidence that Mr. Vigil's storage of expired patient medications in his desk and cubby locker, rather than in a locked medication cabinet, were violations of the Manual and the Disposal of Unusable Products Policy. (*Supra*, pp. 54-68.) Mr. Vigil, therefore, should have completed Medical Incident Reports concerning these medication-related deviations from Policy. That he did not was technically a violation of the Incident Reporting and Notification Policy.

The severity of Mr. Vigil's violation of the Policy was mitigated here, however, by the fact that the established practice in the ALF Unit was for the PTS to remove expired patient medications from the medcart entirely and lock them in his desk cabinet. (Vigil; Valdez.) Mr. Vigil knew or should have known that he was required by Policy to store expired patient medication in the bottom of the medcart, but it is difficult to find his failure to complete a Medication Incident Report particularly egregious when he was following established ALF Unit practice for the handling of expired medications.

### *Medication-Related Safety Hazard for BHI Residents*

Mr. Vigil testified that he found the two expired medications in two patients' active medication bins and removed them from the medcart because he was concerned the expired medication would inadvertently be administered to them. (Vigil.) "That's putting them in harm by leaving the medication in there." (Id.) In other words, by his own admission, Mr. Vigil discovered a medication-related safety hazard for ALF residents. (Id.) He should have completed

a Medication Incident Report for this as well.  His failure to do so was another violation of the Incident Reporting and Notification Policy.

Mr. Vigil's violation of the Policy was somewhat mitigated here, by the fact that he told his supervisor, CBS Director Corinne Dominguez, that he had found more expired patient medication in the medcart.  (Id.)  It is to his credit that Mr. Vigil directly reported his discovery to his supervisor.  But given Mr. Vigil's repeated testimony about the safety hazard posed to the ALF residents by expired medications in the medcart, he should have also completed a Medication Incident Report as required by Policy.

In sum, the Department proved by a preponderance of the evidence that Mr. Vigil violated BHI's Incident Reporting and Notification Policy when he failed to complete Medication Incident Reports on: 1) his storing expired patient medications in his desk and cubby locker, in violation of Policy, and 2) his discovery of expired medications in patients' active medication bins, a safety hazard for those ALF residents.  But his violation of the Policy is mitigated by the fact that: 1) the established practice in the ALF Unit was for the PTS to lock expired patient medications in his desk cabinet until it could be returned to the pharmacist, and 2) he reported finding expired medication in the patients' active medication bins to his supervisor.

**No Violation of Clothing Allowance Policy**

The NFA also alleged that Mr. Vigil violated the Clothing Allowance Policy.  (Ex. 15.) Specifically, it alleges that he "failed to properly handle patient monies associated with their clothing allowance by retaining possession of the monies."  (Id.) The ALJ disagrees.

The specific portion of the Clothing Allowance Policy cited in the NFA as violated by Mr. Vigil concerns its time constraint:

PROTOCOL
    i. Staff are expected to comply with the protocol listed below and it must be accomplished within an eight (8) hour shift.
       (Id.; Ex. 8, Clothing Allowance Policy, Protocol Section 1.)

Background

To accurately analyze whether or not Mr. Vigil violated this part of this Policy, some background information is required first.

Under the Clothing Allowance Policy, the CBS Division of BHI provides each ALF resident with a biannual clothing allowance of $150 for winter and spring purchases. (Ex. 8, Clothing Allowance Policy, Policy Section; *see also* Aragon, Martinez, Valdez, Dominguez.) According to the Policy, to avoid commingling client funds, BHI's Financial Management Department is to issue one $150 check at a time. (Ex. 8, Clothing Allowance Policy, Policy Section; *see also* Aragon.) Also according to the Policy, within an 8-hour shift, the primary PT staff and/or the PTS are then expected to:

    a) complete a clothing inventory for the resident to identify his or her clothing needs,
    b) complete a request for a $150 check from Financial Management,
    c) Receive the $150 check from Financial Management,
    d) Go to the bank to cash the check,
    e) Take the resident shopping or perform shopping for the resident at a local store,
    f) Verify what has been purchased against receipts, and
    g) Deliver receipts and any unused funds to Financial Management.
    (Ex. 8, Clothing Allowance Policy, Protocol Section 1(a)-(g).)

Importantly, the Policy also states, "*[w]hen receipts or unused funds are returned to Financial Management another check will be issued for another [ALF] resident.*" (Ex. 8, Clothing Allowance Policy, Policy Section, emphasis supplied.) In other words, a plain reading of the Policy indicates that only one resident's clothing allowance funds should be disbursed at a time. (Id.)

In reality, the ALF Unit's Clothing Allowance process was vastly different than the one outlined by Policy. Both Mr. Vigil and his dayshift supervisor predecessor, Mr. Valdez, testified that typically Financial Management would issue the $150 checks for all the residents at the same time. (Vigil; Valdez.) Mr. Vigil, and Mr. Valdez before him, would then take the residents out to do their shopping as time permitted. (Id.) Mr. Vigil testified that "you tried to do it... as soon as possible, when you can, as soon as possible. That was my understanding." (Vigil.)

According to both Mr. Vigil and Mr. Valdez, it was impossible to complete shopping for all the ALF residents in one day due to residents' appointments, short staffing, residents' unwillingness, and logistics. (Id.; Valdez; *see also* Aragon, Martinez, Dominguez.) Mr. Valdez elaborated:

> You could never do all the shopping at one time. Number one, each one of those vehicles, like the vans, if they held 10 or 12 residents, then you automatically know they're not all going to fit on those vans, plus the staff it takes to supervise them. And then again, it takes a while. And because some days we're short staffed. So to answer your question, we would do it taking 4-5 residents at a time. They'd come back. We'd take another group. And sometimes it would take a week or two. It would just all depend on how fast the process was, how many people we had staffed, if they didn't pull any staff out of the Units to cover other units.
> ...
> In the time that I did it, there was never a time that we would be able to shop for all the residents on the same day. Even taking the day shift and evening shift, there was no way.
> (Valdez.)

Mr. Valdez also testified that he kept any unspent funds and receipts from the clothing allowance in separate envelopes for separate residents in his locked office desk. (Id.) When all the shopping was completed he would return all the receipts and any remaining funds to the Finance Department at the same time. (Id.) He performed the clothing allowance process this same way for the 3-plus years he was dayshift supervisor and was never counseled, warned, reprimanded, or otherwise told he was doing it wrong. (Id.)

73

During her investigative interview on June 16, Ms. Edmunson, the Finance Cashier responsible for disbursing clothing allowance funds during Mr. Valdez' tenure as ALF supervisor, confirmed that in the past, clothing allowance money and receipts were returned to her after all the shopping was done. (Ex. 16.)   Finance Director Darlene Martinez testified that it is the responsibility of the Finance Cashier to follow up on clothing allowance disbursements that have been out for an extended period of time. (Martinez.) But Mr. Valdez testified that not once during his three years handling the clothing allowance process was he contacted by Evelyn or anyone else from Financial Management or the Cashier's Office asking him to return the clothing allowance funds.

So, at the time Mr. Vigil became ALF dayshift supervisor, the established practice was to take residents shopping as practicable and hold onto all clothing allowance funds, change, and receipts in separate patient envelopes until it was completed. (Vigil; Valdez.)

Spring 2015

In Spring 2015, the time relevant to this appeal, the actual clothing allowance process was even one step further removed from the Clothing Allowance Policy. At that particular time, the BHI Finance Cashier disbursed the combined clothing allowance for 14 ALF residents as two lump sum checks, one for $900 on or around May 4 and one for $1200 on or around May 7. (Vigil; Martinez; Ex. 16.)

Mr. Vigil testified that he directed staff to go cash the checks at the bank and that he was only partway through with the shopping at the time of the incidents underlying this appeal. (Vigil; *see also* Ex. 16.)   Consistent with that, when BHI personnel and law enforcement searched Mr. Vigil's desk area in early June, they found numerous Southwest Capital Bank envelopes in his desk cabinet and drawer, most marked with a resident's name or initials. (Tweed; Chavez; Exs.

16, 18, 22-1.) This is corroborated and fleshed out by the warrant application Return and Inventory, which lists the items confiscated from Mr. Vigil's desk area by the Sheriff's Office on June 5, 2015. (Ex. 18; *see also* Ex. 16.) In relevant part, the confiscated items included:

> From Mr. Vigil's locked desk cabinet, five Southwest Capital Bank envelopes:

>     a.   Three with no name, each containing $150;
>     b.   One with name H.A. containing $150; and
>     c.   One with name L.C. containing $150.

> And from Mr. Vigil's desk drawer, nine additional Southwest Capital Bank envelopes:

>     d.   One with name P.J. containing receipts;
>     e.   One with name R.H. containing $8;
>     f.   One with name S.R. containing $6.64 and receipts;
>     g.   One with name J.F. containing $2.75 and receipts;
>     h.   One with name K. containing $.70;
>     i.   One with name F.J. containing receipts;
>     j.   One with name C.J. containing $1.11 and receipts;
>     k.   One with name H.G. containing $2.31 and receipts; and
>     l.   One with name J. containing $5.08 and receipts.
> (Id.; *see also* Exs. G-1, G-3 – G-4.)

According to Finance Director Darlene Martinez, Finance Cashier Edmunson claimed she contacted the ALF Unit to follow up on the outstanding Spring 2015 clothing allowance funds, but could produce no log or other documentation supporting her claim. (Martinez.) And it is worth reiterating that this was the same Finance Cashier who Mr. Valdez claimed did not follow up with him on outstanding clothing allowance funds during his time as ALF PTS. (Valdez; Ex. 16.)

Appellant Vigil's Explanation

Mr. Vigil explained to Investigator Schaefer and repeated at Hearing that he had not completed the clothing allowance process because the ALF Unit was short staffed. (Vigil; Schaefer; Ex. 16.) Mr. Vigil even recalled asking evening shift supervisor Jesse Montoya for help completing the shopping, but Mr. Montoya flatly refused due to a shortage of available staff. (Vigil.)

Mr. Vigil also explained that he only intended to safeguard the monies until the shopping was completed and he could return all the receipts and change at the same time, so he would not have to make multiple trips back to the Finance "cage," which was on the other side of the BHI campus. (Id.; Schaefer; Ex. 16.)  In her investigative interview, ALF PT-Operational Joleen Ortiz corroborated Mr. Vigil's explanation, reporting that they had not finished the clothing allowance shopping because the last few weeks had been very busy with medical appointments and that the clothing allowance receipts and change would go back to Finance as soon as they were finished with the shopping.  (Ex. 16.)

In sum, the Department failed to prove by a preponderance of the evidence that Mr. Vigil violated the Clothing Allowance Policy.  The premise of that Policy is that the clothing allowance process will be completed for *one* resident at a time.  The Department strayed from the Policy when it disbursed two lump sums of $900 and $1200 for the clothing allowance for all 14 ALF residents. (Martinez.)  For the Department now to turn around and expect Mr. Vigil to have carried out the clothing allowance process for multiple residents within the same 8-hour time period the Policy permits for one resident is unreasonable.  Indeed, by disbursing funds for more than one resident at one time, the Department failed to create the precondition to even trigger the Policy and its 8-hour time limit.  Under these circumstances alone, Mr. Vigil cannot have violated the Clothing Allowance Policy.

Moreover, Mr. Vigil was, again, merely following the practice he learned from his predecessor, Manuel Valdez – holding the clothing allowance funds and receipts for each resident in its own envelope, and waiting until the shopping was complete before returning them to the Finance Department.  (Vigil; Ex. 16.)  There is no evidence Mr. Vigil was ever warned this practice was improper.  (Martinez; Hearing, *generally*.)

Also, it is worth reiterating that Mr. Vigil claims he was not familiar with the Clothing

Allowance Policy. (Vigil; Exs. 14, 16.)  And the Department provided no evidence at Hearing

indicating that Mr. Vigil had reviewed the Clothing Allowance Policy specifically.  (Ex. 20;

Hearing, *generally*; *supra*, p. 28.)  This supports the idea that he was conducting the clothing

allowance process on the practice he had learned alone.

At Hearing, when Mr. Vigil was asked to review the Clothing Allowance Policy, he stated:

> I don't remember really seeing this, but it kind of makes more sense… that we
> go get $150 for the resident and go shopping with the resident one at a time…
> No, I have never seen this one… "Staff are expected to comply with the protocol
> listed below and it must be accomplished within an eight hour shift…." I would
> have brought it to my supervisor's attention… This particular policy, it would
> make any person fail that policy, just by putting "within an eight-hour shift." It
> could make you fail… I would have right away brought it to my supervisor's
> attention and said, you know what, you're setting me up to fail if you're going
> to expect me to work and do clothing allowance… within an 8-hr shift.
> (Vigil.)

The ALJ agrees.

For all these reasons, the Department failed to prove by a preponderance of the evidence

that Mr. Vigil violated BHI's Clothing Allowance Policy.

## Violation of Disciplinary Action Policy

The NFA alleges that Mr. Vigil violated the DOH Disciplinary Action Policy in two ways

– first, with his possession of unlawful controlled substances; second, with the negligence of his

patient medication- and funds-related actions.  (Ex. 15.)

### Unlawful Controlled Substances

The NFA alleges that Mr. Vigil violated the Disciplinary Action Policy with his possession

of unlawful controlled substances. (Id.)  The ALJ disagrees.

The specific portion of the Policy cited in the NFA as violated by Mr. Vigil is:

III. Policy

...

   B. Offenses

     ...

      3. Group 3 Offenses

        ...

         l. Use and/or possession of alcohol and/or unlawful controlled substances while on work premises or assigned work site.
          (Id.; Ex. 2, Disciplinary Action Policy, Policy Section B(3)(l).)

Again, the only controlled substances found in Mr. Vigil's desk and lockers were Hydrocodone and Clonazepam. (*Supra*, pp. 36, 38, 43-44.) But the Hydrocodone was Mr. Vigil's personal prescription medication, and the Clonazepam was patient medication, which he worked with as part of his job. (Vigil; Tweed; Aragon; Moore; Schaefer; Valdez; Exs. 16, 22-6, G-2, K; Hearing, *generally*; *supra*, pp. 45-47, 49.) It was, therefore, not "unlawful" for him to have either while on work premises. Moreover, as Mr. Vigil did not place the Clonazepam in his desk cabinet and did not know it was there, he did not possess it in a way for which the Department can hold him accountable.[11] Regarding these controlled medications, Mr. Vigil did not violate Paragraph III(B)(3)(l) of DOH's Disciplinary Action Policy.

Negligence

The NFA also specifically alleges that Mr. Vigil violated the Disciplinary Action Policy with the negligence of his patient medication- and funds-related actions. (Ex. 15.) The Disciplinary Action Policy defines negligence as:

> Failing through action or omission to exercise reasonable care in particular circumstances or in making a decision in the course of their employment which negatively impacts operations or results in liability to the Department.
> (Ex. 2, Disciplinary Action Policy, Definitions Section S.)

---

[11] According to Black's Law Dictionary, "Possession" is "[h]aving control over a thing with the intent to have and exercise such control." (Black's Law Dictionary 1163, 6th ed. 1990.) The entry continues, "[a] person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it." (Id.)

And the Policy prohibits:

> 3.  Group 3 Offenses
>
> ...
>
> f.  Conduct occurring on or off the job that is related to job performance and is of such nature that to allow the employee to continue in the assigned position could constitute negligence in regard to the Department's duties to the public, other State employees, or individuals served by the Department.
> (Ex. 2, Disciplinary Action Policy, Policy Section B(3)(f).)

### *Documentation and Disposition of Controlled Substance*

As the Department already failed to prove by a preponderance of the evidence that Mr. Vigil: 1) improperly documented any controlled substance, or 2) improperly disposed of or destroyed any unusable controlled substance, he cannot be found negligent for these actions either. (*Supra*, pp. 48-54.)

### *Disposal of Unusable Non-Controlled Substance*

The Department did prove by a preponderance of the evidence that Mr. Vigil improperly stored expired patient medications in his desk cabinet and cubby locker. (*Supra*, p. 54-68.)  While this violated BHI's Disposal of Unusable Products Policy and the Manual, it does not rise to the level of negligence.  It was Mr. Vigil's practice to remove expired patient medication from the medcart specifically ***for the safety of the ALF residents***, to ensure that no resident would inadvertently take or be given outdated medications.  (*Supra*, pp. 61-63.)  All five expired patient prescriptions at issue were in secure locations, two in his "locked" desk cabinet in his locked office, and three in his locked cubby locker.  (*Supra*, pp. 35-36, 38, 63, 67.)   This is evidence that Mr. Vigil *was* exercising reasonable care.  Rather than negatively impacting BHI's operations or its duties to its residents, Mr. Vigil was trying to ensure patient safety with his actions here.  This is not negligence.

79

### Incident Reporting and Notification

The Department proved by a preponderance of the evidence that Mr. Vigil failed to complete Medication Incident Reports concerning: 1) storing expired medications in his desk and cubby locker, which was a violation of Policy, and 2) discovering expired medications in patients' active medication bins, which he believed was a safety-hazard for the residents. (*Supra*, pp. 69-71.) The ALJ finds that the failure to complete a required Medication Incident Report always suggests a lack of reasonable care and a degree of negligence.

Mr. Vigil's failure to complete a Medication Incident Report on a violation of medication-related Policy negatively impacts BHI's operations and constitutes negligence. However, any negligence is mitigated by the fact that it was the practice in the ALF Unit for the PTS to remove expired medications from the medcart entirely and store them in the desk cabinet in the locked office until they could be returned to the pharmacy. (*Supra*, pp. 63-65, 70.) As Mr. Vigil was following what he knew to be the established practice, it minimizes his negligence in failing to file a Medication Incident Report on his own actions here.

Mr. Vigil's failure to complete a Medication Incident Report about finding expired medications in residents' active medication bins negatively impacts both BHI's operations and its duty to the residents it serves and constitutes negligence as well.  His negligence here is somewhat lessened by the fact that he verbally reported his discovery to his supervisor. (*Supra*, pp. 65-66, 71.) But on balance, given Mr. Vigil's adamant recognition of the safety hazard to ALF residents posed by expired medication in their active medication bins (Vigil), the ALJ finds that reasonable care in these circumstances would have included filing a Medication Incident Report. Mr. Vigil's failure to do so was negligent.

### *Clothing Allowance*

For the same reasons the Department failed to prove by a preponderance of the evidence that Mr. Vigil violated BHI's Clothing Allowance Policy, it also failed to prove that Mr. Vigil was negligent for not completing the clothing allowance process for multiple residents within an 8-hour shift. (*Supra*, pp. 71-77.)

The Department also failed to prove that Mr. Vigil negligently commingled the ALF residents' clothing allowance funds. On the contrary, he took the funds *issued in bulk by BHI*, separated them into $150 increments, and placed each $150 in its own envelope for a single resident. (Vigil; *see also* Schaefer, Exs. 16, 18.) According to Finance Director Darlene Martinez, Mr. Vigil's organizing the funds this way was "best practices" for keeping the residents' funds separate. (Martinez.)

In addition, Mr. Vigil claims, and the Sheriff's Office's Return and Inventory confirms, that Mr. Vigil kept the envelopes with the unused, full $150 clothing allowances in his desk cabinet, which he believed was locked, and the envelopes with the minimal clothing allowance change and receipts in his desk drawer, which did not lock. (Vigil; Exs. 18, 22-1, 22-4; *supra*, p. 75.)

Mr. Vigil used good judgment storing the five envelopes containing the full $150 clothing allowance in his locked desk cabinet. (Id.) The ALJ does question, however, why Mr. Vigil left the clothing allowance change in his unlocked desk drawer. (Id.) Though not a large sum of money – approximately $25 in total – it is unclear why Mr. Vigil would have left any clothing allowance funds in his unlocked drawer, particularly given that he shared an office with ALF graveyard shift supervisor Tina Gurule, who he already believed was trying to get him fired at that point. (Vigil; Ex. 18; *supra*, pp. 32-33.)

Finance Director Martinez testified that it is BHI's responsibility to ensure its residents' monies are kept safe, and that there are security concerns with storing unused clothing allowance funds in personal areas. (Martinez; Ex. 16.) Ms. Martinez and former CBS Director Dominguez both pointed out that there were safes available on the BHI campus where unused clothing allowance funds could be stored securely. (Id.; Dominguez.) There was no safe at the ALF Unit, however, and Mr. Vigil claims he was unaware a drop safe was available at all. (Vigil; Martinez; Ex. 16.) Given that, and given the established practice of holding all the clothing allowance funds until the process was complete, it was reasonable for Mr. Vigil to store the unused funds in his locked desk cabinet until the shopping was finished.

On the contrary, Mr. Vigil's decision to store the clothing allowance change in his unlocked desk drawer allowed for its potential theft. This could have negatively impacted BHI's operations and its duty to its residents, as well as resulted in liability to the Department. In this way, Mr. Vigil's handling of the residents' clothing allowance change was a failure to exercise reasonable care and was negligent.

In sum, Mr. Vigil acted negligently, in violation of the DOH Disciplinary Action Policy, when he failed to complete the required Medication Incident Reports and when he left clothing allowance change in his unlocked desk drawer.

**Violation of Code of Conduct**

Finally, the NFA alleges that Mr. Vigil violated the DOH Code of Conduct with his actions. (Ex. 15.) The specific portions of the Code of Conduct cited in the NFA as violated by Mr. Vigil are as follows:

> III. Policy:
>   A. General Provisions
>       a. Employees shall comply with all federal, state, county and local laws and regulations.

82

b. Employees shall behave in a manner that promotes public confidence in the integrity and impartiality of the State.
(Id.; Ex. 3, DOH Code of Conduct, Policy Section III(A)(a)-(b).)

## Complied with Laws and Regulations

The Department failed to present any evidence of Mr. Vigil violating any federal, state, county, or local laws or regulations. (Hearing, *generally*.)

## Public Confidence in the Integrity and Impartiality of the State

The Department proved by a preponderance of the evidence that Mr. Vigil failed to complete Medication Incident Reports concerning his storage of expired patient medication in his locked desk and cubby locker and his discovery of expired medications in the ALF residents' active medication bins. Despite the mitigating factors at play here, including that it was established ALF practice for the PTS to store expired patient medication in his desk cabinet and that Mr. Vigil reported his discovery of the expired medications directly to his supervisor, the ALJ finds that Mr. Vigil's failure to complete required Medication Incident Reports would diminish public confidence in the integrity of the State.

Similarly, the Department proved by a preponderance of the evidence that Mr. Vigil negligently held patient funds in his unlocked desk drawer. The ALJ finds that Mr. Vigil's negligent handling of these funds would also diminish public confidence in the integrity of the State.

The Department also proved by a preponderance of the evidence that Mr. Vigil held expired patient medication in his desk cabinet in his locked office and his locked cubby locker. But as he did this for the safety of the ALF residents, and held the expired medications in secure locations away from the residents, the ALJ finds his actions here would have promoted, rather than diminished, public confidence in the integrity of the State.

83

Mr. Vigil therefore violated the DOH Code of Conduct when he failed to complete the required Medication Incident Reports and when he stored patient funds in his unlocked desk drawer.

## DISCIPLINE OF DISMISSAL WAS NOT REASONABLE

The Department decided to dismiss Mr. Vigil after he was arrested and criminally charged with possession of medications found in his desk cabinet and blue locker. (Exs. 12, 15, C-2, C-3.) It is hard to imagine those events did not influence the Department's decision to terminate him. Two-and-a-half years later, however, Mr. Vigil was acquitted of all charges. (Ex. C-5.)

Mr. Vigil's dismissal was also based on the premise that all the just-cause allegations in his NFA were unequivocally supported. But that is far from the case. Mr. Vigil had prescriptions for the Hydrocodone, there is no preponderance of evidence that he knew about the Clonazepam tablet, he held on to expired patient medication to protect the ALF residents, and he did his best to complete the clothing allowance process for multiple residents at one time. The Department failed to prove by a preponderance of the evidence that Mr. Vigil violated DOH's Drug and Alcohol-Free Workplace Policy, BHI's Controlled Substances Administration Records Policy, or BHI's Clothing Allowance Policy.

Rather, the Department proved by a preponderance of the evidence that it had just cause to discipline Mr. Vigil for only a limited subset of the allegations brought against him. It therefore remains necessary to determine whether the Department's dismissal of Mr. Vigil was reasonable in light of his proven misconduct.

To summarize, the Department proved by a preponderance of the evidence that Mr. Vigil:

- Improperly held expired patient medication in his desk cabinet and cubby locker;
- Failed to complete Medication Incident Reports on his own improper storage of the expired patient medication and his discovery of expired medication in ALF residents' active medication bins; and

- Improperly handled approximately $25 of patient funds by storing the clothing allowance change in his unlocked desk drawer.

These actions were violations of policy and constituted misconduct.

But Mr. Vigil's misconduct and policy violations were mitigated by the following facts:

- It was established practice in the ALF Unit for the PTS to store expired patient medication in his desk cabinet until it could be returned to the pharmacy;
- Mr. Vigil followed this practice to ensure the safety of the ALF residents;
- Mr. Vigil held the expired medications in secure locations – the ostensibly locked desk cabinet of his locked office and in his locked cubby locker; and
- Mr. Vigil reported his discovery of expired patient medication in ALF residents' active medication bins directly to his supervisor, CBS Director Dominguez.

In addition, while Mr. Vigil previously received a LOR (Letter of Reprimand) from DOH, it was for unprofessional conduct in his interactions with a staff member. (Ex. 21.) Because these allegations were not similar in any way to those currently against him in this matter, that previous discipline cannot serve as progressive discipline here.

After significant consideration, the ALJ concludes that Mr. Vigil's misconduct and policy violations are simply insufficient to warrant his dismissal, particularly in the absence of any related progressive discipline. (*Selmeczki* at ¶ 20; *Martinez* at ¶ 42.) Rather, based on Mr. Vigil's limited proven misconduct and the referenced mitigating factors, the more reasonable, appropriate, and proportional sanction to impose upon Mr. Vigil is a 30-day suspension.

## VI.   RECOMMENDED FINDINGS OF FACT

### It was proved by a preponderance of the evidence that:

1. Mr. Vigil was first hired by BHI in 1999, became the ALF Unit Psych Tech Supervisor for evening shift in or around 2011, and became the ALF Unit Psych Tech Supervisor for dayshift in or around 2013. (Vigil; Tweed; Aragon; Ex. 16.)

2. Mr. Vigil held the dayshift Psych Tech Supervisor position at the time of the incidents underlying this appeal. (Id.)

3. When Mr. Vigil was Psych Tech Supervisor, CBS Director Corinne Dominguez was his administrative supervisor; CBS Director of Nursing Cathy Aragon was his clinical

supervisor, until she retired in April 2015; and Executive Nurse Administrator Frances Tweed was also in his chain of command.  (Tweed; Aragon; Dominguez; *see also* Valdez.)

4. On June 6, 2007, Mr. Vigil signed an acknowledgment of DOH's Code of Conduct (HR 015), acknowledging that he received, read, understood, and would follow that Code. (Exs. 3, 10.)

5. On October 31, 2014, Mr. Vigil signed an acknowledgment of DOH's Disciplinary Action Policy (HR 08:10), acknowledging that it was his responsibility to read, understand, and comply with that Policy; that if he had questions about the Policy he would consult with his supervisor or HR staff members; and that violation of the Policy may result in disciplinary action up to and including dismissal.  (Exs. 2, 10.)

6. Mr. Vigil confirmed he was familiar with BHI's Disposal of Unusable Products Policy (PHM 060) when he was working; he also signed his Psych Tech Annual Review on March 19, 2015, indicating he reviewed BHI policies in general in December 2014, and signed his Skills & Knowledge Checklist on December 12, 2014, indicating he had reviewed the Pharmacy policies relevant to Psych Techs.  (Vigil; Exs. 11, 16, 20; *see also* Aragon.)

7. Mr. Vigil's familiarity with BHI's Incident Reporting and Notification Policy is indicated by the same Psych Tech Annual Review he signed on March 19, 2015, which shows he reviewed BHI policies in general in December 2014 and had an education session specifically on Incident Reporting policies on December 17, 2014.  (Ex. 20.)

8. At the time relevant to this appeal, the ALF Unit on the BHI campus consisted of two cottages located next to each other, El Paso and Mesa.  (Tweed; Aragon; Chavez; Exs. 16, I-1; *see also* Valdez.)

9. The ALF Unit is part of BHI's Community Based Services and is an out-patient program; ALF residents live on BHI premises, but are considered out-patients. (Tweed; Aragon; Moore; Smith; Valdez.)

10. ALF Unit Psych Tech Supervisors and staff are trained to assist ALF residents in the self-administration of their medications.  (Tweed; *see also* Valdez, Ex. K.)

11. ALF Psych Tech staff can retrieve medication for the residents, hand medication bottles to residents, and help the residents open medication bottles, but the residents are supposed to take the medication on their own.  (Tweed; Aragon; Moore; *see also* Valdez.)

12. Each ALF Cottage had a locked medroom in its nurses' station, and within each locked medroom was a locked medcart.  (Vigil; Tweed; Aragon; Dominguez; Smith.)

13. The medcarts had a locked top drawer for residents' narcotics/controlled medications; a middle section of residents' individual drawers/bins, for their active, non-controlled medications; and two bottom drawers, for extra medication and for expired medications. (Vigil; Tweed; Aragon; Valdez.)

14. Psych Tech Supervisors and staff had access to the medroom and the medcart, but the residents did not. (Aragon.)

15. At the time of the incidents underlying this appeal, Mr. Vigil shared an office (Supervisors' Office) with ALF evening shift Psych Tech Supervisor Jesse Montoya and ALF graveyard shift Psych Tech Supervisor Tina Gurule. (Vigil; Chavez; Schaefer; Ex. 16.)

16. The Supervisors' Office door locked. (Tweed; Chavez.)

17. Prior to the incidents at issue, Mr. Vigil developed conflicts with certain ALF graveyard staff and ALF graveyard Psych Tech Supervisor Tina Gurule, and he believed that these co-workers were trying to get him fired. (Vigil; Schaefer; Exs. 16, 17.)

18. On May 27, 2015, Mr. Vigil received a Letter of Reprimand for the unprofessional conduct of yelling at and using bad language toward an ALF graveyard staff member when he caught her sleeping. (Exs. 15, 21.)

19. Mr. Vigil submitted a rebuttal to the LOR that same day and later made a complaint to HR claiming that the allegations in the LOR were not true – that he had caught the staff member sleeping, but did not yell bad words at her – but the LOR was not rescinded. (Vigil; Exs. 17, J.)

20. On or around May 29, 2015, an anonymous letter was sent via BHI inter office mail, one copy each to BHI C.O.O. Charles Jaramillo, BHI Assistant Director of HR Richard Vigil, and BHI Standards and Compliance Director Rose Contreras, stating:

> I was told and everybody knows that superviser john vigil has a lot of bottels of the patients meds in his desk, and some are ativans and narcotics locked away. Also hundreds of dollars of there money to. John vigil is the psych tech superviser at the arches. We will send to HR patient avocate and investegations. You cannot tell him how you found out cuase he will know who send this letter.
> (Ex. 16; *see also* Tweed.)

21. BHI Security Director Joe Chavez located the key to unlock the Supervisors' Office door. (Chavez; *see also* Tweed.)

22. On June 3, 2015, Executive Nurse Administrator Frances Tweed, Internal Review Director Antonio Coca, and Security Director Joe Chavez conducted a search of Mr. Vigil's office desk area in El Paso Cottage.  (Tweed; Chavez; Schaefer; Ex 16.)

23. Mr. Vigil's desk cabinet was secured with its own combination lock, but there was still enough play in the cabinet doors that they could be pulled open a couple of inches.  (Id.; Ex. 22-2.)

24. Mr. Vigil believed that his desk cabinet was securely locked.  (Vigil.)

25. Found in Mr. Vigil's locked desk cabinet, in relevant part, were:
    - two prescription bottles of Risperidone for two BHI patients, both of which were expired;
    - a small paper medication cup with a single tablet of Clonazepam inside; and
    - some Southwest Capital Bank money envelopes.
    (Tweed; Chavez; Schaefer; Exs. 16, 22-3 – 22-6; *concur* Exs. 18, C-1, G-1 – G-2.)

26. The June 3 search party also found additional Southwest Capital Bank envelopes in one of Mr. Vigil's unlocked desk drawers.  (Chavez; Exs. 22-1; *see also* Tweed; *concur* Exs. 18, C-1, G-3 – G-4.

27. Law enforcement was contacted and conducted its own search of Mr. Vigil's desk.  (Tweed; Exs. 16, C-1 – C-2; *see also* Chavez.)

28. On June 19, 2015, a second anonymous letter was sent via inter office mail, one copy each to Ms. Tweed, Mr. Jaramillo, and Mr. Richard Vigil, stating:

    > John paul vigil has 2 lokers in mesa and el paso unit 1 in mesa has a combination and 1 in el paso has a yellow lock. I no the 1 in el paso has pills. He uses.
    > (Tweed; Ex. 16.)

29. That same day, Ms. Tweed, Security Officer Louann Gonzales, and Investigator Peter Schaefer conducted a search of the referenced lockers in the ALF Unit.  (Id.; Chavez; Schaefer.)

30. Found in Mr. Vigil's blue, full-sized, gym-style locker, which had his name on it, in relevant part, were:
   - A Centrum Silver vitamin bottle containing multiple, loose, unlabeled medications, including:
     o 9 tablets of Hydrocodone/Acetaminophen 5 mg/500 mg,
     o 2 tablets of Hydrocodone/Acetaminophen 7.5 mg/500 mg,
     o Ibuprofen,
     o Indomethacin,
     o Colchicine, and
     o Clindamycin.
     (Vigil; Tweed; Schaefer; Exs. 16, 22-10, 22-17, 22-30; *concur* Exs. C-2, H-1 – H-4.)

31. Found in a cubby locker with a yellow-trimmed lock, were:
   - A magazine with Mr. Vigil's name and address on the address label; and
   - Three expired prescription medications belonging to two BHI patients:
     o One prescription bottle of Risperidone 1 mg (issued 7/31/14);
     o One prescription bottle of Risperidone 2 mg (issued 6/16/14); and
     o One prescription bottle of Benzotropine 0.5 mg (issued 8/17/14).
     (Tweed; Chavez; Exs. 16, 22-19 – 22-24.)

32. Law enforcement was contacted again and conducted its own search of Mr. Vigil's blue locker. (Tweed; Exs. 16, C-2.)

33. Both the blue locker containing the Hydrocodone and the yellow-locked cubby locker containing three expired patient prescriptions were Mr. Vigil's lockers. (Vigil; Ex. 16.)

34. Locks had to be cut off both lockers in order to search them. (Schaefer; Exs. 16, 22-22, 22-24.)

35. Of the medications found in Mr. Vigil's desk cabinet, blue locker, and yellow-locked cubby locker, Hydrocodone was the only opioid. (https://mayoclinic.org/drugs-supplements; https://medlineplus.gov/druginformation.html; 1.7.12.18(J) NMAC.)

36. Of the medications found in Mr. Vigil's desk cabinet, blue locker, and yellow-locked cubby locker, Hydrocodone and Clonazepam were the only controlled substances under the Controlled Substances Act. (https://deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf; 1.7.12.18(J) NMAC.)

37. Mr. Vigil had prescriptions for the Hydrocodone and all the other prescription medications found in his blue locker. (Vigil; Exs. 22-14, 22-18, D; *concur* Tweed, Smith, Schaefer.)

38. There is no BHI policy that prohibits Mr. Vigil from keeping his personal prescription Hydrocodone in his work locker. (Tweed; *see also* Ex. 4, Drug and Alcohol-Free Workplace Policy.)

89

39. The Clonazepam was patient medication, which Mr. Vigil worked with as part of his job. (Vigil; Tweed; Aragon; Moore; Chavez; Schaefer; Valdez; Exs. 16, 22-6, G-2, K; Hearing, *generally*.)

40. Mr. Vigil did not know about or place the Clonazepam tablet in his desk cabinet. (Vigil; Ex. 16.)

41. Mr. Vigil found two expired patient prescriptions in two ALF residents' active medication bins on June 1, 2015; he thought that was a safety-hazard for the residents. (Vigil.)

42. Mr. Vigil completed no Medication Incident Report on his discovery of expired medications in ALF residents' active medication bins. (Hearing, *generally*.)

43. Mr. Vigil placed the two expired patient prescription medications in his desk cabinet. (Vigil; Ex. 16.)

44. Mr. Vigil knew or should have known that three additional expired patient prescription medications were stored in his yellow-locked cubby locker. (*See* Vigil.)

45. Expired medication should be "segregated and held" in the locked medcart. (Tweed; Aragon; Smith; Ex. 26.)

46. On May 1, 2013, Mr. Vigil signed and acknowledged the NMBHI at Las Vegas CBS Custodial Procedures Manual (revised as of 4/25/12), which provided: "Medications no longer in use, unwanted, outdated, or adulterated will be placed in a quarantine area in the locked medication cabinet and held for destruction by the consultant pharmacist." (Smith; Ex. 26.)

47. Mr. Vigil completed no Medication Incident Report on his storing expired patient prescription medications in his desk and cubby locker. (Hearing, *generally*.)

48. Mr. Vigil's priority was the safety of the ALF residents. (Vigil; Ex. 16; *see also* Swan, Ex. 17.)

49. Mr. Vigil removed expired patient medication from the medcart to safeguard the residents. (Vigil; Schaefer; Ex. 16; *see also* Valdez, Swan, Ex. L.)

50. Mr. Vigil stored the expired patient medication in secure locations, the desk cabinet of his locked office and his locked cubby locker. (Vigil; Tweed; Chavez; Schaefer; Exs. 16, 22-19, 22-22; *concur* Aragon.)

51. There was an established practice at the ALF of the Psych Tech Supervisor removing expired medications from the medcart and storing them in his desk cabinet. (Vigil; Valdez.)

52. Mr. Vigil learned that practice from his dayshift Psych Tech Supervisor predecessor, Manuel Valdez, as well as from his evening shift Psych Tech Supervisor predecessor, Connie Solano. (Id.; *see also* Aragon.)

53. Mr. Vigil told his supervisor, CBS Director Corinne Dominguez, that he would hold on to the expired medications he found on June 1, 2015, until they had a chance to meet. (Vigil.)

54. In Spring 2015, the BHI Finance Cashier disbursed a combined clothing allowance for the 14 ALF residents as two lump sum checks, one for $900 on or around May 4 and one for $1200 on or around May 7, rather than disbursing only one $150 check for each resident at a time. (Id.; Martinez; Ex. 16.)

55. Mr. Vigil took the clothing allowance funds issued in bulk by BHI, separated them into $150 increments, and placed each $150 in its own envelope for each ALF resident. (Vigil; *see also* Schaefer, Exs. 16, 18.)

56. Mr. Vigil learned the practice of holding clothing allowance funds, change, and receipts for each resident in its own envelope, and waiting until the shopping was complete before returning any of it to the Finance Department, from his Psych Tech Supervisor predecessor Manuel Valdez. (Vigil; Ex. 16; *see also* Valdez.)

57. Mr. Vigil stored the envelopes with the pre-shopping, full $150 clothing allowance in his locked desk cabinet. (Vigil; Exs. 18, 22-4.)

58. Mr. Vigil stored the envelopes with the post-shopping clothing allowance receipts and change – approximately $25 in total – in his unlocked desk drawer. (Vigil; Exs. 18, 22-1.)

59. Mr. Vigil was arrested on July 8, 2015, and charged with Possession of Controlled Substances. (Exs. 15, 16, C-2 – C-3.)

60. BHI was aware that Mr. Vigil was arrested, as his arrest occurred on BHI premises. (Vigil; Tweed; Exs. 16, C-2 – C-3.)

61. The NCA proposing Mr. Vigil's dismissal from BHI was dated October 2, 2015, and served on him the same day. (Exs. 12, 15.)

62. Mr. Vigil was given the opportunity to respond to the allegations in his NCA either orally or in writing. (Ex. 12.)

63. Mr. Vigil requested and was granted an Oral Response Meeting, which took place on October 15, 2015. (Ex. 15.)

64. The Department considered the information provided by Mr. Vigil at his ORM, but found no reason to reduce the proposed disciplinary action. (Id.)

65. Mr. Vigil's NFA was dated October 20, 2015, and dismissed him effective October 21, 2015. (Id.; Stip. 2.)

66. At the time of his dismissal, Mr. Vigil was a permanent employee of BHI within the classified service. (Stip. 3.)

67. Mr. Vigil filed the Notice of Appeal of his dismissal with the Board on November 19, 2015. (Stip. 4.)

Any Finding of Fact that constitutes a Conclusion of Law is adopted by the ALJ as such as if originally so denominated.

## VII.   RECOMMENDED CONCLUSIONS OF LAW

1. Mr. Vigil received due process through his NCA and the opportunity to respond to it orally and in writing, as this provided him with notice of the factual basis underlying his proposed dismissal and an opportunity to be heard. (*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545 (1985).)

2. At the time of his dismissal on October 21, 2015, Mr. Vigil was a permanent employee of DOH within the classified service and was entitled by law to appeal his discipline to the Board. (NMSA 1978, Section 10-9-18(A) (2009); 1.7.11.13(C)(4)(a) and 1.7.12.8(A) NMAC.)

3. Mr. Vigil timely filed his Notice of Appeal with the Board within the 30-day period provided by law. (NMSA 1978, Section 10-9-18(A) (2009); 1.7.11.13(C)(4)(a) and 1.7.12.8(B) NMAC.)

4. The Board has personal and subject matter jurisdiction over the parties. (Id.)

5. Under BHI's Disposal of Unusable Products Policy, expired medication is an unusable product. (BHI Disposal of Unusable Products Policy, PHM 060, Definitions Section A(1).)

6. BHI's Disposal of Unusable Products Policy states that "[u]nusable products shall be segregated and held until able to return." (BHI Disposal of Unusable Products Policy, PHM 060, Procedures Section III(A).)

7. The "segregated and held" provision of BHI's Disposal of Unusable Products Policy is informed by the NMBHI at Las Vegas CBS Custodial Procedures Manual (revised as of 4/25/12), which provides that, "Medications no longer in use, unwanted, outdated, or adulterated will be placed in a quarantine area in the locked medication cabinet and held

for destruction by the consultant pharmacist." (NMBHI at Las Vegas CBS Custodial Procedures Manual (revised as of 4/25/12), Drug Policy Section I(E)(6).)

8. Mr. Vigil knew or should have known that expired patient medication was stored in a separate area of the locked medcart.

9. When Mr. Vigil stored expired patient medication in his desk cabinet and cubby locker, he engaged in misconduct and violated BHI's Disposal of Unusable Products Policy. (BHI Disposal of Unusable Products Policy, PHM 060, Procedures Section III(A).)

10. Under BHI's Incident Reporting and Notification Policy, employees are required to complete a Medication Incident Report when there is a medication-related deviation from policy or a medication-related safety hazard for BHI patients. (BHI Incident Reporting and Notification Policy, SCD 001, Definitions Section and Procedures Section IV(I).)

11. When Mr. Vigil failed to complete Medication Incident Reports on: 1) his storing expired patient prescription medications in his desk and cubby locker, in violation of policy; and 2) his discovery of expired medications in ALF residents' active medication bins, a safety hazard for those ALF residents, he engaged in misconduct and violated BHI's Incident Reporting and Notification Policy. (Id.)

12. When Mr. Vigil failed to complete the required Medication Incident Reports and left clothing allowance change in his unlocked desk drawer, he engaged in misconduct, was negligent, violated DOH's Disciplinary Action Policy, and violated DOH's Code of Conduct. (DOH Disciplinary Action Policy, HR.08.10, Definitions Section S and Policy Section B(3)(f); DOH Code of Conduct, HR 015, Policy Section III(A)(b).)

13. When Mr. Vigil violated BHI's Disposal of Unusable Products Policy (PHM 060), BHI's Incident Reporting and Notification Policy (SCD 001), and DOH's Code of Conduct, he violated DOH's Disciplinary Action Policy. (DOH Disciplinary Action Policy, HR.08.10, Policy Section B(3)(bb).)

14. Mr. Vigil's proven misconduct and violations of BHI and DOH policies were inconsistent with his obligations to BHI and DOH. (1.7.11.10(A) NMAC.)

15. Mr. Vigil's proven misconduct and policy violations are mitigated, however by the following facts:
    - It was established practice in the ALF Unit for the Psych Tech Supervisor to store expired patient medication in his desk cabinet until it could be returned to the pharmacy;
    - Mr. Vigil followed this practice to ensure the safety of the ALF residents;
    - Mr. Vigil held the expired medications in secure locations – the locked desk cabinet of his locked office and in his locked cubby locker; and
    - Mr. Vigil reported his discovery of expired patient medication in ALF residents' active medication bins directly to his supervisor, CBS Director Dominguez.

16. The allegations in Mr. Vigil's LOR (unprofessional interaction with co-worker) are wholly unrelated to his proven misconduct here. (*Compare* Ex. 21 *to* Recommended Conclusions of Law 9, 11, and 12.)

17. Mr. Vigil's prior LOR cannot serve as progressive discipline under these circumstances.

18. Based on Mr. Vigil's misconduct and violations of BHI and DOH policy, the Department had just cause to discipline him. (1.7.11.10(B) NMAC.)

19. Given the nature of Mr. Vigil's misconduct, the mitigating factors listed above, and the lack of progressive discipline, however, the discipline of dismissal was not the appropriate sanction to impose on him.

20. Under these circumstances, the appropriate and proportional sanction to impose upon Mr. Vigil is a 30-day suspension.

## VIII.   RECOMMENDED DECISION

Mr. Vigil improperly stored expired patient medication in his desk cabinet and cubby locker; failed to complete Medication Incident Reports on that improper storage and on his discovery of expired medication in ALF residents' active medication bins, and improperly handled clothing allowance change by storing it in his unlocked desk drawer. This misconduct is inconsistent with Mr. Vigil's obligations to DOH and BHI, is a violation of BHI and DOH policies, and is just cause for his discipline. However, given the nature of his misconduct, the mitigating factors listed above that lessen the severity of his misconduct, and the lack of progressive discipline, dismissal was not the appropriate sanction here. Rather, a 30-day suspension is the appropriate, reasonable, and proportional sanction to impose on Mr. Vigil.

Respectfully submitted,

Jessica B. Cooper
Administrative Law Judge

Entered: March 4, 2019