IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN VIGIL,

      **Plaintiff,**

v.                                                  Case No. 1:18-CV-00829-SCY-JFR

FRANCES TWEED, et al.,

      **Defendants.**

MOTION FOR JUDGMENT ON THE PLEADINGS
BY STATE DEFENDANTS

Defendants Frances Tweed, Antonio Coca, Joe Chavez, Corrine Dominguez and the New Mexico Behavioral Health Institute ("State Defendants"), move for a judgment on the pleadings. The applicable statutes of limitation bar the new allegations in Plaintiff's Second Amended Complaint [Doc 38, filed 9-22-19]. Vigil's complaint also fails to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). The individual defendants are entitled to qualified immunity.

1. **Introduction**

Plaintiff John Vigil is an employee with the New Mexico Behavioral Health Institute (NMBHI), the state-run psychiatric hospital in Las Vegas, New Mexico. Vigil's Second Amended Complaint asserts Fourth Amendment claims under 42 U.S.C. Section 1983 against 4 employee defendants for unlawful search and malicious prosecution. He also avers a Section 1983 claim for First Amendment retaliation. There appear to be two claims for alleged Fourth Amendment violations

of the New Mexico Constitution. There is a state law *respondeat superior* claim against NMBHI.

This Court previously dismissed plaintiff's First Amended Complaint, holding that the State defendants were entitled to qualified immunity on Plaintiff's claim of an unreasonable office search.[1] [Doc 30] The Court will recall that Vigil claimed that searches of a desk and locker that he used at NMBHI workplace were unreasonable because the State defendants relied on two anonymous notes to conduct the searches. [*See id.* at 1] Vigil also pled a malicious prosecution claim against the state defendants; however, he later agreed that he could not maintain the claim against these defendants, and the Court dismissed this count. [Doc 23 at 10; *see also* Doc 30 at 5]. The Court further determined that the state defendants were entitled to qualified immunity on Vigil's First Amendment claim. [Doc 30 at 21] The Court also held that the plaintiff's First Amended Complaint failed to state cognizable state law claims. [*Id.* at 28]

In response to the Court's order of dismissal, Vigil has completely changed the alleged conduct underlying the claims. He now contends that all the defendants, including County law enforcement officers, conspired to plant a single pill of Clonazepam in a desk he used at work. [Doc 38 at ¶102] He no longer claims that notes were "anonymous" but instead alleges that all the defendants engaged in a conspiracy to "fabricate" the notes. [*Id.*] Vigil's complaint focuses on the Clonazepam

---

[1] The Court granted Vigil leave to file a second amended complaint. [Doc 37] The Court's order acknowledged that the Defendants could renew their futility and dismissal arguments in a later motion. [Doc 37 at 7]

and the notes, implying that those were the sole basis of the criminal charges. (*See id.*)

Vigil was not, however, merely charged with possession of a single tablet of Clonazepam. The District Attorney also charged him with possession of other drugs, including Risperadone, an expired patient medication that he stored in his desk and lockers in violation of NMBHI policy. There was also a charge for Hydrocodone, a Schedule II controlled substance found in non-prescription bottles. [Criminal Information, Exh. 1 at 27-28; Amended Criminal Information, Exh. 2 at 21-22; *see also* Affidavit for Arrest Warrant, Exh. 3 at 2 (describing numerous Hydrocodone tablets stored in a Centrum vitamin bottle)]. Vigil initially gave equivocal and inconsistent statements about the Hydrocodone (*see* excerpts from Plaintiff's Initial Disclosures, Exh. 4, at 202) but ultimately maintained that he had expired prescriptions[2] from 2007 through 2011, *i.e.,* 4 to 8 years old, for the Hydrocodone. (Exh. 4 at 153, 175-176) The District Court bound Vigil over for trial. [Exh. 5]

As explained below, the allegations in Vigil's Second Amended Complaint do not credibly dispute probable cause based on the charges for possession of the Hydrocodone and Risperadone. To be sure, there were credibility issues at trial over Vigil's explanations, such as whether the Hydrocodone from the search actually originated from those old prescriptions. (*See* Exh. 4 at 158-160). Yet, Vigil's defenses in the criminal trial do not vitiate the existence of probable cause underlying the

---

[2] Hydrocodone was a Schedule II controlled substance when Vigil originally obtained the prescriptions, and pursuant to NMSA 1978, § 30-31-18, such prescriptions expire within 6 months.

arrest. Moreover, the Second Amended Complaint does not allege that any of the state defendants were aware of the old prescriptions when the searches occurred.

Filings from a disciplinary action by NMBHI also indicate that Vigil was improperly storing expired patient medication in his desk, failing to complete medication incident reports to account for that medication and inappropriately holding patient clothing allowance funds in his desk. (SPO Recommended Decision, at 92-94, Exh. 6) This conduct, which his Second Amended Complaint does not dispute, was the basis for a thirty-day suspension. (*Id.*)

The Court should dismiss the Fourth Amendment claims against the state defendants in Counts I and III of the Second Amended Complaint for multiple reasons.  First, the new factual allegations related to the Fourth Amendment claims about a broad conspiracy to plant a pill and fabricate notes are not timely; the applicable statutes of limitation bar any claims based on this new factual scenario. Second, Vigil's conclusory allegations are entirely speculative and implausible, lacking the requisite factual sufficiency to state a claim pursuant to Rule 12(b)(6). The four individual defendants are also entitled to qualified immunity because Vigil's allegations do not establish Fourth Amendment violations against the state defendants under clearly established law.

Further, Vigil's attempt to plead claims for violation of the New Mexico State Constitution, Counts II and IV, is futile because such claims are not recognized as a matter of law. Nor is there any basis for a *respondeat superior* claim, Count VI, against the NMBHI under the New Mexico Tort Claims Act.

Finally, the limited revisions in Vigil's First Amendment claim, Count V, do not overcome the deficiencies the Court previously identified in its order of dismissal.  [Doc 30 at 21]) Defendants are entitled to qualified immunity on this claim as well.

## 2.  The Law on Motions for Judgment on the Pleadings

Under Rules 12(c) and (h)(2)(B), a court may dismiss a complaint (or claim) for "failure to state a claim upon which relief may be granted," the reason for dismissal under Rule 12(b)(6). The same standard for deciding a Rule 12(b)(6) motion to dismiss applies to deciding a 12(c) motion for judgment on the pleadings for failure to state a claim. *Brown v. Montoya*, 662 F.3d 1152, 1160 n.4 (10th Cir. 2011); *see also Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019) ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." (internal quotation marks and citation omitted)), *cert. denied sub nom. Cummings v. Bussey*, No. 18-1357, 2019 WL 4921308 (U.S. Oct. 7, 2019). "[T]he sufficiency of a complaint is a question of law[.]" *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006).

The analysis regarding the sufficiency of the complaint is governed by the standards set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To withstand a motion asserting failure to state a claim, a "complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 570).

Importantly, the Court only accepts well-pleaded *facts* as true when deciding the Motion—not legal conclusions. *See Kan. Penn Gaming*, 656 F.3d at 1214 ("'[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.'" (quoting *Iqbal*, 556 U.S. at 678)).

The Complaint must include sufficient facts regarding each essential element of a claim. The pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 677. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678; *Twombly*, 550 U.S. at 555 ("[C]ourts are not bound to accept as true a legal conclusion couched as a factual allegation." (internal quotation marks and citation omitted)); *Saavedra v. Lowe's Home Centers, Inc.*, 748 F. Supp. 2d 1273, 1281 (D.N.M. 2010) ("A complaint does not 'suffice if it tenders naked assertions devoid of further factual enhancement.'" (quoting *Iqbal*, 129 S. Ct. at 1949)). A plaintiff must allege facts to support its legal conclusions. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010). In evaluating the sufficiency of Plaintiff's Complaint, the Court must "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Mocek v. City of Albuquerque*, 813 F.3d 912, 921 (10th Cir. 2015); *Kan. Penn Gaming*, 656 F.3d at 1214.

The facts pleaded must show that the claimant is entitled to relief. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—***but it has not shown***—that

the pleader is entitled to relief", as required. *Iqbal*, 556 U.S. at 679 (quotations and alterations omitted) (citing Fed.R.Civ.P. Rule 8(a)(2) (requiring the plaintiff to show entitlement to relief)). The degree of specificity of such factual allegations required to satisfy the plausibility requirement is context-specific (*i.e.*, in relation to the claim). *Kan. Penn Gaming*, 656 F.3d at 1215.

### 3. Law on Qualified Immunity

To overcome the defense of qualified immunity, "a plaintiff must properly allege a deprivation of a constitutional right and must further show that the constitutional right was clearly established at the time of the violation." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. at 231 (quoting *Harlow*, 457 U.S. at 818). Qualified

immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). The plaintiff must make this demonstration "on the facts alleged." *Id.*

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. In rejecting a mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." *Id.* at 237.

The clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right

are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083, 179 L.Ed. 2d 1149 (2011). A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." *Zweibon v. Mitchell*, 720 F.2d 162, 172-73, 231 U.S. App. D.C. 398 (D.C. Cir. 1983). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).

### 4.  Vigil's New Factual Allegations Are Untimely

The relevant statute of limitation in New Mexico for Section 1983 claims is three years. *Garcia v. Wilson*, 731 F.3d 640,6512 (10th Cir. 1984) *aff'd* 471 U.S. 261, 280. Any claims under the New Mexico Tort Claims Act ("NMTCA") are subject to a two-year statute of limitation. NMSA 1978, § 37-1-23.

In the present case, the first workplace search allegedly occurred over four years ago on May 29, 2015. Accepting plaintiff's allegations at face value, the newly-alleged conduct of planting evidence and fabricating the notes had to have preceded the searches. Vigil filed his motion to amend [Doc. 31] seeking to allege these new facts on July 8, 2019, over a year after the statute of limitation for Section 1983 claims expired and over two years after the statute on the NMTCA claim ran.

Vigil may not rely upon the relation-back doctrine to save any claim based on this newly alleged conduct. An amended complaint relates back when the proffered amendment asserts a claim that arose out of "the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). This requirement gives a defendant fair notice to anticipate litigation involving a specific factual situation. *Price v. McKee*, No. 12-1432-CM, 2013 U.S. Dist. LEXIS 94562, 2013 WL 3388905, at *4 (D. Kan. July 8, 2013) (quoting *Reed v. Entercom Commc'ns Corp.*, No. 04-2603-CM, 2006 U.S. Dist. LEXIS 26436, 2006 WL 1174023, at *1 (D. Kan. Apr. 28, 2006)). Even when a new pleading shares similar elements to the original claim, it "cannot relate back if the effect of the new pleading is to fault the defendants for conduct different from that identified in the original complaint." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013). An amendment does not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005).

Here, Plaintiff's original complaint alleged that the defendants lacked probable cause to conduct an office search based on the receipt of two anonymous notes. [*See* Doc 23 at 5-9] The complaint gave no notice that anyone previously "planted" a tablet of Clonazepam as Vigil now alleges. The complaint also gave no notice that the defendants had fabricated notes. To the contrary, the complaint and subsequent briefing argued that the notes were unreliable because the author was

unknown. [*See* Doc 23 at 9] The original complaint did not give the state defendants notice of allegations of a broad conspiracy among them and law enforcement to plant evidence and create allegedly fictitious writings as a pretext to then launch a criminal investigation.

To overcome the grant of qualified immunity, plaintiff has simply resorted to alleging entirely new events, claiming that at some point before the search, defendants engaged in a broad conspiracy to plant and fabricate incriminating evidence. This newly alleged conduct is different in type, time and scope from the original allegations. The plaintiff cannot rely on the relation back provisions of Rule 15 to pursue claims based on a different factual scenario. Accordingly, the Court should dismiss the Second Amended Complaint as a matter of law.

## 5. Vigil's Vague, Conclusory Allegations of Conspiracy Among All the Defendants Fail to State a Claim under Fed.R.Civ.P. 12(b)(6).

In the context of a Section 1983 claim, general allegations of multiple defendants' possible role in an alleged constitutional violation do not suffice to state a claim. *Cox v. Glantz*, 2011 U.S. Dist. LEXIS 116287 *22 (D. Okla. 2011). The Tenth Circuit has rejected broad allegations against multiple defendants in Section 1983 cases, because "it is impossible for any of these individuals to know what particular unconstitutional acts they are alleged to have committed. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). The notice required under Fed.R.Civ.P. 8 varies depending on the type of case; in the context of a § 1983 claim "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom* . . . ." *Id.*

This is especially true with conspiracy allegations. Here, Vigil contends that all of the defendants, including the defendant law enforcement officers, engaged in a broad conspiracy to plant a single pill and fabricate notes to maliciously prosecute him in a criminal action. [Doc 38 at ¶102, 129] For such conspiracy claims, a plaintiff "must allege specific facts showing an agreement and concerted action among the defendants." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998); see *also Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004) (requiring plaintiff to allege by direct or circumstantial evidence that defendants had meeting of minds or agreement). "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Tonkovich*, 159 F.3d at 533 (quotation omitted); *see also Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1214 (10th Cir. 2003) (holding conclusory conspiracy allegations are not sufficient to state a constitutional claim). *Eden v. Voss*, 105 Fed. Appx. 234, 246, 2004 WL 1535829, *9 (10th Cir. 2004).

In the present case, Vigil alleges that his domestic partner, Patricia Vigil, brought suit in 2012 against the NMBHI and that Mr. Vigil's "support" for her in that lawsuit is the genesis for defendants' alleged retaliatory motive. [Doc 38 at ¶15] His "support" consists of him being present at some hearings and conferences. [*Id.*] The complaint provides no details about these events, such as when they occurred, who was present, what transpired, and so forth. [*See id.* at ¶12-17] The complaint goes on to assert that defendants Tweed, Coca and Chavez "were angered" by Vigil's "support", but alleges no facts about how any defendant knew

about him attending these hearings, when they acquired that knowledge, how they knew why he was there, why any defendant became angry or why they would decide to retaliate against him years later. [*Id.*] Other than these conclusory statements, there are no allegations of any predicate facts describing how conspiracy formed among the three of them or how it grew to include defendant Dominguez as well as numerous law enforcement officers.

The complaint alleges that Vigil's "superiors" (he doesn't initially identify who) "fabricated a typed letter alleging that Vigil had narcotics stored in his desk." [Doc 38 at ¶18] Although the term "fabricated" implies that the allegations in the note were false, we know from the criminal and personnel proceedings that Vigil did, in fact, have expired patient medications and funds as well as Hydrocodone (narcotics) in his desk. Indeed, the complaint does not explicitly allege that any statements in the first note were actually false. The complaint then alleges that defendants "Frances Tweed, Antonio Coca **and/or** Joe Chavez" accessed Plaintiff's desk cabinet because "there was enough play in the cabinet doors" to allow a single tablet of Clonazepam inside the cabinet. [*Id.* at 22]. In other words, Vigil implies that it was "possible" to access the desk to place a tablet. In the next paragraph, Vigil concludes that the three conducted a search knowing that the tablet of Clonazapam "they planted" would be present. [*Id.* at 23].

In describing the first search, plaintiff alleges that Defendants Frances Tweed, Antonio Coca and/or Joe Chavez found and photographed various items within the desk. Two days later, one of the defendants, Joe Chavez, called law

enforcement to report a "possible narcotics larceny." [*Id.* at 26]   There is no allegation that any other defendant was involved in the call.

The complaint then alleges, in passive voice, that a second note was "fabricated" to incriminate Vigil. [Doc 38 at 32] The complaint does not aver that any defendant did so. The complaint contends that Tweed and other unnamed employees conducted a search of Vigil's lockers but does not describe what they found. [*Id.* at 34] Defendant Tweed reported the second note to law enforcement officers. [*Id.* at 39] They obtained a search warrant and conducted a search of the lockers. Tweed also indicated to the law enforcement officers that the pills revealed during the first search were narcotics. [*Id.* at 41]

The plaintiff's generic, disjunctive allegations against these individual defendants are insufficient to set forth a Section 1983 claim against each of them. First, Vigil's allegations against Defendant Corrine Dominguez are virtually non-existent. There are no factual allegations that Defendant Dominguez knew about any "support" that Vigil offered Patricia Vigil; accordingly, there is no conceivable predicate for any retaliatory motive or culpable mental state. Vigil does not allege Dominguez knew anyone planted a pill or fabricated a note. The complaint alleges merely that she authorized or consented to a search. [Doc 38 at ¶25] Thus, the complaint falls well short of setting forth the necessary factual content to support a Section 1983 claim against her based on supervisory liability.  *See e.g., Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010), *cert. denied,* 131 S.Ct. 2150, 179 L.Ed.2d 935 (2011) (For supervisory liability under Section 1983, plaintiff must

allege facts plausibly showing a supervisor's personal involvement, sufficient causal connection and culpable mental state).

Similarly, Vigil has thrown in Defendant Antonio Coca's name at several places mostly in disjunctive and/or paragraphs that are entirely conclusory. There is no specific factual allegation that Defendant Coca had any involvement with the law enforcement. Such conclusory allegations do not state a claim.

Although Vigil's complaint mentions Chavez and Tweed more frequently, the references remain conclusory and speculative. They are simply implicated along with others in a conclusion that someone planted a pill or fabricated a note, but plaintiff fails to flesh out the factual basis for that conclusion, nor does he provide plausible facts of a conspiracy among multiple individuals. Such hedging allegations are insufficient under *Twombly* and *Iqbal*. "[T]he plausibility standard ... asks for more than a sheer possibility" of unlawful conduct . . ." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011).  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 [citation omitted]. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.*

Significantly, the plaintiff has had opportunities since 2015 to conduct multiple inquiries on these issues, including review of pertinent documents as well as multiple examinations under oath of key witnesses, in both the criminal and

personnel proceedings. Plaintiff's inability to come forward with little more than conclusory statements is insufficient to nudge the allegations from "conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012).

## 6.   The Defendants are Entitled to Qualified Immunity

In evaluating the First Amended Complaint, this Court focused on the second prong of the qualified immunity analysis and whether it was reasonable for the defendants to rely on anonymous notes to conduct a workplace search. After conducting a detailed analysis of applicable precedent concerning workplace searches, the Court held that there is "no clearly established weight of authority" in the Tenth Circuit or other circuits that provided notice that the anonymous tip in this case failed to provide reasonable justification for the searches at issue. [Doc 30 at 19] Plaintiff's new factual allegations in the Second Amended Complaint are a further departure from established precedent.

The first question is whether the Fourth Amendment even applies to the plaintiff's new allegations, and if so, what protected right is at issue. Vigil now alleges that one or more civilian employees (not affiliated with law enforcement), planted a single piece of evidence and created at least one note as a pretext to launch a criminal investigation. Such conduct is not a workplace "search," and there appears to be no clearly established law suggesting that it is. Hypothetically, a civilian making a false statement to a police officer may be actionable under some form of civil state tort law, but that does not mean a cognizable Fourth Amendment

violation arises against a civilian for such conduct. Vigil's complaint fails to satisfy the second prong of qualified immunity related to the search claim in Count I.

Vigil's new allegations also do not meet the first prong of qualified immunity. There are no allegations that planting a tablet or fabricating a note occurred under the color of law, a necessary element of a Section 1983 claim. *See, e.g., Yanaki v. Iomed*, 415 F.3d 1204, 1211-1212 (10th Cir. 2005).

In Count III, the plaintiff reasserts the malicious prosecution claim that he previously admitted that he could not maintain against these defendants. Here again, the law does not appear to be clearly established for the second prong of qualified immunity. Dominguez or Coca had no contact with law enforcement according to the complaint. There are no facts tying them in to any prosecution. Defendant Chavez's only contact was to advise that "a possible larceny occurred." [Doc 38 at ¶26] Defendant Frances Tweed allegedly contacted law enforcement to inform them that a second search had occurred and that the first search found pills that she identified as narcotics. [*Id.* at 39-41] Again, there is no allegation that the two defendants' conduct in contacting officers occurred under color of law.

Further, Vigil's complaint also fails to meet the first prong of the qualified immunity test because his allegations do not vitiate probable cause. Lack of probable cause is an essential element of malicious prosecution. *See Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime was committed and that a specific individual committed it. *Id.* (citations omitted) In a malicious

prosecution claim against law enforcement officers, federal courts may disregard any allegedly tainted evidence to determine whether or not there was still probable cause for the arrest. *Id.* Here, there unquestionably was probable cause for an arrest apart from plaintiff's allegations concerning the Clonazepam tablet.

Mr. Vigil was at a secure medical facility possessing a controlled substance, Hydrocodone. He was initially equivocal in explaining its presence. He also improperly held other expired patient medications and patient funds. Although Mr. Vigil successfully defended the charges, his acquittal does not vitiate probable cause for the original arrest. Specifically, the proffered exculpatory evidence of the old prescriptions is not dispositive on the issue of probable cause for the possession charge as the defense depended on the jury's determining whether his explanation was credible at trial.

Thus, the plaintiff's allegations in the Second Amended Complaint fail to rebut the existence of probable cause based on the totality of the evidence before the law enforcement officers and the District Court Judge. Therefore, these allegations are insufficient to state a Fourth Amended claim for an unreasonable search or malicious prosecution under clearly established law.

For all these reasons, the individual State defendants Tweed, Chavez, Coca and Dominguez are entitled to qualified immunity under both prongs of the analysis.

### 7.  Issue Preclusion Also Bars Plaintiff's Claims

Defendants also join in the County Defendants' Motion to Dismiss [Doc 49] based on the doctrine of issue preclusion as applied to the District Court's order binding over Vigil for trial. [Exh. 4] The state defendants will not repeat the entirety of that argument for the sake of brevity but do want to draw the Court's attention to several key points.

As the County Defendants observe, Judge Browning encountered a similar factual situation in *Ysasi v. Brown*, 3 F. Supp. 3d 1088 (D.N.M. 2014). In that case, the defendants argued that collateral estoppel applied to a state magistrate's determination of probable cause; the prosecution later issued a *nolle prosequi* on the charges. Judge Browning expressed significant reservations about applying issue preclusion to a New Mexico Magistrate Judge's probable cause determination because magistrate judges are not usually lawyers in New Mexico. Yet, Judge Browning determined that he was compelled to apply issue preclusion because the Tenth Circuit had previously applied collateral estoppel in a virtually identical case, *Angel v. Torrance County Sheriffs Dept.,* 183 Fed.Appx. 707 (10th Cir. 2006). *See Ysasi*, 3 F.Supp. at 1165 (stating "The Court will thus grant the MSJ on the unlawful arrest claim, because the Tenth Circuit's determination indicates that it would apply collateral estoppel in this situation").

This case, of course, does not involve a determination by a magistrate judge, but instead a full-fledged District Court Judge, alleviating the principal source of Judge Browning's concerns. The case also does not involve a *nolle prosequi*. The

criminal charge proceeded to trial; Vigil obtained an acquittal based on resolution of factual and credibility issues in his favor. Accordingly, the Tenth Circuit's precedent from *Angel v. Torrance County* applies with even greater force.

Further, Judge Browning also noted in *Ysasi* that, regardless of issue preclusion, the New Mexico Supreme Court treats a magistrate's finding of probable cause as *prima facie* evidence that probable cause did in fact exist for the arrest. *Ysasi*, 3 F.Supp. at 1165. The same could be said here. As set forth earlier, Vigil's alleged facts do not rise to the level of vitiating probable cause because the allegations do not address, let alone dispense with the entirety of the evidence supporting criminal charges.

In sum, for the reasons in the County's brief and Judge Browning's opinion in *Ysasi*, this Court is bound to honor the Tenth Circuit precedent to bar relitigation of the probable cause issue. Because probable cause existed for the arrest and because plaintiff's allegations do not fully address or rebut the evidence supporting probable cause, a malicious prosecution claim may not proceed.

## 8.  The State Law Claims Are Futile

Vigil appears to assert two counts[3] for violations of the New Mexico Constitution based on an unreasonable search and malicious prosecution. [Doc 38 at ¶¶66-97; 108-118] Such claims are futile. "New Mexico courts have 'consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed

---

[3] The Second Amended Complaint does not contain a Count IV; instead the complaint jumps from Count III to V.  Defendants presume from references to state law that Vigil intended to plead a Count for malicious prosecution based on the New Mexico Constitution.

by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.'" *Roybal-Mack v. New Mexico Department of Public Safety*, 2017 U.S. Dist. LEXIS 107038 at ¶13-14, (citing *Barreras v. State of New Mexico Corrections Department*, 2003-NMCA-027). Thus, Vigil's claims for civil damages based on State Constitutional violations fail to state a claim under Fed.R.Civ.P. 12(b)(6).

### 9.  The Court Should Dismiss Defendant NMBHI

In Paragraph 142 of the plaintiff's Second Amended Complaint, plaintiff Vigil asserts a legal conclusion that the NMBHI is liable under the doctrine of *respondeat superior* for a violation of the New Mexico Tort Claims Act (NMTCA) perpetrated by any state employee. [Doc 38 at 25] The complaint contains no further allegations against the NMBHI.

In *Silva v. State*, 1987-NMSC-107, the New Mexico Supreme Court held that a governmental entity may be susceptible to suit under the New Mexico Tort Claims Act for *respondeat superior*. To name a particular entity under the NMTCA requires two things: (1) a negligent public employee who meets one of the waiver exceptions under Sections 41-4-5 to 41-4-12 of the NMTCA; and (2) an entity that has immediate supervisory responsibilities over the employee. *Silva* at *15 [citation omitted]. If a public employee meets an exception to immunity, then the particular entity that supervises the employee can be named as a defendant in an action under the NMTCA. *Id. See also Lyman v. Aeromark Corp.,* 499 Fed.Appx. 771, 774 (10th Cir. 2012); *Segura v. Collonde*, 895 F.Supp.2d 1141, 1149-1150 (D.N.M. 2012) (J.

Vasquez)*; Hernandez v. City of Albuquerque*, 2017 U.S. Dist. LEXIS 99144; *Malone v. the Board of County Commissioners for the County of Dona Ana*, 2016 U.S. Dist. LEXIS 129236.

To support his *respondeat superior* claim, Vigil asserts a bare legal conclusion that the individual state employee defendants were operating a medical facility "negligently", invoking the waiver of immunity under NMSA 1978 §41-4-9. [Doc 38 at 17, ¶ 94] However, this legal conclusion does not suffice to support a legally cognizable claim against the NMBHI. As was the case with Vigil's First Amended Complaint [*see* Doc 30 at 27-28], the Second Amended Complaint does not assert any plausible factual allegations of negligence. It does not include a count for negligence generally, let alone factual allegations of negligence that fall within one of the enumerated waivers of immunity under the Act. [*Id.*]

Moreover, the medical facilities waiver that Vigil cites in his complaint states as follows:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.

§41-4-9. The waiver plainly applies to the provision of medical services by employees at medical facilities and must involve claims for "bodily injury, wrongful death or property damage." *Id.* Statutory provisions purporting to

waive governmental immunity are strictly construed. *Kreutzer v. Aldo Leopold High Sch.,* 2018-NMCA-005 at *45 [citation omitted].

The subject matter of Vigil's claims does not fall within § 41-4-9 as a matter of law. Vigil did not receive medical services from the defendants; the gravamen of the complaint concerns employment issues, not medical services. Vigil does not claim "bodily injury, wrongful death or property damage" to partake of the waiver. *See* § 41-4-9. Thus, not only does the complaint fail to contain factual allegations of plausible negligence, Vigil has failed to identify a viable waiver of immunity.

The only state law claims against the state employee defendants are for alleged violations of the New Mexico Constitution. However, such claims do not sound in negligence. Vigil cannot rely on alleged civil rights violations to trigger a waiver of immunity under the NMTCA for negligence. *Cf. Roybal-Mack v. New Mexico Department of Public Safety*, 2017 U.S. Dist. LEXIS 107038 at ¶13 -14.

This leaves Vigil's three Federal Section 1983 claims based on unreasonable search, malicious prosecution or First Amendment retaliation. Section 1983 only permits such actions against individuals, not state entities. The NMTCA does not waive immunity for damages arising for Federal civil rights violations except in one instance, which is the waiver of immunity applicable to law enforcement officers who negligently cause one of the torts or statutory violations enumerated in §41-4-12.

Although Vigil claims that the County law enforcement officers fall within §41-4-12, he does not claim that any of the NMBHI employee defendants do. [*Compare* Doc 38 at ¶93 *with* ¶94] The Second Amended Complaint also does not set forth allegations that plausibly support a conclusion that the four were acting as law enforcement officers. Nor is the operation of the State psychiatric hospital consistent with the duties of a law enforcement officer. Accordingly, the counts asserting Section 1983 claims against the NMBHI do not provide a basis for *respondeat superior* liability under the NMTCA based on the allegations of the Second Amended Complaint.

Lacking an applicable tort claims waiver, the claim against the NMBHI fails as a matter of law. *Segura v. Collonde*, 895 F.Supp.2d 1141, 1149-1150 (D.N.M. 2012). The statute of limitation has also lapsed. *See supra* at 9-11. The Court should also dismiss this claim with prejudice.

## 10. Defendants Remain Entitled to Qualified Immunity on the First Amendment Count

This Court originally granted the defendants qualified immunity on plaintiff's First Amendment claim because the plaintiff failed to cite clearly established law demonstrating that the "cursory allegations in the FAC are subject to defeat Defendants' assertion of qualified immunity." [Doc 30 at 21] The Court held that the description of the speech in the First Amended Complaint was not sufficient to enable the Court to determine to what extent the plaintiff was complaining about his own employment conditions and to what extent plaintiff was

speaking for others who cannot speak for themselves due to neglect and mismanagement at a public institution. [*Id.*]

The allegations of the Second Amended Complaint fare no better. Vigil's "amendments" in Count V of the Second Amended Complaint consist of little more than rearranging the paragraphs in Count V of the First Amended Complaint. The substance is substantially the same.

Although Vigil's complaint frames the count as a "chilling" claim [Doc 38 at ¶136], a different test applies to the employment context. To establish First Amendment retaliation by his employer, an employee must allege and ultimately prove: (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) The first three "prongs" are issues of law to be decided by the court; the last two are factual issues to be decided by the factfinder. *Id.*

The second element is the requirement that the claim be based on employee speech that is "on a matter of public concern." *Id.* "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v.*

*Roe*, 543 U.S. 77, 83-84, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004). The public concern requirement limits the protection of speech by an employee to speech that the employee makes in his capacity as a citizen, rather than simply as an employee. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (employee is protected against retaliation only if "the employee spoke as a citizen on a matter of public concern"). Moreover, the Supreme Court has decided that the public concern requirement also applies when a government employee complains of retaliation based on his exercise of the First Amendment right to petition the government for redress of grievances. *See Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2495, 180 L. Ed. 2d 408 (2011).

Here, the only description of speech appears in two paragraphs. First, in Paragraph 43, the plaintiff alleges that he supported his partner, Patricia Vigil, in her lawsuit. Yet, the Court previously recognized that such allegations, analogous to a Freedom of Association claim, are not sufficient to state a claim for First Amendment retaliation. [Doc 30 at 22-25]

The second allegation of speech is in Paragraph 47, which indicates that at some point the plaintiff had spoken out over mismanagement at NMBHI including employee misbehavior and misclassification of patient residents. This allegedly led to the patients being assigned to plaintiff's unit. [*Id.* at ¶48] This is substantially the same allegation from the First Amended Complaint. [Doc 1-1 at ¶48-49] Thus, the Second Amended Complaint has the very same deficiency that the Court previously identified as warranting qualified immunity. [Doc 30 at 21]

Moreover, the complaint also lacks the other necessary facts to show a plausible First Amendment violation: the dates the protected speech occurred, the actual substance of the communications, the audience for plaintiff's speech, how any of the defendants were aware of the plaintiff's speech, when they became aware of it and so forth. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, are insufficient to state a claim. *Iqbal*, 556 U.S. at 678.

## 11. Conclusion

For all these reasons, plaintiff's Second Amended Complaint against the State Defendants should be dismissed with prejudice.

Respectfully submitted,

**LONG, KOMER & ASSOCIATES, P.A.**

*Attorneys for Defendants Tweed,*
*Dominguez, Coca, Chavez and New Mexico*
*Behavioral Health Institute*


*/s/ Mark E. Komer*
MARK E. KOMER
P. O. Box 5098
Santa Fe, NM  87502-5098
505-982-8405
mark@longkomer.com
email@longkomer.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of December 2019, I filed the foregoing **Motion for Judgment on the Pleadings** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Joe M. Romero, Jr.
joe@romeroandwinder.com

*Attorneys for Plaintiffs*


Christina L.G. Brennan
James P. Sullivan
christina@brennsull.com
jamie@brennsull.com

*Attorneys for County Defendants*


By:     *s/ Mark E. Komer*
        Mark E. Komer

FOURTH JUDICIAL DISTRICT COURT
COUNTY OF SAN MIGUEL
STATE OF NEW MEXICO

4TH JUDICIAL DISTRICT COURT
SAN MIGUEL, MORA & GUADALUPE
FILED IN MY OFFICE

2015 NOV -6  AM 10: 17

NO. D412CR 2015 - 208

JUDGE: Matthew J. Sandoval

STATE OF NEW MEXICO,

                    Plaintiff,

        vs.

**JOHN PAUL VIGIL,**
Address:               512 lugar de los Caballeros
                       Las Vegas, NM  87701
DOB:                   12/08/1963
SS#:                   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
Magistrate Court No.: M-48-FR-201500145
                       Defendant,


**Crimes:**     Possession of a Controlled Substance (Felony - Narcotic Drug)**(DA Charge
              Code 5614),**  Possession of a Controlled Substance**(DA Charge Code 5801) &**
              Dangerous drugs, conditions for sale - sell, dispose of or possess dangerous
              drugs**(DA Charge Code 0399)**


### CRIMINAL INFORMATION

        **COMES NOW** the Fourth Judicial District Attorney, of San Miguel County, State of New

Mexico, by and through its Deputy District Attorney, James Grayson, and accuses the above-

named Defendant of the crimes of:

### Count 1:

        **Possession of a Controlled Substance (Felony - Narcotic Drug)**, on or about June 26,

2015, in San Miguel County, New Mexico, the above-named defendant did intentionally have in his

possession (Hydrocodone), a narcotic drug which is a Schedule I or II controlled substance, the

possession of which is regulated or prohibited by law, a fourth degree felony, contrary to Section

30-31-23(E), NMSA 1978.

### Count 2:
**Dangerous drugs, conditions for sale - sell, dispose of or possess dangerous**

**drugs**, on or about June 5, 2015, in San Miguel County, New Mexico, the above-named

defendant did sell, dispose of or possess dangerous drugs (Risperidone), a fourth degree

felony, contrary to Section 26-01-26(A), NMSA 1978.

<u>**Count 3:**</u>

**Possession of a Controlled Substance**, on or about June 5, 2015, in San Miguel County, New Mexico, the above-named defendant did intentionally have in his possession (Lorazapam/Ativan), which is a controlled substance or a controlled substance analog of a substance enumerated in Schedule I, II, III, or IV, a misdemeanor, contrary to Section 30-31-23(A), NMSA 1978.

The names of the witnesses upon whose testimony this Information is based are as follows:

Undersheriff Anthony Madrid, Deputy Sean Armijo & Frances Tweed.

RESPECTFULLY SUBMITTED,

**RICHARD D. FLORES**
DISTRICT ATTORNEY

By: _____

**James Grayson**
Deputy District Attorney
1800 New Mexico Avenue
Las Vegas, NM  87701
505-425-6746

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing pleading was sent via electronic disclosure/mailed/hand-delivered/placed in the bin of Paul J. Kennedy, on this ___5^th___ day of November, 2015.

_____

DA Case No. 2015-S0656-46

FOURTH JUDICIAL DISTRICT COURT
COUNTY OF SAN MIGUEL
STATE OF NEW MEXICO

THIS PLEADING WAS FILED IN OPEN COURT
ON _Oct_, 25, 20 16
AT _1:02PM_ O'CLOCK

NO. D-412-CR-0201500208_____

JUDGE: Matthew J. Sandoval _____

MATTHEW J. SANDOVAL
DISTRICT JUDGE
DIVISION III

STATE OF NEW MEXICO,

                         Plaintiff,

         vs.

**JOHN PAUL VIGIL**,
Address:              512 lugar de los Caballeros
                      Las Vegas, NM 87701
DOB:                  12/08/1963
SS#:                  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
Magistrate Court No.: M-48-FR-201500145
                      Defendant,

**Crimes:**       Possession of a Controlled Substance (Felony - Narcotic Drug)**(DA Charge Code 5614),**  Dangerous drugs, conditions for sale - sell, dispose of or possess dangerous drugs**(DA Charge Code 0399)** & Possession of a Controlled Substance**(DA Charge Code 5801)**

### *AMENDED*
### CRIMINAL INFORMATION

    **COMES NOW** the Fourth Judicial District Attorney, of San Miguel County, State of New

Mexico, by and through its Deputy District Attorney, James Grayson, and accuses the above-

named Defendant of the crimes of:

### Count 1:

    **Possession of a Controlled Substance (Felony - Narcotic Drug)**, on or about June 26,

2015, in San Miguel County, New Mexico, the above-named defendant did intentionally have in his

possession (Hydrocodone), a narcotic drug which is a Schedule I or II controlled substance, the

possession of which is regulated or prohibited by law, a fourth degree felony, contrary to Section

30-31-23(E), NMSA 1978.

### Count 2:
**Dangerous drugs, conditions for sale - sell, dispose of or possess dangerous**

**drugs**, on or about June 5, 2015, in San Miguel County, New Mexico, the above-named

defendant did sell, dispose of or possess dangerous drugs (Risperidone), a fourth degree felony, contrary to Section 26-01-26(A), NMSA 1978.

### Count 3:

**Possession of a Controlled Substance**, on or about June 5, 2015, in San Miguel County, New Mexico, the above-named defendant did intentionally have in his possession *(Clonazepam)*, which is a controlled substance or a controlled substance analog of a substance enumerated in Schedule I, II, III, or IV, a misdemeanor, contrary to Section 30-31-23(A), NMSA 1978.


The names of the witnesses upon whose testimony this Information is based are as follows:


Undersheriff Anthony Madrid, Deputy Sean Armijo & Frances Tweed.




RESPECTFULLY SUBMITTED,

**RICHARD D. FLORES**
DISTRICT ATTORNEY

By: _____
~~James~~ Grayson
Deputy District Attorney
1800 New Mexico Avenue
Las Vegas, NM  87701
505-425-6746




### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was sent via electronic disclosure/mailed/hand-delivered/placed in the bin of Paul J. Kennedy, on this _25th_ day of October, 2016.

_____




DA Case No. 2015-S0656-46

**STATE OF NEW MEXICO**

In the Magistrate Court
San Miguel County
State of New Mexico                              *CASE# 15-12389*
Plaintiff,

FILED IN
SAN MIGUEL MAGISTRATE COURT

JUL 8 2015

By_____Clerk

VS.

Name:  John Paul Vigil
Dob:    12/08/1963
SSN:    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
Add:    512 Lugar De Los Caballeros, Las Vegas, New Mexico 87701
Defendant,

M-48-FR-2015-145-1

<u>**AFFIDAVIT FOR ARREST**</u>

The undersigned, being duly sworn, on his oath, states that he has reason to believe that on or about the 26th day of June 2015, in the County of San Miguel, State of New Mexico, the above-named defendant did commit the crimes of: **Possession of a Controlled Substance (felony), Possession of a Controlled Substance (misdemeanor – possession of a controlled substance NOT listed in 30-31-23(E) as felony possession)**

On June 5th, 2015 at approximately 10:00 a.m., Deputy Sean Armijo was dispatched to 3695 Hot Springs Blvd. (New Mexico Behavioral Health Institute) in reference to possible larceny of narcotics. Upon my arrival on scene Deputy Armijo made contact with Security Supervisor, Joe Chavez, who advised him Frances Tweed had received an anonymous letter stating an NMBHI employee was stealing medication and money from patients currently being treated at NMBHI. Ms. Tweed is the executive nurse administrator for NMBHI. Ms. Tweed provided Deputy Armijo with a copy of the anonymous letter. The letter alleged that Psych Tech Supervisor, John Vigil, had money and prescription narcotics belonging to various patients at NMBHI, locked inside of his desk.

On June 5th, 2015 Myself and Deputy Sean Armijo executed a search warrant on J. Vigil's desk and surrounding work area. During the course of the warrant, Ativan, a scheduled narcotic was located and seized, along with a substantial amount of money possibly belonging to NMBHI patients. Other medication belonging to NMBHI patients that are not scheduled narcotics, were also located during the course of the warrant. Ativan, another form of Lorazepam is listed as a Schedule VI in the controlled substances act.

On June 19th, 2015 at approximately 11:00 a.m., I was advised by Ms. Frances Tweed that a secondary anonymous letter had come in with more allegations against J. Vigil. The anonymous letter stated J. Vigil had two other lockers in different areas of NMBHI, and J. Vigil had narcotics in those lockers. Myself and Ms. Tweed proceeded to El Paso Cottage where J. Vigil's locker was located. Mr. Vigil's locker was blue in color and labeled with his name on it. I was later advised by Ms. Frances Tweed; security had cut the lock to his locker and had conducted a search on it. Ms. Tweed advised me that approximately eleven (9) Hydrocodone

Vigil v. Tweed, et al.                    Plaintiff's Initial Rule 26 Disclosures                    000002

Exhibit 3

pills were located in a "Centrum" vitamin bottle and two (2) more Hydrocodone were located inside of J. Vigil's locker. Ms. Tweed stated she had researched the pill's descriptors and found it to be Hydrocodone. On June 26th, 2015 myself and Investigator/Deputy Antoine Whitfield executed a search warrant signed by 4th Judicial District Judge Gerald Baca on J. Vigil's work locker. During the course of the search, eleven (11) Hydrocodone pills were located inside of a Centrum Multi-Vitamin container. The pills were seized for evidence purposes. Upon information and belief, Hydrocodone is listed as a Schedule II narcotic in controlled substances act.

Upon information from NMBHI Director Troy Jones, Mr. Vigil has authority to assist in the distribution of medication to patients; however he does not have authority to possess the drugs under any circumstances.

Affiant, Undersheriff Anthony L. Madrid is a full time salaried Undersheriff employed by the San Miguel County Sheriff's Office for approximately 8 months. The undersigned further states the following facts on oath to establish probable cause to believe that the above-named defendant committed the crimes charged:

Anthony L. Madrid
San Miguel County Sheriff's Office
Affiant

_7/8/15_
Date

Subscribed and sworn to me before this __8th__ day of __July__, 2015.

Approved by: Tom Clayton
District Attorney's Office

Judge: ~~Christian Montano~~
Gerald E. Baca
District Judge

State vs. John Paul Vigil
D-412-CR-2015-00208
Jury Trial 11/14/2017

1    DA: Well, what did he tell you?

2    Witness 5: Well he told me that um…um…mostly his lockers just contained uh…some

3    food, some clothes, some personal medication. Um…he said the medications that we

4    found were his except for Hydrocodone which was not his. Um…he said regarding

5    the…that was the blue locker. Regarding the little smaller, yellow lockers, he said he'd

6    never given anyone keys to those lockers and he kept the locks…keys for the lockers on

7    his keyring. Um…regarding client medication that was reportedly found in those lockers,

8    uh…he just told me he didn't put that there.

9    DA: Okay. So…so…just so we're clear, he…he denied ownership of the Hydrocodone?

10   Witness 5: Yes.

11   DA: Uh…did he say he had a prescription?

12   Witness 5: No.

13   DA: Did he ever provide you with a prescription?

14   Witness 5: No.

15   DA: Okay. Pass the witness.

16   Attorney 1: Mr. Schaffer, let me direct your attention to the second interview first, if you

17   don't mind.

18   Witness 5:  Sure. No problem.

19   Attorney 1: I have it as June 25th. Is that your recollection?

20   Witness 5: That's my recollection, sir.

21   Attorney 1: What are you referring to right now?

22   Witness 5: Um…a copy of the investigative report which has interview transcriptions.

Exhibit 4

State vs. John Paul Vigil
D-412-CR-2015-00208
Jury Trial 11/14/2017

1   Attorney 1: Okay. Do you recognize…

2   Defendant: I don't know what you're talking about.

3   Attorney 1: Do you recognize it as your prescription records?

4   Defendant: Oh, this is exhibit A?

5   Attorney 1: Yeah.

6   Defendant: Oh, yes…yes.

7   Attorney 1: Alright, and uh…uh…was there a period in time between 2007and 2011

8   when you were receiving prescriptions from your physicians for Hydrocodone?

9   Defendant: I'm sorry?

10  Attorney 1: Alright. Was there a period of time, between '07…

11  Defendant: Oh, yes, there was.

12  Attorney 1: …and 2011when you were receiving Hydrocodone prescriptions from you

13  physicians?

14  Defendant: Yes, there…there was a time that I was doing…yes.

15  Attorney 1: Okay. Do you know what Hydrocodone is?

16  Defendant: Now I do.

17  Attorney 1: Okay. Did you know what it was back then?

18  Defendant: No.

19  Attorney 1: Okay, did you know it was a pain killer?

20  Defendant: Yes I did know it was a pain killer. The doctor tells you 'I'm going to give

21  you something for pain.' Okay.

22  Attorney 1: Did you know it was a narcotic?

State vs. John Paul Vigil
D-412-CR-2015-00208
Jury Trial 11/14/2017

1    Defendant: Um…6/24/2015.

2    DA: And that's the statement we're talking about when you gave the interview to Mr.

3    Schaffer?

4    Defendant: Right.

5    DA: Will you please read the high…underlined portion?

6    Defendant: Okay, before I go any further and read the underlined portion, when I was in

7    the interview with…

8    DA: You're Honor…

9    Defendant: Mr. Schaffer, he…

10   Judge: Mr. Vigil, will you answer the question?

11   Defendant: Okay, it says uh the medication found were mine except the Hydrocodone.

12   DA: And from your exhibit, (Inaudible 10:12:14), from the testimony, your…your

13   exhibit…defense exhibit A, you'll agree with me that the most recent prescription for

14   Hydrocodone was August 28, 2011?

15   Defendant: Yes.

16   DA: And before that was May 9th, 2011?

17   Defendant: Yes.

18   DA: And then before that was uh…August 2011…excuse me, January of 2011?

19   Defendant: Right.

20   DA: And then October 2010.

21   Defendant: Yes

22   DA: February 2010.

State vs. John Paul Vigil
D-412-CR-2015-00208
Jury Trial 11/14/2017

1    Defendant: Yes.

2    DA: And April 2007.

3    Defendant: Okay.

4    DA: So you were prescribed Hydrocodone six different occasions according to your

5    exhibit, correct?

6    Defendant:  Back in that year, yes.

7    DA: And so that would have made the most recent prescription approximately four years

8    old, correct?

9    Defendant: Correct.

10   DA: And then the oldest one would have been, at the time, approximately eight years old.

11   Okay and you are aware that prescriptions do have expiration dates?

12   Defendant: Yes I am.

13   DA: Okay. And um…when you were uh…providing your direct testimony, you

14   identified the other substances that were in this Centrum bottle? That you were pretty

15   specific, correct? You knew what each one was, right?

16   Defendant: Uh…it's kind of been a long time but like I…I was able to…to figure out

17   which ones they were, yes.

18   DA: Okay, and ca…Hydrocodone were also in that same bottle.

19   Defendant: According to them, yes. Cause I don't even see the Centrum bottle here.

20   DA: No further questions.

21   Judge: Any redirects, Mr. Kennedy?

State vs. John Paul Vigil
D-412-CR-2015-00208
Jury Trial 11/14/2017

1    which is something you kind of uh…order through the mail to see if it helps you relieve

2    Gout. It contains uh…tur…uh…turmeric uh…milk thistle, uh… devil's claw, grape seed

3    extract, tart cherries. Stuff like that is used to…

4    Attorney 1: Okay.

5    Defendant: …control Gout simsons…symptoms, if you kind of look at it in uh…herbalist

6    kind of way.

7    Attorney 1: Alright. Not a…not a…

8    Defendant: (Inaudible 9:51:20) suffer unless you try to…you're grasping at everything to

9    see if it helps you…

10   Attorney 1: Not a prescription?

11   Defendant: (Nothing does 9:51:24)

12   Attorney 1: Not a prescription?

13   Defendant: (Nothing does 9:51:25)

14   Attorney 1: Not a prescription medication?

15   Defendant: I'm sorry?

16   Attorney 1: Not a prescription medication?

17   Defendant: No…no…no…not a prescription medication.

18   Attorney 1: Now, uh…how did all those medications, along with the Hydrocodone, get in

19   that Centrum bottle?

20   Defendant: Well, the…the…you know, I…it's hard to carry all this medications in

21   containers so I…this is what I always do. I've done this all my life. I have one container

22   like this Centrum bottle. I still do it, you know. I…I go to Albuquerque; I visit my son

State vs. John Paul Vigil
D-412-CR-2015-00208
Jury Trial 11/14/2017

1   over there. I mean, we stay there for two/three days. I through in two, three, four pills of

2   this; two, three, four pill of uh…Indomethacin. Two, three, four of Colchicine, uh…and I

3   take them uh…I take uh…three, four pills of (Hydro Cloracline 9:52:04, Hydroxyzine

4   9:2:06, Hydrochloride 9:52:07). Uh…what else do I take? I'm mean, the list uh…

5   Attorney 1: So you throw those together in a…in a Centrum bottle?

6   Defendant: Well, I take them all together in a Centrum bottle so I'm not carrying

7   ten…ten uh…prescribed bottles with me. You know, I need a case.

8   Attorney 1: Alright.

9   Defendant: Or then, I don't want nothing, you know…or, I don't want to lose the whole

10  bottle because if I lose the whole bottle, I can't go to the doctor and tell the doctor…I

11  mean, I can't go to the pharmacist at Walgreens and tell Walgreens or Plaza drugs, 'you

12  know what, I lost my medication. I need for you to give me something for my…for my

13  arthritis'. They're going to say, 'Well the insurance don't cover it. Colcrys … Colcrys I

14  think is worth like six hundred dollars for a bottle of maybe 30 pills. It's about six

15  hundred dollars.

16  Attorney 1: Okay.

17  Defendant: They won't even prescribe…they won't give it to me because they

18  prescription…

19  Attorney 1: How…

20  Defendant: …is already administered.

21  Attorney 1: How did that Centrum bottle uh…that…that we see that picture there,

22  uh…end up in your locker?

State vs. John Paul Vigil
D-412-CR-2015-00208
Jury Trial 11/14/2017

1   Defendant: I probably...uh…what I'm thinking is that um… I probably came from

2   vacation. I probably put it there and um…like I didn't take my medication. Like I have

3   other medications, I just left them there.

4   Attorney 1: Alright.

5   Defendant: That locker, I never get into that locker. I never use the locker again. I just

6   locked it and pretty much used just the locker that was inside my office.

7   Attorney 1: Alright. Uh…is there any doubt in your mind that those Hydrocodone's you

8   got pursuant to the prescriptions that we've found here in court?

9   Defendant: Did…I'm sorry, again? Uh…huh…Is there any doubt that they're mine?

10  Attorney 1: Yeah.

11  Defendant: No, there's no doubt that they're mine. I have prescriptions for them.

12  Attorney 1: Alright. How come you didn't take them all?

13  Defendant: Cause I know they mess up your liver.

14  Attorney 1: Okay.

15  Defendant: And I wasn't in pain anymore really, so I was under contr…uh…I…I had

16  already uh…gone through my operation. My nose was okay. Uh…

17  Attorney 1: So, if…if you were….

18  Defendant: My shingles were over with. I was feeling okay. I…there was no need to… I

19  don't take the medications. They were there…

20  Attorney 1: So when you were no longer in pain, you stopped taking the Hydrocodone?

21  Defendant: I stopped taking the Hydrocodone, yes.

STATE OF NEW MEXICO
SAN MIGUEL COUNTY MAGISTRATE COURT IN LAS VEGAS

**State of New Mexico**
**v**
**John Vigil, Defendant**

2015 DEC 16 AM 8:28

FILED IN
SAN MIGUEL MAGISTRATE COURT
OCT 21 2015
By _____ Clerk

No. M-48-FR-2015-00145

## ORDER ON PRELIMINARY EXAMINATION  D-412-CR-2015-208

On October 21, 2015,

Per the criminal complaint, the following **charge(s)** appeared before the court for preliminary examination:

| | | | |
|---|---|---|---|
| 1 | Possession of a Controlled Substance (Felony - Narcotic Drug) | 4th Degree Felony | 30-31-23(E) |
| 2 | Possession of a Controlled Substance (Misdemeanor) | Misdemeanor | 30-31-23(A) |
| 3 | Dangerous Drugs, Conditions for Sale | 4th Degree Felony | 26-1-16 |

A preliminary examination was held on the offense(s) listed above. The state appeared through James W. Grayson. The defendant appeared in person and through counsel, Paul John Kennedy.
(*check all that apply*)[1]

[ ]    It is hereby ORDERED that the defendant is BOUND OVER FOR TRIAL in the district court as to the following **count(s)**:  1-3

[ ]    As to the following **count(s)**, the court FINDS there is no probable cause to believe that the charged offense was committed and that the defendant committed the offense. It is hereby ORDERED that the defendant is DISCHARGED as to the following **count(s)**:

2

**IT IS SO ORDERED.**

Dated: 10/21/15    _____
                                          **Judge**

### USE NOTES

1.  Every count listed in the complaint must be accounted for in this bind-over order.
2.  If the court finds probable cause for any felony offense, all misdemeanor charges in the complaint must be included in this bind-over order.
3.  Attach copy of Complaint, any Warrants issued, Appearance Bond or Bail Bond, and Order Specifying Conditions of Release.
    [As amended by Supreme Court Order No. 14-8300-020, effective for all cases pending or filed on or after December 31, 2014.]

**Distribution**    1 copy - Court    1 copy - Defendant    1 copy – Prosecutor    Criminal Forms 9-608, 9-207

**Court Information:**
San Miguel County Magistrate Court in Las Vegas  312 Bibb Drive

Las Vegas NM  87701    phone 505-425-5204    (fax) 505-425-0422    web site: www.nmcourts.com



EXHIBIT
A

Exhibit 5

64. The Department considered the information provided by Mr. Vigil at his ORM, but found no reason to reduce the proposed disciplinary action. (Id.)

65. Mr. Vigil's NFA was dated October 20, 2015, and dismissed him effective October 21, 2015. (Id.; Stip. 2.)

66. At the time of his dismissal, Mr. Vigil was a permanent employee of BHI within the classified service. (Stip. 3.)

67. Mr. Vigil filed the Notice of Appeal of his dismissal with the Board on November 19, 2015. (Stip. 4.)

Any Finding of Fact that constitutes a Conclusion of Law is adopted by the ALJ as such as if originally so denominated.

## VII.   RECOMMENDED CONCLUSIONS OF LAW

1. Mr. Vigil received due process through his NCA and the opportunity to respond to it orally and in writing, as this provided him with notice of the factual basis underlying his proposed dismissal and an opportunity to be heard. (*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545 (1985).)

2. At the time of his dismissal on October 21, 2015, Mr. Vigil was a permanent employee of DOH within the classified service and was entitled by law to appeal his discipline to the Board. (NMSA 1978, Section 10-9-18(A) (2009); 1.7.11.13(C)(4)(a) and 1.7.12.8(A) NMAC.)

3. Mr. Vigil timely filed his Notice of Appeal with the Board within the 30-day period provided by law. (NMSA 1978, Section 10-9-18(A) (2009); 1.7.11.13(C)(4)(a) and 1.7.12.8(B) NMAC.)

4. The Board has personal and subject matter jurisdiction over the parties. (Id.)

5. Under BHI's Disposal of Unusable Products Policy, expired medication is an unusable product. (BHI Disposal of Unusable Products Policy, PHM 060, Definitions Section A(1).)

6. BHI's Disposal of Unusable Products Policy states that "[u]nusable products shall be segregated and held until able to return." (BHI Disposal of Unusable Products Policy, PHM 060, Procedures Section III(A).)

7. The "segregated and held" provision of BHI's Disposal of Unusable Products Policy is informed by the NMBHI at Las Vegas CBS Custodial Procedures Manual (revised as of 4/25/12), which provides that, "Medications no longer in use, unwanted, outdated, or adulterated will be placed in a quarantine area in the locked medication cabinet and held

92

Vigil v. Tweed, et al.                    Plaintiff's Initial Rule 26 Disclosures                    001109

Exhibit 6

for destruction by the consultant pharmacist." (NMBHI at Las Vegas CBS Custodial Procedures Manual (revised as of 4/25/12), Drug Policy Section I(E)(6).)

8. Mr. Vigil knew or should have known that expired patient medication was stored in a separate area of the locked medcart.

9. When Mr. Vigil stored expired patient medication in his desk cabinet and cubby locker, he engaged in misconduct and violated BHI's Disposal of Unusable Products Policy. (BHI Disposal of Unusable Products Policy, PHM 060, Procedures Section III(A).)

10. Under BHI's Incident Reporting and Notification Policy, employees are required to complete a Medication Incident Report when there is a medication-related deviation from policy or a medication-related safety hazard for BHI patients. (BHI Incident Reporting and Notification Policy, SCD 001, Definitions Section and Procedures Section IV(I).)

11. When Mr. Vigil failed to complete Medication Incident Reports on: 1) his storing expired patient prescription medications in his desk and cubby locker, in violation of policy; and 2) his discovery of expired medications in ALF residents' active medication bins, a safety hazard for those ALF residents, he engaged in misconduct and violated BHI's Incident Reporting and Notification Policy. (Id.)

12. When Mr. Vigil failed to complete the required Medication Incident Reports and left clothing allowance change in his unlocked desk drawer, he engaged in misconduct, was negligent, violated DOH's Disciplinary Action Policy, and violated DOH's Code of Conduct. (DOH Disciplinary Action Policy, HR.08.10, Definitions Section S and Policy Section B(3)(f); DOH Code of Conduct, HR 015, Policy Section III(A)(b).)

13. When Mr. Vigil violated BHI's Disposal of Unusable Products Policy (PHM 060), BHI's Incident Reporting and Notification Policy (SCD 001), and DOH's Code of Conduct, he violated DOH's Disciplinary Action Policy. (DOH Disciplinary Action Policy, HR.08.10, Policy Section B(3)(bb).)

14. Mr. Vigil's proven misconduct and violations of BHI and DOH policies were inconsistent with his obligations to BHI and DOH. (1.7.11.10(A) NMAC.)

15. Mr. Vigil's proven misconduct and policy violations are mitigated, however by the following facts:
    - It was established practice in the ALF Unit for the Psych Tech Supervisor to store expired patient medication in his desk cabinet until it could be returned to the pharmacy;
    - Mr. Vigil followed this practice to ensure the safety of the ALF residents;
    - Mr. Vigil held the expired medications in secure locations – the locked desk cabinet of his locked office and in his locked cubby locker; and
    - Mr. Vigil reported his discovery of expired patient medication in ALF residents' active medication bins directly to his supervisor, CBS Director Dominguez.

93

16. The allegations in Mr. Vigil's LOR (unprofessional interaction with co-worker) are wholly unrelated to his proven misconduct here. (*Compare* Ex. 21 *to* Recommended Conclusions of Law 9, 11, and 12.)

17. Mr. Vigil's prior LOR cannot serve as progressive discipline under these circumstances.

18. Based on Mr. Vigil's misconduct and violations of BHI and DOH policy, the Department had just cause to discipline him. (1.7.11.10(B) NMAC.)

19. Given the nature of Mr. Vigil's misconduct, the mitigating factors listed above, and the lack of progressive discipline, however, the discipline of dismissal was not the appropriate sanction to impose on him.

20. Under these circumstances, the appropriate and proportional sanction to impose upon Mr. Vigil is a 30-day suspension.

## VIII.    RECOMMENDED DECISION

Mr. Vigil improperly stored expired patient medication in his desk cabinet and cubby locker; failed to complete Medication Incident Reports on that improper storage and on his discovery of expired medication in ALF residents' active medication bins, and improperly handled clothing allowance change by storing it in his unlocked desk drawer. This misconduct is inconsistent with Mr. Vigil's obligations to DOH and BHI, is a violation of BHI and DOH policies, and is just cause for his discipline. However, given the nature of his misconduct, the mitigating factors listed above that lessen the severity of his misconduct, and the lack of progressive discipline, dismissal was not the appropriate sanction here. Rather, a 30-day suspension is the appropriate, reasonable, and proportional sanction to impose on Mr. Vigil.

Respectfully submitted,

Jessica B. Cooper
Administrative Law Judge

Entered: March 4, 2019

94