IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOHN VIGIL,

     Plaintiff,

v.                         Case No. 18-CV-00829-SCY/JKR

FRANCES TWEED, et al.,

     Defendants.

## MOTION FOR SUMMARY JUDGMENT
## BASED ON QUALIFIED IMMUNITY

State Defendants, Francis Tweed, Corinne Dominguez, Antonio Coca and Joe Chavez, move the Court for summary judgment. The Defendants have qualified immunity from Plaintiff John Vigil's claims under 42 U.S.C. § 1983.

### 1. Introduction

In the wake of the Court's previous rulings[1], this lawsuit involves a claim under Section 1983 for First Amendment Retaliation against the State Defendants. Vigil is a former employee of the New Mexico Behavioral Health Institute ("BHI") of New Mexico Department of Health ("DOH"). On May 29, 2015, BHI administrators received the first of two anonymous notes accusing Vigil of exploitation of patient medications and funds. BHI Administration along with the DOH Human Resources

---

[1] The Court dismissed all other claims. *See* Doc. 30 Memorandum Opinion, filed 6-7-2019; Doc. 66 Memorandum Opinion, filed 6-16-20; Doc. 82, Memorandum Opinion Denying Rule 54(b) Motion, filed 8-12-20; Doc. 104 Memorandum Opinion filed 7-14-21. The Court also determined that Vigil may not pursue amended allegations that defendants fabricated evidence to "frame" him. Doc. 66 at 7-11.

Bureau directed Tweed, Coca and Chavez to conduct a workplace search of Vigil's desk, cabinets and lockers implicated in the notes. The search revealed patient medication and funds. After receiving a second note, BHI and the DOH directed Tweed to conduct another search, which again, revealed unauthorized medications. Tweed's superiors also directed her to contact law enforcement about the notes and the office searches. County law enforcement arrested Vigil and charged him with drug possession. He was later acquitted.

Vigil claims that the office searches and law enforcement contacts induced his arrest and prosecution and were retaliation for earlier speech protected under the First Amendment. The defendants, however, are entitled to qualified immunity because the offices searches, arrest and prosecution were reasonable and supported by probable cause. *Hartman v. Moore*, 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006.) Nor is there clearly established law allowing for a First Amendment claim under the particular facts of this case.

Further, Vigil lacks proof of elements of his First Amendment claim. The searches, law enforcement contacts, the ensuing arrest and prosecution were not substantially motivated by protected speech. The contacts with law enforcement did not occur under color of law. Vigil's alleged speech also does not garner First Amendment protection.

Accordingly, the State Defendants seek summary judgment of the basis of qualified immunity.

## 2. Statement of Undisputed Facts

1.    John Vigil worked for the BHI as a Psych Tech Supervisor in the Assisted

Living Facility ("ALF"). (ALJ Findings[2], Exh. 1, Nos. 000108-117, at ¶ 1-2; *see also*

Job Description, JRQ, Skills and Knowledge Checklist, Exh. 2)

2.    On or around May 29, 2015, an anonymous letter was sent via BHI inter office

mail, one copy each to BHI Chief Operating Officer Charles Jaramillo, BHI

Assistant Director of HR Richard Vigil, and BHI Standards and Compliance

Director Rose Contreras, stating:

> I was told and everybody knows that superviser john vigil has a lot of
> bottels of the patients meds in his desk, and some are ativans and
> narcotics locked away. Also hundreds of dollars of there money to. John
> vigil is the psych tech superviser at the arches. We will send to HR patient
> avocate and investegations. You cannot tell him how you found out cuase
> he will know who send this letter.

(Exh. 1, No. 000110, at ¶ 20; BHI Incident Report Forms, Exh. 3; *See also*

Testimony of Francis Tweed, Exh. 4 at 98:11–101:20)

3.    BHI initiated an internal investigation. (*See* Investigation Report, Exh. 5 at 2)

BHI Chief Administrator Troy Jones contacted Tweed and directed her to confer

with Elona Cruz in the DOH Human Resources Bureau in Santa Fe about the

letter. (Tweed, Exh. 4 at 98:13-99:2)

---

[2] Like the criminal proceeding, *see* Doc. 66 at 23-26, the Administrative Law Judge's
findings in the personnel hearing are binding on Vigil here. *See Mascarenas v. City of
Albuquerque*, 2012-NMCA-031, ¶ 31-36, 271 P. 3d 781, 789-791. The factual issues were
necessarily adjudicated in determining Vigil's disciplinary violations. Thus, the State
Defendants cite to the ALJ's Findings & Conclusions, Exhibit 1. Other portions of the ALJ's
decision, such as testimony summaries and evidentiary analysis, were previously
introduced. *See* Doc. 34-1.

4.    Elona Cruz directed Tweed to search the office. (*Id.* at 98:25-99:2)

5.    On June 3, 2015, Tweed, along with Internal Review Director Antonio Coca, and Security Director Joe Chavez, searched the Supervisor's office desk area in the El Paso Cottage. (Tweed, Exh. 4 at 101:21–110:19; Testimony of Joe Chavez, Exh. 6 at 649:5-660:20)

6.    Vigil's desk cabinet had a combination lock, but there was enough play in the cabinet doors to pull them open a couple of inches. Chavez was able to look into the cabinet and see patient medications. (Exh. 1, No. 000111, at ¶ 23; Tweed, Exh. 4 at 102:4-11; Chavez, Exh. 6, 650:11-653:1; 682-16-22)

7.    Found in Mr. Vigil's locked desk cabinet were two expired prescription bottles of Risperidone for two BHI patients and a paper medication cup with a tablet of Clonazepam. There were also money envelopes. (Exh. 1, No. 000111, at ¶ 25; Tweed, Exh. 4 at 103:3-109:20; Chavez, Exh. 6 at 651:16-657:21; Report, Exh. 5 at 2)

8.    Because the search revealed prescription medications, Tweed was unsure if a crime had been committed. Tweed reported back to Ms. Cruz in Human Resources who advised her "to go ahead and contact the police." (Tweed, Exh. 4 at 103:10-20)

9.    Law enforcement was contacted and conducted their own search of Mr. Vigil's desk. (Exh. 1, No. 000111, at ¶27; Tweed, Exh. 4 at 105:2; Search Warrant and Affidavit, Doc 87-1 filed 9/24/20)

10.    On June 19, 2015, Tweed, Jaramillo, and Vigil received a second anonymous letter via inter office mail, one copy each to, stating:

> John paul vigil has 2 lokers in mesa and el paso unit I in mesa has a
> combination and 1 in el paso has a yellow lock. I no the 1 in el paso has
> pills. He uses.

(Exh. 1, No. 000111, at ¶28; Exh. 5 at 3)

11.    The Human Resources Bureau directed Ms. Tweed to conduct another search
and contact law enforcement. (Tweed, Exh. 4 at 114:25-115:25; Exh. 5 at 3)

12.    Tweed, Security Officer Louann Gonzales, and Investigator Peter Schaefer
searched the lockers. (*Id.*) Law enforcement came to the premises but did not
conduct a search at that time. (*See* Tweed, Exh. 4 at 128:2-129-5)

13.    Found in Mr. Vigil's blue locker was a Centrum Silver vitamin bottle
containing multiple, loose, unlabeled medications, including: 9 tablets of
Hydrocodone 5 mg/500 mg, 2 tablets of Hydrocodone 7.5 mg/500 mg, Ibuprofen,
Indomethacin, Colchicine, and Clindamycin. (Exh. 1, No. 000112, at ¶ 30; Tweed,
Exh. 4 at 119:25-120:25; Exh. 5 at 3)

14.    Also found in a cubby locker were a magazine with Mr. Vigil's name and
address and three expired prescription medications belonging to two BHI patients.
(Exh. 1, No. 000112, at ¶31; Tweed, Exh. 4 at 124:6-25)

15.    The blue locker containing the Hydrocodone and the cubby containing the
expired patient prescriptions were Vigil's. (Exh. 1, No. 000112, at ¶33; Chavez, Exh.
6 at 674:25-675:3)

16.    On June 26, 2015, law enforcement conducted its own search of Mr. Vigil's
blue locker. (*See* Warrant and Affidavit, Doc 87-2, filed 9-24-20)

17.   On June 24, 2015, Vigil wrote a statement claiming that someone was "planting medications in my locker that does [sic] not belong to me;" he alleged retaliation by his co-workers on the night shift. (Exh. 7, 6-24-2015 Vigil handwritten statement; also attached Vigil's testimony reading statement verbatim) He provided another written statement on June 24, 2015, also denying that the hydrocodone belonged to him. (Exh. 8, Vigil Staff Voluntary Statement)

18.   The Clonazepam was patient medication, which Mr. Vigil worked with as part of his job. (Exh. 1, No. 000113, at ¶39)

19.   Mr. Vigil claimed that he did not know about or place the Clonazepam tablet in his desk cabinet. (*Id.* ¶40)

20.   On June 25, 2015, Vigil gave an interview to Investigator Schaefer, again denying the Hydrocodone was his.  (*See* Exh. 5 at 9)

21.   Vigil's supervisor, Defendant Corinne Dominguez, knew of the investigation but did not participate in it; she had no contacts with law enforcement. (*See* Exh. 9, Testimony of Corinne Dominguez at 639:18-640:5)

22.   On July 8, 2015, Undersheriff Deputy Anthony Madrid with the San Miguel County Sheriff's Office filed a criminal complaint and affidavit for the arrest of Mr. Vigil for possession of a controlled substance. (Exh. 10 – Criminal Complaint and Affidavit for Arrest Warrant 7-8-2015). According to the affidavit, Ms. Tweed had reported that the BHI had received an anonymous letter stating that Mr. Vigil was stealing medications and funds from BHI patients. She provided a copy of the letter to Deputy Madrid. The affidavit goes on to detail the searches conducted by the BHI

employees as well as those by the Sheriff's Office, including the medications and funds found in Mr. Vigil's desk and lockers. The affidavit concludes by noting that the BHI Director Troy Jones advised that Mr. Vigil only had authority to assist patients with their medications but did not have authority to possess the drugs. *Id.*

23.   The arrest warrant, the police report, the search warrants and statement of probable cause all set forth the same information about the communications from the State Defendants. (*Compare* 6-5-2015 Police Report, Exh. 11, *with* 6-8-2015 Search Warrant, Doc 87-1, *with* 6/26/2015 Search Warrant, Doc 87-2, *with* Exh. 10, 7-8-15 Criminal Complaint and Affidavit for Arrest Warrant, *with* 10/21/15 Amended Criminal Complaint and Statement of Probable Cause, Exh. 12)

24.   Vigil was arrested by the San Miguel County Sheriff's Department and charged with felony and misdemeanor possession of drugs and controlled substances. (Second Amended Complaint Doc. 38 at ¶52)

25.   On October 21, 2015, a state magistrate judge conducted a preliminary examination and issued a bind-over order finding probable cause for the charges. (Doc. 66 at 21 (citing Doc. 49 and attached exhibits))

26.   On August 25, 2016, the state district court judge denied a motion to suppress evidence, finding that Plaintiff had no reasonable expectation of privacy in his workplace desk, cabinet, and locker and that the State Defendants acted reasonably in searching these areas for work-related employee misconduct. (*Id.*)

27.   Plaintiff was acquitted at trial. (Doc. 38 at ¶ 56)

28.   In October 2015, the DOH issued a notice of final action terminating Vigil for misconduct, which he then appealed. (*See* Doc. 34-1 at 2) The State Personnel Board conducted an administrative hearing during July and August 2018, with Administrative Law Judge Jessica Cooper presiding. (*Id.* at 8) Mr. Vigil appeared through counsel and presented and cross examined witness, introduced exhibits and made legal arguments. (*See generally* Doc 34-1; *see also* Exh. 1)

29.   On March 4, 2019, ALJ Cooper issued a Recommended Decision, including Findings of Fact and Conclusions of Law. (*Id.*)

30.   ALR Cooper concluded that Vigil had violated policies related to medication handling in the facility by improperly storing patient medications in his desk and cubby locker.  (Exh. 1 at No. 000115-000116 ¶¶ 5-14; Doc 34-1 at 47)

31.    He also failed to complete medication incident reports related to patient medications. *Id.* He improperly handled patient funds by storing them in his unlocked desk drawer. *Id.* The ALJ also determined that there were mitigating factors in Mr. Vigil's favor and that he was subject to progressive discipline. (*Id.*  at No. 000116, ¶15-20) The ALJ determined that he should receive a 30-day suspension in lieu of termination. *Id.*

32.    SPO adopted the ALJ's decision. (Doc. 34-3, Final Decision) Mr. Vigil had the opportunity to appeal (*see* Rule 1-074 NMRA), but he did not do so.

33.   Plaintiff Vigil submitted a single narrative answer to multiple interrogatories asking him to detail his allegations concerning protected speech and the defendant's alleged involvement. (*See* Exh. 13, Plaintiff's Answers to Interrogatories, pp. 1,8-12)

34.   In deposition testimony, Vigil responded to questions asking him to explain his allegations of protected speech and retaliation by each defendant. (*See* excerpts attached as Exh. 14)

### 3.  Law on Qualified Immunity & Summary Judgment

To overcome the defense of qualified immunity, "a plaintiff must properly allege a deprivation of a constitutional right and must further show that the constitutional right was clearly established at the time of the violation." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012).  "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted).

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. at 231 (quoting *Harlow*, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  The plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." *Pearson* at 237.

The clearly established prong of the qualified immunity test is a very high burden for the plaintiff:  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (emphasis added).  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the

law of the jurisdiction as to be "indisputable" and "unquestioned." *Zweibon v. Mitchell*, 720 F.2d 162, 172-73, 231 U.S. App. D.C. 398 (D.C. Cir. 1983).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although a moving party "always bears the initial responsibility of informing the district court of the basis for its motion," *id.* at 323, 106 S.Ct. 2548, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

## 4. Plaintiff Cannot Show his Claim for First Amendment Retaliation Rests upon Clearly Established Law

Vigil alleges that the State Defendants, particularly Tweed, retaliated against him by conducting the office searches, contacting law enforcement, and providing false information, causing Vigil's arrest and prosecution. (*See* Doc. 38 at ¶130) However, previous judicial determinations that the office searches were reasonable, and that probable cause supported Vigil's arrest and prosecution preclude his

Section 1983 claim. *Hartman v. Moore*, 547 U.S. 250, 263, 126 S.Ct. 1695, 164 L.Ed.2d 441 (plaintiffs in retaliatory prosecution cases must prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause). *McBeth v. Himes*, 598 F.3d 708, 719 (10th Cir.2010) (extending *Hartman's* probable cause rationale to a retaliation claim based on suspension of business license). *See also Nieves v. Bartlett*, __ U.S. __, 139 S. Ct. 1715, 1726, 204 L.Ed.2d 1 (2019) (holding that "the existence of probable cause should also generally defeat a First Amendment Retaliatory Arrest claim).

*Hartman* involved a First Amendment claim for retaliatory prosecution. The Supreme Court opened its analysis by acknowledging the First Amendment standard for retaliation claims: "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. 547 U.S. at 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). "If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim." *Id.* [citations omitted]. The Court observed that the causation standard for the plaintiff to connect the retaliatory motive with the adverse action is "but-for causation, without which the adverse action would not have been taken." *Id.* at 260, 126 S.Ct. 1695.

The Court then recognized that retaliatory prosecution cases differ from ordinarily retaliation cases in two ways. First,

> there will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge. Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive.

547 U.S. at 261, 126 S.Ct. 1695.

Second, the Court explained that causation is retaliatory prosecution cases is multi-layered. *See id.* The lawsuit generally must be brought against the governmental official who acted with the retaliatory motive, while the prosecutor, who formally initiated the criminal charges, enjoys absolute immunity for prosecutorial decisions. *Id.* at 261–62, 126 S.Ct. 1695. Thus, unlike a normal retaliation case, where the same person possesses the retaliatory animus and takes the adverse action against the plaintiff, in the retaliatory prosecution context, the requisite causal connection is "between the retaliatory animus of one person and the action of another." *Id.* at 262, 126 S.Ct. 1695. The Court elaborated:

> the defendant will be a nonprosecutor, an official, like an inspector here, who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute. The consequence is that a plaintiff like Moore must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging.

*Id.*

The Court stated that, "Some sort of allegation, then, is needed both to bridge the gap between the nonprosecuting government agent's motive and the

prosecutor's action, and to address the presumption of prosecutorial regularity." *Id.* at 263, 126 S.Ct. 1695. The Court held that, "The connection, to be alleged and shown, is the absence of probable cause." *Id.*

The Tenth Circuit has since extended *Hartman* to a claim for First Amendment retaliation against government officials for threatening the plaintiff with suspension of a daycare license and coercing her into agreeing to relinquish her license. *See McBeth v. Himes*, 598 F.3d 708, 719 (10th Cir. 2010). Based on *Hartman*, the Court held that the plaintiff had to plead and prove that the officials lacked cause to seek suspension of her license. *See also, e.g., Glover v. Mabrey*, 384 Fed.Appx. 763, 2010 WL 2563032 (10th Circuit 2010) (unpublished) (plaintiff alleging that officials retaliated by inducing an IRS audit had to plead and prove lack of cause for the audit); *Scott v. Tempelmeyer*, 867 F.3d 1067, 1071-72 (8th Cir 2017) (no clearly established right to be free from regulatory enforcement that is otherwise supported by cause).

Following *Hartman*, a circuit conflict continued to exist about whether the presence of probable cause also precludes a First Amendment claim based on a retaliatory arrest. *See Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 182 L.Ed.2d 985 (reversing 10th Circuit decision allowing a First Amendment retaliatory arrest claim to proceed despite the presence of probable cause on the grounds that the law was not clearly established). However, most recently, the Supreme Court determined in *Nieves v. Bartlett*, __ U.S. __, 139 S. Ct. 1715, 1726, 204 L.Ed.2d 1 (2019), that probable cause also precludes an arrest claim.

In the present case, this Court determined that the Magistrate Judge in the criminal proceeding found that probable cause existed for the three criminal charges against Vigil (Doc. 66 at 21) and that he is precluded from relitigating the probable cause determination. *Id.* at 26. Further, this Court also held that the plaintiff is precluded from relitigating the legality of the searches conducted by the State defendants. (*Id.*) A state district judge also ruled in the criminal proceeding that the plaintiff had "no reasonable expectation of privacy in his workplace desk, cabinet, and locker" and that "the State Defendants acted reasonably in searching these areas for work-related employee misconduct." (Doc. 66 at (citing Doc. 49-4 at 1)) Observing that the "State Defendants' interest in investigating allegations of narcotics trafficking on their property is extremely strong", this Court also determined that, "[n]o 'clearly established weight of authority' in the Tenth Circuit or other circuits provided notice that the anonymous tip in this case failed to provide reasonable justification for the searches at issue." (Doc. 30 at 19)

Accordingly, there was cause for searches, arrest, and prosecution. The *Hartman* line of cases is dispositive. The State Defendants are entitled to qualified immunity on Vigil's claim of First Amendment retaliation. Further, there is no clearly established law recognizing a First Amendment claim under the particular facts of this case. The Court should grant summary judgment in favor of the State Defendants.

**5. State Defendants are Also Entitled to Summary Judgment on the First Prong of Qualified Immunity**

The State Defendants are also entitled to qualified immunity because Vigil lacks evidence to support the elements of a claim for First Amendment retaliation. Vigil alleges that the State Defendants' searches and contacts with law enforcement were sufficient to chill a person of ordinary firmness in the exercise of their First Amendment Rights. (Doc. 38 at ¶136, 137) To assert a claim for First Amendment retaliation in this context, a plaintiff must establish that: (1) the plaintiff was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

At the summary judgment stage, facts must show the defendants "acted on the basis of a culpable subjective state of mind" to satisfy the third step. *Trant v. Oklahoma,* 754 F.3d 1158, 1170 (10th Cir. 2014) (citing *McCook v. Spriner Sch. Dist.*, 44 Fed. Appx. 896, 905 (10th Cir.2002)) "If the defendant's intent in urging adverse action against the employee is not retaliatory" or "if the defendant's conduct did not cause the adverse action, then the defendant may successfully defend the retaliation claim." *Id.* (citing *Worrell*, 219 F.3d at 1213). "And temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Id.* (citing *Butler v. City of Prairie Village*, 172 F.3d 736, 746 (10th Cir.1999)).

The plaintiff also has the burden in a Section 1983 cases of proving that a defendant's occurred under color of law. *D.T. ex rel. M.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176, 1186 (10th Cir.1990).

> "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." However, "the fact that a tort was committed by an individual employed by the state does not, ipso facto, warrant attributing all of the employee's actions to the state." Rather, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."

*Schaffer v. Salt Lake City Corp*, 814 F.3d 1151, 1155–56 (10th Cir. 2016) (citations omitted). Reporting suspicious activity, signing witness statements and furnishing information to law enforcement officers does not occur under color of state law. *See Schaffer*, 814 F.3d at 1115-1158 (On duty, public parking enforcement officers did not act under color of law in reporting aggravated assault with a motor vehicle, leading to criminal charges).

**Defendants Chavez & Coca.** Troy Jones, the Chief BHI administrator, and Elona Cruz of the DOH Human Rights Bureau directed the June 3, 2015 office search after BHI received the first note. Defendants Chavez and Coca participated in that search; Chavez later spoke with the County law enforcement officers about the search results. There is no allegation or evidence of further involvement by Chavez or Coca in the ensuing criminal charges or prosecution. When asked in his deposition about Chavez and Coca, Vigil only speculated that they might somehow be involved. (*See* Vigil Depo, Exh. 14, at 13:15-14:4)

Vigil has not shown, with evidence, that the search or any other conduct by Chavez and Coca was substantially motivated as retaliation against Mr. Vigil based on protected speech. Chavez and Coca did not order the search, and any alleged retaliatory animus by them (and there is no evidence of such animus) did not motivate it. Further, Chavez' statements to police about the search conduct did not occur under color of law based on 10th Circuit precedent. Any citizen may communicate with a police officer about a potential crime. *Schaffer*, 814 F.3d at 1156.

Although Vigil has not alleged a retaliatory animus by Troy Jones and Elona Cruz, the superiors who ordered the search, such an allegation would not save Vigil's claims. The Tenth Circuit has not decided whether a subordinate employee can be liable for First Amendment retaliation when he or she merely acts at the direction of a superior who desires to retaliate. *Muhammad v. Hall,* 674 Fed.Appx. 810, 813 (10th Cir. 2017) (unpublished) (citing *Trant v. Oklahoma*, 754 F.3d at 1170 n.5 (10th Cir. 2014) (stating that "[w]e have never held that true subordinate employees may be liable for First Amendment retaliation claims" and declining to decide the issue)). The Court stated, "this lack of precedent also means that the law is not clearly established," so that a plaintiff "would be entitled to the protection of qualified immunity" on such a claim.[3] *Id.*

In sum, plaintiff's evidence and allegations against Defendants Chavez and Coca do not show a cognizable Constitutional violation.

---

[3] Thus, the law remained unsettled in 2017, two years **after** the conduct here.

*Motion for Summary Judgment  18*

*Corinne Dominguez*. The Second Amended Complaint makes conclusory allegations that Defendant Corinne Dominguez "consented to and/or authorized and/or agreed to" the office searches and that she was acting as a supervisor. (Doc. 38 at ¶ 25) Supervisory officials may be held liable in their individual capacity but not under a theory of respondeat superior. *Cox v. Glanz*, 800 F.3d 1231, 1248 n.9 (10th Cir. 2015). A plaintiff must show that a subordinate violated the Constitution and an affirmative link between the supervisor and the constitutional violation. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). An "affirmative link" requires "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Id.*

Plaintiff has no evidence to support a claim against Ms. Dominguez. In his deposition, Vigil speculated that Dominguez was "in cahoots" with Tweed and had "a feeling she had something to do with the D.A. and all them." (Vigil Depo, Exh. 14 at 85:23-86:23) But there is no evidence that she participated or directed the searches, the investigation, or any interaction with the police. Vigil conceded as much in his deposition. (*See, e.g., id.* at 107:25-108:10)

Vigil also claimed in his deposition that Dominguez was aware that "everyone stored medication there" referencing employee desks and lockers. (*Id.* at 99:18-101:17) He alleges that Ms. Dominguez could have stopped the criminal inquiry "right away" by saying to the Sheriff's Office that it was "common practice." *Id.*

These contentions are inadmissible speculation. According to the search warrant affidavits and criminal complaints, Troy Jones, the Chief BHI administrator (and

Ms. Dominguez' superior) informed law enforcement that Mr. Vigil had "authority to assist in the distribution of medication to patients; however, he does not have authority to possess the drugs." (*See, e.g.,* Search Warrant Affidavit, Doc 87-1 at SMC 000383) Therefore, the Sheriff's Office relied on statements from Troy Jones, not Ms. Dominguez. Moreover, in his personnel board hearing, Vigil raised the very same defense about medication storage, alleging that he did not violate DOH policy; the hearing officer rejected it, finding that Vigil violated policies about medication storage. (Exh. 1 at No. 000113, ¶43-46; No. 000115-000116, ¶5-14)

In sum, Ms. Dominguez had no interaction with the Sheriff's Office and was not involved in the internal or criminal investigations. Nor was it her obligation to absolve Vigil of policy violations with law enforcement. The allegations do not arise under color of law or rest upon clearly established law.

***Frances Tweed***. Defendant Tweed participated in searches that, again, her superiors directed due to suspected patient exploitation. Such facts do not show retaliatory animus by the supervisors or Ms. Tweed. And again, this Circuit has not recognized a retaliation claim under Section 1983 when an employee is following her supervisor's directions.

According to interrogatory answers, Vigil claims that Tweed provided false information to the police that his possession of expired patient medications in his desk and lockers was against BHI policy. (*See* Exh. 13 at p.12) He also claims that she falsely stated that plaintiff could not possess his own medication, hydrocodone, on the premises under BHI policy. (*Id.*)

To begin with, Vigil has not provided evidence that Tweed made these specific statements to law enforcement during the criminal investigation. At the summary judgment stage, Vigil has the burden to come forward with specific facts about the communications to establish the elements of his claim. *Celotex,* 477 U.S. at 325, 166 S.Ct. 2548.

Vigil may contend that Tweed later made false statements at Vigil's preliminary hearing or criminal trials. However, Tweed has absolute immunity under Section 1983 based on any purported false testimony at such proceedings. *See Rehberg v. Paulk*, 566 U.S. 356, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012) (pretrial grand jury proceedings); *Briscoe v. LaHue*, 460 U.S. 325, 332-333, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (testimony at trial). *Rehberg* immunity includes any alleged "perjurious testimony" as well as any preparatory activity leading to that testimony. *Id.* Thus, Vigil may not support his First Amendment retaliation claim based on testimony Tweed gave at any preliminary hearing or trial.[4]

This leaves Tweed's statements recited in the police report and warrant and arrest affidavits and so forth. (*See* Doc 87-1, 87-2, Exh. 10, 11, 12) Those documents closely track each other: (1) Tweed advised officers about the 2 anonymous notes; (2) after the first search, Tweed stated that a pill inside of a cup was "possibly Ativan" and that she had "researched its descriptors and found it to be Ativan"; (3) Tweed later advised that during the second search, "security had cut the lock to his locker and had conducted a search on it . . . that approximately eleven (9) Hydrocodone

---

[4] Vigil also did not allege perjurious testimony in the second amended complaint.

pills were located in a "Centrum" vitamin bottle and two (2) more Hydrocodone were in Vigil's locker and that "she had researched the pill's descriptors and found it to be Hydrocodone." (*Id.*)

Here again, BHI directed Tweed to cooperate with law enforcement because a crime may have occurred. Advising law enforcement about the notes and providing copies of them was not "substantially motivated" by anything other than investigation of a potential patient exploitation. Communicating with law enforcement also did not occur under color of law. *Schaffer*, 814 F.3d at 1155-56.

Vigil may also complain about Tweed's identification of the pill in the cup as "possibly Ativan." But as Tweed testified, the first anonymous note mentioned "Ativan", and Tweed recalled that she had identified the drug as a "Clonazepam" a generic. (Tweed, Exh. 4 at 108:4-109:10) Both drugs are Benzodiazepines, *i.e.,* controlled substances.[5] Therefore, any naming inconsistency is immaterial, and again, the conduct did not occur under color of law.

Vigil also claims that he had old prescriptions for Hydrocodone, authorizing him to possess it at work and that Tweed misrepresented these facts to law enforcement. (*See* Exh. 13 at p.12). However, the police reports, search and arrest affidavits and statements of probable cause do not evince a statement by Tweed that Vigil was not "authorized" to possess the hydrocodone. The criminal filings merely reflect that the search found hydrocodone in a generic vitamin bottle in Vigil's lockers.

---

[5] *See* https://www.dea.gov/sites/default/files/2020-06/Benzodiazepenes-2020_1.pdf

Law enforcement apparently charged Vigil for the Hydrocodone due to his changing stories. On June 24, 2015, Vigil wrote two statements claiming that someone was planting medication in his lockers and that the Hydrocodone was not his. On June 25, 2015, Vigil again disclaimed the Hydrocodone during an interview. Later, Vigil changed his story and claimed that the hydrocodone was from old prescriptions that he had forgotten. (Exh. 14 at 70:25-72:2)

Thus, on June 19, 2015 when Tweed interacted with law enforcement, she could not have known knew that the hydrocodone was Vigil's old prescription. The criminal pleadings reflect that she merely reported the search results, which law enforcement later verified with their own search. The report to law enforcement was not substantially motivated as retaliation for any protected speech, and once again, providing information to police does not arise under the color of law.

***No Protected Speech.*** Finally, Defendants reiterate their argument that Vigil's alleged speech is not protected under a First Amendment claim. Whether speech is protected is a question of law. *See Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010)

Vigil first claims he engaged in protected speech by supporting his companion, Patricia Vigil, in her private lawsuit against the DOH, through attending her deposition, a mediation and other proceedings as well as serving a subpoena. (*See* Exh. 13 at 11) These allegations do not constitute protected speech, nor do they support a Free Association claim as this Court previously determined. (*See* Doc. 30, filed 06-07-2019, at 22-25)

Vigil also alleges that he made comments to his supervisors, Dominguez and Tweed, about inadequate staffing in his ALF unit, duty lapses by the nightshift staff and concerns about ALF residents' competency to self-administer medications. (*See generally* Exh. 13) However, these communications arose from Vigil performing the job Vigil was "paid to do" as an ALF supervisor[6] and are therefore not protected. *Green v. Board of County Comm'rs,* 472 F.3d 794, 801 (10th Cir. 2007); *see also Rohrbough,* 596 F.3d at 746 (10th Cir. 2010) (Nurse's complaints of a hospital's staffing crisis, a heart transplant misallocation and ensuing cover-up fell within the nurse's employment obligations for patient safety and well-being).

The Tenth Circuit's decisions "have taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Id.* at 746 (citation omitted). The Court looks both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties. *Id.* The Court may also examine the speaker's motive. *Lighton v. Univ. of Utah*, 209 F.3d 1215, 1224 (10th Cir. 2000). Speech pursuant to the employee's duty to report a particular activity is usually within that employee's official duties. *Rohrbough*, 596 F.3d at 746. Speech directed to an individual within an employee's chain of command is often found to be pursuant to that employee's official duties. *Id.*

---

[6] Although Vigil's chilling claim involves the three-part *Worrell* test, the 10th Circuit in *Leverington v. City of Colo. Springs*, 643 F.3d 719, 773-74 (10th Cir.2011) noted that it is likely the public concern test from the first elements of the *Garcetti/Pickering* analysis applies to chilling claims involving speech by public employees.

Mr. Vigil was a shift supervisor. "His duties generally involved observing and caring for NMBHI residents, to include ensuring their safety and welfare, observing their condition, monitoring their medication and activities of daily living (ADL), and assisting or leading them in their therapeutic and recreational activities. (Exh. 13 at 2) He had a duty to report safety issues to his supervisor, Corinne Dominguez. (Exh. 14 at 19:19-20:5) His major responsibilities included ensuring "adequate coverage for shifts in coordination with other supervisors." (*See* Exh. 2) He was required to "[e]nsure that Incident Reports" were "completed and reported" to his supervisor. (*Id.)* He had to "[g]uide and direct staff to provide the highest quality of care to clients in residential services, ensuring safety and Residential Service to clients at all times." (*Id.)*

At some point, Vigil communicated to Dominguez that he could not adequately handle the duties of transporting residents on errands and appointments due to his other obligations at the facility and the lack of staff to assist him. (*See, e.g.*, Exh. 13 at 9; Exh 14 at 38:24-42:4) But these internal comments about staffing difficulties by a supervisor, who managed staffing, are not protected speech. *See Rohrbough,* 596 F.3d at 748 (hospital nurse's staffing complaints not protected).

Vigil had ongoing conflicts and run-ins with the nightshift supervisor, accusing her and her staff of "duty lapses." He asserted that the nightshift was inattentive and using the TV room excessively; he accused one or more employees of sleeping on duty. (*See* Exh 13; Exh. 14 at 32:21-33:16; 47:16-57:9) In early 2015, he submitted a required incident report about a resident fall, which he blamed on the nightshift

staff. (*See* Exh. 14 at 28:10-21; 33:3-16, *see also* Exh. 7) In February 2015, he was accused of yelling obscenities and denigrating a nightshift employee who he alleged had been sleeping on the job. (Exh. 7)

Internal reports by a supervisor to his superior about staff's duty lapses and submission of a required incident report are not protected speech. Vigil's official duties were to monitor resident care and safety as well as to report incidents in the facility. *See Rohrbough,* 596 F.3d at 748-750. These comments also occurred in the context of an ongoing internal employee conflict with the nightshift supervisor, which is a personnel matter, not protected speech. *E.g., Lighton*, 209 F.3d at 1225.

Finally, Vigil alleges that he advised his supervisors that some residents were too incompetent to take their own medications, that the Psych Techs needed more training to assist them and that it was difficult to manage the residents with the limited staff. (*See* Exh. 13 at 13-14; Exh. 14 at 33:7-35:17) Here again, these sorts of internal discussions among healthcare providers about resident acuity, competence, staff management and so forth are commonplace in a healthcare setting and fell within Vigil's duties as a supervisor. *Rohrbough,* 596 F.3d at 748-750 (complaints by nurse about specific incidents of substandard patient care not protected speech).

In sum, Vigil's evidence does not establish the elements of a First Amendment retaliation claim. He cannot show that the State Defendants' conduct related to the searches and contact with law enforcement were retaliation for protected speech, under the color of law.

6. **Conclusion**

The State Defendants are entitled to qualified immunity because clearly established law does not support Vigil's retaliation claim, and he lacks evidence to support the claim. The Court should grant summary judgment for the Defendants.

LONG, KOMER & ASSOCIATES, P.A.

*Attorneys for Defendants*

*/s/ Mark E. Komer*
Mark E. Komer
P. O. Box 5098
Santa Fe, NM  87502-5098
505-982-8405
mark@longkomer.com
email@longkomer.com

**Certificate of Service**

I hereby certify that on the 24th day of March 2022, I filed the foregoing Motion for Summary Judgment electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Joe M. Romero, Jr.
joe@romeroandwinder.com

*Attorneys for Plaintiffs*

By: *s/ Mark E. Komer*
Mark E. Komer