## Page 78

1  prescription meds or herbal supplements in a single
2  plastic container, so as not to travel with eight or
3  nine different prescription or herbal supplement
4  containers. That's what they found.
5              And -- and Ms. Tweed made the statement
6  to the police that it was against the law to have
7  prescription medication in a container that's not a
8  labeled -- not a prescription-labeled container. And
9  initially -- initially he didn't remember -- when being
10  bombarded with accusations that all kinds of narcotics
11  and drugs were found in his locker, he didn't remember
12  those prescriptions years earlier for hydrocodone. He
13  hadn't taken it for years.
14              And so later on, when he interviewed with
15  Officer Madrid, he says, "I might have a prescription
16  for it. I'm not sure." But he'd already been charged.
17  And -- and he had to present that prescription
18  medication at trial. He had to testify at trial as to
19  his understanding of what he was authorized to do with
20  the expired and discontinued meds. And a jury took
21  about a half hour to acquit him.
22              But this was after an earlier mistrial.
23  And the mistrial occurred because of Ms. Tweed. She
24  was called as a witness. The witnesses were instructed
25  during their testimony -- the BHI witness. There was a

## Page 79

1  couple of them; Mr. Chavez, Mr. Schaeffer, the
2  investigator who did the internal review investigation,
3  and Ms. Tweed. They were instructed not to address --
4  during their factual presentation of the case, not to
5  bring up the clothing allowance monies that were found
6  in the desk because Mr. Vigil had not been charged with
7  anything related to that.
8              Well, Ms. Tweed brought it up during her
9  testimony, a mistrial was declared, and Mr. Vigil had
10  to wait another year and change to get his day in
11  court.
12              So, Your Honor, at the -- at the end of
13  the day, BHI had a lot to do with, in -- in our
14  contention, with the criminal case, with the delay of
15  this case before Your Honor, and -- and I think the
16  evidence will clearly show with regard to the -- to the
17  Notice of Final Action and the policies that he is
18  specifically and expressly on notice and alleged to
19  have violated, he didn't violate. And I'm prepared to
20  describe during the factual presentation and
21  examination of the witnesses why he didn't violate
22  them.
23              And Mr. Vigil [sic], his predecessor,
24  will testify that everything that John did in this case
25  was the identical things that he did in terms of

## Page 80

1  removing and segregating nonprescription -- or I'm
2  sorry, discontinued or expired medications. And -- and
3  completing all the shopping of the clothing allowance
4  before returning it back to the financial management
5  office.
6              And as a result, we don't believe that
7  the evidence will show that there's just cause for this
8  termination. And -- and even if, as Ms. Corinne
9  Dominguez says, that he may have deviated from some of
10  the policies, there was mitigating and important
11  reasons why he may have deviated, if he deviated at
12  all, from those policies. And that had to do with
13  patient safety, receiving the checks involved, and --
14  and so forth, Your Honor.
15              ALJ COOPER: Okay. Thank you.
16              Okay. Do you want to call your first
17  witness?
18              MR. TREMAINE: Yes, Your Honor. We
19  call --
20              MR. ROMERO: Your Honor, could I have
21  just a minute break to use the bathroom once more?
22              ALJ COOPER: Absolutely. Absolutely.
23  Let's take five.
24              (Off the record.)
25              ALJ COOPER: Okay. The time is 11:01.

## Page 81

1  We're back on the record.
2              Okay. Good morning.
3              THE WITNESS: Good morning.
4              ALJ COOPER: I need to swear you in. Can
5  you raise your right hand?
6              FRANCES TWEED,
7  called as a witness on behalf of the appellee, having
8  been first duly sworn, was examined and testified under
9  oath as follows:
10              ALJ COOPER: Thank you.
11              Can you state and spell your name for the
12  record?
13              THE WITNESS: Frances Tweed.
14  F-r-a-n-c-e-s T-w-e-e-d.
15              ALJ COOPER: Thank you very much.
16              So I've already introduced myself to you.
17  I'm Jessica Cooper, the hearing officer for the State
18  Personnel Board, and I'm conducting this hearing
19  requested by Mr. Vigil concerning the disciplinary
20  action taken against him by the Department.
21              I am making a recording of the
22  proceeding. That black gadget in front of you is your
23  microphone. You don't have to speak directly into it.
24  Just keep your voice up, okay?
25              THE WITNESS: Yes.

## Page 98

1   Q.  Okay.  And correct me if I -- well, tell me
2   again how long it takes to get from either cottage to
3   the pharmacy.
4   A.  About five minutes.
5   Q.  Okay.  Okay.
6       So big picture question, Ms. Tweed.  Would
7   it ever be appropriate within NMBHI to store expired,
8   discontinued, or contaminated medication outside of the
9   medical room?
10  A.  No.
11  Q.  Okay.  So I'm going to get to this incident in
12  2015 which you were involved in.
13      Can you tell us how you became involved in
14  an -- the incident that we're here for involving
15  Mr. Vigil and storage of medication?
16  A.  The administrator at the time, Dr. Troy Jones,
17  asked me to -- to contact our Human Resource Bureau,
18  Elona Cruz, and ask how to proceed after he -- we --
19  administration received an anonymous letter stating
20  that Mr. Vigil had some patient medications stored in
21  his office.  I think it said his desk.  And also
22  that -- some money, patient money.
23      So he asked me to consult with Santa Fe
24  Human Resource Bureau, who oversees Department of
25  Health, our operations.  And I was told by Elona that

## Page 99

1   we should search the locker.  His office.  I mean, his
2   desk.
3   Q.  Okay.  Can you say for certain where that
4   anonymous letter came from?
5   A.  No.
6   Q.  Okay.  And can you explain to us how -- how
7   the letter was received?
8   A.  It was an interoffice envelope.  And I believe
9   it was different -- the same letter was delivered to
10  administration.  I think it was -- it was either to
11  Troy or Charles Jaramillo, who was our chief operating
12  officer.
13      One went to standards and compliance, I
14  believe to Rose Contreras, who was a director of
15  standards and compliance.
16  Q.  Uh-huh.
17  A.  And a third letter I believe went to the
18  patient advocate or --
19  Q.  Uh-huh.
20  A.  -- some -- I think -- I believe that's what it
21  was.
22  Q.  Okay.  And that -- that anonymous letter you
23  said indicated that Mr. Vigil had patient medications
24  and -- and money in certain locations?
25  A.  In his office.  I think it said in his desk.

## Page 100

1   Q.  Okay.  So in terms of your role as executive
2   nurse administrator at the time, what is your concern
3   when you receive any type of report of that nature?
4   A.  Well, it's a possibility of exploiting a
5   patient.  It was exploitation if it -- you know,
6   especially if it didn't belong --
7   Q.  Uh-huh.
8   A.  It belongs in the med room, but it wasn't
9   there.  So it was significant enough that -- because it
10  was an anonymous letter, we weren't sure exactly how to
11  proceed with that.
12  Q.  Okay.
13  A.  So that's why we consulted with our Human
14  Resource Bureau director, Elona Cruz, and asked her,
15  you know, "What do we do with this?"
16  Q.  So pursuant to your discussion with Ms. Cruz,
17  what steps did you take to respond to that letter?
18  A.  After I spoke to her, I communicated with
19  Dr. Jones.  And she was specific that she wanted for
20  the people to -- to go into the office and the desk
21  area was -- she wanted it to be me -- our internal
22  review director at the time was Antonio Coca.  And then
23  our director of security or -- or security supervisor,
24  Joseph Chavez.
25      So she asked that the three of us go to the

## Page 101

1   cottage where his office was and do an inspection to
2   see if indeed there were medications and money stored
3   there.
4   Q.  Did you personally take part in going to the
5   office and -- and looking?
6   A.  I did.
7   Q.  Okay.  Can you tell us -- can you walk us
8   through going to that -- strike that.  Let me back up.
9       Can you recall when you received -- when
10  you received the anonymous letter, when you first
11  became aware of it?
12  A.  I didn't receive the first letter.  They were
13  two separate letters.
14  Q.  Uh-huh.
15  A.  I was told by Dr. Jones -- I don't remember
16  exactly the date the letter arrived at standards or to
17  these offices.  I can't remember the exact date.  I
18  know it was at the beginning of June.
19  Q.  Okay.  So beginning of June 2015?
20  A.  '15.
21  Q.  Okay.  So now can you please walk us through
22  your involvement in going to the office and -- and
23  following up?
24  A.  Okay.  Security, Joe Chavez, Mr. Coca, and I
25  went to the unit.  I believe that we had to get a key

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

1  because it was a key to the office that I didn't have.
2  So I think that -- I don't remember if Mr. Chavez had
3  to secure a key to get into the office.
4        We got in there and realized that the
5  medication was in a cabinet that locked with a padlock.
6  And so that was where the medication was.
7    Q.  So how -- if it was in a locked cabinet, how
8  did you realize that the medication was located there?
9    A.  I believe Mr. Chavez was able to peek in and
10  he was able to see that there were some bottles in
11  there.
12    Q.  Okay.  And what happened next?
13    A.  I believe, as I recall, because this was years
14  ago, that the decision was made to -- to cut the
15  padlock so that we could look in there.  And I believe
16  Mr. Vigil was on vacation, so he was not on duty.
17  Either that or he had called in sick.  But I know he
18  was not on duty that day.
19    Q.  Okay.  Are you able to say -- from your last
20  response, I -- am I to understand that you could not
21  say when he was out or the duration and when he was on
22  leave or sick?
23    A.  I would have to look at the schedule to know
24  if he was on a scheduled vacation or if he was on sick
25  leave.  I can't remember --

1    Q.  Okay.
2    A.  -- if he had called in that day.
3    Q.  Okay.  So there was a review -- there was --
4  Mr. Chavez and you were in the office and you looked,
5  you -- you located medication in the cabinet, right?
6    A.  After the broke -- the lock was broken,
7  correct.
8    Q.  Okay.
9    A.  Uh-huh.
10    Q.  Okay.  So what happened then?
11    A.  After we figured out what was in there, we --
12  I made another phone call to Ms. Cruz and asked her if
13  we should notify the police because we weren't sure if
14  a crime had been committed, based on the fact that
15  these medications are prescribed medications that were
16  found in there.
17    Q.  Uh-huh.
18    A.  Risperdal, which is a antipsychotic medication
19  that requires a prescription.  So I was advised to go
20  ahead and contact the police.  And we put everything
21  back as we found it.  We put a different lock on the --
22  on -- in the area, on the cabinet.
23    Q.  Okay.  Did anyone take photographs during that
24  time period?
25    A.  Yes.  Mr. Chavez did take photographs.

1    Q.  Okay.  Could I refer you to Department's
2  Exhibit 22?  And these are -- just for clarification,
3  these are individually labeled with sub numbers.  And I
4  want to talk to you right now about 22, dash, some
5  zeros, 1 all the way through number 6.  Could you
6  review, please 22-1 through 22-6, and let me know if
7  you recognize those.
8    A.  Yes.
9    Q.  So let's just start at the beginning.  22,
10  dash, zeros, 1, what is depicted in that?
11    A.  Some Southwest Capital Bank envelopes and a
12  Priority Mail.  I'm not sure what's in there.
13    Q.  Okay.
14    A.  Package.
15    Q.  And is it -- in 01 -- would there be any
16  reason to have client funds in a Priority Mail
17  envelope?
18    A.  No.
19    Q.  And do you have an understanding of what is
20  contained in the Southwest Capital Bank envelopes?
21    A.  I didn't at the time.
22    Q.  Okay.  Have you learned what is contained
23  in those envelopes since?
24    A.  Yes.  I understand that there was money in
25  there.

1    Q.  And how did you become aware of that?
2    A.  I believe after the police did their search.
3    Q.  Okay.  Did you receive an inventory of any
4  kind?
5    A.  I didn't.  The administrator did.  I did not.
6    Q.  Okay.  And what is your understanding of the
7  nature of what's contained in the envelopes?
8    A.  Money, but I don't know how much.
9    Q.  Okay.  Do you know where that money came from
10  or what its purpose was?
11    A.  My understanding that it was patient funds,
12  because there were some receipts also with the
13  envelopes.
14    Q.  Okay.  All right.
15        So briefly, 22-02.  This -- do I understand
16  your response to mean that you -- you've recognized all
17  six of these photographs that I've referenced?
18    A.  Yes.
19    Q.  Okay.  Thank you.
20        And the -- fair to say that this is a
21  picture of someone cutting the lock on -- that we
22  referenced earlier?
23    A.  Yeah.
24    Q.  All right.
25    A.  That's Mr. Chavez's arm.

1  Q.  Okay.  And so is -- is this the same cabinet
2  or -- or desk, if you will, that the -- that the
3  medications were located in?
4  A.  Yes.
5  Q.  Okay.  The top part, the lock that is being
6  cut, what was contained behind those doors?
7  A.  That was where the medication and the
8  envelopes and other items were inside.
9  Q.  Okay.  And then Exhibit 22-03?
10  A.  That was inside that cabinet that the lock was
11  just broken.
12  Q.  Okay.  So this is the top of the cabinet, this
13  is where Mr. Chavez --
14  A.  Yep.
15  Q.  -- noticed the medications?
16  A.  Right.
17  Q.  Okay.
18       03 here is -- is redacted.  Have you
19  reviewed -- are you aware of whose prescriptions these
20  are?
21  A.  It was two of the patients, the current -- the
22  patients that were at the ALF at that time.
23  Q.  Okay.  So these prescriptions, there's three
24  bottles depicted here.  Were they identified as
25  prescriptions belong to someone other than Mr. Vigil?

1  A.  Yes.
2  Q.  And all of them were belonging to patients?
3  A.  Yes.  Or residents.  I believe they call them
4  residents.
5  Q.  Residents.
6  A.  Yeah.
7  Q.  Thank you.
8       Skipping past 4.
9       The 22-05, is this is -- is this the same --
10  depicting the same area or medications that were in 03?
11  A.  Yes.
12  Q.  Okay.  And this is a -- a closeup, so were you
13  able to -- and were you at the time able to identify
14  what type of prescription this is?
15  A.  Yes.
16  Q.  Okay.  And it -- what was your understanding
17  of the -- of the drug contained in the --
18  A.  That's what -- the risperidone is an
19  antipsychotic --
20  Q.  Okay.
21  A.  -- prescription drug.  Right.
22  Q.  Is that -- is that a scheduled drug?
23  A.  No.
24  Q.  Okay.  Thank you.
25       And is there -- okay.

1       I'm going to direct you to 22-06.  Do you
2  recognize that?
3  A.  Yes.
4  Q.  And so what is that?
5  A.  When we discovered, we weren't sure what it
6  was, but we knew that it was in a paper cup that's
7  usually used to give the cup to the patient.  So took a
8  picture of it and had -- was labeled.  So when I
9  returned to my office, I looked it up on our intranet.
10  There's a pharmacology website that we have access to,
11  to identify drugs.  And identified it as clonazepam.
12  Q.  Okay.  Are you aware that at least the police
13  officer took a position that you indicated it was
14  Ativan?
15  A.  I don't know that I'm the one that said it was
16  Ativan.  I believe that the initial note said that he
17  had Ativan.
18  Q.  Uh-huh.
19  A.  I think when I was talking to the police
20  officer, I was explaining that it -- Ativan and
21  clonazepam are basically the same medication.  One is
22  short-acting, one is long-acting.  One's a generic, the
23  other -- you know, they might be generic.  So it's a
24  similar drug.
25  Q.  Uh-huh.

1  A.  It's almost like ibuprofen, where you -- it's
2  a generic, but you might have different brand names
3  that contain ibuprofen.  So I think that that might
4  have been part of the confusion.  I know that the
5  initial note --
6  Q.  Uh-huh.
7  A.  -- that sent also said that he had Ativan in
8  his locker.
9  Q.  Okay.
10  A.  Or in his desk.  I'm sorry.
11  Q.  So at this point, once you and Mr. Chavez had
12  found these medications in the cabinet and the money
13  that was in the drawer and took the photographs, what
14  was the next step that you took?
15  A.  Well, we locked it again.  We put a -- we
16  locked it up, put a different lock on it, and then
17  referred back to Human Resource Bureau to ask what do
18  we do from there.
19  Q.  Okay.
20  A.  And completed an incident report.
21  Q.  Okay.  Did you ultimately notify law
22  enforcement?
23  A.  I did.
24  Q.  Okay.  And so can you briefly outline what the
25  decision-making process was in terms of -- in terms of

1　notifying law enforcement and outline for us what
2　concerns you had that motivated that notification?
3　　　A.　Well, what I mentioned before is that I wasn't
4　sure if a crime had been committed.
5　　　Q.　Uh-huh.
6　　　A.　What -- finding the risperidone and that one
7　pill.　So I called the state police, just to notify
8　them.　And then believe that they ended up sending the
9　sheriff's department instead of the state police.
10　　　　　　We opted not to remove anything until they
11　had a chance to review it to see, you know, if they
12　were going to take any action.　And we were going to
13　proceed with an internal investigation, which is
14　normal, because -- because it was possible
15　exploitation, I had to complete a incident report and
16　report it to Department of Health Improvement.
17　　　　　　Our process is that whenever we report any
18　allegation of abuse, neglect, or exploitation, we
19　conduct an internal investigation.
20　　　Q.　Okay.　So let's talk about the internal
21　investigation process.
22　　　　　　Do you -- I believe that you said that you
23　were the director of standards compliance at one time?
24　　　A.　Uh-huh.
25　　　Q.　Okay.　And that -- that would be responsible

1　for internal review, correct?
2　　　A.　Right.
3　　　Q.　Okay.
4　　　A.　And investigate and reported to the director
5　of standards compliance.
6　　　Q.　So in a situation where you have a report of
7　inappropriately stored medication or diverted
8　medication, anything of that nature, you conduct an
9　internal review investigation?
10　　　A.　If we suspect abuse, neglect -- abuse,
11　neglect, exploitation, or we also investigate, like,
12　significant injuries.
13　　　Q.　Uh-huh.
14　　　A.　Sometimes theft.　Those kinds of issues get
15　investigated.
16　　　Q.　Okay.　And since law enforcement was notified
17　in this case, can you explain what happens to the --
18　the IR investigation while law enforcement is involved?
19　　　A.　They usually take two different paths.
20　　　Q.　Uh-huh.
21　　　A.　Normally we would start and see what the
22　police are going to do.　And independent of that
23　investigation, we would conduct our own.
24　　　Q.　Okay.　If the police are pursuing an
25　investigation, is it normal or customary to suspend the

1　internal review investigation?
2　　　A.　Not necessarily.　We might -- we might wait
3　and see what's going to happen.　And I -- to be honest,
4　I do not know what happened in this case because I was
5　not administratively responsible --
6　　　Q.　Uh-huh.
7　　　A.　-- for the admin-- assisted living facility,
8　so I don't know if they did a concurrent investigation,
9　if they waited for the police to start their
10　investigation.　But it really was dependent on that
11　specific case.
12　　　Q.　Okay.　So I just want to make sure we're clear
13　on this.
14　　　　　　At this time, is it true that you had
15　clinical oversight of CBS and were responding in that
16　capacity because of the medication?
17　　　A.　I was responding because the administrator
18　told me to respond.
19　　　Q.　Okay.
20　　　A.　It could've been somebody else.　He could've
21　asked the division director to respond.
22　　　Q.　Right.　Okay.
23　　　A.　He could've asked the director of nurses to
24　respond.　But he asked me to do it, so that's the
25　reason that I did it.

1　　　Q.　Okay.　Okay.　Thank you.
2　　　　　　I guess what I'm trying to put a point on
3　is storage of medications and -- and possible diversion
4　of medications would have been something that was
5　within your job duties because it would -- it would be
6　under the clinical side of the assisted living
7　facility?
8　　　A.　That's correct.
9　　　Q.　Okay.
10　　　A.　Yeah.
11　　　Q.　Thank you.
12　　　　　　All right.　And the investigation would've
13　been handled by HR and on the administrative side; is
14　that fair?
15　　　A.　Standards compliance.　The Internal Review
16　Department.
17　　　Q.　Okay.　And in -- in terms of -- in terms of
18　the discussions down the road, that resulted in
19　disciplinary action.　Was that something that you were
20　aware of?
21　　　A.　Okay.　Standards compliance, the investigators
22　are strictly fact-finders.
23　　　Q.　Uh-huh.
24　　　A.　After they complete the investigation, the
25　supervisor, whoever supervises the person, is the one

1 who would oversee the -- would review the
2 investigation. They would consult with human resources
3 and possibly Human Resource Bureau in Santa Fe --
4     **Q. Uh-huh.**
5     A. -- to determine what type of discipline, if
6 any, is to be taken. Because Corinne Dominguez was the
7 administrator --
8     **Q. Uh-huh.**
9     A. -- in the ALF and also the clinical director
10 for Community Based Services, she's the one that
11 oversaw the investigation. I never saw it. I was not
12 going to be the one that took any disciplinary action,
13 so I -- I did not review the investigation.
14     **Q. Okay. So you did not review Peter Schaeffer's**
15 **report of investigation?**
16     A. That's correct.
17     **Q. And you were not directly involved in**
18 **discussions or determination of what disciplinary**
19 **action to take?**
20     A. That's correct.
21     **Q. Okay. That was Corinne Dominguez, in**
22 **consultation with whoever she consulted with?**
23     A. Correct.
24     **Q. Okay.**
25     **So moving forward, what is the -- what is**

1 **the next step in this process? What happened after**
2 **this?**
3     A. Seems like the police had called people in,
4 interviewed various people. And then seems like when
5 they were just closing out their piece of the
6 investigation, another anonymous letter was received.
7 And that one did come to me. One of the letters did
8 come to me and it stated that there were additional
9 medications in his locker in -- I believe it was in
10 Mesa. I think it was the different cottage.
11     So at that point, again consulted with HRB.
12 They told us, you know, "Go look in the other locker."
13 So we did, and at that point it was -- I believe
14 Mr. Chavez was gone that day, so it was me, one of the
15 other security officers, who I'm completely blanking
16 out her name. It's a female security officer. And I
17 believe Peter Schaeffer was involved because Antonio
18 was out that day. So we went into -- and searched his
19 personal locker.
20     **Q. If I said the name Luann Gonzales [phonetic],**
21 **would that --**
22     A. Yes. Luann Gonzales. Thank you.
23     **Q. Are there -- so it was the three of you that**
24 **went to the Mesa Cottage to look in lockers?**
25     A. Right.

1     **Q. Okay. And when in time did this happen**
2 **compared to the first search?**
3     A. Oh, I believe it was, like, a week apart.
4 Maybe not even.
5     **Q. Okay.**
6     A. I -- I would have to look and -- I'm not
7 positive.
8     **Q. Uh-huh. Some time had transpired?**
9     A. Uh-huh. Sometime in June.
10     **Q. The -- going to direct you to the rest of**
11 **these exhibits, 22-7 through 30. If you could just**
12 **flip through those and let me know if you recognize the**
13 **photographs.**
14     A. Through 30?
15     **Q. Yeah. All the way through the end.**
16     A. Take me a little while.
17     (Pause in the proceedings.)
18     THE WITNESS: Okay.
19 BY MR. TREMAINE:
20     **Q. Do you know -- do you recognize these**
21 **photographs?**
22     A. Yes.
23     **Q. And do you know who took the photographs?**
24     A. I believe it was Luann.
25     **Q. Okay. And they were all taken on the same**

1 day?
2     A. Yes.
3     **Q. And they were taken in Mesa Cottage?**
4     A. Some of them in Mesa. I believe the last one
5 we went back to El Paso. Because there were
6 different -- he had different lockers, I believe.
7     **Q. Okay. So can you talk me through the process**
8 **of this search?**
9     A. The locker was --
10     MR. ROMERO: Objection. She wasn't at
11 that search, I don't recall, on the 19th.
12     THE WITNESS: This is not the police
13 search. This is the search that we did. This is not
14 the police search.
15     MR. ROMERO: On the 19th?
16     ALJ COOPER: She said that she was there
17 for a search. She and Luann Gonzales and Peter
18 Schaeffer, right?
19     THE WITNESS: The initial one. This is
20 when we went in as employees to search.
21     MR. ROMERO: Okay.
22     THE WITNESS: This was not the police
23 search.
24     MR. ROMERO: Sorry.
25     ALJ COOPER: That's okay.

## Page 118

1        THE WITNESS: Yeah.

2        And some of these pictures, that's a good

3 point, could have been taken during the police search.

4 I was not present at the police search for the first

5 locker -- I mean, the first -- for the first letter,

6 but I was at the second one. So this could've been --

7 some of these photos might have been taken by the

8 police. I thought they were our pictures, but I'm not

9 a hundred percent sure. But these are the medications

10 that were found in there.

11 BY MR. TREMAINE:

12    **Q. Okay. So during -- we can clarify that search**

13 **and the police involvement, but first the -- these**

14 **photographs, do they fairly and accurately depict the**

15 **medications that you were aware of existing in the**

16 **lockers pursuant to the second search?**

17    A. Correct.

18    **Q. Okay. And so now if you could please tell us,**

19 **like, how -- explain for us the -- the staff search**

20 **versus the police search. How did that happen?**

21    A. Well, if you'll look at, like, Exhibit 22-27,

22 that's Peter Schaeffer pointing out to the locker that

23 we opened. So that's why I'm pretty sure this is the

24 photos of the pictures that we did. I'm -- of course,

25 I'm not a hundred percent sure they all are, but I know

## Page 119

1 that one was, because that's Peter pointing to the --

2 one of the lockers that we opened in I believe the

3 other cottage, because in that first locker we found

4 keys to other locks.

5     And see, one -- the second letter said

6 that -- described the lock that we would find. And I

7 don't know if it was an orange stripe or whatever. And

8 that's how we found that the -- those keys opened other

9 lockers. So there was actually patient medication in I

10 believe three other lockers in his lockers.

11    **Q. Okay. So the -- the first locker that you**

12 **went to, you identified by the lock?**

13    A. His name was on the first one. So that one

14 was easy.

15    **Q. Okay.**

16    A. And we broke that one. And then inside we

17 found keys to other lockers. So that's how we were

18 able to find two other lockers, I believe, in Mesa, and

19 then had to go back to El Paso for another one.

20    **Q. Okay. The -- the one that his name was on, is**

21 **that the big blue one?**

22    A. Yes.

23    **Q. Okay. So that's the one that is in 22-30?**

24    A. Yes.

25    **Q. Okay. So what do you recall finding in -- in**

## Page 120

1 locker 8, with his name on it?

2    A. In -- is that it, locker 8? Yeah. In there

3 was a Centrum vitamin or multivitamin. I think it was

4 a Centrum vitamin pill. That's in 13. And in there

5 contained all those different mixtures of pills.

6    **Q. Okay. Is that fairly depicted in 11, 12, and**

7 **13?**

8    A. Yes.

9    **Q. Okay. What is -- in 12 and 13, what is this**

10 **little paper cup at the -- at the bottom? Do you**

11 **know --**

12    A. I don't remember.

13    **Q. -- is there medication in that or --**

14    A. Looks like there is, but I don't remember.

15    **Q. Okay. And were you aware of what medications**

16 **were contained in the Centrum bottle?**

17    A. We identified them as hydrocodone, two

18 different doses. I believe there were, like, seven to

19 nine of the larger, white oblong pills were

20 hydrocodone. And then two of the smaller ones were a

21 different dose of hydrocodone. And then we also found

22 some -- I believe it was ibuprofen, something --

23 another medication, like colchicine, I believe, that's

24 for gout. So there were different medications mixed in

25 here.

## Page 121

1    **Q. All contained within the Centrum bottle?**

2    A. Right. Correct.

3    **Q. And were there -- were there any patient**

4 **medications located in that locker?**

5    A. I thought we did find one prescription med

6 belonging to a patient in that locker, but I couldn't

7 swear to it.

8    **Q. Okay.**

9    A. I'm relatively sure there was. I'm trying to

10 flip through the pictures.

11    **Q. Sure.**

12    A. And I know we found some in another locker

13 that was in El Paso. But we were able to get into that

14 locker because of a key that we found in --

15    **Q. Well, how about if -- if we move through the**

16 **rest of the photographs in the process, if you**

17 **recognize --**

18    A. Okay.

19    **Q. -- anything, we can refer back to that. I**

20 **don't want to make you flip through --**

21    A. Okay.

22    **Q. -- everything.**

23    So after you got -- went into that locker,

24 **found the Centrum Silver bottle and the keys to other**

25 **lockers, what did you do then?**

31 (Pages 118 to 121)

## Page 122

1  A. We put a different lock on it, consulted
2  again, called the police again, and then they came out
3  and did another search.
4  **Q. Okay. So how about this Exhibit -- indicated**
5  **it was 27. Mr. Schaeffer is standing, pointing to a**
6  **locker and there's bolt cutters in the foreground.**
7  A. Uh-huh.
8  **Q. Was that lock cut off and -- on the same day,**
9  **the search of the other lockers?**
10  A. Yes.
11  **Q. Okay. And did that search of the smaller,**
12  **like, cubby-style lockers occur before or after the**
13  **police search?**
14  A. Before.
15  **Q. Before. Okay.**
16  **And can you explain to me what you found in**
17  **the cubby lockers?**
18  A. That's where I believe we found some patient
19  medications also in that locker.
20  **Q. Can I refer you briefly to 22-14?**
21  A. That might have been it. Yeah.
22  **Q. Did you -- at the time that you conducted the**
23  **search, were you aware of -- you were aware of this**
24  **prescription?**
25  A. I believe I was, yeah.

## Page 123

1  **Q. No problem. Okay.**
2  A. Because I do recall that -- I don't remember
3  what the medication was, who it belonged to, but I knew
4  that we found some patient --
5  **Q. Okay.**
6  A. -- medication in those lockers.
7  **Q. As you can see, this is redacted --**
8  A. Uh-huh.
9  **Q. -- for patient information. Was -- did this**
10  **belong to John Vigil or --**
11  A. No.
12  **Q. Okay.**
13  A. It was an antibiotic. I believe it says
14  "clindamycin."
15  **Q. Okay. And Exhibit 22-18, the prescription**
16  **depicted here in the bottle next to the Centrum.**
17  A. Okay. That's where it was.
18  **Q. Is that --**
19  A. Yeah.
20  **Q. Can you -- do you recall --**
21  A. Yeah.
22  **Q. -- if that was patient medication or if it was**
23  **Mr. Vigil's?**
24  A. I believe that was the patient medication.
25  **Q. Okay.**

## Page 124

1  MR. ROMERO: What number is that?
2  MR. TREMAINE: 22- --
3  THE WITNESS: 18.
4  MR. TREMAINE: -- 18.
5  BY MR. TREMAINE:
6  **Q. Okay. So moving on to 22-19, do you recognize**
7  **that photograph?**
8  A. Yeah. That was one of the other smaller
9  lockers where we found patient medication stored.
10  **Q. Okay. Are those patient medications the same**
11  **ones depicted in 22-20?**
12  A. I believe so, yes.
13  **Q. Okay. And again, these are redacted. Were**
14  **you able to identify whether these belonged to**
15  **Mr. Vigil or to someone else?**
16  A. They belonged to a resident.
17  **Q. Okay. Did you find any indication in the**
18  **locker that the locker belonged to Mr. Vigil?**
19  A. I believe that we found a magazine that had
20  his name on it.
21  **Q. Could I refer you to 22-21 and 22-22.**
22  A. Okay. That -- yeah, that -- I'm pretty sure
23  we also had -- might have been one of the other lockers
24  that had a magazine that was in his name. But, yeah,
25  this was in the locker also.

## Page 125

1  **Q. Okay. And how about 22-23? Is this the same**
2  **or different cubby locker?**
3  A. I'm not -- I mean, I don't know if it was the
4  same as the previous one or not. I know that we locked
5  at three different lockers.
6  **Q. Okay.**
7  A. This might have been one of the last ones that
8  we looked at.
9  **Q. Okay.**
10  ALJ COOPER: You went through three
11  different cubby lockers?
12  THE WITNESS: We -- the main one and then
13  two --
14  ALJ COOPER: And then two cubby lockers.
15  THE WITNESS: Yeah.
16  ALJ COOPER: Okay.
17  THE WITNESS: Actually, it might have
18  been two cubby lockers in Mesa and then one at El Paso.
19  But the one in El Paso I don't believe we found. We
20  went back to the other one. I don't think we found any
21  patient medication in that one.
22  MR. ROMERO: Your Honor, if I may
23  interject just real quickly, because this has gotten
24  confusing --
25  ALJ COOPER: Uh-huh.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

1  MR. ROMERO: -- to me.
2       The Notice of Final Action identifies on
3  the second search patients' prescription medications
4  being found in -- in the El Paso Cottage lockers that
5  were searched. In other words, there was the
6  hydrocodone that was found in the Mesa Cottage big
7  locker, and I think that's referenced in the -- let me
8  just make sure I'm not talking out of school like I was
9  a while ago, Judge.
10       Regarding the June 19th search, the
11 search of a locker with -- in Mesa found these -- these
12 medications, the hydrocodone, clindamycin, and so
13 forth. There's no reference to any of those
14 medications being patient medications or patient
15 prescription bottles.
16       And then the -- subsequently, in the next
17 paragraph, the search proceeded to El Paso Cottage and
18 in a locker containing mail with Vigil's name in it,
19 three prescription medications were found for two
20 separate patients. Two of the bottles were for one
21 patient and one for a second.
22       ALJ COOPER: Uh-huh.
23       MR. ROMERO: So -- and that -- that had
24 been my operating assumption, and that's what's
25 alleged. So I'm just a little bit confused about -- I

1  think there was a reference to patient medication in
2  the Mesa Cottage also.
3       THE WITNESS: Let me just say that this
4  was 2015, okay? I do not recall exactly which exact
5  cottage or lockers they were found in. I was not part
6  of the investigation. I was not part of drafting the
7  letter, so I can't speak to that at all. That would be
8  somebody else.
9  BY MR. TREMAINE:
10 Q. Okay. The --
11 A. And I -- you know, the -- El Paso Cottage is
12 where we found the medication on the first search, in
13 his office, right? That's where his office was.
14 Q. Uh-huh.
15 A. And as I recall, we searched both cottages,
16 Mesa and El Paso. So it is possible that I might be
17 confused as to which cottage the medication was found
18 on --
19       ALJ COOPER: On the second --
20       THE WITNESS: -- on the second time.
21       ALJ COOPER: On the second search.
22       THE WITNESS: It's possible, because we
23 searched both cottages, so I might be wrong on where we
24 found -- I know that they were in more than one locker.
25 That, I remember. So it is possible that I'm confused.

1  BY MR. TREMAINE:
2  Q. Okay. Is it safe to say that you are certain
3  that you found patient medications in a locker that you
4  identified as belonging to Mr. Vigil in the second
5  search?
6  A. Yes. I'm sure of that.
7  Q. Okay. So after the -- you assisted in
8  conducting the second search prior to the law
9  enforcement search, what did you do -- and the photos
10 were taken, what did you do next?
11 A. I contacted the -- HRB again; Elona.
12 Contacted the police again. They returned and searched
13 those -- the locker also.
14 Q. The police did?
15 A. The police did.
16 Q. All right. And what happened after that?
17 A. I believe that they made the decision that
18 they were going to take it to the DA's office to find
19 out if there was sufficient information to -- to get --
20 to bind it over to court or whatever they do.
21       So they did complete an investigation.
22 They -- they did contact me when they were interviewing
23 different employees.
24 Q. Okay.
25 A. And they also interviewed Mr. Vigil.

1  Q. And did you have any involvement after that
2  point?
3  A. After that investigation?
4  Q. Uh-huh.
5  A. No.
6  Q. Okay. As the now facility administrator and
7  the then executive nurse administrator, what -- what
8  issues are posed by this type of medication storage?
9  A. Well, it seems to -- I mean, policy
10 violations. Handling money. Improperly storing
11 medication. Having patient funds and money within your
12 possession instead of in the med room, where they
13 should've been. So numerous policy violation [sic].
14       Possible exploitation. Most likely
15 exploitation of patients. So using -- or having in
16 possession patient money and medications that don't
17 belong to you.
18 Q. Okay. One brief moment.
19       Can you speak to knowledge of trainings
20 that psych tech supervisors within the assisted living
21 facility received regarding medication storage; in
22 particular, storage of expired medication?
23 A. All psych techs, not just the supervisors,
24 were required to attend a training or do a training on
25 how to safely assist in the self-administration of