# NEW MEXICO BEHAVIORAL HEALTH INSTITUTE at Las Vegas
## Internal Review Department
### Report of Investigation (Amended 9-18-15, changes noted on P.13)

**Case #:** 15-06-06      **DRNM:** N/A
**Case Name:** CBS / AFL Clients, (currently 2 but potentially 15 clients)  **Hosp. #:** N/A

**Summary of the Allegation:** Exploitation (medications/money)
On 6-1-15, an anonymous letter was sent (inter officer mail) to C.O.O. Charles Jaramillo, Asst. Dir. HR Richard Vigil and Standards and Compliance Dir. Rose Contreras, which alleged exploitation of CBS/ALF clients. The writer of the letter alleged El Paso Psych Tech Supervisor John Vigil was in possession of clients' medications and money, which were reportedly locked inside a personal cabinet in his office. The writer requested to remain anonymous.

**Name of alleged victims:** 15 CBS / ALF clients
**Alleged target directly involved in this incident:** PTS John P. Vigil, CBS/ALF staff
**Date & time the incident occurred:** (prior to) 5-29-15
**Date incident was reported:** 5-29-15
**Location of reported incident:** Mesa Cottage, CBS/ALF, NMBHI Grounds

**List of documentation:**
NMBHI Incident reports, (2) dated 5-29-15, initiated by C.O.O. Charles Jaramillo and HR Assit Dir. Richard Vigil.
DOH/DHI Incident reports, (2) dated 6-3-15, initiated by Ex. Nursing Dir. Frances Tweed.
NMBHI Incident Report, dated 6-19-15, completed by Ex. Dir. of nursing, RN Frances Tweed.
DOH/DHI Incident report, dated 6-19-15, completed by Ex. Dir. of nursing, RN Frances Tweed.
Inter-Office memos, (3), dated 6-19-15, submitted as additional related information, by Ex. Dir. of Nursing RN Frances Tweed, Security Officer Luann Gonzales and Internal Review Investigator Peter Schaefer

**Facility Documents:**
Internal E-Mails, authorizing delays in the investigation.
Internal E-Mails, documenting interaction between department heads, regarding details of Client funds.
Finance Dept. Funds dispersal ledger, dated from 5-5-15 through 5-13-15, (1 Pg)
SMC-SO, Warrant application Return and Inventory list, documenting property seized in warrant search. (5 Pgs)
Prepared accounting of Semi-Annual clothing allowance, expenditures for 15 CBS/Alf clients, as per SMC-SO Doc.

**List of Witnesses:**

| NAME | TITLE | UNIT | DATE |
|---|---|---|---|
| Darlene Martinez | C.F.O. | NMBHI | 6-16-15 |
| Evelyn Edmunson | Cashier | NMBHI Finance Office | 6-16-15 |
| Clarence J. Montoya | PTS | CBS / Alf | 6-16-15 |
| Jovita Romero | PTO | CBS / Alf | 6-16-15 |
| Valentina Gurule | PTS | CBS / Alf | 6-17-15 |
| Joleen Ortiz | PTO | CBS / Alf | 6-17-15 |
| John P. Vigil | PTS | CBS / Alf | 6-17-15, 6-24-15 |
| Rosie Lucero | PTO | CBS / Alf | 6-17-15 |
| Yvette Ortega | PTB | CBS / Alf | 6-17-15 |
| Cruzita Padilla | Non- Employee | N/A | 6-23-15 |

**Documented Facts as Reported:**

    On 5-29-15, (2) **NMBHI Incident Reports** were initiated (simultaneously) by C.O.O. Charles Jaramillo and HR Assit Dir. Richard Vigil, titled "John Vigil", which documented receipt of an anonymous letter received at their offices, via inter-departmental mail. Jaramillo and Vigil both noted the following: Please review attached anonymous letter and I (we) recommend internal investigation into the allegation. The attached anonymous letter was typed and was as follows (verbatim): "I was told and everybody knows that supervisor john vigil has a lot bottels of the patients meds in his desk, and some are ativans and narcotics locked away. Also hundreds of dollars of there money to. John vigil is the psych tech

supervisor at the arches.  We will send to HR patient avocate and investigations.  You canot tell him you found out cuase he will know who send this letter."

In the "Administrative Request for investigation" process, collectively it was decided the details of the letter needed to be somewhat corroborated and the decision was made to enter Vigil's office and examine the cabinet in question and possibly the contents of it.  Internal Review Dir. Antonio Coca, Security Director Joe Chavez and Ex. Nursing Dir. Frances Tweed entered Vigils office on 6-3-15.  Coca noted the doors of the cabinet, although locked with a combination style padlock, were not tight and some of the contents of the cabinet were able to be seen, "plain view" through a large crack at the center of the cabinet where the lock hasp was mounted.  Coca, Tweed and Chavez saw medication bottles and decided to make entry into the cabinet, by cutting the lock.  Several of the pill bottles had client names on them as well as some small plastic cups with as yet unidentified pills/tablets in them.  Coca relayed that at that point Tweed stated "I think this may be an issue for the state Police" and decided to contact them.  Coca noted Chavez had brought along an extra NMBHI padlock and after placing the few items inspected back inside in their original locations, they re-secured the cabinet.  Tweed noted the two client names and prepared (2) DOH/DHI Incident Reports, for alleged Exploitation, as there was no apparent reason for those clients' medications to have been locked up there, in a personally controlled cabinet, inside the supervisor's office.

On 6-3-15, **(2) DOH/DHI Incident Reports** were submitted by Ex. Nursing Dir.  RN Frances Tweed, which described alleged exploitation of at least two CNBS/Alf clients, by PTS John Vigil.  Tweed noted (exactly the same narrative for both reports, on behalf of **(both Client #1 and Client #2)**, as follows:  Tweed noted an anonymous letter was received at standards and compliance, human resources and the Patient advocate and had been routed through inter-office mail.  (Tweed noted, see attached letter) Tweed noted John Vigil was the Psych tech supervisor, on the 7-3 shift, at the Alf units, located on NMBHI grounds.   Tweed noted she and Security Supervisor, Internal Review Director went to Vigil's office, where they found that Vigil did have cabinets over his desk, which had a padlock.  Tweed noted Vigil was on vacation at that time.  Tweed noted Security Supervisor cut the lock and they confirmed the medication bottles did have the names of **(both Client #1 and Client #2)**, as well as cash money (2- $1 bills).  Tweed noted a review of both clients' medical records, indicated **(both Client #1 and Client #2)** had been receiving PM doses of the medication found (Risperdone).  Tweed noted both clients were assessed by RN Mable Arguello-Vasquez and both had vital signs WNL. Tweed noted both clients would continue to be monitored by CBS/Alf staff and the allegation would be investigated by Internal Review.

On 6-5-15, an **Internal E-mail** from Ex. Nursing Dir. RN Frances Tweed, to Elona Cruz, which noted the following:  Good morning, I wanted to update you on the situation with the medication allegation at the Alf cottages.  The state police officers were in training this morning, so they sent SMC-SO Deputy Armijo.  He interviewed the night supervisor who was there working overtime.  He plans on returning at 3 pm to interview the evening supervisor.  These two employees share an office with John Vigil.  Deputy Armijo requested the photos that were taken by Joe Chavez, NMBHI Security Supervisor (Whitter approved this).   Two other Sherriff Deputies showed up and they all went to the unit and took photos of the shared office.  They did not touch any items in there.  We did notice there were some envelopes from the bank.  They chose not to look in the envelopes.  They told us they were going to consult the DA's office to see if they needed a warrant to search his belongings, because it was evident he had personal items in there.  They planned on interviewing Vigil on Tuesday, when he returns from vacation.  I will keep you informed.  Please let me know if you have any questions or concerns.  We will hold off doing our own investigation until the Sherriff's office concludes theirs.

On 6-5-15, an **Internal E-mail** from Standards and Compliance Dir. Rose Contreras to Ex. Nursing Dir. RN Frances Tweed, which noted the following:  Frances, I just talked to Antonio.  5 days is usually required of all A.N. E. allegations but we are used to requesting extensions, so Antonio will go ahead and do that.  He will wait for word from you and will begin our investigation after the police have completed their interviews and provide their summary findings, if they are willing to share them.

A copy of the **Warrant Application Return and Inventory**, was provided by the SMC-SO's office, which precisely documented the search of a wooden desk and surrounding work space of John Vigil on 6-5-15.   The 34 items noted to have been confiscated in the search, included, 14 bank envelopes, (most of which were marked apparently with clients' initials and which contained money and or receipts for purchases), 1 orange envelope (containing $635.00), a "play" $20. Bill, Pill Bottles, Loose pills and antibiotics.  The search was conducted by Under Sherriff Anthony Madrid and Deputy Sean Armijo.

*Contact was made with Under Sheriff Madrid, regarding the requested return of NMBHI funds and associated receipts, as an "annual fiscal year end" audit needed to be concluded and the moneys confiscated are part of that audit. Madrid stated he would contact the ADA and attempt to get authorization for the evidence to be photographically represented and subsequently returned to the NMBHI Finance department, ASAP. Madrid noted in a return call on 6-19-15 that the request had been forwarded to the DA's office and as soon as approval could be granted, the cash property and accompanying medication details would be returned to NMBHI.*

On 6-19-15, an **NMBHI Incident Report** was submitted by Ex. Dir. of Nursing RN Frances Tweed, which documented the receipt of another anonymous letter about John Vigil. Tweed noted that morning she received and inter office mail envelope, which contained (3) smaller sealed envelopes, one addressed to her, one to HR Assit Dir. Richard Vigil and the last to C.O.O. Charles Jaramillo. Tweed noted the smaller envelopes contained a brief typed letter, identical and anonymous. Tweed noted the letter reported: John Vigil had 3 more lockers in the Mesa and El Paso cottages, one with a combination lock and the others which reportedly had pills in them. (See attached letter) The attached anonymous letter was typed and was as follows (verbatim): "John paul vigil has 2 lokers in mesa an el paso unit 1 in mesa has a combination and 1 in elpaso has a yellow lock. I no the 1 in el paso has pills. He uses." Tweed noted she consulted with OGC, who approved her to call the Sheriff's office. Tweed noted SMC-SO Under Sheriff Anthony Madrid went with her and looked at the lockers. Tweed noted (as per Madrid) NMBHI was to proceed with the investigation and notify the SMC-SO if anything was found in Vigil's lockers (specifically medications or money). Tweed noted she notified Security Supervisor Joe Chavez, On-Call Administrator, CBS Dir. Corrine Dominguez, and Internal Review Investigator Peter Schaefer.

On 6-19-15, an **Inter-Office Memo** was submitted by Ex. Dir. of Nursing RN Frances Tweed, as additional information. Tweed noted she, Luann Gonzales and Peter Schaefer conducted a search of the lockers at approximately 1345 hrs. Tweed noted they started at Mesa and broke the lock on a locker with Vigil's name on it. Tweed noted the locker was cluttered and even had mouse droppings inside. Tweed noted Peter removed all of the items and Luann took pictures. Tweed noted inside a "Centrum Silver" they found several different pills and capsules. Tweed noted Luann used her phone and they were able to identify most of the pills. Tweed noted they had found 9 (formerly noted as 7) tablets (white oblong with score and noted "Watson 349"). Tweed noted they were able to identify these seven as Acetaminophen 500 / hydrocodone 5 mg. Tweed noted they also found 2 tablets (white oblong, scored and noted "Watson 385"). Tweed noted those 2 tablets were identified as being Acetaminophen 500 mg / Hydrocodone 7.5 mg. Tweed noted both of these varieties are schedule 2 narcotics. Tweed noted other medication found were not controlled substances, some were prescription medications and some were over the counter medications. Tweed noted they were as followed: Ibuprofen, Indomethacin, Colchicine and Clindamycin. Tweed noted they went to El Paso and broke into two lockers there, which had no names on them but which had yellow locks (yellow plastic trim) on them. Tweed noted Locker #4 contained a magazine with Vigil's name on it, as well as (3) prescription bottles, from two separate clients, 2 of which were labeled as **(Client #1)** and the last was labeled as **(Client #3)**. Tweed noted of the two labeled as **(Client #1)**, one was Risperdone 2mg, with an issue date of 6-14-14 and the second was Benztropine 0.5 mg, issued on 8-17-14. Tweed noted the one labeled for **(Client #3)** was Risperdone 1mg with an issue date of 7-31-14. Tweed noted there was another locker (#1) which contained only personal items. Tweed noted they returned to Mesa cottage, because of keys found in the first locker. Tweed noted there they discovered another unidentified locker (#10), (by using the found keys) which had personal belongings which belonged to Vigil, as well as a copy of Vigil's photo ID. Tweed noted the search was completed by 1430 hrs and that she then contacted U.S. Madrid (to advise of the findings). Tweed noted Madrid advised he would be contacting the D.A.'s office to obtain a search warrant and she notified Whitter Tidmore from OGC.

On 6-19-15, an Inter-Office Memo was submitted by Security Officer **Luann Gonzales**, as additional information. Gonzales noted on 6-19-15, at approximately 1345 hrs she was dispatched to Mesa / El Paso cottages to assist RN Frances Tweed and Peter Schaefer to cut locks on lockers. Gonzales noted she also assisted in taking pictures of the contents found inside the lockers. Gonzales noted after investigating the contents of the lockers, they placed new locks on 3 of the 4 lockers entered.

On 6-19-15, an Inter-Office Memo was submitted by this Investigator **Peter Schaefer**, as additional information. This investigator noted the following: On 6-19-15, this Investigator met with Ex. Dir. of Nursing, RN Frances Tweed, after being contacted about another locker search, subsequent to another anonymous letter, received by the nursing

Page 3 Case #15-06-06
Form#051

Dept. I met with Tweed and Security Officer Luanne Gonzales at the El Paso Cottage, to conduct cursory but witnessed and documented search of (3) lockers, reportedly used by PTS John P. Vigil. According to the letter the addition spaces the writer felt administration should check for property (medications) exploited taken from clients, included a full sized gym style locker with accompanying cubby locker with Vigil's name on it, (2) separate "cubby" style lockers in the El Paso cottage (not identified with Vigil's name) with identical master key locks with yellow plastic trim (unknown locker numbers). According to the letter Vigil's "extra" lockers also contained drugs taken from clients.

We started with Vigil's marked locker, one 8" wide, right side unit of a blue double sided gym style locker, with an 8" x8" cube locker above. The lock was cut using lock cutters and later replaced with an NMBHI Security lock. The items noted in the locker included: food stuffs (tea, soup, cereal, sweeteners etc.) clothing (black sweat shirt and pants), books (mostly paperbacks, some hard cover), magazines (biker and playboy), VCR and DVD movies, hygiene products, medications (some packaged, some loose), "Centrum Silver" vitamin container (not containing centrum vitamins, but instead numerous loose not labeled medication tablets of several different varieties), as well as a set of keys (apparently for lockers). Tweed and Gonzales used a pharmaceutical identification Application, to tentatively identify the loose medication tablets. Tweed advised verbally several of the tablets were Class IV controlled substances and as they were not contained inside a labeled prescription bottle, made the possession of same an illegal act. Tweed indicated she intended on contacting the SMC-SO. All of the contents were photographed and returned to the locker, pending a search by the SMC-SO at request, by Tweed, of their further involvement.

The next lockers searched were (2) smaller "cubby" style cube lockers in the Mesa Cottage, T.V. Room, where staff lockers are kept. There were only two lockers with locks, as described in the letter, having master locks with yellow plastic trim. The lockers were searched one at a time and the locks were cut using lock cutters and later replaced with an NMBHI Security lock. It should be noted the found keys were tried but did not open these lockers. The items noted in the first locker included: (3) Labeled medication bottles from (2) separate clients, some magazines and a piece of mail with Vigil's name on it. The medications (Risperdone) were expired but had apparently come from the medication cart, containing clients' medications, at some point. The items noted in the second locker included: personal hygiene products, some food items and some plastic utensils. The keys taken from the large style locker also did not fit any other lockers in that area and were returned to the gym style locker in the El Paso cottage.

While returning the keys to the Gym style locker, it was decided to try the keys on all of the other lockers in the room and one locker was opened using those keys, which were subsequently placed back inside the large gym style locker. The third "cubby" style cube locker contained only junk, to include plastic utensils, some more food stuffs and a copy of Vigil's driver's license on some found personal paperwork. The lock securing that locker was replaced, as there had been no need to cut it and because there was no contraband inside.

It should be noted, Vigil had at least (4) lockers, in addition to his personal area inside the supervisor office, and may actually have more lockers, used by him. Tweed noted she intended on instituting a unit wide (El Paso and Mesa Cottages) identification of locker usage, to determine if all other lockers with locks were assigned and used by staff legitimately. Tweed was not directing search of those lockers, identified as used by staff, but only ones that may have unidentified users. Tweed also noted that as several of Vigil's lockers had what appeared to be mouse droppings inside them, she intended on directing all staff to remove personal belongings, which may be contaminated with mouse droppings, as well as food stuffs kept in lockers, as it was a health hazard.

On 6-19-15, a **DOH/DHI Incident Report** was submitted by Ex. Dir. of Nursing RN Frances Tweed, which documented a perceived exploitation of CBS/ALF **(client# 3's)** medication. Tweed noted she had received an anonymous letter, alleging John Vigil had medications in his personal locker. Tweed noted after consulting with OGC on the issue, she, Security Officer Luann Gonzales and Internal Review Investigator Peter Schaefer "broke into" entered Vigil's lockers and found (client) prescription bottles dated from 2014, labeled Risperidone 1mg. Tweed noted the issue would be investigated further by Internal Review, as client exploitation. Tweed noted **(Client #3's)** Plenary Guardian was notified. Tweed noted the prescription found was old and that upon assessment, **(Client #3)** was stable and **(Client #3's)** vital signs had been stable. Tweed noted **(Client #3)** would continue to be monitored. Tweed noted she notified Dr. Jones, Corrine Dominguez, Internal Review and Security.

On 6-24-15, an Inter-Office Memo was submitted by this Investigator **Peter Schaefer**, as additional information. On 6-24-15, pursuant to a detail in a written statement taken from PTS John Vigil, this Investigator attempted to corroborate what was noted. Regarding the general access to his upright locker at the Mesa Cottage, Vigil stated he had never given the combination to his lock to anyone else. Vigil noted he often could not remember the combination, so he wrote the combination on the wall in the same room, as the locker. Vigil stated he had not been inside that locker in quite a while,

but that he would look up the number and then open the locker.  Vigil described having written the three numbers on the wall, up high, next to a large wooden cabinet.

   This Investigator decided to corroborate this detail, if possible and went to Ex. Dir. of Nursing RN Frances Tweed's office for assistance.  Tweed accompanied and witnessed the search for the numbers, reportedly written on the wall.  This Investigator did locate a series of numbers, written in pencil on the wall, up high to the left of a large wooden cabinet, across the room from the locker.  The numbers: 11, 28 and 13 were written in line above each other, with a "total" line and the number 52 below the line as if someone had added up the numbers and put down a sum.   The cut lock in question was recovered from the locker, the "combination" was tried on the lock and it opened up.  The lock was placed back inside the locker and secured.   The numbers were very faint and in pencil and in this Investigator's opinion, would not have been generally visible, if someone did not know where to look.            Peter Schaefer, IR Invest.

**Facility documents:**

   An **NMBHI Finance Department Dispersal Ledger** (1 page) was reproduced by Finance Cashier Evelyn Edmunson, which documented the dispersal of two checks ($ 900. on 5-6-15 and $1,200. On 5-13-15), which were for a bi-annual clothing allotment for (14) CBS/Alf clients.  The ledger also noted the two check dispersals were accepted and signed for by PTO Joleen Ortiz and Jovita Romero.

   A **Prepared "Accounting" of Semi-Annual clothing allowance expenditures** for 15 CBS/Alf clients, as per SMC-SO Doc.   The details in the warrant Application Return and Inventory were documented to include the reported amount of unspent change and noted receipts.  The 14 bank envelopes appeared accurate, as one of the 15 clients has her shopping done through her guardian and did not receive a clothing allotment from NMBHI.  Pending a formal audit, by the Finance Department, after return of the (NMBHI Fiscal) evidence, by the SMC-SO, it is undetermined if any funds were missing or possibly misappropriated by Vigil.

   CBS Dir. Corrine Dominguez provided several **Internal NMBHI Documents**, which detailed the specific policies regarding CBS clients' monies and how they are to be paid out, dispersed and handled.  The following document copies are included in this report: NMBHI Policy # CBS RES 148, detailing the Bi-Annual dispersal of clothing allowances (Winter/Sumer).  Internal Memo dated 4-29-14, by Dominguez, detailing the monthly payout process, for staff notice/training.  ALF "House rules", detailing among other things, the maximum amount of cash allowed for clients to be in possession of.  ALF "resident agreement", which details, among other things, purchases which may be arranged, at amounts in excess of the allowed amounts.

   A **Staff Development Training Document**, certified annually that Vigil had passed the "Assisting with medications, The right way" re-certification.  The packet, dated 3-11-15, contained a verification form, signed by Vigil, attesting to his having completed the attached tests personally, without assistance from any other person/source.  Of 50 questions, Vigil appeared to have gotten only two questions wrong and several of the questions were immediately pertinent to this investigation, for example: #12, Controlled medications can be thrown away only by a consultant pharmacist, in front of a witness. (True)  Vigil marked true.  #22, If the resident refuses to take the medication, record it in the medication record. (True) Vigil marked true.  # 24, It doesn't matter where you store a medication that you must hold for the consulting Pharmacist. (False)  Vigil marked false.  #26, In order to help a resident take their medications: A.They must give written consent. B. You must complete a state approved training course. C. The doctor must order the medications. D. Al of the above. (D)  Vigil circled C but corrected it to D.  #44, What should you do if a medication is changed or discontinued?  Vigil answered, Notify nurse/staff of the changes.    Vigil displayed his apparent confidence in the rules and passed the test with a score of 90%

   A **Human Resources document**, confirmed annually, that Vigil was aware of policies, he normally worked with and he signed a copy of the "Skills and Knowledge Checklist" every year or two since 1999 (13 times.)  The Checklist instructions include a direction to check off the policies or procedures the staff understands and can perform the part of the policy required by the staff's position.  It notes if the staff checks off a box, he/she may be required to perform the duty, pass a quiz about it, or explain it. Vigil consistently checked all of the boxes on the checklist, indicating he was proficient and knowledgeable of the policies listed.

**Medical Records:**

No medical records were reviewed by this Investigator, as the exact identification, condition and quantity of the confiscated medications were not made available by the SMC-SO, as of 6-19-15. A pending report of positive identification, condition and quantity of the medications, as well as the prescribed client's names and the medication expirations, may reveal need for further review of medical/ pharmacy records.

**Written or Verbal statements and Interview:**

On 6-16-15, this Investigator met with Finance Dir. **Darlene Martinez**, regarding details of the dispersal of annual clothing allowance money for the CBS/ALF clients. Martinez stated on 6-11-15 she called a meeting with Kenny and Evelyn, regarding the annual ALF Clothing Allowance Dispersals. Martinez stated in her conversations with Kenny and Evelyn they advised her they were not aware of any policy noting they had to cut single checks, (for $150.00) one for each client. Martinez stated both explained that was why they issued two "bulk" checks. Martinez noted the attached E-Mail sent to Charles Jaramillo on 6-11-15, which contained additional details. Martinez stated when the applicable policy was forwarded to her by Corrine Dominguez on 6-11-15, it was shared with all data processing staff. Martinez stated they (Finance Dept.) was in the process of performing an internal audit for FY 2014 and that once she had the receipts for this year (summer purchases FY 2015) they will also perform an audit of the receipts and remaining funds. Martinez stated it was important that all staff understand the fiscal importance of not leaving client cash in drawers, at any time. Martinez stated all cash should be sent to the safes on the NMBHI Campus. *The attached E-Mail was as follows:*

*'Charles, in speaking with Kenny about payouts done in may for 2 bulk amounts, for the annual ALF client clothing allowances, he informed me, he never made any changes from the standard practice of issuing 1 payout of $ 150.00 per client. I called a meeting with Kenny and Evelyn to discuss the issue. Evelyn informed me she was the one who offered John Vigil the option to accept 2 bulk payments for all of the ALF clothing allowances. She indicated she did not think it would be an issue to issue 2 bulk payments. John agreed to accept bulk, instead of individual payouts and that was how the checks issue came about. I then asked Evelyn if she was keeping track of all receipts and change for the ALF clothing allowances and she re-assured me that she does have all this information returned and had been reconciling each year. However, Evelyn reported she had not yet received the receipts and or change from these two bulk checks, as of yesterday. Check cut on 5-4-15 for $ 900.00 picked up on 5-6-15 by Joleen (Ortiz) Check cut on 5-7-15 for $ 1,200.00, picked up on 5-13-15, by Jovita (Romero). Evelyn had been informed of not changing standard procedures, unless it was cleared through me or you in the future. She was also informed that individual payouts of $ 150.00 needed to be made for each client, each year. I also advised Evelyn to consult with her supervisor or me when she did not receive receipts on any type of payouts, which she was administering. In this case it has been almost 1 month since they picked up the checks and we still do not have receipts from John Vigil. Therefore I informed her that these types of issues need to be reported to her supervisor immediately. I was going to call John Vigil, in regards to turning in the receipts to Evelyn, so that she may reconcile this year's ALF clothing allowance. I wanted to run this E-mail by you first."*

On 6-16-15, this Investigator met with Finance Cashier **Evelyn Edmunson**, regarding the dispersals of two annual clothing allowances, for the ALF clients. Edmunson stated she received payout requests for the clothing allowances for the ALF clients and the checks were picked up by ALF employees, Joleen (on 5-6-15 for $900.00) and later Jovita (on 5-13-15 for $ 1,200.00) Edmunson stated as of 6-16-15, she had not received any receipts from those payouts. Edmunson stated in the past, money and receipts were returned to her at the cashier's office, after shopping.

On 6-16-15, this investigator met with PTS **C. Jesse Montoya**, regarding the allegation of exploitation of ALF clients. Montoya stated he had started working at the ALF units on 4-27-15 and immediately began hearing rumors about John Vigil taking medications and money from clients, which came from several staff members at different times. Montoya stated he had never received any complaints from any clients about missing medications or money. Montoya stated he could recall only one incident of a missing pill (Ativan) just about the time he started working at the ALF units. Montoya stated (he was aware) medications was to be locked up in the med cart, in the med room and if he had seen any medications stored elsewhere, he would have reported it. Montoya stated the 3-11 shift had not dealt with any clothing allowances, since he had worked there. Montoya stated the Supervisor's office was shared by all of the supervisors, however Vigil had his own cabinet, locked with a combination lock. Montoya stated his relationship with Vigil had been good to that day and he had not witnessed any inappropriate behaviors by Vigil.

On 6-16-15, this Investigator met with PTO **Jovita Romero**, regarding the allegation of exploitation of ALF clients. Romero stated on 5-17-15, she had picked up a check from "Evelyn" at the cage, for Mesa, which was for $ 1,200.00. Romero stated she delivered it to John Romero, who gave it back to her and told her to take it to the bank and cash it, at the South West Capital bank, on Hot Springs Blvd. Romero stated the teller divided it into eight envelopes with $150.00 in each. Romero stated she brought them back and delivered them to Vigil. Romero stated she did not take any of the Mesa clients shopping but had taken 3 El Paso clients shopping. Romero stated all change and receipts were given back to Vigil. Romero stated she had no access to Vigil's cabinet and had no further access to the money or envelopes after that point. Romero stated at no time had she seen any medications in any place, other than the med cart. Romero stated she rarely worked with Vigil and had never witnessed Vigil exploit any clients.

On 6-17-15, this Investigator met with PTS **Valentina Gurule**, regarding the allegation of exploitation of ALF clients. Gurule stated she was the graveyard supervisor at the ALF cottages and was aware of the situation with John Vigil. Regarding money in Vigils cabinet, Gurule stated she had no knowledge of any moneys in the cabinet. Gurule stated Vigil handled the client's money dispersals and she was never involved. Regarding medications, Gurule stated she was never aware of any medications kept or stored outside of the medication room. Gurule stated at no time had any clients come to her to report exploitation. Gurule stated she and Vigil had an extremely difficult working relationship and in the past few months she had noticed Vigil seemed more erratic than usual. Gurule stated at times Vigil had come to work, disheveled, with hair uncombed and acting oddly. Gurule stated she had no access to Vigil's cabinet or knowledge of the lock combination.

On 6-17-15, this Investigator met with PTO **Joleen Ortiz**, regarding the allegation of exploitation of ALF clients. Ortiz stated she had worked at the ALF units and had picked up a clothing allowance check on 5-4-15. Ortiz stated she took it to John Vigil and later she and Vigil went to the bank, where Vigil cashed the check. Ortiz stated Vigil received the $ 900.00 in individual envelopes ($150.00 /ea.) Ortiz stated she took 2 clients shopping and returned receipts and left over money to Vigil. Ortiz stated Vigil kept the money, but she did not know where he kept it. Ortiz stated at no time was she aware of any medications, kept outside of the medication room. Ortiz stated she had a decent relationship with Vigil and that he had never treated her or any clients poorly. Ortiz stated she had only worked at the ALF units for a few months and had no basis for judging Vigil's demeanor. Regarding the money (generally), Ortiz stated they were not done shopping for all of the clients and as soon as they were finished, the receipts and change would go back to the cage. Ortiz stated that was because the last few weeks they had been very busy with medical appointments and they were not able to finish the shopping.

On 6-17-15, this Investigator met with PTS **John Vigil**, regarding the allegation of exploitation of ALF clients. Vigil stated he was the daytime supervisor at the ALF units and had been recently interviewed by the Sheriff, regarding the contents of his cabinet.
Regarding the money found, Vigil stated the money was clients' clothing allowances, which he and staff had not been able to "do"(take clients shopping), because of being short staffed. Vigil noted several clients were taken shopping and their money was spent. Vigil stated his intent was to secure the money until the shopping was done. Vigil stated (verbally) the money, change and receipts should add up perfectly, as he had not taken any of it. When asked if he was familiar with the policies pertaining to client clothing allowance money dispersals, and client funds in general, Vigil stated (verbally) he was not aware of any particular policies regarding that. When asked, as a supervisor who handles the spending of the annual clothing allowances, how he knew what to do, he stated (verbally) he just did it the way his predecessor did it. Vigil was shown copies of the applicable policies and after going over them, Vigil indicated he was unaware he was required to return the money/change/receipts as soon as the shopping was done (for each client) and was unaware of there being a drop safe at the PBX office.
Regarding medications found, Vigil stated he had asked the graveyard shift supervisor to check and or have the staff check, at the beginning of each month, to make sure the medications on both El Paso and Mesa were consistent with the MAR. Vigil stated he brought it to his supervisor, it would be a good idea, in a meeting with Corrine (Dominguez), Jesse (Montoya) and Jeanie (Moore) the nurse who took over Kathy Aragon's position. Vigil stated on 6-1-15, he had asked his staff if they had followed up on the medication inventory and they replied no. Vigil stated he checked the medication carts at El Paso and Mesa and recovered some medications. Vigil stated he secured the medications in his cabinet, for client safety. When asked if he was aware of any policies pertaining to the storage of medications, he stated (verbally) "no" and he was not aware of having violated any NMBHI policies regarding medications. Vigil did state he was aware medications were normally only secured in the medication room. Vigil stated he did not recall leaving any anti-biotics or

loose pills in the cabinet.  Vigil stated the 29 tablets of Colchicine was his own personal medications.   Vigil stated he had no knowledge of a container of Monolucast sodium in his bottom desk drawer.  Vigil stated the five $ 1.00 bills were his, as was a $ 20.00 bill, which possibly was not real, which had been given to him by a friend (Tony Maes).  Regarding an Envelope with $635.00 in side, Vigil stated it was his money, from his renter and was due to be given to his son and daughter, because they had a baby girl.

    Vigil stated he was unaware of any violations of policies regarding storing personal items of value (on NMBHI grounds). Vigil stated it was common knowledge by his co-workers that he kept the clothing allowance money in his cabinet but as for his personal property, he tried to keep that to his self.  Regarding access to his personal cabinet in the supervisor's office, Vigil stated his previous lock had to be cut off by security, due to him forgetting his combination.  Vigil stated he placed a new combination lock (on the cabinet) and for fear of forgetting the combination again, he did not remove the printed combination sticker from the back of his new lock.  Vigil stated although the cabinet was his own personal cabinet, it was obviously not secure.  Vigil stated his actions and intentions were well meant and he was just attempting to protect the residents and staff from any incidents.  When asked if there were any inter-personal issues between himself and any other staff members, which might explain the reason behind the anonymous letter writer's allegations, Vigil declined to comment further.  Regarding policies, which may or may not have been violated by him. Vigil claimed ignorance (of general knowledge of policy).  Vigil denied (verbally) any exploitation of clients in any way.
*The interview was witnessed by Intern Investigator Michaelann Velasquez.*

    On 6-17-15, this Investigator met with PTO **Rosie Lucero**, regarding the allegation of exploitation of ALF clients.  Lucero stated she had only worked at the ALF units for a couple of months and had not worked with John Vigil for long.  Lucero stated she was unaware of Vigil keeping medications and client money in his personal cabinet.  Lucero stated she had never seen Vigil abuse or exploit a client.

    On 6-18-15, this Investigator met with PTB **Yvette Ortega**, regarding the allegation of exploitation of ALF clients.  Ortega stated she had worked at the ALF cottages for approximately 3 years but did not work directly with John Vigil.  Ortega stated she was unaware of any money or medications kept in the supervisor's office.  Ortega noted several months ago, she had taken a client out for personal hygiene products and Vigil had given her a $10.00 (bill).  Ortega noted upon return she gave Vigil the receipt and change and Vigil put the change in his pocket.  Ortega stated (verbally) she was unaware what circumstances surrounded her getting the money or after returning the change to Vigil.  Ortega stated she had never witnessed Vigil abuse or exploit any clients.

    On 6-24-15, this Investigator contacted CBS, RN **Jeanie Moore**, by phone, regarding he oversight duties at the ALF units.  Moore noted she was currently all alone and handling all of the CBS nursing duties, but agreed to a brief phone interview.  Moore explained, since Cathy Aragon's retirement, her taking over Aragon's position and other nursing staff being out on vacation.  Moore noted she had only worked with John Vigil at the ALF units for a few months but had worked with him years ago at APD admissions.  Moore stated she had never witnessed Vigil abusing or exploiting any clients, was fairly competent as a Tech staff and had a good rapport with the clients.  Moore stated she had heard some of the issues as of late between Vigil and co-workers, but had not witnessed anything first hand.  Moore stated she had not received any medication complaints, regarding "missing" medications.  Moore stated presently she is attempting to get authorization for a full time unit RN position, to fill, so that she would not be spread so thin.  Moore noted her current minimal duties at the ALF units as:  updating the client's MAR records monthly, making periodic med changes in the MAR, when PCP change meds, completing quarterly physical assessments and updating Treatment Plans.  Moore stated occasionally staff will call her with questions about medications and she will either be able to deal with it over the phone, or would have to go to the unit to deal with it.

    On 6-24-15, this Investigator contacted (former/retired) CBS RN **Cathy Aragon**, by phone, regarding her knowledge of med error reports from the ALF cottages.  Aragon stated she did not recall receiving any med error complaints regarding missing medications, from staff or clients at the ALF units.  Aragon noted she had received a call recently from John Vigil regarding the ongoing investigation.  Aragon stated Vigil told her that a staff member had advised him his personal areas had been searched and client medications had been found in his cabinet.  Aragon stated she advised Vigil she was retired and was not even comfortable providing him any advice.  Aragon stated Vigil described to her he had stored discontinued medications in his cabinet and was going to return them to CBS, but was ill and on vacation and had not had the chance to do so.  Aragon stated she told him she could not assist him in any way.  Aragon explained the meds may have been discontinued, due to a med change order from a PCP, or just that they were surplus and apparently

expired. Aragon stated, either way, all staff was familiar with return/disposal policies, regarding surplus/D/C meds, that they were to be noted as returned/ destroyed, placed inside a clear zip lock bag, sealed and returned to either the CBS pharmacy or the NMBHI Pharmacy, for destruction or return to the issuing pharmacy for credit and destruction. Aragon stated, aside from what Vigil relayed to her in his recent call, she had no previous personal knowledge of Vigil taking or stockpiling medications, in his personal areas at work, in the time she worked with him. Aragon stated Vigil had relayed the medications were Risperidone, which she noted would be useless for a health person to take and if he actually had a need for them and was conscious of that need, that he likely would not have been able to formulate a plan to take the meds. Aragon asked if any narcotics were found in Vigil's possession, as that was also relayed by Vigil to have been alleged. This Investigator was unable to provide that information, but asked about any reported missing narcotics. Aragon noted she did not recall any med errors, regarding missing narcotics, as that would have been immediately reported and followed up on.

On 6-23-15, this Investigator met with non-employees, **Cruzita Padilla and Janette Martinez**, who showed up at the Internal Review offices, to relay some information on this case. Padilla and Martinez area not employees, but were confronted at Padilla's daughter's residence by John Vigil. Both described various landlord / tenant type issues they argued about with Vigil and this Investigator advised NMBHI and this office had no power to investigate anything which happens outside of this facility. Padilla and Martinez described what happened as Vigil attempting to coerce Padilla's son Steven Jaramillo to sign a receipt that he had given Vigil cash money for his rent, which Padilla denied had happened. The issue of the origin of the cash money was an issue during this investigation. Padilla also stated she also found drugs in a bag and that Vigil and his "wife" Patricia Vigil cleaned up and took the bag of medications, but left one pack. Padilla gave a written statement attesting to the details of that encounter and turned over the drugs and some documents, to be given to the police. (see transcription of statement given)

On 6-24-15, this Investigator met with **Cruzita Padilla**, (non-employee) regarding some information pertinent to this case. Padilla stated recently John Vigil had approached her son in law, Steven Jaramillo, to ask him if he would write out rent receipts, saying he paid rent on the mobile home. Padilla stated Vigil told them was being investigated for stealing money from residents at Las Vegas medical Center. Padilla stated no rent had been paid by Jaramillo to Vigil. Padilla also stated she had given some medications to this Investigator, which were left behind (at the abandoned trailer next to her daughter's) by Vigil.

On 6-25-15, this Investigator met again with PTS **John Vigil**, regarding follow-up for a second search of his personal areas. Vigil stated he had been advised his extra lockers had been searched. Regarding the lock on his large locker, Vigil stated he had written the combination to the lock on the wall next to the wooden locker, so that he would not forget it. Regarding the contents of the locker, Vigil stated he had not been into the locker for a while and it contained food clothes and personal medication. Vigil stated the medications fond were his, except the Hydrocodone, which was not his. Regarding the small lockers, with "yellow" locks at El Paso, Vigil stated they were his lockers. Vigil stated he kept the keys to those locks on his car key ring and had not given any copies to anyone else. Regarding clients' medications found in the lockers, Vigil stated he had not put them there. Regarding keys found in his tall locker, hanging on a hook, they were not his keys. Vigil stated he had called Cathy (retired RN Cathy Aragon) to notify her about what was going on at work and just to talk to someone, because I was close to her. Vigil stated he recently had contact with his renters, who paid him the cash money, found in his locker. Vigil stated he had landlord tenant issues with these people. Vigil stated these renters have since left the property. Vigil stated he had not been inside these trailers for quite some time and had not left personal property there. Vigil was asked if the name Marcus Trujillo meant anything to him and he responded, Marcus Trujillo was teen ager, whose family lived at that trailer. Vigil stated those renters left a lot of property and he had to go and clean out the trailer. Vigil stated he believed his ongoing conflict with the graveyard shift staff, had resulted in these allegations. Vigil stated he also felt he was being set up and the narcotics had been planted, to get rid of him. Vigil stated staff "Pauline" (Pauline Lucero) had advised him that Tina (Tina Gurule) had been going around asking staff to make false allegations and file incident reports on him, so he would be removed from his position as supervisor. *Vigil was advised to document all of those details, but that this investigation was not about his allegation of interpersonal conflict with co-workers. Vigil did produce a written accounting of those details later, but was advised to submit them to his supervisors and through proper channels.*

**Findings:**
- On 5-29-15, (2) **NMBHI Incident Reports** were initiated (simultaneously) by C.O.O. Charles Jaramillo and HR Assit Dir. Richard Vigil, titled "John Vigil", which documented receipt of an anonymous letter received at their offices, via inter-departmental mail.
- On 6-3-15, **(2) DOH/DHI Incident Reports** were submitted by Ex. Nursing Dir. RN Frances Tweed, which described alleged exploitation of at least two CNBS/Alf clients **(Client # 1 and Client #2)**, by PTS John Vigil.
- On 6-19-15, an **NMBHI Incident Report** was submitted by Ex. Dir. of Nursing RN Frances Tweed, which documented the receipt of another anonymous letter about John Vigil.
- On 6-19-15, a **DOH/DHI Incident Report** was submitted by Ex. Dir. of Nursing RN Frances Tweed, which documented a perceived exploitation of CBS/ALF client **(Client #3's)** medication.

**Allegations:**
- On 6-1-15, an anonymous letter was sent (via Inter-Office mail) to both C.O.O. Charles Jaramillo and Asst. Dir. HR Richard Vigil, which alleged exploitation of CBS/ALF clients. The writer of the letter alleged El Paso Psych Tech Supervisor John Vigil was in possession of clients' medications and money, which were reportedly locked inside a personal cabinet in his office.
- On 6-19-15, a second anonymous letter was received (via Inter-Office mail) by Ex. Dir. of Nursing, RN Frances tweed, which alleged additional exploitation of CBS/ALF clients. The writer of the letter alleged ALF Psych Tech Supervisor John Vigil had additional lockers in both the Mesa and El Paso cottages, which contained clients' medications.
    - Vigil stated he believed his ongoing conflict with the graveyard shift staff, had resulted in these allegations.
    - Vigil stated he also felt he was being set up and the narcotics had been planted, to get rid of him.
    - Vigil stated the money, change and receipts should add up perfectly, as he had not taken any of it.
    - Vigil stated he secured the medications in his cabinet, for client safety.

**Results of Investigation:**
- Pursuant to the receipt of the first anonymous letter, alleging exploitation of ALF clients, the personal secure areas of Psych tech Supervisor John Vigil's desk, in the El Paso Cottage, were searched.
    - Tweed noted she and Security Supervisor (Joe Chavez), Internal Review Director (Antonio Coca) went to Vigil's office, where they found that Vigil did have cabinets over his desk, which had a padlock.
    - Tweed noted Vigil was on vacation at that time.
    - Tweed noted Chavez cut the lock and they confirmed the medication bottles did have the names of at least two clients **(Client #1 and Client #2)**, as well as cash money (2- $1 bills).
    - Tweed noted the cabinet was re-secured with a Security Dept. lock.
    - Tweed requested police involvement, involved the SMC-SO, who agreed to obtain a search warrant for the cabinet and later served the search warrant on 6-5-15.
- The Warrant Application Return and Inventory, was provided by the SMC-SO's office, which precisely documented the search of a wooden desk and surrounding work space of John Vigil on 6-5-15.
    - The 34 items noted to have been confiscated in the search, included, 14 bank envelopes, (most of which were marked apparently with clients' initials and which contained money and or receipts for purchases), 1 orange envelope (containing $635.00), a "play" $20. Bill, Pill Bottles, Loose pills and antibiotics.
    - The search was conducted by Under Sherriff Anthony Madrid and Deputy Sean Armijo.
- Regarding Cash money and receipts in bank envelopes, it was identified by Finance Director Darlene Martinez, as annual Clothing Allowances for CBS /ALF clients.
    - Pending the return by SMC-SO and the SMC D.A.'s office of the confiscated money and receipts, and a subsequent fiscal audit, it is unknown whether the money is accounted for.
    - Vigil claimed ignorance of policies regarding the Clothing Allowance dispersals or clients' funds in general.
    - Vigil stated he had not returned the money receipts to the finance office, as the client sopping was not yet completed.
    - Vigil stated he only intended on safeguarding the money until he could finish the client shopping and return all of the receipts and money at the same time.
    - Vigil stated he never exploited any clients.
- Regarding the cash money recovered by SMC-SO in their search, which was not obviously client funds:

- Vigil claimed small loose bills were his, as was an orange envelope containing $635.00 in cash.
  - Vigil claimed ignorance of policies regarding the keeping of valuable personal items at work.
  - The storage of valuable personal items, on NMBHI grounds, is against policy.
- Regarding medications (labeled prescription and loose pills), recovered by the SMC-SO in their search:
  - Vigil stated he had placed the clients' prescription medications in his cabinet, pending turning them over to his supervisor, because they were reportedly expired.
  - Vigil denied having knowledge of any loose medications in the cabinet.
  - Vigil admitted the (non-client) prescription medications and over the counter medications were his own.
  - The storage of any unlabeled or non-prescription personal medications is against State Law.
  - The storage of any client medications anywhere other than the medication room is also against policy.
  - As for unlabeled, loose Class IV narcotics, found, Vigil stated he had no knowledge of that.
  - Vigil insinuated, during his interview that someone else may have planted the loose medications.
- Regarding access to the personal secured cabinet searched by NMBHI Administration and the SMC-SO, Vigil claimed it was not secure.
  - Vigil stated he had left the combination sticker on the rear of the combination lock, due to being afraid he would forget his combination.
  - Staff interviewed stated they knew Vigil took care of the clothing allowance money, but none stated they had any access to or knowledge of the money being stored inside Vigil's cabinet.
  - Staff interviewed stated they were not aware of medications being stored anywhere other than the medication room.
  - None of the staff interviewed, admitted being the writer of the anonymous letter.
- Pursuant to a second anonymous letter on 6-19-15, alleging Vigil having additional lockers, reportedly also containing client medications, the described lockers were searched.
  - Tweed noted she, Luann Gonzales and Peter Schaefer conducted a search of the lockers at approximately 1345 hrs.
  - Tweed noted they started at Mesa and broke the lock on a locker with Vigil's name on it.
  - Tweed noted inside a "Centrum Silver" they found several different pills and capsules.
  - Tweed noted they had found 7 tablets (white oblong with score and noted "Watson 349").
  - Tweed noted they were able to identify these seven as Acetaminophen 500 / hydrocodone 5 mg.
  - Tweed noted they also found 2 tablets (white oblong, scored and noted "Watson 385").
  - Tweed noted those 2 tablets were identified as being Acetaminophen 500 mg / Hydrocodone 7.5 mg.
  - Tweed noted both of these varieties are schedule 2 narcotics.
  - Tweed noted other medication found were not controlled substances, some were prescription medications and some were over the counter medications.
  - Tweed noted they were as followed: Ibuprofen, Indomethacin, Colchicine and Clindamycin.
  - Tweed noted they went to El Paso and broke into two lockers there, which had no names on them but which had yellow locks (yellow plastic trim) on them.
  - Tweed noted Locker #4 contained a magazine with Vigil's name on it, as well as (3) prescription bottles, from two separate clients, 2 of which were labeled as **(Client #1)** and the last was labeled as **(Client #3)**.
  - Tweed noted of the two labeled as **(Client #1)**, one was Risperdone 2mg, with an issue date of 6-14-14 and the second was Benztropine 0.5 mg, issued on 8-17-14.
  - Tweed noted the one labeled for **(Client #3)** was Risperdone 1mg with an issue date of 7-31-14.
- The contents of the searched lockers was noted and the items placed back inside, before a Security department lock was placed on three lockers to secure them, pending a SMC-SO Warrant and search of the lockers.
  - The SMC-SO was intending on completing a formal search, with a warrant and taking the located property as evidence, but had not, as of 6-23-15.
  - Tweed noted (verbally) the search warrant and an arrest warrant for Vigil, were expected simultaneously by the SMC-CO Under Sheriff Anthony Madrid.
- As of 6-23-15, no arrangements were made to re-interview Vigil on the details of the secondary search, as the formal search warrant and arrest warrants were pending and this office did not want to obstruct the SMC-SO case.
  - On 6-25-15, this Investigator met again with Vigil, regarding follow-up for a second search of his personal areas.

- Regarding the contents of the locker, Vigil stated he had not been into the locker for a while and it contained food clothes and personal medication.
    - Vigil stated the medications fond were his, except the Hydrocodone, which was not his.
- Regarding the lock on his large locker, Vigil stated he had written the combination to the lock on the wall next to the wooden locker, so that he would not forget it.
    - This Investigator decided to corroborate this detail, if possible and went to Ex. Dir. of Nursing RN Frances Tweed's office for assistance.
    - Tweed accompanied and witnessed the search for the numbers, reportedly written on the wall.
    - This Investigator did locate a series of numbers, written in pencil on the wall, up high to the left of a large wooden cabinet, across the room from the locker.
    - The numbers: 11, 28 and 13 were written in line above each other, with a "total" line and the number 52 below the line as if someone had added up the numbers and put down a sum.
    - The cut lock in question was recovered from the locker, the "combination" was tried on the lock and it opened up.
    - The lock was placed back inside the locker and secured.
    - The numbers were very faint and in pencil and in this investigator's opinion, would not have been generally visible, if someone did not know where to look.
- Regarding the small lockers, with "yellow" locks at El Paso, Vigil stated they were his lockers.
    - Vigil stated he kept the keys to those locks on his car key ring and had not given any copies to anyone else.
    - Regarding Clients' medications found in the lockers, Vigil stated he had not put them there.
- All three clients identified in the misuse/mishandling of medications were assessed and no ill effects were noted, as well as there being no apparent knowledge of the activity of Vigil, by any of the identified clients.
    - Aragon explained the meds may have been discontinued, due to a med change order from a PCP, or just that they were surplus and apparently expired.
    - Aragon stated, either way, all staff was familiar with return/disposal policies, regarding surplus/D/C meds, that they were to be noted as returned/ destroyed, placed inside a clear zip lock bag, sealed and returned to either the CBS pharmacy or the NMBHI Pharmacy, for destruction or return to the issuing pharmacy for credit and destruction.

**Findings Summary:**
- **Vigil denied any exploitation of clients in any way.**
- **Vigil stated he intended on returning all of the remaining money and receipts for the Clothing Allowance shopping, as soon as it was finished.**
- **Pending a Finance Dept. Audit, it was unknown if any client money was misappropriated.**
- **Vigil stated he took and secured the medications, for the client's safety, as they were expired and intended on turning them over to Corrine Dominguez.**
- **Vigil stated his actions were well intended but claimed ignorance of policy, as the reason he did what he did.**
- **Vigil signed a "Skills and Knowledge Checklist" 13 times almost annually since 1999, attesting to his confidence in job applicable NMBHI policies.**
- **Vigil completed the "Assisting with medications" Re-certification test annually almost every year since 1999.**
- **Vigil was in violation of numerous NMBHI Policies as well as some State Statutes.**

**I AFFIRM AND SWEAR the above information is true and correct based upon the statements given to me and the information and records reviewed.**


_____              _____6-30-15_____
**Peter Schaefer, Investigator**                             **Date**

**Amendment to report:**

On 9-15-15, pursuant to notification by Ex. Dir. of Nursing RN Frances Tweed, several minor changes are hereby made to the investigation. Two separate E-mails are noted, which contain pertinent information, as follows:

**CHANGE #1**
Re: Interoffice E-mail: dated 6-5-15, at 1521 hrs.
Between Frances Tweed and Atty. Maura Shuttleworth, not previously provided, indicated the following notation:
(Noted after a preliminary search of John Vigil's desk and personal area on 6-3-15) Tweed noted in the E-Mail:
- One paper medication cup that contained a small yellow pill. I was able to confirm (by looking at our pharmacy online module) that it was a Clonazapam 0.5mg. That is a controlled substance (schedule II narcotic) it is for anti- anxiety.
    - The later identification by members of the SMC-SO, was separate and outside of our control.

**CHANGE #2**
Re: Interoffice E-Mail: dated 9-16-15, at 1333 hrs.
Between Frances tweed and This Investigator (Peter Schaefer)
(photographed during a follow-up search of John Vigil's additional lockers, on 6-19-15) Tweed noted in the E-Mail:
Peter, See Attached. (photos) In reviewing the photos which were taken on 6-19-15, the correct count for the Acetaminophen/hydrocodone 500mg/5mg, was 9 and not 7 as noted in a previous memo.

The photos included with the memo, clearly show and confirm 9 white oval tablets were found.

The change was made to the report on P.3, line 25. (The number 7 was noted changed to 9)