Page 642

1    ALJ COOPER: Okay. The time is
2  4 o'clock. We are back on the record.
3         So Mr. Romero said that he was going to
4  try and call his witnesses telephonically tomorrow,
5  those two witnesses.
6         MR. TREMAINE: Okay. Department has two
7  witnesses left. At this time, we'll call Joe Chavez.
8         ALJ COOPER: Thank you.
9         (Witness summoned.)
10        MR. TREMAINE: Mr. Chavez.
11        THE WITNESS: Hi there.
12        MR. TREMAINE: Have a seat.
13        ALJ COOPER: Good afternoon.
14        THE WITNESS: Hello.
15        ALJ COOPER: Okay. So I need to swear
16  you in, okay?
17        THE WITNESS: Okay.
18        ALJ COOPER: Can you raise your right
19  hand? Thank you.
20              JOSEPH CHAVEZ,
21  called as a witness on behalf of the appellee, having
22  been first duly sworn, was examined and testified under
23  oath as follows:
24        ALJ COOPER: Thank you. Go ahead, have a
25  seat.

Page 643

1          Can you please state and spell your name
2   for the record?
3          THE WITNESS: My name is Joseph Chavez.
4   And did you say spell as well?
5          ALJ COOPER: Please.
6          THE WITNESS: J-o-s-e-p-h C-h-a-v-e-z.
7          ALJ COOPER: Thank you.
8          Okay. So I'm Jessica Cooper. I'm the
9   administrative law judge for the State Personnel Board
10  and I'm conducting this hearing requested by
11  Mr. Vigil --
12         THE WITNESS: Okay.
13         ALJ COOPER: -- concerning the
14  disciplinary action taken against him by the
15  Department.
16         THE WITNESS: Okay.
17         ALJ COOPER: I'm making an audio
18  recording of the proceeding. Your microphone's right
19  in front of you. You don't have to speak right into
20  it. Just keep your voice up, okay?
21         THE WITNESS: Okay.
22         ALJ COOPER: Okay. Thank you very much.
23         Go ahead, Mr. Tremaine.
24
25

Page 644

1               DIRECT EXAMINATION
2  BY MR. TREMAINE:
3      Q. Good morning afternoon, Mr. Chavez. Or "good
4  morning afternoon." Good afternoon, Mr. Chavez.
5         What is your current position with BHI?
6      A. My current position is I'm the director of
7  security and communications for our facility.
8      Q. Okay. How long have you been the director?
9      A. How long I've been the director? I've been
10  the director -- I was interim for two years and I've
11  had the position officially for three.
12     Q. So a total of five?
13     A. Total of I guess five years, you could say.
14     Q. Okay. And how long have you been with BHI in
15  total?
16     A. BHI, 16 years this year.
17     Q. Okay. And so three years were you the interim
18  director or the -- in the position of security director
19  in June of 2015?
20     A. I had -- 2015, I had just gotten into the
21  position of director.
22     Q. Okay. Do you know Mr. Vigil?
23     A. Yes, from work.
24     Q. Okay. And how -- how long did you know him
25  through work?

Page 645

1      A. Well, it would be years, I'd say, just from
2   passing, coming, going, working shifts, doing rounds,
3   bumping into him in town.
4      Q. Uh-huh.
5      A. I could say a while. I -- over 10 years,
6   15 years maybe, from day one that I started. So it was
7   a good time that I knew him by person.
8      Q. Okay.
9      A. I was working with the State.
10     Q. Okay. And you are aware, because we're here,
11  that Mr. Vigil was dismissed from his position as a
12  result of an investigation that you took one part in?
13     A. Yes.
14     Q. Okay. Could you please let us know how you
15  became aware of that situation?
16     A. To backtrack to what I can recall, there was
17  an anonymous letter sent to our facility. Apparently,
18  there was two. I was advised about the second one. I
19  think it was the second one I was advised on, about
20  items belonging to patients being stored in a personal
21  work area, I guess, desk area, I guess you could say.
22        I was advised that they had received the
23  letter and they were awaiting further instruction on
24  how they wanted to proceed.
25     Q. Okay.

Page 646

1  A. And they wanted to let us know because there
2  was a question about personal locks being placed on the
3  desk that weren't originally on the desk that didn't
4  come equipped with the desk. And they wanted to get me
5  involved because they knew they were going to require
6  my department to cut the locks if they needed to access
7  the area.
8  **Q. So can you -- the desks at BHI or, in**
9  **particular, the ALF unit, do they normally have, like,**
10 **the hinge thing that allows you to padlock it?**
11 A. To my knowledge, no. To -- all the desks that
12 I've seen that we've issued or I've had to work with
13 and be part of or transfer out of units and stuff, they
14 usually come with little barrel locks that -- with a
15 little lever lock or something that holds the door shut
16 or things like that.
17 **Q. Okay.**
18 A. This one was like a latch system with an
19 actual little lock on it.
20 **Q. Okay. The -- the latch I've -- I've been**
21 **describing is like the type of latch you would get at,**
22 **like, Ace Hardware, something like that? Is that the**
23 **type of --**
24 A. Yeah. Ace Hardware --
25 **Q. Okay.**

Page 647

1  A. -- or --
2  **Q. Okay.**
3  A. -- or maybe even Walmart. Just a real simple
4  loop with a closure, and then you put your lock on it.
5  **Q. Okay. Is it normal to see that kind of**
6  **hardware on a desk at BHI?**
7  A. Not really. More so, like I say, the little
8  barrel locks.
9  **Q. Okay.**
10 A. (Indiscernible) with a lock and a key so you
11 can have it and stuff.
12 **Q. And you referenced the personal locks that**
13 **would need to be cut. Is it normal for staff to use**
14 **personal locks on desks?**
15 A. I would say no. I would say no, because I
16 don't see very many personal locks on desks.
17 **Q. Okay. Are you able to -- are you the right**
18 **person to ask to find out how staff get lockers?**
19 A. I don't know what the exact process is now. I
20 know there were -- the facility's trying to keep an
21 inventory who's issued which locker. I think now
22 they're doing an issue process. If you want a locker,
23 you ask for it. They say, "Okay. This is your locker
24 here and we know it belongs to you."
25 **Q. So at this time --**

Page 648

1  A. It's been a while that that's been going on.
2  I think --
3  **Q. Okay.**
4  A. -- it just maybe hasn't been as consistent --
5  **Q. Okay.**
6  A. -- in some areas.
7  **Q. Okay. At this time, there's an inventory of**
8  **who has what locker?**
9  A. Yeah. I received a list. Maybe even two
10 months ago I think was my most current list that I
11 received.
12 **Q. In 2015 was there, like, tracking of who had**
13 **what lockers?**
14 A. Through my department, no. Everything was
15 pretty much with managers. Supervisors, I think, on
16 the units, knew whose locker was whose or --
17 **Q. Okay.**
18 A. So if there was any question, it would
19 probably go through a supervisor. "Hey, whose locker
20 is number 15?" And they would go check and they'd be
21 like, "Oh, it's so-and-so's," or --
22 **Q. Would it be normal for one staff member to**
23 **have three or four lockers?**
24 A. It'd be -- that would be a little strange, but
25 it's not unseen before.

Page 649

1  **Q. Okay.**
2  A. It's -- it has happened a few times where
3  somebody's had two lockers or --
4  **Q. Uh-huh. Okay.**
5  **So kind of getting back to the process**
6  **here, what steps did you take to assist in this**
7  **investigation? You know, I believe you had said that**
8  **you were -- the facility was awaiting a -- a decision**
9  **about how to move forward because the areas were**
10 **locked. So what's the next step that you took?**
11 A. Well, the next step that I was asked to take
12 was to go into the office there, because there were
13 three supervisors who shared the same room, I guess,
14 as -- as an office area, three desks. And then they
15 asked me to take a look. Not to touch anything, just
16 to take a look and see what the environment was like.
17 Was there locks on the cabinet as suggested and such?
18 And then when I did see the locks on the
19 cabinets, I just went back and reported it to my
20 administrator. And the nurse managers and the people
21 that had asked me to get involved, that notified me,
22 that, yes, I did see the locks. And I awaited further
23 instructions from that point.
24 **Q. Who were you discussing that with?**
25 A. I believe my biggest contact was with

Page 650

1  Ms. Frances Tweed.
2  Q. Okay. Was there any discussion with -- at
3  that point with the former director, Mr. Jones?
4  A. I believe so.
5  Q. Okay. Was there anybody --
6  A. I can't --
7  Q. -- else involved in the discussion of how to
8  go about the investigation, that you can recall?
9  A. Directly with me, no.
10  Q. Okay.
11  A. My -- my whole part at that point was -- after
12  I reported that, yes, there was a -- a padlock in -- on
13  top of the desk on the cabinets. And I just waited to
14  see what they were going to decide; if they were just
15  going to call it a day or -- they were going to
16  contact, I believe, the legal team. I don't remember
17  which -- which legal representative from our facility
18  was contacted exactly, but they were awaiting
19  instruction -- further instruction from them.
20  Q. And so once you verified that the padlock was
21  on the cabinet and went back and talked to your -- the
22  individuals you were talking to, what happened then?
23  A. I waited -- I couldn't tell you how long I
24  waited for a response back from my higher-ups.
25  Q. Okay.

Page 651

1  A. But I do remember we got the call to go ahead
2  and go down there with -- I want to say -- it's been --
3  it's been a while, so I want to say it was maybe Mabel.
4  One of the nurse managers.
5  Q. Okay.
6  A. I know it was a nurse. It was a nurse from --
7  from one of the -- it might have been Mabel. I know it
8  wasn't Frances, but it might have been Mabel who went
9  with me. I had Mabel take the photographs --
10  Q. Uh-huh.
11  A. -- of me. I believe it was her. She took the
12  photographs of the lock. And then me, when I put
13  the -- the cutters to the lock, as I pressed it, as the
14  lock broke, as we removed it, and then as we first
15  opened the cabinet.
16  Q. When you opened the cabinet, you saw
17  prescription medications inside?
18  A. Yes. There was some prescription bottles and
19  some of the little paper cups for dispensing meds. I
20  think there was, like, one or two --
21  Q. At the time --
22  A. -- of those.
23  Q. I'm sorry.
24  A. Oh, I think there was just one or two of those
25  little paper cups.

Page 652

1  Q. Okay.
2  A. But there were some prescription bottles in
3  there.
4  Q. At the time that you cut the padlock, did you
5  already know that there were prescription bottles
6  inside?
7  A. Yes.
8  Q. How did you know?
9  A. And the -- the way I found out was when we
10  first went back over there and we were talking about,
11  you know, the lock --
12  Q. Uh-huh.
13  A. -- they gave us the order to go ahead and cut
14  it, and I was looking at the cabinet. And you could
15  pull the cabinet, and there was some slack. So the
16  cabinet doors would literally -- I don't know how to
17  explain it, but they would open to where you can kind
18  of see in. Kind of like the door that doesn't close
19  completely.
20  Q. Okay.
21  A. And when we were able to look up, we were able
22  to see one bottle. And when I read the name on it, it
23  was a female's name. I don't know the name.
24  Q. Uh-huh.
25  A. But the -- the nurse -- I remember the nurse

Page 653

1  saying, "That's one of the clients from here."
2  Q. Okay.
3  A. That was one of the first things. And then we
4  proceeded forward and cut it. And then we took
5  pictures of the bottle where it was at.
6  Q. Okay.
7  A. And I believe that was in the photographs that
8  I took after that, because after it was cut I took the
9  majority of the photos after that.
10  Q. Okay. Can I show you -- have you refer to the
11  black binder? So it's the bottom one there.
12  A. Black one?
13  Q. Yeah. Exhibit 22. And if you could review
14  subnumbers 1 through 6.
15  A. Subnumber 1 through 6?
16  Q. Yes.
17      MR. ROMERO: Which exhibit? I'm sorry.
18      MR. TREMAINE: 22-1 through 6.
19      THE WITNESS: Okay.
20      (Pause in the proceedings.)
21      THE WITNESS: Okay.
22  BY MR. TREMAINE:
23  Q. Have you seen those photographs before?
24  A. Yes. I took those pictures.
25  Q. Okay. And so specifically number 2.

Page 654

1  A. Oh, I didn't take that picture. I'm sorry.
2  Q. Okay.
3  A. That's the one where they were taking pictures
4  of me cutting the --
5  Q. Okay. Just clarifying that.
6  A. -- the lock on there.
7  Q. And were all of those pictures taken on the
8  same day?
9  A. On these six, yes.
10 Q. Okay. All right.
11     So I'm going to skip 1 for a second,
12 because it's a different subject matter. But Number 2,
13 this combination lock that you're about to cut in the
14 photograph --
15 A. Yes.
16 Q. -- and this cabinet, this is what we've been
17 talking about?
18 A. Yes.
19 Q. Okay.
20 A. Because after we cut the lock, we did put a
21 key lock on it to resecure it to leave it the way it
22 was.
23 Q. Okay. So you found it with the combination
24 lock?
25 A. That's correct.

Page 655

1  Q. Okay. And then you could see the drugs behind
2  the door and -- and proceeded to cut the -- the lock?
3  A. Yes.
4  Q. Exhibit 22, number 3?
5  A. Yes, on number 3.
6  Q. Is it accurate to say that that's an internal
7  view of -- of the cabinet once you opened both doors?
8  A. Yes.
9  Q. And the -- the three prescription bottles that
10 you can see there, were you able to identify the names
11 on those bottles?
12 A. I know that --
13 Q. I'm -- so to be specific, I'm not asking you
14 what the names were.
15 A. Uh-huh.
16 Q. I'm asking you if you were able to read the
17 name on the bottles and -- and then whether or not they
18 belonged to Mr. Vigil.
19 A. I believe that the -- the bottle, right-hand
20 side of the yellow lighter --
21 Q. Uh-huh.
22 A. -- that was the bottle, I believe, that was
23 identified with the female client from that -- from
24 that cottage.
25 Q. Okay.

Page 656

1  A. That I confirmed that, yeah, I do see
2  something that belongs to --
3  Q. Okay.
4  A. -- to the -- to the client on there. The
5  other one, I -- I don't recall.
6  Q. Okay.
7  A. I know they did a better inventory when the
8  sheriff's department and everybody else got involved.
9  Q. Okay.
10 A. They did an actual full inventory. I just
11 took pictures of what we found and then resecured the
12 area. We even --
13 Q. Okay.
14 A. -- not even allowed the supervisors -- the
15 other supervisors to enter the area after that
16 happened.
17 Q. Okay. Did any of the prescription bottles
18 that you found in that cabinet have Mr. Vigil's name on
19 them?
20 A. I don't recall.
21 Q. Okay. So moving on from the medications in
22 the cabinet, can you go back to 22, sub 1?
23 A. Sub 1? Okay.
24 Q. And what -- what was the purpose of taking
25 this picture?

Page 657

1  A. It was just the stuff that was in the desk as
2  we were opening it up. I just started taking pictures
3  of everything that was there. I didn't want nobody
4  saying that, you know, all of a sudden, this was here
5  or whatever. This is what I found at the time. I knew
6  that that's (indiscernible). As to what was in the
7  envelopes, we didn't touch.
8  Q. Uh-huh.
9  A. I just opened the drawers and took pictures of
10 what was in there, and then we closed the drawers. We
11 assumed that it was money, so that was one of our --
12 Q. In the Southwest Capital Bank --
13 A. Yeah.
14 Q. -- envelopes?
15 A. We -- we figured that's what it was. The
16 plastic bag, it didn't have a description on it. I
17 knew it had an address -- addressee on it.
18 Q. Okay.
19 A. I don't remember if it was Mr. Vigil's. It
20 might've been. But it had an addressee on it, so we
21 just took pictures and reclosed it.
22 Q. Can you tell from the review of the photograph
23 if it had Mr. Vigil's address on it?
24 A. On the package? Yeah. I think it would -- I
25 think it would've said "John Vigil." I can't read

Page 658

1  beyond that, but, I think it was -- I think it does say
2  his name on it.
3      Q.  Okay.  Is it safe to say that this package
4  didn't come from the Finance Division?
5      A.  I wouldn't think so, because it would be --
6  anything to our facility would be checked into our
7  warehouse and then issued out.
8      Q.  Okay.
9      A.  Or assigned out, for something like that.
10     Q.  Okay.  And 22, sub 6?
11     A.  6?  Okay.
12     Q.  What is that a photograph of?
13     A.  It was a little paper cup with a -- a pill
14  inside of it.
15     Q.  Okay.  Did you have any discussions or take
16  part in any investigation in -- as to what that pill
17  was?
18     A.  No.  My understanding is there was markings on
19  pills that they can use for identification, and that's
20  probably what they were going to do with it.
21     Q.  Okay.  Is this photograph taken where you
22  found the pill?
23     A.  No.  I believe that was taken after the
24  sheriff's department got there and started doing an
25  inventory.

Page 659

1           This was -- I'm looking at the pictures as
2  I'm going through the little book here, and for some
3  reason they're not in the exact order that we took
4  them.  I thought they were, looking at the first ones.
5      Q.  Okay.
6      A.  But they're not.  I don't -- I'm not sure what
7  happened there.
8      Q.  Okay.
9      A.  But then we show one of just the cabinet with
10  everything in there, the drawer with everything in it,
11  is the photographs that we took, the lock, and then
12  everything else when the sheriff's department got there
13  from there, so . . .
14     Q.  So can you see -- this paper cup with the pill
15  in it that's in sub 6, can you see that anywhere in 22,
16  sub 3?
17     A.  22, sub 3?  22, sub 3, that was the one that's
18  right there in front of that bottle on the right-hand
19  side of that yellow lighter.
20     Q.  Okay.  So there's the yellow lighter, then
21  that prescription bottle --
22     A.  Uh-huh.
23     Q.  -- and then that white area --
24     A.  That little paper cup.
25     Q.  -- in front of it is the paper cup?

Page 660

1      A.  That was there.
2      Q.  Okay.  And you moved it out of the cabinet and
3  took this close-up picture of it later?
4      A.  After the sheriff's department got there,
5  yeah.
6      Q.  Okay.
7      A.  After we reported out findings, and then they
8  wanted us to call the sheriff.
9      Q.  Okay.  Once you took all -- took the
10  photographs -- before the sheriffs got there, once you
11  took the photographs, what did you do?
12     A.  I took them back to my office and I stored
13  them onto my -- my hard drive on my computer.  I
14  uploaded them.
15     Q.  Okay.
16     A.  I want to say that we showed them to our
17  administrator, and I believe we shared them with Legal.
18     Q.  Okay.  So the administrator at the time would
19  have been Troy Jones?
20     A.  Yes.
21     Q.  Okay.  So you shared them with Mr. Jones, and
22  then you would've shared them with Legal.  Did you do
23  that or --
24     A.  No.
25     Q.  Okay.

Page 661

1      A.  I -- I just provide my -- my -- my superiors
2  with whatever information they need.
3      Q.  Okay.
4      A.  Now, if, for example, I got a directive, say,
5  from Weir [phonetic] and Ms. Tweed or somebody or
6  Troy's, like, right in front --
7      Q.  Uh-huh.
8      A.  -- then I would just provide him with whatever
9  he needed.  But usually it filters down to my
10  higher-ups and then they tell me, "Well, here's the
11  response from Legal.  Go ahead and release the DVD, the
12  photographs," whatever it is that we're -- we're
13  dealing with at the time.
14     Q.  And so to clarify, when you say, "Weir,"
15  you're referring to another attorney within
16  (indiscernible) --
17     A.  Yeah.  I'm -- I was just using that as an
18  example.  I don't remember who was exactly involved
19  with that whole --
20     Q.  Okay.
21     A.  -- that whole thing.
22     Q.  And were you present for the police search of
23  the office?
24     A.  I was not present.  I had a prior engagement
25  that I needed to attend.  So what I did do is I did

Page 674

1  know.
2  BY MR. TREMAINE:
3      Q. Mr. Chavez, could you look at 23 and 26 real
4  quick. Did -- 23 is locker 4 and it has a butterfly
5  sticker on it and 26 is locker 1 and it has a butterfly
6  sticker on it.
7      A. That's the --
8      Q. It looks like both of those have Master Locks
9  with keys on them. Are those the locks that were found
10  on the lockers?
11      A. Yes, because -- let me -- (indiscernible).
12      Q. Or do you know? I --
13      A. I -- I couldn't tell you. I know that the
14  locks that we use to secure things are Brinks' locks.
15      Q. Okay.
16      A. But I do know that my facility has been known
17  to have commercial locks through maintenance.
18      Q. Okay.
19      A. Master Locks. So I couldn't tell you if that
20  was one of our locks or if that was --
21      Q. Okay. And --
22      A. -- a personal lock.
23      Q. -- if you could look at -- at 27 again.
24      A. Okay.
25      Q. This room that has the -- the big blue locker

Page 675

1  with Mr. Vigil's name on it. And you see Mr. Schaeffer
2  here pointing at a -- at a particular locker. Is it --
3      A. Uh-huh.
4      Q. Is it true that that's a different locker than
5  what's in 23 and 26?
6      A. 23 and 26? If he's pointing at the one
7  closest to the wall, I would say yes, because it
8  doesn't have the butterfly on it.
9      Q. Okay. From your memory, are the lockers in 23
10  and 26, are they in the same room as the lockers in 27?
11      A. I almost want to say they were in a different
12  cottage, but I don't remember.
13      Q. Okay.
14      A. Because there's two cottages over there for
15  the ALFs and I can't recall if there were one in each
16  or if they were both in the same.
17      Q. Okay.
18      A. Honestly, I couldn't.
19      Q. Okay. And the -- so the locker -- the locker
20  that you helped search, you said it had contraband in
21  it, but it -- is it true that it did not contain any
22  prescription medications or client funds or anything
23  like that?
24      A. No. That's just the little --
25      Q. Okay.

Page 676

1      A. -- odds and ends and stuff like that. The
2  one -- that one with the blue locker that I went
3  through that I was part of didn't have anything like
4  medications or pills that I can recall, anything like
5  that.
6      Q. Okay. So the --
7      ALJ COOPER: So it was a different blue
8  locker that you went through without Mr. Vigil's name
9  on it?
10      THE WITNESS: Yes. It was the second one
11  that was investigated. And I think there's even a
12  picture that I saw in here. And I wish I could be more
13  remembering, but I want to say that little document
14  with the shipping tag that had his name on it was found
15  inside that locker. And I think that's where we took
16  the picture, because it didn't have his name on the
17  locker, but it had --
18      ALJ COOPER: Oh.
19      THE WITNESS: -- the tag inside of it.
20  BY MR. TREMAINE:
21      Q. Okay. And is that referring to the locker
22  number 10 that's in the same room as the blue locker?
23      A. The blue locker? If it's a blue locker, yes,
24  because I don't remember the locker names or numbers.
25  Let's see.

Page 677

1      ALJ COOPER: I think this was a different
2  set of blue lockers.
3      THE WITNESS: There were -- there were
4  two.
5      ALJ COOPER: I think what's in 27 is a
6  different set of blue lockers than the one with
7  Mr. Vigil's name on it.
8      MR. ROMERO: Yes. I'm -- I'm sorry, but
9  I'm totally flummoxed. But go ahead.
10  BY MR. TREMAINE:
11      Q. Well, Mr. Chavez, I'm certainly not trying to
12  confuse you. I'm -- I'm trying to elicit from you an
13  understanding of which lockers you assisted in
14  searching and -- and which units. So if -- if going
15  through the photographs is not helpful, you could just
16  explain.
17      A. I could tell you that the blue locker that we
18  opened had magazines and books, some, like, tracking
19  stickers. It had a dirty magazine inside of it.
20  That's what I recall the most, because the photo we
21  took, you could see the magazine facing up towards us.
22  And I don't see that photograph in here.
23      Q. Right.
24      A. That's why I'm confused. When I'm looking at
25  it, I see the blue locker that's open and you can see

Page 682

1  understanding -- and -- and I'll -- if -- if it jibes
2  with your recollection, fine.  But the -- according to
3  Mr. Schaeffer's report, the first anonymous letter was
4  received May 29th of 2015, and then your participation
5  in the search with Mr. Coca and Ms. Tweed --
6       A.  Uh-huh.
7       Q.  -- in -- in John Vigil's office was on
8  June 5th.  Does -- and that's where you searched
9  solely, so we can get away completely from lockers?
10      A.  Yes.
11      Q.  According to Mr. Schaeffer's report, you
12 solely searched on that date, June 5th, the locked desk
13 cabinet.
14      A.  That was -- that was probably the date that we
15 opened up the cabinet, took a look and then we --
16      Q.  Yeah.  And -- and according to your testimony
17 earlier and according to Mr. Schaeffer's report, you
18 folks were able to pull back the -- the door a little
19 bit.  There was a little play between the -- I guess
20 the hasp of the lock, and see two prescription bottles,
21 correct?
22      A.  Yes.
23      Q.  Okay.  And then -- and then based on that, the
24 police were contacted and on June 5th, two days later,
25 they executed a warrant just -- just of the contents

Page 683

1  discovered in Mr. Vigil's desk and desk cabinet, which
2  would've been the envelopes and the two prescription
3  bottles and a single tablet in the paper pill
4  dispenser.  Does that --
5       A.  Yes, sir.
6       Q.  -- jibe with your memory?
7       A.  Now, that -- that makes -- yes.
8       Q.  Okay.
9       A.  You kind of clarified it for me.  As a matter
10 of fact, though, it was a couple of days after when the
11 sheriff's department came back with a warrant to take
12 care of the --
13      Q.  Yeah.  And I --
14      A.  -- the search.
15      Q.  I have the -- the warrant.  It's copy of the
16 warrant itself.  And the return, that confirms that was
17 all done on the 5th of June, which would have been two
18 days after --
19      A.  The initial date.
20      Q.  Yeah.
21          Now, with regard to -- to that search -- do
22 you have the -- you have the exhibit book in front of
23 you, right?
24      A.  Yes.
25      Q.  Okay.  Exhibit 16.  If you could go to

Page 684

1  Exhibit 16.  And sort of towards the back third of
2  Exhibit 16, there is a page 2 of Peter Schaeffer's
3  report.
4       A.  Page 2 of Peter Schaeffer's report?
5       Q.  Yeah.  It's a total of a -- keep
6  (indiscernible).
7       A.  Okay.  I'm sorry.
8       Q.  Yeah, no problem.
9       A.  This is --
10      Q.  Page 2.
11      A.  Okay.
12      Q.  Okay.  Now, according to -- according to Peter
13 Schaeffer's recollection as -- as confirmed in his
14 report, it says that Antonio Coca, Joe Chavez, and
15 Frances Tweed entered Vigil's office on June 3rd.
16 That's consistent with your recollection?
17      A.  Yes.  And -- and just to add onto that, now I
18 remember it was Frances, it was Antonio Coca.  And I
19 had gotten the lock and the key to secure the desk for
20 Mabel Aguayo [phonetic].  That's how --
21      Q.  So --
22      A.  -- Mabel Aguayo came into it.
23      Q.  So you had to get through the locked door in
24 the office before breaking the lock on the desk
25 cabinet, correct?

Page 685

1       A.  Yes.
2       Q.  And -- but before breaking the lock on the
3  desk cabinet, you -- according to this, you were able
4  to -- through the play between the -- the lock hasp and
5  the lock, you were able to see the prescription
6  medication bottles, right?
7       A.  Yes.  With the -- with the client's name on
8  it.
9       Q.  Okay.  And then after seeing that, according
10 to this report, Mr. Coca relayed to Mr. Schaeffer at
11 this point that Ms. Tweed stated, "I think this may be
12 an issue for state police," and decided to contact
13 them?
14      A.  Yes.
15      Q.  Do you recall that?
16      A.  Uh-huh.  I do.
17      Q.  Okay.
18      A.  And the state police were diverted down to the
19 sheriff's department for investigation, so it was the
20 sheriff's department who showed up on our campus, not
21 state police.
22      Q.  So -- so my -- my question is --
23          MR. ROMERO:  Give me that little picture.
24 BY MR. ROMERO:
25      Q.  My question is:  You have -- you have a