## Page 594

1  THE WITNESS: Maybe a couple times a week
2  or so.
3  ALJ COOPER: For how long? For how many
4  weeks?
5  THE WITNESS: Maybe about a month or so
6  before I was going to leave.
7  ALJ COOPER: And everybody already knew
8  that you were retiring?
9  THE WITNESS: Yes. Oh, yes.
10  ALJ COOPER: Okay. I don't have any
11  further questions. Does anybody have follow-up?
12  MR. TREMAINE: No.
13  MR. ROMERO: Just one quick follow-up.
14  ALJ COOPER: Go ahead.
15  FURTHER REDIRECT EXAMINATION
16  BY MR. ROMERO:
17  Q. Separate from that -- separate from that one
18  month or so that he came in twice a week to sort of, I
19  guess, work with you on the day shift, were there other
20  times prior to that? Because I think prior to that you
21  said he worked the night shift?
22  A. He worked the 3:00 --
23  Q. Or the evening shift?
24  A. He worked the 3:00 to 11:00 shift, correct.
25  The evening shift.

## Page 595

1  Q. Okay. So in the course of him working the
2  evening shift and you working the day shift, would
3  you -- would you communicate with one another?
4  A. Oh, yes.
5  Q. And -- and he was -- he was aware, based from
6  those discussions or -- or just observing you as to
7  your practices as to how you operated in doing your
8  job?
9  A. That's correct, yes.
10  Q. Okay. Thank you.
11  MR. ROMERO: I have no further questions.
12  ALJ COOPER: Okay. I don't have any
13  further questions? Anybody?
14  Okay. Mr. Valdez, thank you very much
15  for your testimony.
16  Is this witness released?
17  MR. ROMERO: Yes, Your Honor.
18  MR. TREMAINE: Yes.
19  ALJ COOPER: Okay. Thank you very much.
20  THE WITNESS: Thank you.
21  MR. ROMERO: And thank you for calling
22  him out order.
23  ALJ COOPER: Of course.
24  THE WITNESS: Thank you.
25  ALJ COOPER: Okay. Back to you,

## Page 596

1  Mr. Tremaine.
2  MR. TREMAINE: I'm going to call Corinne
3  Dominguez, Your Honor.
4  ALJ COOPER: Okay.
5  MR. TREMAINE: And I'm just finding what
6  I was going to ask her.
7  (Phone ringing.)
8  THE WITNESS: Hello?
9  MR. TREMAINE: Hello. Is this Corinne
10  Dominguez?
11  THE WITNESS: Yes, it is.
12  MR. TREMAINE: Hello. My name is Jesse
13  Tremaine. I want to let you know that I am calling you
14  from a recorded hearing at the State Personnel Office
15  and I'm going to have -- the judge is coming over to
16  talk to you now.
17  THE WITNESS: Okay.
18  ALJ COOPER: Hi, Ms. Dominguez. Can you
19  hear me?
20  THE WITNESS: I can.
21  ALJ COOPER: Okay. So my name is Jessica
22  Cooper and I'm the hearing officer for the State
23  Personnel Board. I'm conducting this hearing requested
24  by Mr. Vigil concerning the disciplinary action taken
25  against him by the Department.

## Page 597

1  THE WITNESS: Uh-huh.
2  ALJ COOPER: I do need to swear you in.
3  Can you raise your right hand?
4  THE WITNESS: I'm raising my right hand.
5  ALJ COOPER: Thank you.
6  CORINNE DOMINGUEZ,
7  called as a witness on behalf of the appellee, having
8  been first duly sworn, was examined and testified
9  telephonically under oath as follows:
10  ALJ COOPER: Thank you.
11  And can you state and spell your name for
12  the record?
13  THE WITNESS: My name is Corinne F.
14  Dominguez. C-o-r-i-n-n-e, F, Dominguez,
15  D-o-m-i-n-g-u-e-z.
16  ALJ COOPER: Thank you very much. And as
17  Mr. Tremaine told you, this proceeding is being
18  recorded, so just keep your voice up, please, okay?
19  THE WITNESS: Okay.
20  ALJ COOPER: Thank you very much.
21  DIRECT EXAMINATION
22  BY MR. TREMAINE:
23  Q. Good afternoon, Ms. Dominguez.
24  A. Good afternoon.
25  Q. Thank you for bearing with us while we got to

Page 614

1  prior to this, that I can recall that there was
2  supposed to have been, like -- like, a safe that was
3  somewhere in the adult psych division area where
4  they -- people actually walk in. But I don't know if
5  that existed anymore, and that's why we decided to
6  change -- I can't remember. Never mind.
7     Q. Okay. So I want to make sure we got that
8  accurately. It sounds like you're saying that at some
9  point in your memory there was a change in the policy.
10    A. Yeah, there was a change.
11    Q. So -- and at some point, are you saying that
12 money could've been stored in a safe in APD?
13    A. Yeah. There was a safe there that we -- we
14 were supposed to take it over there and they were
15 supposed to put it in that safe. I think it belonged
16 to Financial Management.
17    Q. Oh, okay. And would anybody but Financial
18 Management have access to that safe?
19    A. You know what? I'm not really sure about
20 that.
21    Q. Okay.
22    A. Because I'm not sure how that worked. I
23 can't -- I can't remember. You know, it would be kind
24 of crazy if somebody else had keys to it, but I
25 (indiscernible - phone rang).

Page 615

1     Q. Okay. And can you -- can you shed any light
2  on --
3     A. It wasn't -- and just to make it clear, it
4  wasn't my responsibility to check and make sure that
5  safe was available. It was my responsibility to write
6  the policy and make sure staff followed it. That's all
7  I can say.
8     Q. Right. Right. I'm just trying to get some
9  clarity about the -- the timeline here with this policy
10 change. Are you able to give us any markers for when
11 that would've happened?
12    A. Not really. I would assume it would've
13 probably been around the same time. It could've been
14 the earlier. I'm not really positive.
15    Q. So I have -- I have State's Exhibit 8, which
16 has been admitted. And it is called CBS Res. 118, the
17 clothing allowance policy.
18    A. Okay.
19    Q. And it has an effective date of January 1st,
20 2005, and says that it has a revised date of
21 September 26th, 2008. Also a reviewed date of May 7th,
22 2014. So I just want to get a sense from you if those
23 dates make sense to you or if you would take issue with
24 any of that.
25    A. There was a time when we had a -- we had a

Page 616

1  policy that said they had to be reviewed. I think it
2  was annually or something like that. And then I don't
3  know, I think after that we went to three years. But,
4  you know, I can't remember. I can't remember.
5     Q. Okay. I -- one moment.
6      So, Ms. Dominguez, just in terms of the big
7  picture, you reviewed the report from Peter Schaeffer
8  and you reviewed the document that had been consulted
9  between BHI and HR that resulted in the Notice of Final
10 Action and you signed that, right?
11    A. I probably did, yeah.
12    Q. Okay. And so the -- you are aware that
13 Mr. Vigil was dismissed for -- from his position for
14 the -- the issues we've been discussing?
15    A. It's -- to the best of my knowledge, yeah.
16 Without having those papers in front of me, I can't
17 make those, you know, conclusions.
18    Q. Oh, okay. So I'm -- I guess I should -- I
19 need to clarify then. Are you saying you cannot
20 remember if he was dismissed or you cannot remember
21 what your judgment about the situation was at the time?
22    A. Ask that question again, please.
23    Q. Well, do you recall that Mr. Vigil was
24 dismissed?
25    A. Oh, yes. Yes.

Page 617

1     Q. Okay. Okay. So without the papers in front
2  of you, what is it that you were saying you could not
3  comment upon?
4     A. The dates, the reviews. You know, just the
5  policy itself.
6     Q. Okay.
7     A. You know, any of the specifics of the policy.
8  It would be -- it's -- you know, it's been almost two
9  and a half years that I retired. I kind of put that
10 out of my mind. That's it.
11    Q. Okay. Do you recall generally what your
12 judgment of this situation was once the documents came
13 to you for review?
14    A. What my judgment was?
15    Q. Yes. Did -- you felt dismissal was
16 appropriate?
17    A. Yes.
18    Q. Okay.
19    A. I was following the protocol of what we needed
20 to do --
21    Q. Okay.
22    A. -- in accordance with HR and their
23 consultation with me.
24    Q. Okay.
25     MR. TREMAINE: I do not have any further

Page 638

 1    FURTHER CROSS-EXAMINATION
 2    BY MR. ROMERO:
 3        Q.  You're almost done, Ms. Dominguez.  Just a
 4    couple questions.
 5        A.  Okay.
 6        Q.  In response to Judge Cooper, you -- you
 7    indicated that part of your basis for signing off on
 8    that letter was that you had discussed it with, I think
 9    you said your boss, Ms. -- Ms. Tweed; is that correct?
10        A.  I probably did.  You know, I -- if there's --
11    probably.
12        Q.  And you indicated that the reason you did that
13    is -- is you were aware that she was familiar or had
14    worked on the investigation?
15        A.  That would be the reason I would be talking to
16    her about it.  I think she was -- at that time, she was
17    either our boss or Troy Jones was out of -- out of the
18    state, or if she was in charge.  That's all I can
19    remember.
20        Q.  And if I understood your -- your -- if I
21    understood your answer correctly earlier, you said that
22    that letter was not actually written by you, although
23    you signed it.
24        A.  They let me look at it and they -- you know,
25    and I looked at it and, you know, I might have changed

Page 639

 1    a couple words, but nothing big, because I wasn't the
 2    final -- the final say on that letter.  As a matter of
 3    fact, it's my understanding that even our HR wasn't the
 4    final say, that it was actually an attorney out of the
 5    Department of Health.
 6        Q.  Okay.  Well, but the letter itself you
 7    indicated earlier you believed was -- was written, you
 8    know, as sort of a joint project between HR and
 9    Ms. Tweed.
10        A.  Probably, yes.
11        Q.  Okay.
12        MR. ROMERO:  That's all I have.  Thank
13    you.
14        THE WITNESS:  Put a letter together, but
15    I wasn't investigating myself.  It would've been too
16    difficult.
17    BY MR. ROMERO:
18        Q.  Correct.  Because you weren't -- you weren't
19    intricately involved in the investigation?
20        A.  No.
21        Q.  Okay.  And then once it was written by your
22    local HR and/or Ms. Tweed, it would've then gotten sent
23    to the -- the -- I guess the legal people, when you
24    said the attorneys would've been sort of the last scrub
25    on it?

Page 640

 1        A.  I would say, yes.  That's usually how it
 2    worked.
 3        Q.  Okay.  That's -- that's the best of your
 4    memory with regard to the process?
 5        A.  Yes.
 6        Q.  Okay.  And with regard to the -- the policies
 7    that you -- you indicated earlier in response to Judge
 8    Cooper, you said you would be very disappointed that
 9    your policies were not being followed, correct?
10        A.  Absolutely.
11        Q.  If that -- if that had happened.  Do you -- do
12    you know for a fact that -- that either Mr. Valdez or
13    Mr. Vigil had been specifically trained on -- on -- and
14    were aware of these particular policies, the --
15        A.  Oh, yes.
16        Q.  -- the policy regarding unusable products and
17    the clothing allowance policy?
18        A.  Absolutely.  If we had any changes, we'd --
19    Cathy would've probably met with them or I would've.
20        Q.  Okay.
21        A.  I don't remember.
22        Q.  Are you aware or do you know whether there's
23    any documentation confirming their acknowledgement
24    or -- or your confirmation of having trained them on
25    these specific policies?

Page 641

 1        A.  No.
 2        Q.  Okay.
 3        MR. ROMERO:  All right, ma'am.  Thank
 4    you.
 5        Now --
 6        MR. TREMAINE:  No redirect.
 7        MR. ROMERO:  -- Judge, do we --
 8        Hold -- hold on.  I'm not sure if anyone
 9    else is going to ask you any final questions.
10        THE WITNESS:  Okay.
11        ALJ COOPER:  Thank you very much,
12    Ms. Dominguez.  Nobody has any further questions for
13    you.
14        This witness is --
15        THE WITNESS:  Okay.
16        ALJ COOPER:  -- released?
17        MR. ROMERO:  Yes.
18        ALJ COOPER:  Thank you so much.
19        THE WITNESS:  Thank you, guys.
20        ALJ COOPER:  Have a good day.
21        THE WITNESS:  You, too.  Bye.
22        MR. ROMERO:  Your Honor, could we take a
23    break?
24        ALJ COOPER:  Sure.  Let's take five.
25        (Off the record.)