IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN VIGIL,

    Plaintiff,

vs.

FRANCES TWEED, et al.,

    Defendant.
_____/

Case No. 18-CV-00829-SCY/JKR

### DEPOSITION OF JOHN VIGIL

December 22, 2021

500 4th Street NW, Suite 105

Albuquerque, New Mexico

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:    MARK E. KOMER
               ATTORNEY FOR THE DEFENDANTS

REPORTED BY:   CARRIE HEWERDINE, RDR, CCR #512
               PAUL BACA COURT REPORTERS
               500 4th Street, Suite 105
               Albuquerque, New Mexico 87102

1  A  Not that I can think of.
2  Q  What about UNM down in Sandoval County?
3  A  Oh, yeah.
4  Q  That's okay.
5  A  Yeah.
6  Q  Who do you -- are you still seeing someone
7  there?
8  A  Yes.
9  Q  Okay.
10  A  Yes. Yes. I have an appointment now,
11  sometime -- sometime, I believe, in January.
12  Q  And what are you seeing UNM for?
13  A  I see them for, like, arthritis and -- what
14  you call it? Un-- "undifferentiated inflammatory
15  arthritis," they call it.
16     I can't make out what it is, but they know I
17  have it.
18  Q  Anything else?
19  A  No.
20  Q  Does that cover all the healthcare providers?
21  A  I'm sorry?
22  Q  Does that cover all the healthcare providers
23  you --
24  A  Yes. Yes.
25  Q  Are you employed anywhere at the present time?

1  A  No.
2  Q  Do you have any plans to become employed?
3  A  I wish I could. I -- I wish I could. I --
4  for right now, I -- I don't see myself getting any other
5  job any more. I wish I could.
6     I've always thought working was the way to go.
7  You know, but I wish -- I don't know. I find it very
8  hard now.
9  Q  (Audio distortion)
10     THE REPORTER: I'm sorry. I'm not hearing
11  you.
12     MR. KOMER: Yeah. Let me speak up.
13  BY MR. KOMER:
14  Q  Was the last job you had at New Mexico
15  Behavioral Health Institute?
16  A  Yes.
17  Q  You took a retirement from that position in --
18  was it March of last year, March or April?
19  A  Yes.
20  Q  Of this year, I think?
21  A  Yes.
22  Q  2021, right?
23     Does that sound right?
24  A  No. I think it was last year. Right? 2020.
25  Q  2020?

1  A  Yes, I think.
2  Q  Okay.
3  A  Yeah.
4  Q  It's been more --
5     MR. ROMERO: It's over --
6  BY MR. KOMER:
7  Q  It's been more than a year since you've
8  worked?
9  A  Yes. I already got -- I'm thinking. Was it
10  last year? Was it this year? No.
11  Q  I think we can figure out by looking at the
12  records.
13     Is Patricia Vigil working anywhere?
14  A  No. No. She can't handle it. She's --
15  Q  When was the last time she was working.
16  A  The same time. The same thing. As soon as
17  she went through her problems with the New Mexico
18  Behavioral Health Institute, she has never worked -- oh,
19  wait a minute. I think she does work a little bit. I'm
20  sorry.
21     I think she has, like, a little part-time job
22  doing a little bit of home health with her mother and
23  father. I'm not which one -- I'm not sure which one.
24     But, yes, I think she does, like, do like a
25  couple of hours a week. She has her father -- he is in

1  hospice right now. He's in hospice.
2  Q  So she's actually taking care of her --
3  A  Yes.
4  Q  -- one or more of her parents?
5  A  One of her parents, I think. I don't think
6  both of them. But I think one of them. And I'm not
7  sure -- very few hours. I don't know exactly how many
8  hours.
9  Q  We're here to talk about your allegations in
10  the Complaint related to the First Amendment for
11  retaliation claim.
12     And I've read things that your attorney -- you
13  worked with your attorney to submit to me for
14  information about things.
15     ==One thing I was curious about, though, the==
16  ==Defendants Antonio Coca (phonetic), and I think the==
17  ==other one is Joe Chavez.==
18     ==Can you -- Mr. Vigil, can you explain to me -- ==
19  ==some of the claims in the case have been dismissed out==
20  ==and some remain, the one being the First Amendment claim==
21  ==here.==
22     ==I'm just curious in relation to your First==
23  ==Amendment claim, what are you contending that==
24  ==Antonio Coca did wrong with regard to retaliation==
25  ==against you?==

Page 14

1   A   Well, he could have been very well part of it.
2   That -- that, I -- he was one of the security guards,
3   him -- him and Joe Chavez, I think -- I believe was the
4   other one.
5       Q   That's the other one I'm talking about.
6       A   Yes.  And they were very close to
7   Frances Tweed, you know, so I know they did have -- they
8   have access to my office.  The security guard has access
9   to my office.  So, yes.
10      Q   Okay.  Other than being close to Ms. Tweed or
11  having access to your office, is there any specific
12  thing that you believe they did to retaliate against
13  you?
14      A   Well, they go there and talk to me once in a
15  while.  I -- I think I trusted them, you know, to the
16  point to where I would talk to them.
17          Especially what happened after my, umm --
18  wife's deposition.  They were always curious.  They'd go
19  over there, talk to me, what's going on?
20          And I thought they were a little bit kind of
21  my friends or whatever.  But that actually would be
22  doing their rounds, doing -- checking on the fire
23  extinguishers, checking the dates.  So they had to go
24  there because of the clients acting up.  They had to go
25  there on various occasions all the time, and, umm, so I

Page 15

1   would stay there and talk to them quite a bit about --
2   complain to them about what was happening, you know,
3   and -- about my wife, should -- I call her my wife.
4   That's -- you know.  So don't like to really like to use
5   the word "domestic partner."
6           Anyway, so I talk about Patricia.  I tell them
7   that she was having it hard on her.  It was hard on the
8   family and stuff like that.
9           You know, I know that I caught them inside my
10  office a couple of times, you know.  But then again,
11  that was their job, I guess.  I don't know.
12          Because there was an office -- I had a big
13  office, and inside that office, there was three -- three
14  supervisors' desks in there, so all three supervisors
15  had access to one office, if that makes sense.
16          It would be like being in here.  I had a desk
17  over there.  The other supervisor had a desk there and
18  another desk over there.  So instead of one supervisor
19  having one key to his only office, it wasn't like that
20  with us.  So there, we had three -- three -- so they --
21  like I said.  So, umm, there's, umm, lot of
22  inconsistencies or consistencies or whatever you want to
23  call it that I feel that they could have done.
24          Like I said, they were very close to Frances
25  Tweed.  You know?

Page 16

1       Q   Okay.
2       A   And I think Joe Chavez was one of the main
3   guys there -- what you call it -- as head of security.
4   And you don't get those jobs without knowing somebody.
5   That's for sure.
6       Q   I and that's what I want to ask you.
7           Did -- Joe Chavez, you think, you recall being
8   the head of security there; is that right?
9       A   I think he was.  Yes.
10      Q   Okay.  Was he -- he wasn't a supervisor,
11  correct?
12      A   No, but he was a supervisor for the -- for the
13  securities.
14      Q   And you were a site tech supervisor, correct?
15  That was your job?
16      A   Yes.
17      Q   And what was Antonio Coca's job?
18      A   I think he was -- I'm not sure, I know he was
19  a security guard also, but I don't know if he was --
20  what his rank was as far as security guard.
21          But I -- I mean, you know, I don't know what
22  he -- what his title was, but I know he was he security
23  guard.
24      Q   And you said you had talked to them about some
25  things involving Patricia Vigil, how hard she was having

Page 17

1   it and --
2       A   And what Paul -- you know, I -- I don't want
3   to -- how the government operated or whatever you want
4   to call it, you know, it was -- like pretty devious, I
5   guess.  I don't know.
6       Q   Why were you talking to these two guys
7   about --
8       A   Just conversation when they going there, you
9   know.  You know, it's just -- what do you call it?  Shop
10  talk.  I don't know how you want to call it.
11          But that's what talk about all the time.  You
12  know?  How's it going and that's the conversation, how
13  was it going with Patricia and that's how the
14  conversation would start and then, you know -- I don't
15  know.
16      Q   And let's --
17      A   And then, I'd actually talk to them also about
18  the clients.  You know?  The clients because the -- the
19  clients weren't really fit to be there, that they
20  weren't really, umm -- you know, stuff like that, that
21  they were getting harder and harder on the staff and
22  Frances Tweed was pulling out everybody and leaving us
23  short-staffed.
24          And then they were bringing -- as a matter of
25  fact, they brought -- they were bringing in -- I think

Page 18

1  they allowed some guy, umm, that threatened to kill one
2  of our techs at a time, and they had to, I don't know,
3  finally get -- I guess, let him go from the -- they call
4  it the "ARCHES" because that's what it was called when I
5  first started there. It was called the "ARCHES," not
6  the ALF like they call it now.
7     Q   It is assisted living facility?
8     A   Now is -- yeah. They changed it to that in
9  the middle of -- well, I probably worked there more --
10 approximately maybe three years.
11        But when I started there, and -- actually,
12 when I started working there at the State Hospital, I
13 did go to -- I did get familiar with that -- the ARCH
14 because that's where one of my first places I went when
15 I started working. In the beginning, you know, they
16 sent me to work at that ARCH, and it was, I think,
17 adult -- Adult Residential Community Housing. I think
18 that's what it was called.
19        And then, from there, umm -- when I decided to
20 go apply for the job as a supervisor there, because's I
21 felt I was already getting ready to retire. I went to
22 go look at it, check it out, and, you know, and it was
23 still called the "ARCH." So I started to work. I got
24 my -- you know, I went and interviewed, and I got the
25 job.

Page 19

1     Q   Did Mr. Coca have any responsibilities
2  concerning patient care in that unit?
3     A   They kind of had responsibility in all the
4  units being that they're security guard. So, yes.
5     Q   Okay. So what exactly -- what's your
6  understanding of what they did?
7     A   Well, they're supposed to -- well, we're as --
8  we're supposed to be, like, a team. So if they see
9  anything that's outside of the norm or out of the
10 ordinary, they're supposed to report it or -- or let you
11 know, at least, or something.
12        And if they see any, umm -- they're supposed
13 to go and help with acting out patients that -- that's
14 the -- when people recall. You know? They don't have,
15 like, a specific team to go handle the clients, but --
16 so they would go over there and -- and kind of help --
17 intervene, I guess or to get -- what do you call it --
18 everything back under control, I guess.
19    Q   Okay. And you had some responsibilities with
20 regard to patient safety, right? Is that correct?
21    A   Yes.
22    Q   So if you saw something unsafe, you had a duty
23 to report that, correct?
24    A   Yes.
25    Q   If you -- if you saw something unsafe, who

Page 20

1  would you typically report that to?
2     A   I would report it to Corinne Dominguez, I
3  guess.
4     Q   Was she your direct supervisor?
5     A   Yes.
6     Q   What was her job title?
7     A   I think she was -- oh, my. It's been so long.
8  She was the administrator to -- what was it?
9         Umm, she was my administrator. I knew that.
10 And she -- but she worked out of another, umm -- she
11 worked out of -- what was that little unit called? Let
12 me see what the heck was it called?
13        I always have a hard time remembering that
14 place now. Like, I wanted to just block everything out.
15 You have to forgive me for not remembering everything.
16 Some things I just wanted to just block out.
17        But it wasn't really through the hospital.
18 Through NMBHI, and it wasn't through El Centro. It was
19 a place in between that I cannot remember the name of
20 it.
21        But she was the administrator to -- it was an
22 out-patient also. It's, like, an out-patient, umm,
23 facility, that's in Las Vegas. I can't remember the
24 name of it.
25    Q   What about -- she was also your supervisor in

Page 21

1  the ARCHES or the ALF?
2     A   Yes.
3     Q   You also called it that?
4     A   Yes.
5     Q   Was there any other supervisor between you and
6  her?
7     A   Not really. Not really. It would be her and
8  Cathy, a little bit, because she was a nurse. I guess
9  you kind of go by rank.
10        And then, I really don't know where
11 Frances Tweed fell into the picture. I really -- I know
12 that I had to -- it wasn't, like -- it was just, like,
13 all, umm, odd.
14        I always felt it odd because this unit was not
15 there where it's at. It used to be somewhere down on
16 Grant or some street over there. When I first started
17 years ago, it was, like, in the middle of the town. And
18 then, all of a sudden, they moved it in between, into
19 the NMBHI.
20        And I kind of always -- I mean, to me, I don't
21 know how Frances Tweed -- I know when I made the
22 schedule, I had to turn in the schedule to Frances Tweed
23 and Mable Vasquez (phonetic). That's -- other than
24 that, she started just getting involved, I think, more
25 and more and more and more. And, umm, that's -- that's

Page 26

 1   A   Yes. They can come and go as they please.
 2   They're supposed to -- they're not supposed -- there
 3   goes that word.
 4        They're supposed to be able to be just
 5   functional -- just pretty much like any other individual
 6   except for a little bit of problems.
 7        When I -- when the ARCH was there, it's
 8   supposed to be, more or less, that you kind of taught
 9   them how to -- they were supposed to be there with
10   social workers, kind of learn the ADLs, their every-day
11   activities, and stuff like -- the washer, the dryer.
12   Then just get -- maybe their social worker would find
13   them placement out in the city, in the -- you know, in
14   town, and rent out an apartment for them. They would be
15   able to go out and live, you know, in society.
16        But that's not the case with these -- this
17   became -- some of them just stayed there so long that
18   they really got so elderly that they became -- what do
19   you call it? Just old. You know? And they really
20   couldn't fend for themselves.
21        Other people are just getting -- they're
22   coming in, and they were -- I don't know if -- they were
23   trying to make space for other people. I don't know if
24   they were coming from other units.
25        But all I know is we were getting people that

Page 27

 1   didn't fit the criteria that just were -- either they
 2   couldn't read or write. They were -- one was a blind
 3   person. Probably -- I don't remember towards the end, I
 4   think. But in the beginning, I think there was, like,
 5   15 clients. I don't know. Towards the end, maybe
 6   12 residents or whatever.
 7        But by the time -- you know what? I think we
 8   were ordering trays for them to eat probably in the
 9   neighborhood of about 6, 7 trays already. At the end,
10   we were ordering trays to be delivered to the unit.
11        And then they switched it over to the ALF when
12   I complained to, umm, Corinne. I complained to -- to,
13   umm, Frances Tweed. Nobody would listen to me. I went
14   to talk to, umm-- to Troy Jones.
15        And also, I would meet him there at the -- in
16   the -- what do you call it? At the -- on the grounds,
17   and he recognized me, but -- asked me how it's going,
18   and -- and I would tell him, you know, it's getting
19   harder and harder to deal with the clients.
20        But nobody did anything about it, you know,
21   other than change the name of the ARCH to the ALF. But
22   they didn't add any additional training to anybody.
23   Q   Let's slow down just a little bit.
24        Did you put any of these -- these concerns in
25   writing?

Page 28

 1   A   Yeah. I put some concerns in writing. But, I
 2   mean, I don't know what good it would do because when
 3   you look for it and nobody finds them, they disappeared.
 4   That's what happened to my wife's incident reports and
 5   all that. She couldn't find nothing after, you know --
 6   what her she did.
 7        And I didn't make any copies because they say
 8   it's illegal to make copies of incident reports. Or --
 9   or you can't. You're not supposed to.
10   Q   All right. So it sounds as though you may
11   have followed a policy at the facility to make an
12   incident report.
13        Is that what you did?
14   A   Yes.
15   Q   You felt this was serious enough to warrant an
16   incident report under the policy?
17   A   Well, I think I went and made an incident
18   report on when one of the residents fell down and stayed
19   there all -- I walked in -- I remember it was towards,
20   you know, towards the end of my career. But her name --
21   can I say their name or no?
22   Q   You can say her name.
23        MR. ROMERO: Yeah.
24        THE WITNESS: Okay. Her name was
25   ▓▓▓▓. She had -- I came around -- came in the

Page 29

 1   morning, probably it -- about at 6:30 because I would
 2   have the 7:00 to -- 7:00 to 3:00 shift. And I was
 3   allowed to come in a little early, and I was allowed to
 4   stay late because they didn't have a supervisor. When
 5   I -- when I went from being a supervisor from evening
 6   shift -- that's where I got my job. And then from
 7   there, I went to day shift. They never replaced me.
 8   They left -- they left my vacancy open for, like, almost
 9   two years, I think. And so that was very hard on me
10   because I had to do two shifts. Right?
11        And then even part of Tina who was the
12   supervisor on graveyard because a lot of her techs
13   wouldn't really get along with her, so they would bring
14   me their forms and all that stuff. And it was getting
15   crazy.
16        But the -- yeah. On that particular day, I
17   walked in and I did rounds. And I couldn't find ▓▓▓▓.
18   I mean, like, where is ▓▓▓▓? And then, umm, nobody
19   knew.
20   BY MR. KOMER:
21   Q   She was in the bathroom on the floor, right?
22   A   Yeah. She was on the floor urinating. I
23   guess -- well, what happened -- and I don't know if it
24   was her or somebody, but I think at that time, one of
25   the restrooms had broken, so they allowed the males to

Page 30

1  commingle with the females and use the same restroom.
2       So I don't know if one of the males went and
3  peed on the floor. When she walked in, because it's
4  dark at night, she might have slipped and fell. I don't
5  know. That's -- because the males and females were
6  using the same restroom.
7       So all I know is that I walked in the morning,
8  and I couldn't find her, and -- and I'm, like, "Where is
9  ▮▮▮▮?" And I did the rounds, and I couldn't find her.
10 And I had to -- and the staff was inside the TV room,
11 and I had to tell them, "Well, where's" -- you know, the
12 TV room unfortunately, point -- was pointing in that
13 direction (witness indicating) in the corner of the
14 building, and the -- the nurses station or whatever you
15 want to call it, the desk, was behind them. So they
16 wouldn't pay attention. They would watch TV. And they
17 wouldn't know what's going on. You know what I mean?
18      It's not like they were watching TV in front
19 of them where the clients would have to pass in front of
20 them to see what they were doing at night. They just
21 were completely -- I don't know the word to use. But
22 they were completely just -- they didn't know where the
23 clients were at any time. They -- they were taking in
24 movies, CDs, or DVDs, should I call them. I don't know.
25 DVDs, they were taking in DVDs and watching movies, is I

Page 31

1  couldn't find her.
2       I went inside the TV room and I tell them,
3  "Where's ▮▮▮▮?" They couldn't find her.
4       Umm, I started -- I finally thought maybe -- I
5  started looking -- opening the restrooms. I looked
6  inside the washer and dryer -- not the washer and
7  dryer -- but inside the dryer room -- whatever you want
8  to call it -- the laundry room, and I couldn't find her.
9       And finally, I went, looked inside the
10 restroom, and I found her where she had fallen down.
11      And I had to call the ambulance. And I --
12 they transported her to Alta Vista. She told me herself
13 she he had been in there a couple of hours. She was
14 yelling, and they couldn't hear. And it was in the
15 wintertime when it was really cold. I -- so I told my
16 techs that I was going to go visit her, stay with her,
17 check on her. You know?
18      So I kind of followed the ambulance and went
19 and made sure she was okay and came back, wrote an
20 incident report.
21      And I had a meeting with Corinne Dominguez,
22 and I suggested that they close the TV room because of
23 that incident --
24      Q   Who --
25      A   -- from -- from 10:00 -- I think -- and they

Page 32

1  did close it finally from, like, 10:30 to 6:00 in the
2  morning.
3       Q   Were the people in the TV room people you were
4  supposed to be supervising?
5       A   No. No. That was graveyard. That was 11:00
6  to 7:00.
7       Q   So you weren't -- because I was confused about
8  that. You said something about having supervisory
9  duties on the night shift.
10      A   Yeah. Well, sometimes.
11      Q   Would that include the graveyard shift?
12      A   I would -- if I stayed over or somebody where
13 they needed a supervisor on graveyard, then I would -- I
14 would obviously be their supervisor for the night.
15      But, no, I was basically day shift or evening
16 shift.
17      Q   Okay.
18      A   Because they didn't -- they hadn't replaced
19 me. But, no, those people on graveyard were
20 Tina Gulet's (phonetic) staff.
21      Q   So you were -- one of the things you were
22 talking to your supervisor about was the graveyard
23 shift's use of the TV room and, perhaps, not paying
24 enough attention to the residents?
25           Is that what you were raising for your

Page 33

1  supervisor?
2       A   Yes. Yes.
3       Q   And who was the other supervisor you
4  mentioned? Tina Gulet; is that right?
5       A   That's right. Yeah.
6       Q   And she was, what, graveyard shift supervisor?
7       A   Yes.
8       Q   And, I mean, that was out of a safety concern
9  that you had for the residents, correct?
10      A   Yes.
11      Q   And in connection with the patient fall or
12 resident fall, you were required to do an incident
13 report on it?
14      A   (Witness nods head)
15      Q   On an event like that, aren't you?
16      A   Yes.
17      Q   Let's talk a little more about -- I mean, you
18 said you made some complaints about -- what I'm
19 understanding is you felt that some of the residents
20 weren't suited to the ALF unit because they were too --
21 I'll use the word "complicated" or -- is that a fair way
22 to put it?
23      A   I think they were way past the ALF unit. They
24 should have been pretty much long-term.
25           I think -- my understand is after whatever

Page 34

1  happened, I think they had been removed -- like,
2  60 percent of those residents after they -- after all
3  these thing came to light, should I say. I guess my
4  understanding is they removed most was those patients
5  out of there because of -- yeah. No, they were way past
6  un-- assisted living. Some -- I think -- and if my
7  memory serves me right, I think they even had somebody
8  that passed away there at the hospice, right there at
9  the unit. I'm almost, like, sure that happened. I
10 don't know.
11         But, yeah. There was people there that was
12 already over 80-some years old. Like I said, when a
13 person's blind and stuff like that, it's very hard to
14 deal with them and -- that needs a -- pretty much, that
15 needs almost a 24-hour care. You know?
16     Q  Did you -- did you file an incident report
17 about that?
18     A  I'm pretty sure I might have -- yeah. I'm
19 pretty sure I -- well, the -- the incident reports I was
20 filing on was when people would have accidents and stuff
21 like that.
22         But I would talk to the director -- to my
23 director to -- and I've gone and I went and talked to
24 Frances Tweed a couple of -- a few times -- not a few --
25 a couple of times -- bunch of times when I would take

Page 35

1  her the -- what do you call it, the -- the schedule. I
2  would tell her, you know, we're short of staff, and
3  these residents are getting harder and harder to deal
4  with. They're just getting harder and harder to deal
5  with. And they're -- and people -- and you guys keep on
6  taking staff away from me. You know, the staff was
7  just -- they were taking staff away from me.
8         And then, what really started -- what really,
9  really messed everything up is when they -- they were
10 taking -- they were -- we had a couple -- see, our staff
11 had to be trained to be med certified. And they had to
12 have a driver's license. They -- to be able to -- we
13 had a van there, parked next to the unit, right, because
14 it was residential. It was supposed to be -- oh, we
15 want to go to Allsups. We want to go wherever. You had
16 to take them to doctor's appointment, all the way to
17 Santa Fe.
18     Q  Why couldn't they drive on --
19     A  Because, umm -- I don't know. They just
20 didn't have a vehicle, I guess. They just didn't have a
21 vehicle, maybe. I don't know. I don't know.
22         But you couldn't trust them to get on the van
23 and take off on your van. You know, you need a driver's
24 license from the state hospital from the State. To be
25 able to drive one of the vehicles from the state, you

Page 36

1  have to have a driver's license.
2      Q  Did any of the residents have their own
3  vehicles there that could come and go?
4      A  Yeah. Some -- on the hospital grounds? Yeah.
5  Some of them would go and -- not come and go. But some
6  would go and park it there and then admit themselves.
7  And then, when they could get out of there, they would
8  take off, but -- on the vehicle. But no, none -- not in
9  my unit, none --
10     Q  I want to know about --
11     A  Yeah.
12     Q  I'm not talking about the hospital.
13     A  Okay.
14     Q  I'm talking about any --
15     A  No, not in my unit. None of them had a
16 vehicle. No.
17     Q  So, I mean, if they were going to come and go
18 anywhere, it was usually chaperoned, right?
19     A  Yes. Yes. They either go walking into town,
20 or one of my staff would drive them into town.
21     Q  Did they walk into the town on their own?
22     A  Yes.
23     Q  And --
24     A  Yes. Some of them; not at of them. Remember,
25 we're talking about a bunch of mixed oranges and apples

Page 37

1  here. There was maybe -- out of the -- like I said, 10,
2  12, maybe -- I don't know. Maybe, like, four maybe or
3  five might have been able to walk into town. I don't
4  know. Not very many. Not very many.
5      Q  And how many residents were in your unit in
6  your --
7         At one time?
8      A  At one time, I think there were 15, 12 maybe.
9  I'm not sure. I'm not sure. I can't remember that no
10 more. I'm not even sure on that.
11     Q  How many were in there that you didn't feel
12 should have been in there?
13     A  Like I said, probably about 50 percent. Maybe
14 even -- geez, I don't even know if it was even --
15 probably -- I would say probably about 70 --
16 70 percent -- 60 or 70 percent of those residents
17 shouldn't have been there.
18     Q  That's what I'm wondering.
19        Is your complaint that the facility wasn't
20 staffed adequately to handle them, or that the patients
21 shouldn't have been in there at all?
22     A  Both.
23     Q  Both?
24     A  (Witness nods head)
25     Q  And who did you -- were you involved in

Page 38

    1  setting the staff in the unit?
    2      A   Was I involved in what?
    3      Q   Staffing the unit.
    4          Like coming up with the schedules --
    5      A   Yes.
    6      Q   -- and shifts and things of that nature,
    7  right?
    8      A   Yeah. That was my job.
    9      Q   Okay. So if you had concerns about staffing
   10  in the unit, you would go and talk to Ms. Dominguez
   11  about that? Is that right?
   12      A   That's correct.
   13      Q   Did you ever talk to Ms. Tweed about it?
   14      A   Yes.
   15      Q   All right. And what -- what was your
   16  relationship to Ms. Tweed?
   17      A   Well, at first, I thought it was okay. I
   18  mean, I had no problems with her. I -- at first, I
   19  thought she was -- yeah. I thought it was okay.
   20          My understanding was she was all right. I
   21  mean, I had to work with her. You know? And just doing
   22  my time there until I retired. So, you know, just
   23  anybody else -- just like anybody else.
   24      Q   And when did you talk with her about any
   25  staffing concerns that you had as the site tech

Page 39

    1  supervisor?
    2      A   Well, when I notice -- see, when I got there,
    3  nobody trains me, not -- nobody trains you. I just went
    4  and got training from the other supervisors -- name was
    5  Manuel Valdez. That's who I got trained more or less.
    6          But I didn't get trained by Corinne or Tweed
    7  or nothing like that. I got trained pretty much by my
    8  predecessor, Manuel Valdez.
    9          When I started seeing stuff that -- you know,
   10  they're supposed to have, like, social workers. Some of
   11  these patients didn't have social workers. That was,
   12  like, a real worrisome to me. That was like really
   13  bother. That bothered me a lot because you couldn't be
   14  able to call the social worker and tell him something
   15  concerning their -- their client.
   16          They were supposed to -- in my opinion, we're
   17  the ones that were supposed to do a lot of stuff for
   18  these clients.
   19          But some of these clients didn't have any
   20  social workers any more. I don't know. Probably
   21  60 percent of them didn't have social workers any more.
   22          So we depended on being -- I had to be a
   23  social worker. I had to be a supervisor. Then
   24  sometimes, I had to, like, play the role of a nurse, and
   25  all kinds of stuff, all on me, when I -- you know, and a

Page 40

    1  lot of the staff, too. Not just me. When I wasn't
    2  there, I'm sure other staff had to take over, you know,
    3  and stuff like that.
    4          But it -- it was just -- when it was very hard
    5  to be able to take care of them, that you started having
    6  to order trays, and -- and go pick up the trays for
    7  them --
    8      Q   Are you talking about food trays?
    9      A   Yeah. Food tray.
   10          Yeah. Because we had -- you needed to take
   11  them to the -- we had eye doctors. I think he came,
   12  like, every three months.
   13          And then sometimes because they were so old
   14  and some were diabetic. You have to get a special
   15  doctor. You know, stuff like that. Or their --
   16  their -- their what do you call it? You have to make
   17  sure that they are right -- proper food, make sure they
   18  had right blood pressure. You had to check the food
   19  that it wasn't full of salt and stuff like that.
   20          Pretty much you couldn't just stay on the unit
   21  and just do your job. You had to really take them out
   22  and do everything with them. You know what I mean? You
   23  had to take them out to appointments -- dentists,
   24  their -- their eye doctors, the foot doctors, the
   25  regular doctor appointment. Stuff like that.

Page 41

    1          So it was -- then when you took them out, you
    2  couldn't just go by yourself. You had to take two staff
    3  to take them. One driving the van and one next to him,
    4  and then maybe you could leave that one person -- staff
    5  with the guy at the -- or the girl, the female -- at
    6  the -- what do you call it -- at the doctor's
    7  appointment while the driver would come back and he'd
    8  have to go pick up medication. Stuff like that.
    9          You know, we were all over the place. We were
   10  all over the place, doing stuff with them.
   11          And so, this -- then what hurt me a lot these
   12  residents would come to me and ask me: Go you can go
   13  take us to -- go for a ride to Gallinas or to the --
   14  what was that castle -- that castle that's real famous
   15  here in Las Vegas.
   16      Q   Montezuma?
   17      A   Montezuma Castle.
   18          We want to go for a ride, John.
   19          I'm sorry. I can't. The van's busy at an
   20  appointment.
   21          I would really feel for them, and then you
   22  couldn't leave, like, some of them and take the rest.
   23  And it was really hard to -- so I felt that some of the
   24  residents that were, like, fairly well, they were being
   25  neglected because of this.

11 (Pages 38 to 41)

Page 42

1  You know, because you couldn't take them
2  anywhere because you had to be dealing with other ones.
3  You know what I mean?  So you couldn't -- I don't know.
4  That's the way I looked at it.
5      Q  I understand.  All right.
6      We talked about -- I think we talked about the
7  staffing and the assignment of these residents to the
8  unit, and then this other incident involving Helen.
9      Were there any other topics that you were
10 complaining about that to Ms. Dominguez --
11     A  Yeah.  But I don't remember exactly.  Umm, I
12 complained to her -- well, they changed the paper
13 because I think one of the papers even said they
14 couldn't even be admitted there without a knife.  I
15 said -- you know that's -- I remember I was looking at
16 one of our paperwork said that they can't be admitted to
17 the ALF unit without a knife.  I think what they tried,
18 without weapons, I think it said.  And I think they said
19 with weapons so though they had to change that.
20     What else did I notice that there was, umm --
21 they were just, umm -- like I said, going back to the
22 people that were blind and stuff, that you had to pretty
23 much walk them around.  They were -- umm, you had to
24 literally be there.  There was a client that they
25 brought -- there was a couple of clients that, I don't

Page 43

1  remember where they came from, but they were -- sneak
2  out in the middle of the night, at 3:00 in the
3  morning -- well, not sneak out.  You don't have to.
4  Right?  That was their unit.
5      Q  They're supposed to be able to come and go?
6      A  Yeah.  But at that time, you're already
7  feeling that they're kind of, you know, be careful with
8  them.  Make sure you know where they're at at all times.
9  You know?  So, yeah.
10     One of them had the tendency -- I think
11 somebody made a police -- not a police report, but a --
12 a report that they had -- one of the nurses called
13 from -- I think, it was from Ponderosa, that she was out
14 there in the storm, at 3:00 in the morning.  Her name
15 was            .  And she was --
16     Q  At a facility like that, that's called
17 "elopement," isn't it?
18     A  Right.  Yeah.  Probably.  Elopement.
19     Q  That's another thing where it happens, you're
20 supposed to --
21     A  Yeah.  Well, they smoke.  They --
22     Q  You know about that, right?
23     A  Yeah.  They smoke, and they like to go there
24 looking for cigarette butts.  That's what was the
25 purpose.

Page 44

1      She knew that people could smoke over there,
2  by the staff.  And she knew where they could hide
3  them -- throw the butts.  So she'd -- she wanted a toke
4  of the nicotine.  So she took off walking all the time.
5  And all hours of the night, she'd take off.  And you
6  would -- you're afraid that they're going to fall down,
7  trip, slide, or something or freeze.  You know, Vegas is
8  a cold town.
9      So, you know, it was just a real -- just
10 something really bad waiting to happen.  I think one of
11 the -- one of the clients, our clients passed away.  She
12 got ran over by a truck, right there.
13     Q  When did that happen?
14     A  I'm not sure what year.  I think, maybe, in
15 2013, around there.  2012, 2014 was --         , I
16 think her name was.  So she had gone down, walking
17 towards the cafeteria.  And I think she was coming back
18 up, and this truck just -- I think I was in the -- at
19 that time, I'm not sure if I was a supervisor or not,
20 but I was getting close to there.  But I think I was
21 covering another unit when I heard the -- when they ran
22 her over, and they killed her.  One of the guys that was
23 driving the truck for the -- taking the food trays
24 killed her.  And she died right there.
25     Q  She wasn't part of your unit?

Page 45

1      A  Yes, she was.
2      Q  Was she?
3      A  Yes.
4      Q  You were supervising her that night?
5      A  No, I wasn't supervising her that night.  I
6  was at the suitcase unit when that happened.
7      Q  Let's talk about these anonymous things a
8  little bit.
9      I'm just wondering -- I mean, just in terms --
10 did -- when did you first find out that the note had
11 been sent about alleging these things about the patient
12 medications, on the floor?
13     A  I'm not sure I -- I don't remember how I -- I
14 think, umm, they told me to go to the -- to go to
15 Frances Tweed's office, to report to Frances Tweed's
16 office; not to go to the unit.
17     I don't remember they -- I think I went to the
18 unit, and they told me to go to Frances Tweed's office
19 or they called me.  I can't recollect.  But I remember
20 that I had to go to Frances Tweed's office.
21     Q  What happened?
22     A  She told me -- she told me that I was under
23 investigations, that they -- not to go to my unit, that
24 I was under investigation and that she was going to put
25 me on -- I don't remember what she said -- for me to use

Page 46

1  my sick leave.
2      She said, "What do you want to do?  You want
3  to use your sick leave or your annual leave because
4  you're going to be under investigation.  It's going to
5  take a while.  So you're going to have to decide which
6  one you want to use."
7      Q  What did you tell her?
8      A  I told her why would I -- if I'm under
9  investigation, don't I -- don't -- don't the hospital
10 provides what you call that -- I don't remember what
11 it's called.
12     Q  Administrative leave?
13     A  Administrative leave.
14     Q  What did she say?
15     A  She said, "No, John, it does not.  You need to
16 get -- either choose your sick leave or your annual
17 leave until we find a placement for you."
18     Q  Okay.
19     A  So I did -- I said, "Well, what's going on?"
20        And she said, "I can't talk about it."
21        "You mean -- I'm under investigation for
22 what?"
23        And she said, "Like I told you, I can't talk
24 about it.  Your under investigation."
25     Q  When did you find out there had been an

Page 47

1  anonymous note?
2      A  I think she told me that there was an
3  anonymous-- she told me that there was an anonymous
4  note.  She told me that there's an anonymous note, and
5  it suggests that you -- that you -- that's all she said.
6  "There was an anonymous note, and it's suggesting --
7  pertaining to the residents," she said.  Something like
8  that.  To that effect.
9         She said something like that:  Pertaining to
10 the resident, so you're under investigation.
11        And I didn't even no what the heck she was
12 talking about.  And I said, well, can't I -- if you were
13 to ask me would happened or what's going on, I could
14 probably explain, I told her.  And she didn't want to
15 let me explain.
16     Q  Who were the employees that were involved in
17 the TV room incident?
18     A  I can't -- I know it had to have been somebody
19 from graveyard.  I can't recollect if it was -- which
20 ones exactly they were.  It's been five, six years ago.
21 I can't recollect out of the top of my mind who.  I
22 wasn't even concerned about them.  I just went over
23 there -- I mean, my mind was with ▌.
24        You know?  She was the one that needed my
25 help.  I had to call the ambulance; make an incident

Page 48

1  report; go to the -- go with them over there -- to go
2  with her to the hospital.
3         By that time, it was some of my employees had
4  probably -- more than likely, had to have already gotten
5  there and started taking over the units and were taking
6  care of the other residents.
7         But my -- I just remember being, like, where
8  is she?  And I don't know.  And they wouldn't even get
9  up to look for her.  You know what I mean?  They
10 wouldn't even get up to look for her.
11     Q  Didn't you at one point say that the
12 individuals involved in that TV room incident, those
13 employees had been retaliating against you?
14     A  Yeah.  There was a couple of them, Tina Gulet,
15 the supervisor.  We were clashing because I -- she
16 was -- in my opinion, she wasn't doing what needed to be
17 done.  She was just going in there and sleeping.  She
18 was sleeping on the job.
19        And -- well, if you -- if you're an employee
20 and you see your boss is asleep, what are you going to
21 do?  I mean, I know you're supposed to ask the question;
22 not me.  Sorry about that.
23     Q  Yes.
24     A  You know, incriminate yourself.
25        But anyway.  So everybody was sleeping.

Page 49

1  Right?  They catch her sleeping, and they know you're
2  sleeping.  You can't tell them -- now, you just lost
3  that -- the ability to redirect your staff or correct
4  them because, now, they're going to say:  Why are you
5  telling me not to sleep when you're sleeping on the job?
6         There was an -- you know --
7      Q  My question was more -- I think you had
8  complained that they were retaliating against you.
9      A  Well --
10     Q  What were they doing to you?
11     A  Well, they didn't like the fact that I shut
12 the TV down.
13        You mean, as far as the techs, you mean --
14     Q  Yeah.
15     A  -- from graveyard?
16        Well, they didn't like the fact that they
17 shut -- I told Corinne, and I said -- she sent the memo
18 out.  I told her, "Corinne, these people aren't watching
19 the residents.  Look at what happened.  Somebody is
20 eventually going to either really get hurt and -- or cut
21 themselves or -- you know, and we're not going to make
22 it in time for these people to -- we can't" --
23        I told her this -- if they -- I've already
24 explained to them:  Look, if you're going to be watching
25 TV, you guys should take turns.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Page 50

But I wasn't their supervisor. I told them: You know what? You could do it. One could read a book. The other one could be over here in the TV room or whatever. Take a break.

I had no problem with it. I told Corinne. You know, we met with -- with what's her name? Tina Gulet, the supervisor from graveyard. I told them I don't really have a problem with what -- when it's getting to this line, when it's crossing the line that I'm coming in at 6:30 in the morning and not finding the resident. They don't know where she's at. Well, that's -- I think maybe that's where they even -- I'm not exactly sure. But, you know, you're supposed to have a book, like a paper where you do the rounds, and you're supposed to mark if they're asleep or whatever, ever half hour, and the rounds haven't been touched for, you know, two hours at a time or, you know, stuff like that. Nobody is looking at these patients, and she's inside the -- the restroom, urinated, in the middle of -- I think it was November, December. I don't know what month it happened. I know -- I'm pretty sure it was -- it happened in the wintertime because she said it was cold.

And so I said, the TV room has got to go, I told Corinne. You know?

Page 51

Q  And let me just -- just ask you: Did Corinne Dominguez direct -- make some kind of change --
A  Yes.
Q  -- to the TV room?
A  Yes.
Q  What did she do?
A  She sent a memo out that the TV -- I told her -- she said, "Well, what do you suggest?"

I said, "Look, we don't want" -- the clients can watch the news until about 10:30, 11:00, when they finish. And then after 11:00 until 6:00, when they start getting up, 5:30 in the morning. You know when they can watch the news again or do whatever. Right? In the meantime, they're kind of supposed to be asleep anyway.

And unless -- I said, "Unless a particular client would come up to us and ask us, you know, 'I want to watch TV.', then you open the room for them, and they can watch TV."
Q  That was your suggestion?
A  That was my suggestion.

But she said, "No, I think we'll just close it." She said, "We'll close it from 10:30 to 6:00, and we'll see how it goes."

Ooh, when that happened, it was like -- I had,

Page 52

like, stepped on -- I went back and -- yeah. It didn't help any. I tell you. People were used to their ways of not doing their job.
Q  Did someone say something to you?
A  Yeah.
Q  Who?
A  Tina did. Tina Gulet did.
Q  What did she tell you?
A  She said that she didn't like me getting in her fucking business.
Q  Did anybody else -- what about any of the techs? Did they say anything to you about it?
A  Yeah. There was -- I was starting to argue with Brian. We were starting to be a little bit confidential [sic]. He was from evening shift.

There was a couple of other techs from evenings that were not just -- not doing their job any more. I was finding people sleeping. I'd walk in, and "Where's the other tech?"

"Oh, I don't know."

"What do you mean you don't know? You're supposed to know where she is."

"I'm not the supervisor," they would tell me. Stuff like that.
Q  But you were a supervisor.

Page 53

So if you saw someone goofing off on the job, you let them have it right?
A  Well, according to Corinne, I couldn't. That was what sucked. I mean, I could direct mine, but I couldn't -- excuse the language. I couldn't -- I could direct -- I -- I could direct my -- see, what happened that -- I caught one of them asleep. What's her name? Yvette Ortega (phonetic), I caught her sleeping, and I brought it to Tina Gulet's attention. I went over there to -- I told Cathy Aragon about it.

And what happened is, I walked in Monday, in the morning. I couldn't -- I seen one -- I think -- what was her name? She was sitting right next to her, Yvette Ortega, and the other one was, uh -- I can't remember the other, her friend that was there all the time. She was sitting right next to her, and, I mean, she was -- one person was sitting at the desk.

I walk in, in the morning. There was nobody but one person, one of the techs was there. I'm, like, where is -- which one was the one that was missing? One of them was missing. I'm not exactly sure which one was missing.

But I said, "Where's your partner? You know, where's the other worker?"

And she said, "I don't know. Maybe in the

14 (Pages 50 to 53)

Page 54

restroom, but not really none of my business to -- I'm not the supervisor," she told me.

Anyway, I went to -- I knocked on the door in the restroom. Nothing. And I looked inside the laundry room. Nothing.

So I went to walk to the other unit. We have two units. And she wasn't on the other -- on the other unit. No.

So by the time I walked back, she was sitting down next to the other one, reading a book. And I'm, like, "Where'd you come from?"

She said, "Oh, I was just outside getting some air." Something to that effect.

So when they left, I started looking in the other rooms, and I told Cathy and Corinne I had found a bed made up with -- sheets and everything because the beds -- the rooms that there wasn't supposed to be a patient, there wasn't supposed to be a made-up bed. It was supposed to be just a mattress by itself. No -- no covers, no -- no pillows, no -- no -- none of that.

So I felt the bed, and it was warm. I felt it. I felt the bed and could see the indentation where the person was sleeping. And I -- it was warm. So I brought it to their attention, you know, that they're sleeping on the job.

Page 55

And there comes Tina Gulet again, jumping on my case, stepping -- you know: What the fuck business do you have with mine. Let me take care of -- don't worry about my staff she would tell me.

And I said, "Yeah. But the patients are being neglected because your staff didn't do their job. They're supposed to be out there giving coffee. The coffee -- they're not giving them coffee at the right time. They're not giving the meds at the right time. They're not doing any of that. They're not picking up the trash."

The trash was a problem, too. They would never pick up trash. That was one of their, umm -- one of their duties to do. And we'd go in there, and we'd find all the trash there.

The laundry room was full of laundry and stuff like that, you know, that they wouldn't finish.

So we just -- we just starting to -- we just started to butt heads with one another because she wasn't doing her job at all.

And eventually, I guess one of the techs -- what was her name -- Pauline Lucero recorded her sleeping because she reported her, too, that all she was doing was sleeping.

And Pauline was one of the -- she was one of

Page 56

the only hard workers in the graveyard shift. You know, she was one of those that stay away all night long, no matter what. She would tend to residents, never go into the TV room. She'd stay there either reading a book or doing her duties. And she's the one that started complaining about Tina, also: Hey, you know, this lady is sleeping.

And -- all I would hear from Corinne is: John, I'm about to retire. I'm about to retire. I really don't want to be bothered with this. Okay? You know, just -- I'm -- you know, I think for a while there, Corinne started to -- to talk to Tina about it. But I don't know what happened there. All of a sudden, she just backed off.

So whatever happened between them -- you know, I think they had to go through mediation a little bit there because you know, Corinne was -- at first, you know: Hey, you're supposed to be doing this. You're supposed to be doing that.

But I guess Tina had a one track mind, and she didn't care. She was about to retire, too. She was about, I think, she only had, like, a year to go when I got there, so she was at the end of her career. And they caught her sleeping on the job. They recorded her with a video, with the cell phone, sleeping. And I

Page 57

think maybe she got three days suspension or something like that. But, you know ...

Q You weren't there for -- when that happened, right?

A No, but I think I walked in -- I'm not sure if I was there. But I heard -- I know it happened. I know it happened. And I was -- I think I came in that morning or -- no. I wasn't present on the graveyard when it happened. I was not present when it happened.

Q What -- what I was originally asking you about was whether anyone in that TV room retaliated against you, did something against you.

That's what I wanted to know.

A Yeah. Yvette and her -- well, they're the ones that -- somebody went and -- yeah. Because she said -- she accused me of yelling at her.

Q Who is "she"?

A What was her name? Oh, there was Yvette Ortega, and the other one was -- I can't remember her name, and -- I can't remember her name. But Yvette -- it was Yvette anyway. Yvette was the one that -- that retaliated against me and started accusing me that I had -- yelled at her, bad words, that I got in there saying, "What the fuck are you doing? I catch you sleeping. Fucking asleep all the time." And she

Page 70

1  Q  -- in the Centrum bottle?
2  A  It could have been me or Patricia, because
3  when we -- when we go out of town -- I had a son -- I
4  have son in Albuquerque.  We go visit him.  We go to
5  Albuquerque.  We go on vacation -- Las Vegas Nevada or
6  Colorado, wherever we go, Wyoming.  I'd have to pack my
7  medications, and I could have either put it there.  I
8  don't know -- I don't know if they were there for about
9  two, three years.  I hardly ever used that locker.
10      And so they were there for a long time.  There
11  was -- I -- you know.
12  Q  No, I understand.
13      I -- but the thing was, it was in a Centrum
14  bottom, not like a bottle you get at pharmacy that --
15  A  Right.
16  Q  -- that says it's a prescription, right?
17  A  Yes.
18  Q  Am I right about that?
19  A  Yes.
20  Q  All right.  So someone picking that bottle up
21  wouldn't necessarily know --
22  A  Right.
23  Q  -- where it came from, right?  Is that fair?
24  A  Exactly.
25  Q  All right.  And my understanding is that you

Page 71

1  provided, at some point, a defense during the trial that
2  you actually had a prescription for that medication,
3  correct?
4  A  Yes, sir.
5  Q  And I think you were acquitted of charges as
6  to that -- possessing that medication, correct?
7  A  Yes.  Because, umm -- yeah.  Yes.  Because --
8  yeah.  The -- the -- uh, yes.
9      That, umm -- that deal was actually -- so --
10  there so long.  I hardly ever -- that it was actually --
11  yeah.  They should have been -- I think the D.A. -- the
12  police should have been more -- more, umm -- I don't
13  know.  For some reason, they just failed to -- to see
14  the truth or look for the truth.  They just found those
15  there, and they -- they stopped making those
16  hydrocodones because they asked me, "Well, do you have a
17  prescription?  And how can you prove it that those are
18  the same."
19      And I told them, "Look at them."  I told them,
20  "They even stopped making those particular
21  hydrocodones."  I think they went into my locker in
22  2015.  Well, they stopped making those hydrocodones in
23  2013.  And they were -- they were trying to say that I
24  was selling them when they were -- you know, they were
25  just -- you know, in 2013, they stopped -- the

Page 72

1  manufacturer stopped manufacturing that particular
2  hydrocodone.
3  Q  Let me ask you this:  When they first -- when
4  the police or the investigator first asked you about the
5  hydrocodone, do you recall that you didn't remember why
6  it would have been in your locker?
7  A  Yes, I recall not remembering -- well, to be
8  honest with you, I didn't even know that they were
9  narcotics.  As crazy it might sound, I didn't even know.
10  I went to Dr. Lopez, and I asked him, because I didn't
11  even know that they were narcotics.
12      It was a friend of mine that told me they were
13  narcotics.  His name is Adam.  I asked him I remember
14  that.  That one, I remember specifically for sure.
15      I told him -- Well, what happened.
16      I said, "I don't know.  They broke in, and
17  they found narcotics."
18      "Narcotics?"
19      I said, "Yeah.  They call those
20  hydrocodones -- those are the --"
21      "The doctor gives you those?  The doctor gives
22  you narcotics?"
23      I told him, "I have to go ask Dr. Lopez."
24      And I asked him, Is it true that the doctor
25  provides the narcotics?

Page 73

1      And he said, Yeah.  And he said --
2          (Phone ringing)
3      THE WITNESS:  I told him about what had
4  happened.  I told him that they had found them inside a
5  Centrum bottle.
6      And he said, "Well, there's nothing wrong with
7  that."  He said, "I carry my medication in my pocket
8  wherever I go."  He said that there's nothing wrong with
9  that.
10      And then, so -- yeah.  I didn't know that a
11  doctor could provide them.  I told him, "Where did I get
12  them from?"  I couldn't even remember where I got them
13  from.  They were there so long, I couldn't even remember
14  where I got them from.
15      He had to look inside his -- whatever -- and
16  he said that he could have -- he thinks I got them from
17  some -- I had gotten operated on my nose, and that's
18  where he says I -- that I got them from.  Because my
19  nose was wrong.  They had to operate.  And he said he
20  thought that's where I got them, from Dr. Brown, he
21  said.  That's who gave them to me.
22      I didn't know they were narcotics.  I would
23  have -- and I don't take them so, you know, I don't
24  really take them.  I just thought: How painful this is
25  going to be? Right?

Page 82

1  deal with me -- to me, they just wanted to the get rid
2  of me, you know, for probably complaining and for
3  retaliation -- probably because of my wife, Patricia.
4  You know? Because -- yeah.
5      No, I wasn't doing anything wrong or different
6  than anybody else. Nothing different.
7      And everybody knew that Manuel Valdez, the
8  supervisor before him, the supervisor before -- that
9  unit had been open there for how many years?
10     And then nobody -- there were no charges on
11 anybody else; but, yet, when it came to me, they had to
12 go in there and look and see.
13     Everybody was doing the same thing. Everybody
14 had -- and that wasn't even the patients' money. That
15 wasn't patients' money. That was money that was given
16 from -- from the page -- from the hospital to be spent
17 on the patients. That's the difference. It wasn't --
18 it wasn't a patient's money.
19     MR. KOMER: All right. Well, let's stop.
20 Let's take a break. Because I think we've been going a
21 little more than an hour and a half.
22     THE WITNESS: Okay.
23     MR. KOMER: What are you looking at? Fifteen
24 minutes, ten minutes?
25     MR. ROMERO: It's up to -- he needs to head

Page 83

1  out to Texas.
2      THE WITNESS: I'm okay with continuing -- I'm
3  okay for a while.
4      MR. KOMER: Well, the court reporter needs a
5  break, too.
6  (Proceedings recessed from 2:34 p.m. until 2:48 p.m.)
7      MR. KOMER: All right. Let's go ahead and get
8  started.
9  BY MR. KOMER:
10     Q  We were talking before the break about a bunch
11 of policies you acknowledge signing.
12     MR. KOMER: Let me -- I have attached as
13 Exhibit 2, what I think is what you were referring to?
14     THE WITNESS: Okay.
15         (Deposition Exhibit No. 2 marked)
16 BY MR. KOMER:
17     Q  Why don't you take a look at Exhibit 2, which
18 is --
19     A  Exhibit 2? What is -- okay.
20     Q  Tell me if you recognize that.
21     A  Yeah. It looks familiar.
22        What was the words that are missing here, on
23 the top part there.
24     Q  Yeah. They do have a hole and -- I'm sure we
25 can probably find a version without on the hole.

Page 84

1      (Phone ringing)
2  BY MR. KOMER:
3      Q  Let me ask you this: Take a look at
4  Exhibit 2; do you see the handwriting at the top,
5  "John Vigil" and so forth?
6         That's your name, right?
7      A  Yes.
8      Q  And let's turn over to the second page.
9  There's a signature --
10     A  Yes.
11     Q  -- of the tech or nurse, which --
12        Is that your signature there?
13     A  Yes, it is.
14     Q  Okay. And we were talking earlier about an
15 acknowledgment of receiving and reviewing policies.
16        You remember talking about that?
17     A  Yes.
18     Q  Does that -- does Exhibit 2 appears to be that
19 acknowledgment from your personnel board hearing?
20     A  No -- this one here?
21     Q  Yes.
22     A  I don't remember seeing this on the personnel
23 board. I -- hearing -- no.
24        It must have been because it says "Exhibit 2,"
25 or is that from the -- from the -- what do you call

Page 85

1  those people? The judge, the district judge?
2      Q  I don't know that it has anything do with the
3  district judge?
4      A  Oh, I don't know either. I -- it might have
5  been there, but I don't recall it being there. But
6  maybe. I don't -- it's been a long time, but -- yeah.
7  I know it says "Exhibit." I know it looks familiar.
8      Q  I just put Exhibit 2 --
9      A  Oh, you just put it?
10     Q  Yeah.
11     A  Well, I don't recall seeing this one with
12 Jessica Cooper. I don't remember that one.
13     Q  All right. But it does appear to have your
14 handwriting and --
15     A  Yes.
16     Q  -- your signature on it?
17     A  Yes.
18     Q  Correct?
19     A  Yes.
20     Q  And it's basically indicating that you
21 reviewed a number of NMBHI policies, correct?
22     A  Correct.
23     Q  Let's talk about Corinne Dominguez a little
24 bit.
25        I want to get your understanding of what

22 (Pages 82 to 85)

Page 86

1  she -- what you claim that she did that constitutes
2  First Amendment retaliation with regard to these
3  criminal charges.
4      A   Well, I have a feeling she had something to do
5  with the D.A. and all them.  They were in cahoots, first
6  of all, but when I --
7      Q   First of all, who is "they"?
8      A   Corinne -- Corinne and Frances Tweed.
9      Q   Okay.
10     A   I think they knew Richard Flores very well.
11 Who knows?  They might have even been classmates or
12 whatever.  Like I said, I found a picture of that.
13         And then, like I said, the judge,
14 Matt Sandoval, he has his -- his son-in-law in a very
15 well placement job there at NMBHI.  That's how come I
16 never liked that he was there.  I had even asked my
17 attorney to really recuse him, but he said, "No.  I know
18 him.  I can handle it."  He never did.
19         But my -- I don't know.  I -- that's --
20 anyway, that's more or less what my grounds is at.
21         But back to your question that you just said,
22 what was that again?  What did Corinne do against me,
23 you think?
24     Q   That's what I'm asking you, with regard to
25 these complaints?

Page 87

1      A   Corinne was my direct supervisor.  Corinne
2  knew that -- about what the medication and everything.
3  Corinne knew that we were short-staffed.  She let it go
4  on.  She knew about Tina Gulet, what was happening.  She
5  knew about the graveyard staff that was falling asleep
6  on the unit.
7          She -- all they needed to do was get together,
8  her and -- or she could have said:  You know what?
9  Let's me see what's going on.  Let me talk to my tech
10 and see what happened.
11         And she didn't go that way.  She took herself
12 out of the picture and Frances Tweed came into the
13 picture.
14         Corinne, at one point, she started to
15 retaliate -- treat me differently after I went in front
16 of -- I went with my -- with Patricia to a deposition.
17 And after that happened -- well, let me rewind a little
18 bit.
19         I had started getting -- I had seen a doctor,
20 Ron Bang (phonetic) for itching on the skin, and he --
21 in Albuquerque.  And I went over there for an
22 appointment.  The same day -- I think she had her
23 appointment the next day.
24         And I had to -- he had given me, uh, two-day
25 off.  So I wasn't even supposed to be at work.  He had

Page 88

1  given me leave.  He had given me an excuse, a doctor's
2  excuse.  So I went with Patricia to the -- what do you
3  call it -- to the -- to the deposition.  I seen
4  Frances Tweed there.  I seen Troy Jones there.  And I
5  seen Tina.  Her name -- last name, Rosemary Pino.  She
6  was a human resource director, I think.
7          So I was there with her, but I didn't
8  participate or testify for her or nothing.  She was
9  doing what I was doing now, and she was -- and I was
10 waiting for her in the lobby and doing stuff also.
11         Well, when I got back, you know, Corinne was a
12 completely different person.  She called me to her
13 office.  She had me -- she accused me of drinking on the
14 job.  She had me breathe into her mouth at one point.
15         And then she called me back again.  And then
16 she tells me she -- I don't which, if she was slamming a
17 book or her hands.  But she was standing -- it was a
18 desks like this, actually -- not as big, but almost like
19 this big.  And I was in -- the door was that way, and
20 she was here.  And I remember her, she (indicating) --
21 "John," she said, "What were you doing over there?"
22         Over there?  And I'm, like, "Where?"
23         And she was, like, "Over there at the
24 deposition.  You had no business, John, over there," she
25 kept on saying.  And -- "and people are very upset

Page 89

1  and -- and" -- you know, I don't know.  She just kept on
2  and on.
3          And I was looking at her like what the heck
4  did I do?  I never knew it was that -- I never been to a
5  deposition or nothing.  I had no clue what was going on.
6          She was slamming her hands or her book -- I
7  don't recall what it was.  I remember she was carrying a
8  book.  So I was just looking at her face when she was
9  slamming, and I didn't notice what was using to slam the
10 table.
11         And she said, "They are very angry."
12         And I said "Why?"
13         "Well, you were there.  They want to see your
14 leave, John.  They want to see what kind of leave you
15 were using.  And you better hope that you were using --
16 you had leave" -- or something like that.
17         "Well, who saw me there?"
18         And -- and then she said, "You know who saw
19 you there.  Who was there, John?  She said, Who was
20 there?"
21         And I said -- Well, I just said -- that's the
22 way she was talking to me.  You know, I'm not saying
23 that to you.  She was using that tone of voice to me.
24 She was being loud and yelling at me.
25         And I'm, like, "Well, I seen Frances Tweed and

Page 98

1  Somewhere?
2     A  Yeah. Somewhere. Somewhere in Albuquerque.
3  I don't --
4     Q  How long were you at the deposition?
5     A  I would say about a good -- all day long.
6  About five hours probably. I don't know. About six
7  hours.
8     Q  I understand the leave about the doctor's
9  visit.
10        Did you take a different kind of leave the
11 second day?
12    A  The -- the leave was for two days. The leave
13 was two or three days. It was good for two or three
14 days.
15        So I was in the scope of that leave during the
16 time it happened.
17        But according to Santa Fe, I didn't even need
18 to take leave. I could have just called in sick that
19 day, and I could have been with my wife -- with Patricia
20 over there. According to them.
21    Q  I understand.
22        Did -- did you indicate on any leave form that
23 you were taking --
24    A  Yes.
25    Q  -- time off to attend a deposition before you

Page 99

1  did -- before you attended the deposition?
2     A  I'm not sure if I -- I'm not sure what I put
3  on the leave form. But I did write a letter to -- I did
4  send -- I did give Corinne -- Frances Tweed a note.
5        She knew that I was going to be there.
6  Frances Tweed knew that I was going to be at the
7  deposition because I told her that I was, in no way,
8  going to participate, but I was going with my wife,
9  Patricia, to go over there and to be over there.
10       And she said, "Okay. Fine."
11    Q  When did she tell you that?
12    A  That day -- right before going to -- right
13 before going to Albuquerque.
14    Q  Okay. So before that --
15    A  I wrote a note. I wrote a note.
16    Q  Okay. So it shouldn't have been a surprise?
17    A  Yeah. It shouldn't have been a surprise.
18    Q  All right. So the original question that
19 kicked all this off was, I was asking you what Corinne
20 did -- Ms. Dominguez, your supervisor, what she did that
21 you believed constitutes First Amendment retaliation in
22 relation to your criminal case.
23       That's what I want to know.
24    A  Well, she knew that the medication -- she knew
25 that -- she was the director to our unit. She knew that

Page 100

1  everybody stored medication there. And so did Frances.
2        So why would they go and say -- charge me with
3  criminal activity when everybody else had done it before
4  me?
5        And -- and stuff like that. I don't
6  understand why -- you know, to me, Corinne could have
7  stopped it right away and said: That's common practice.
8        Frances Tweed could have stopped it right
9  away.
10       And remember, the medication was still inside
11 the unit anyway. It's not like they did a search
12 warrant and went to the house, and they went over there
13 and they found the medication. Right?
14       It's like -- the way I looked at it was, I was
15 shopping at Wal-mart and I had clothes inside the cart.
16 Here comes the police to arrest me because the clothes
17 are inside the cart.
18       It is the same thing with me with the
19 medications that are inside their locker, and that
20 was -- where was I going to put expired meds? There was
21 no other place to put the expired meds. There was
22 nowhere else to put the money.
23       The only place to keep it -- I couldn't leave
24 it -- the money thrown on top of a desk like that. I
25 couldn't leave the expired meds, because they're already

Page 101

1  been an incident where -- what's his name --
2  Jimmy Lopez, one of the techs, had given the wrong
3  medication to one -- to the wrong patient.
4        And that's -- that's pretty severe, in my
5  opinion, because he made an incident report. And I
6  spoke to him about it, and I told him, "What did
7  Frances Tweed tell you about that?"
8        His comment was that Frances Tweed told him
9  not to do the incident report on something so drastic
10 because they don't want to get in trouble with JACO
11 (phonetic). "If you asked me in front of anybody, I'm
12 going to deny it anyway," he told me.
13       So that's -- and I'm, like -- I couldn't
14 believe it. And so -- and then what -- when I started
15 feeling that Frances Tweed and Corinne were in for doing
16 this is because -- how come Jimmy Lopez -- and she had a
17 picture of Jimmy Lopez in his her office, by the way.
18    Q  Who is Jimmy Lopez?
19    A  He was a tech that worked in my unit. He
20 had -- he had lost medication. He had lost Phenazepam
21 prior to this happening to me. He made an incident
22 report that he lost the Phenazepam.
23       And going back to the Phenazepam, he wasn't --
24    Q  And he lost it prior to it being found in
25 your --

Page 106

1  tell -- she would be over there, picking up stuff from
2  the ground and everything. I'm, like, something is
3  wrong. What happened to her Risperidone? Sure enough,
4  I opened the cart and there was the pill expired.
5      I said, "You're giving her these expired
6  meds."
7      That night, we had to take her back to the
8  doctor, have the doctor reanalyze her, and pick up the
9  milligrams of Risperidone.
10      But in reality, you don't need to do that
11  because she was not taking the right medication.
12      And they take, like, a month to get back in
13  track. So it's very hard to -- that's how come I was
14  just -- and everybody knew that. I had called Corinne.
15  I had called the -- to let them know that: Hey, you
16  know what? What's her name -- Tina Gulet is not doing
17  her job at graveyard. She's not comparing the mark to
18  the medication. She's not doing nothing like that.
19      "Well, you know what? I don't know. I don't
20  have that much time, John. And I don't really like to
21  be bothered."
22      "But these are the clients, Corinne, that
23  we're talking about."
24      She just -- and then, on top of that,
25  Frances Tweed got to a point where she was taking up --

Page 107

1  I don't know why she was doing that. That -- she was
2  getting one of my techs and taking him out.
3      We had -- finally, at the end, we only had one
4  tech on that unit. We had one tech on this unit. I'm,
5  like, "That's crazy."
6      So then she was removing that tech with
7  another tech from another unit that didn't have a
8  driver's license. That didn't have -- wasn't med
9  certified.
10      What good does that tech do to me? So then I
11  get in trouble because I tell the tech: Do you have a
12  driver's license?
13      "No."
14      That wasn't my job to ask -- to go over there
15  and ask him like a cop.
16      Something like: You have it? No.
17      So I had to go tell Frances Tweed, "Tweed,
18  you're sending me a patient -- staff here that doesn't
19  have even a driver's license? I can't use them."
20      Q   Let me -- who testified at your criminal
21  trial?
22      A   Who testified at my criminal trial?
23      Q   Yes.
24      A   Frances Tweed.
25      Q   So Corinne Dominguez didn't testify at your

Page 108

1  criminal trial, correct?
2      A   No. She said -- she said that she had left
3  everything to -- that she didn't even lock at the
4  paperwork, that Frances Tweed signed on me.
5      She said, "I left it all to Frances Tweed. I
6  trusted her to do the right thing."
7      Q   Where did Corinne say this?
8      A   She said it on the trial.
9      Q   The personnel board hearing?
10     A   Yes.
11     Q   Okay. You understand the personnel board
12  hearing is different than the criminal trial --
13     A   No, I just know we were -- yeah.
14     Q   Okay. All right. I know -- I know they're
15  both kind of formal proceedings.
16     A   Yeah.
17     Q   And they may run together in your mind because
18  they happened a long time ago.
19         At your criminal trial, I didn't understand
20  Corinne to --
21         (Concurrent conversations)
22         THE WITNESS: Right.
23  BY MR. KOMER:
24     Q   -- to testify. I think you told me she
25  didn't. She wasn't there?

Page 109

1      A   Who? Corinne Dominguez? No. She was at --
2  what do you call it -- at the personnel. That's where
3  she said that.
4      Q   Okay.
5      A   But Frances went to say in the -- where they
6  had her under oath. She said that she had climbed on
7  top of a -- my cabinet and went on the chairs that
8  moves, and that she had -- was able to open it and look
9  inside, and that she was able to see the medication,
10  that they belonged to NMBHI.
11         That's what she testified under oath.
12         And I'm, like, no way she couldn't have done
13  that because --
14     Q   What medications is she referring to? The --
15         (Concurrent conversations)
16         THE WITNESS: Yeah -- no. Probably the --
17  probably the Risperidone.
18  BY MR. KOMER:
19     Q   Okay.
20     A   But she -- we didn't get that -- we -- yeah.
21         Anyway, she -- so she was just -- I don't
22  believe that that happened.
23         But the thing is that she knew -- everybody
24  knew that those meds were in there, and the money was
25  there. They tried to get me for the spending of the