**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

JOHN VIGIL,

        Plaintiff,

        v.                                                Civ. No. 18-829 SCY/JFR

FRANCES TWEED, in her individual capacity,
CORRINE DOMINGUEZ, in her individual
capacity, ANTONIO COCA, in his individual
capacity, JOE CHAVEZ, in his individual
capacity, NEW MEXICO BEHAVIORAL
HEALTH INSTITUTE, a political subdivision
of the NEW MEXICO DEPARTMENT OF
HEALTH a division of the STATE OF NEW
MEXICO, DEPUTY SEAN ARMIJO, in his
individual capacity as a deputy employed by the
San Miguel County Sheriff's Office,
UNDERSHERIFF ANTHONY MADRID, in
his individual capacity as a deputy employed by
the San Miguel County Sheriff's Office,
DEPUTY ANTOINE WHITFIELD, in his
individual capacity as a deputy employed by the
San Miguel County Sheriff's Office, and
BOARD OF COUNTY COMMISSIONERS OF
THE COUNTY OF SAN MIGUEL,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER[1]</u>

      Plaintiff was an employee of a state-run psychiatric hospital, the New Mexico Behavioral

Health Institute ("BHI" or "NMBHI") in Las Vegas, New Mexico. He brought this suit against

the hospital, San Miguel County, and an assortment of individual defendants, claiming that a

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all
proceedings and to enter an order of judgment. Docs. 15, 21, & 22.

series of searches conducted of his belongings at his workplace was unlawful and the defendants retaliated against him for exercising his First Amendment rights. The Court has dismissed most of the claims in the operative complaint and dismissed all the claims against the County and individual County defendants. The remaining defendants, Francis Tweed, Corinne Dominguez, Antonio Coca, and Joe Chavez (hereinafter "Defendants"), move for summary judgment on the single remaining claim: First Amendment retaliation. Defendants assert the defense of qualified immunity. The Court concludes that Plaintiff's claim fails at both prongs of the qualified immunity analysis and, therefore, GRANTS Defendants' motion for summary judgment.

## **BACKGROUND**

The procedural history of this case is summarized at length in the Court's previous Memorandum Opinions. Docs. 30, 66, 82, 102 & 104. As relevant here, the Defendants filed their Motion For Summary Judgment Based On Qualified Immunity on March 24, 2022. Doc. 123. Plaintiff filed a response in opposition on May 2, Doc. 130, and Defendants filed their reply on May 26, Doc. 133.

Defendants argue that they are entitled to qualified immunity on Plaintiff's First Amendment claim. First, they assert this is a retaliatory prosecution claim that requires pleading and proving a lack of probable cause for the prosecution, Doc. 123 at 11-15, which Plaintiff cannot do because this Court has found Plaintiff is collaterally estopped from relitigating the state court's determination that probable cause supported the prosecution at issue. *Id*. Second, Defendants argue that their actions were not taken "under color of law" for Section 1983 purposes and the evidence shows a lack of personal involvement or wrongdoing by the individual defendants. *Id.* at 17-23. Finally, Defendants argue Plaintiff did not engage in constitutionally protected speech. *Id.* at 23-26. Because the Court agrees with Defendants on the

final argument—that Plaintiff did not engage in constitutionally protected speech—it grants

qualified immunity and does not address Defendants' other arguments.

> A.      Allegations in the complaint

In the operative complaint, Plaintiff alleges that his partner, Patricia J. Vigil, brought suit

against the BHI for discrimination and retaliation in June 2012. Second Amended Complaint

("Compl."), Doc. 38 ¶¶ 12-13. "Throughout the course of Ms. Vigil's litigation, Plaintiff

supported her. Plaintiff was present at hearings and conferences in his personal capacity in

support of Ms. Vigil." *Id.* ¶ 15. "Plaintiff spoke out about the abuse that his longtime partner

suffered in order to prevent it from continuing to occur to her and to other employees." *Id.* ¶ 122.

"Upon information and belief, after Ms. Vigil's lawsuit was settled for a substantial sum,

Defendants and others sought to retaliate against Plaintiff for his support of his partner." *Id.* ¶ 17.

"Defendants Frances Tweed, Corrine Dominguez, Antonio Coca, and/or Joe Chavez were aware

that Plaintiff had also exercised his First Amendment protected right of speech in support of

Patricia J. Vigil by speaking out about the repulsive and unlawful treatment that she endured

throughout the course of her lawsuit against NMBHI." *Id.* ¶ 128.

In addition, "Plaintiff specifically complained to NMBHI employees, including but not

limited to Defendants Frances Tweed, Corrine Dominguez, Antonio Coca, and/or Joe Chavez

that patients were suffering as a result of placing patients who had extremely limited cognitive

skills into placements designed for patients who were able to take care of themselves." *Id.* ¶ 123.

"Plaintiff spoke out about other instances involving the mistreatment of patients in his unit at

NMBHI." *Id.* ¶ 124. "He was motivated to do so to bring attention to the patient's well-being and

their plight at NMBHI." *Id.* ¶ 125. "The widespread misclassification of NMBHI residents/

patients caused people who could not independently function to be assigned to the unit that

Plaintiff oversaw." *Id.* ¶ 133. "Said unit was not designed to house people who could not, for

example, manage their own money or take their own medication." *Id.* ¶ 134. "These failings were compounded by the lack of medical staff in the unit in which Plaintiff worked." *Id.* ¶ 135.

Subsequent to Plaintiff's speaking out, Plaintiff alleges Defendants engaged in a campaign of retaliatory prosecution: searching his office, calling law enforcement, and accusing Plaintiff of possession of controlled substances, leading to criminal charges being filed against Plaintiff. *Id.* ¶¶ 18, 127. "Plaintiff engaged in no activity that would legitimately give rise to a criminal complaint for 'trafficking in a controlled substance' of any sort." *Id.* ¶ 126. "Defendants caused the aforementioned criminal charges to be brought against Plaintiff in retaliation for Plaintiff's First Amendment protected activities." *Id.* ¶ 130. "The First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for engaging in First Amendment protected activity." *Id.* ¶ 137.

After having initially dismissed Plaintiff's First Amendment retaliation claims in the initial pleading, the Court found that additions Plaintiff made to the second amended complaint "cure the concern over whether Plaintiff was speaking on a matter of public concern, or simply making complaints about the conditions of his own employment." Doc. 66 at 13. Thus, the Court found that Plaintiff's allegations in the second amended complaint stated a claim to relief. *Id.*

B.   <u>Facts on summary judgment</u>

Plaintiff John Vigil worked for BHI as a Psych Tech Supervisor in the Assisted Living Facility ("ALF"). UMF 1.[2] On or around May 29, 2015, an anonymous letter was sent via BHI

---

[2] The references to "UMF" are to Defendant's statement of Undisputed Material Facts ("UMF"), Doc. 123 at 3-9, and are undisputed unless indicated otherwise.

The UMFs in Defendants' motion mostly do not pertain to the argument that Plaintiff did not engage in protected speech under the First Amendment. Instead, the relevant facts are scattered throughout Defendants' argument section. *See* Doc. 123 at 23, 25-26 (citing to various places in the record rather than the statement of UMFs). This practice violates the Local Rules'

inter office mail, stating that Plaintiff had patient medications and cash in his desk. UMF 2. BHI initiated an internal investigation, pursuant to which Defendants Tweed, Coca, and Chavez searched Plaintiff's office. UMFs 3-5. Plaintiff's desk cabinet had a combination lock, but there was enough play in the cabinet doors to pull them open a couple of inches. UMF 6. Defendant Chavez was able to look into the cabinet and see patient medications. *Id.* Defendants found two expired prescription bottles of Risperidone for two BHI patients and a paper medication cup with a tablet of Clonazepam. UMF 7. There were also money envelopes. *Id.* The Clonazepam was patient medication, which Plaintiff worked with as part of his job. UMF 18. Plaintiff claimed that he did not know about or place the Clonazepam tablet in his desk cabinet. UMF 19.

Defendants contacted law enforcement, who conducted their own search of Plaintiff's desk. UMF 9. In his response on summary judgment, Plaintiff asserts that Defendant Tweed knew no crime had been committed and, in support, cites testimony from a former dayshift psych tech supervisor that he, too, stored expired patient medication in his locked desk and learned these practices from his own predecessor. Doc. 130 at 13; Doc. 130-1 at 17-18 (administrative law judge findings). The Court does not find the dispute about whether Defendant Tweed honestly believed a crime to have been committed to be material to questions at issue in this

---

requirement that a motion for summary judgment "must set out a concise statement of *all* of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies." D.N.M.LR-Civ. 56(b) (emphasis added). Plaintiff's brief suffers from the same deficiency. *Cf.* Doc. 130 at 3-13 (setting forth a lengthy factual narrative rather than a concise statement of numbered facts).

This violation of the Local Rules complicated the Court's analysis. Nonetheless, given that neither party complains about the procedure or requests relief on the basis of this violation of the Local Rules, the Court proceeds to the evaluate the merits of the motion taking into account the record citations scattered through the parties' briefs. *Bylin v. Billings*, 568 F.3d 1224, 1230 n.7 (10th Cir. 2009) (district courts have wide latitude in interpreting and applying their local rules).

Opinion: whether Defendant engaged in speech pursuant to his official duties and whether Defendant's conduct constituted speech.

On June 19, 2015, a second anonymous letter was sent via inter office mail, stating Plaintiff was storing "pills" in three of his lockers at work and that "[h]e uses." UMF 10. Defendant Tweed and two others searched the lockers. UMFs 11 & 12. Law enforcement came to the premises but did not conduct a search at that time. UMF 12. Defendants found in Plaintiff's blue locker a Centrum Silver vitamin bottle containing multiple, loose, unlabeled medications, including: 9 tablets of Hydrocodone 5 mg/500 mg, 2 tablets of Hydrocodone 7.5 mg/500 mg, Ibuprofen, Indomethacin, Colchicine, and Clindamycin. UMFs 13 & 15. Defendants found in Plaintiff's cubby locker a magazine with Plaintiff's name and address and three expired prescription medications belonging to patients. UMFs 14 & 15. On June 24 and 25, 2015, Plaintiff provided a series of statements denying that the medications in his locker were his; he alleged retaliation by his co-workers on the night shift. UMFs 17 & 20.

On June 26, law enforcement conducted its own search of Plaintiff's blue locker. UMF 16. On July 8 Undersheriff Deputy Anthony Madrid with the San Miguel County Sheriff's Office filed a criminal complaint and affidavit for Plaintiff's arrest for possession of a controlled substance. UMF 22. Plaintiff was arrested by the San Miguel County Sheriff's Department and charged with felony and misdemeanor possession of drugs and controlled substances. UMF 24. Plaintiff was acquitted at trial. UMF 27.

In October 2015, the New Mexico Department of Health issued a notice of final action terminating Plaintiff for misconduct, which he appealed. UMF 28. On March 4, 2019, ALJ Cooper issued a Recommended Decision, including Findings of Fact and Conclusions of Law. UMF 29. ALJ Cooper concluded that Plaintiff had violated some internal policies and was

negligent in storing a small amount of cash relating to patient clothing allowance funds in his

desk. UMFs 30-31. Plaintiff concedes that he violated policy by failing to complete medication

incident reports, but re-asserts that he believed such practice was long-standing and reasonable.

Doc. 130 at 15. Indeed, the ALJ agreed with Plaintiff that there were mitigating factors in his

favor and that dismissal was not the appropriate sanction; rather, the ALJ recommended a 30-day

suspension. UMF 31; Doc. 123-1 at 10 ¶ 15; *id.* at 11. The State Personnel Office adopted the

ALJ's decision on March 22, 2019 and directed the parties to determine back pay and benefits.

UMF 32; Doc. 34-3. Plaintiff returned to work in 2019 but took medical retirement in March

2020. Doc. 123-13 at 2.

## STANDARD OF REVIEW

Qualified immunity protects public officials from liability "insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)). When an individual defendant raises the qualified

immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-

part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that

1) the officer violated a constitutional or statutory right and 2) the right was clearly established

when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir.

2002); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). A court may address these

prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid

qualified immunity, *Olsen*, 312 F.3d at 1304.

In determining whether an officer is entitled to qualified immunity, the relevant question

is not whether the officer made a mistake or whether, in retrospect, the officer should have acted

differently. "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Instead, the relevant inquiry is whether an officer had clear notice that the specific conduct in which the officer engaged was illegal.

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The action at issue need not have been previously declared unlawful, but its unlawfulness must be evident in light of preexisting law. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Except for egregious circumstances in which every reasonable officer would understand the conduct at issue to be unreasonable, unlawfulness is generally demonstrated "when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law." *Id.* at 1069-70 (internal quotation marks omitted). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an officer acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015). Furthermore, the cases so cited must clearly establish that "the scope of the right encompasses the facts presented." *Quinn*, 780 F.3d at 1012 (internal quotation marks omitted; emphasis removed).

In recent years, the Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). "The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation marks and citations omitted). "[T]he defense of qualified immunity gives public officials the benefit of legal doubts." *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted). Thus, qualified immunity provides "ample room for mistaken judgments" and protects all but "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 314, 343 (1986).

## DISCUSSION

Defendants argue that Plaintiff did not engage in speech protected by the First Amendment. Doc. 123 at 23. In response, Plaintiff identifies two categories of allegedly protected speech he engaged in: (1) speaking out about dangerous conditions BHI was putting patients into; and (2) supporting his domestic partner's lawsuit against BHI. Doc. 130 at 22. The Court disagrees. Under the first category, Plaintiff's speech was unprotected because Plaintiff made it pursuant to his official duties. Under the second category, Plaintiff produced evidence showing only that he engaged in unprotected conduct. Therefore, both categories of alleged speech on which Plaintiff bases his First Amendment retaliation claim fail at the first prong of the qualified immunity analysis. Further, Plaintiff's First Amendment retaliation claim fails at the second prong of the qualified immunity analysis because there is an absence of clearly established law that would put reasonable officials in Defendants' positions on notice that Plaintiff engaged in protected speech.

I.      **Whether The Speech Is Protected**

    A.      Speaking out on behalf of patients

    Plaintiff's first category of alleged protected speech concerns his complaints to

Defendants about inadequate staffing in his unit, duty lapses by the nightshift staff, and concerns

about residents' competency to self-administer medications. Defendants contend this speech was

not protected under the First Amendment. Plaintiff argues that, in its order denying Defendants'

motion for judgment on the pleadings, the Court already resolved this issue in his favor. Doc.

130 at 23. The issue the Court addressed in its previous order, however, was different than the

issue before it now. Consider the procedural history of this First Amendment retaliation issue.

    On October 12, 2018, Defendants filed a motion to dismiss this claim. Doc. 16 at 14-17.

As the Court noted in its June 7, 2019 Memorandum Opinion and Order granting Defendants'

motion, the "First Amendment balances a government employees' right to freedom of speech

against a government employer's interest in regulating civil service." Doc. 30 at 20. Further, the

Court noted that which side of *Garcetti/Pickering*[3] balancing test Plaintiff's First Amendment

retaliation claim falls on depends on a five-step inquiry:

> (1) whether the speech was made pursuant to an employee's official duties; (2)
> whether the speech was on a matter of public concern; (3) whether the
> government's interests, as employer, in promoting the efficiency of the public
> service are sufficient to outweigh the plaintiff's free speech interests; (4) whether
> the protected speech was a motivating factor in the adverse employment action;
> and (5) whether the defendant would have reached the same employment decision
> in the absence of the protected conduct.

*Id.* (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)). The first three steps of

this test are issues of law "to be resolved by the district court, while the last two are ordinarily for

---

[3] The name of this test derives from two Supreme Court decisions the Court discusses below:
*Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410
(2006).

the trier of fact." *Brammer-Hoelter v. Twin Peaks Charter Acad.,* 492 F.3d 1192, 1203 (10th Cir. 2007).

In their first motion to dismiss, Defendants made no argument regarding the first prong in this five-step inquiry (whether the speech was pursuant to an official duty). Doc. 16 at 14-17. Instead, Defendants argued that Plaintiff failed to state a claim regarding the second prong (whether the speech was on a matter of public concern) and third prong (balancing the government's interests as employer against the plaintiff's free speech interests). *Id*. The Court agreed, dismissed Plaintiff's First Amendment retaliation claim without prejudice, and allowed Plaintiff to amend his complaint. Docs. 30, 37. After Plaintiff filed a second amended complaint, Doc. 38, Defendants filed another motion to dismiss, Doc. 50. This time Defendants' arguments focused only on the second prong: whether the speech was on a matter of public concern. Doc. 50 at 25. The Court rejected Defendants' argument, concluding that the additions Plaintiff made to the second amended complaint "cure the concern over whether Plaintiff was speaking on a matter of public concern, or simply making complaints about the conditions of his own employment." Doc. 66 at 13.

Granted, in addressing the second prong (the public concern prong), Defendants included one sentence in their brief that did also touch on the first prong (official duties). Doc. 50 at 26 ("The public concern requirement limits the protection of speech by an employee to speech that the employee makes in his capacity as a citizen, rather than simply as an employee."). Defendants did not squarely address the first prong, however, and, to the extent Defendants touched on it, the Court noted, "Here, no indication exists that Plaintiff's employment duties included discussing the placement of his patients with his supervisors." Doc. 66 at 13. In other words, viewing Plaintiff's allegations in the light most favorable to him, and in the absence of

Defendants pointing to any deficiency in the second amended complaint as it relates to the first prong (official duties), the Court denied Defendants' motion to dismiss that was directed at the public interest, not official duties, prong.

But this matter is now before the Court on a motion for summary judgment, in which Defendants do squarely address the official duties prong and argue that the undisputed facts demonstrate that Plaintiff spoke pursuant to his official duties. Doc. 123 at 24 (repeatedly asserting Plaintiff's speech was made pursuant to his official duties and arguing, "these communications arose from Vigil performing the job Vigil was 'paid to do' as an ALF supervisor and are therefore not protected" (footnote omitted)). Thus, unlike at the motion to dismiss stage where the Court was presented with the issue of whether Plaintiff allegedly spoke out about a matter of public concern, the Court is now evaluating whether evidence exists to support a conclusion that Plaintiff spoke as a private citizen rather than as part of his official duties. And, that Plaintiff's pleading stated a claim under Rule 12(b)(6) does not answer whether Plaintiff has enough evidence to proceed to trial under Rule 56. The Court therefore proceeds to evaluate this argument under the summary judgment framework.

This evaluation begins with *Pickering v. Board of Education*, 391 U.S. 563 (1968). There, the Supreme Court stated, "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected" and that courts must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568 (internal quotation marks omitted).

Almost forty years later, in *Garcetti v. Ceballos*, the Supreme Court provided further guidance. 547 U.S. 410 (2006). Relevant to the present case, the Supreme Court held, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[4] *Id.* at 421. *Ceballos* arose when plaintiff Ceballos, a supervising prosecutor at a district attorney's office, wrote a memo "pursuant to Ceballos' official duties" that was critical of an affidavit a police officer filed in support of a search warrant. *Id.* at 420-21. "[T]he fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case [ ] distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline." *Id.* at 422. The Court explained:

> Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Id.*

---

[4] Neither party argues that the *Garcetti/Pickering* test is inapplicable in this case on the basis that the alleged retaliatory acts encompass something other than employer discipline (such as searching an office and calling the police). The Court does not resolve this question, but observes that the Tenth Circuit has held that conduct is an "adverse employment action" for purposes of this test as long as it would be sufficient to chill a person of ordinary firmness from exercising his First Amendment rights. *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1238 (10th Cir. 2009). In any event, it would be Plaintiff's burden to come forward with clearly established law showing the public-employment test does not apply here, which he has not done.

Thus, the Supreme Court made clear in *Garcetti* that, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Id.* at 424. The Supreme Court declined, however, "to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," as the speech at issue in *Garcetti* indisputably occurred within the scope of official duties. *Id.* Fortunately, since *Garcetti*, the Tenth Circuit has filled in the legal framework for cases where the parties dispute whether the speech at issue was pursuant to an employee's official duties. *Green v. Board of County Commissioners*, 472 F.3d 794, 798-99 (10th Cir. 2007).

*Green* involved a drug-lab technician who, concerned that her company's drug tests were returning too many false positives, advocated for a confirmation testing policy. *Id*. at 796. After her supervisors resisted adopting such a policy, plaintiff Green independently sent a test out for confirmation and learned the initial test produced a false positive. *Id*. Although this caused Green's employer to adopt a confirmation testing policy, Green alleged that it also caused her employer to start treating her less favorably. *Id*. So, Green filed a First Amendment retaliation suit. *Id*. In reviewing the district court's order granting summary judgment to the defendants, the Tenth Circuit noted that the "starting point for [the] analysis" of Green's claim is to "determine what speech and conduct is at issue." *Id.* at 799. Accordingly, the Court begins its analysis in this case by determining what speech and conduct by Plaintiff is at issue.

        1.    <u>The Speech At Issue</u>

Defendants point to Plaintiff's interrogatory answers as undisputed evidence of his speech. UMF 33. The relevant interrogatory answer described:

- Staffing issues: As an ALF supervisor, Plaintiff verbally complained directly to his immediate supervisor Defendant Dominguez that in her capacity of Executive Nurse Administrator, Defendant Tweed would routinely and regularly require ALF

14

employees to be transferred from their assigned ALF related duties to work in other units on the NMBHI grounds. The result was that the ALF unit was often left short staffed and unable to fully carry out ALF related duties.

- Night shift concerns: Plaintiff tried to correct or report duty lapses on the part of the graveyard shift, and was retaliated against for doing so. Later, Plaintiff discovered that a patient had been injured during the night shift. He discovered the night shift supervisor watching TV or sleeping. Plaintiff was disciplined for allegedly raising his voice and being disrespectful to the night shift supervisor.

- Medication administration: Plaintiff complained to Defendants, in particular Defendants Dominguez and Tweed, that the psych tech staff was not trained, but nonetheless being forced, to administer meds to ALF unit residents due to the incompetency of many of these residents to self-administer. Defendants Tweed and Dominguez were aware of this problem, but looked the other way and expected Plaintiff as the supervisor for both the day and night shift to "take care of it." When Plaintiff complained about the impossible situation, he was ignored. The practice posed a danger or risk to many of the more mentally incompetent ALF unit residents.

Doc. 123-12 at 4-7. Because the interrogatory specifically directed Plaintiff to list all instances of speech about patient care, patient mistreatment, BHI mismanagement, employee misbehavior, resident misclassification, and staffing issues, *id.* at 6-9, the Court accepts this as undisputed evidence of the same. Further, in his response on summary judgment, Plaintiff does not cite to evidence of additional instances of speaking out on behalf of patients.

Notably, the speech here (expressing concern for the allegedly poor treatment of mentally incompetent patients), like the speech in *Green* (expressing concern that a company's drug tests were coming back positive for individuals who had not used drugs), deals with topics about which the public would be concerned. The Tenth Circuit's focus, however, like this Court's present focus, was on the official duties prong, not the public interest prong.[5] Thus, in cases that

---

[5] The Tenth Circuit noted that the Supreme Court in *Garcetti* "concluded the public interest was protected by other means, including a 'powerful network of legislative enactments—such as whistle-blower protection laws and labor codes'—not by permitting First Amendment retaliation claims based on 'expressions employees make pursuant to their professional duties.'" *Green*, 472 F.3d at 801 (quoting *Garcetti*, 547 U.S. at 425).

turn on resolution of the official duties prong, like *Green* and the present case, arguments

directed to the public interest prong are misplaced.

        2.    <u>Plaintiff's Job Duties</u>

To determine whether the speech identified in the first step was made as part of an

employee's official duties, a district court's second step is to examine the employee's job

description, while keeping in mind that job descriptions are neither necessary nor sufficient

evidence to classify the speech as within the job scope. *Green*, 472 F.3d at 799-800. For

evidence of Plaintiff's job duties here, Defendants cite the following:

- Plaintiff's "duties generally involved observing and caring for NMBHI residents, to include ensuring their safety and welfare, observing their condition, monitoring their medication and Activities of Daily Living . . . , and assisting or leading them in their therapeutic and recreational activities. After becoming a supervisor, Plaintiff was also responsible for supervising employees in the performance of their Psych Tech duties." Doc. 123-13 at 2 (Plf's interrogatory answer).

- Plaintiff had "some responsibilities with regard to patient safety." If he saw something unsafe, he had a duty to report it. He would make that report to Defendant Dominguez. Doc. 123-14 at 4 (Plf's dep. at 19:19-20:5); *id.* at 6 (Plf's dep. at 33:11-16) ("Q: And in connection with the patient fall or resident fall, you were required to do an incident report on it . . . On an event like that, aren't you? A: Yes.").

- Plaintiff's job description included duties to ensure "adequate coverage for shifts in coordination with other supervisors"; to "[g]uide and direct staff to provide the highest quality of care to clients in residential services, ensuring safety and Residential Service to clients at all times"; and to "[e]nsure that Incident Reports" were "completed and reported" to his supervisor. Doc. 123-2 at 1 (job description).

That is, Defendants cite evidence in addition to the job description—Plaintiff's own testimony

about his job duties as he actually performed them.

Plaintiff argues in his response that "It was not part of Mr. Vigil's job to raise the alarm

that BHI was placing people in harm's way." Doc. 130 at 23. Plaintiff does not, however, cite

evidence in support of this contention or point to any evidence disputing Defendants' evidence of

his job duties. Therefore, the Court must proceed in its legal evaluation adopting Defendants'

undisputed facts regarding Plaintiff's job duties.

3.     Employee vs. Citizen

Having defined an employee's speech and job description, the next step is to consider

various factors that indicate whether, as a matter of law, the speech was made as an employee or

a citizen. In *Green*, the Tenth Circuit acknowledged that an argument could be made either way.

Because "Ms. Green was not a policymaker and her job responsibilities focused on the logistics

of taking tests and keeping records," it could be argued that she "was not doing the job she was

hired to do, but was acting outside her day-to-day job responsibilities for the public good." 472

F.3d at 800. Ultimately, however, the Tenth Circuit concluded her actions were more similar to

that of an employee than a citizen:

> Ms. Green was not communicating with newspapers or her legislators or
> performing some similar activity afforded citizens; rather, even if not explicitly
> required as part of her day-to-day job responsibilities, her activities stemmed from
> and were the type of activities that she was paid to do. Particularly, it was part of
> her job to ensure that the testing machines were working correctly, and it was part
> of her job to interact with her supervisors, clients, and third parties regarding
> testing policies and issues. Her disagreement with her supervisors' evaluation of
> the need for a formal testing policy, and her unauthorized obtaining of the
> confirmation test to prove her point, inescapably invoke *Garcetti*'s admonishment
> that government employee's First Amendment rights do "not invest them with a
> right to perform their jobs however they see fit."

*Id.* at 800-01.

Similarly, Plaintiff was not communicating with newspapers or legislators or performing

some similar activity afforded citizens; rather, his activities stemmed from and were the type of

activities that he was paid to do. Particularly, it was part of his job to ensure the safety and

welfare of NMBHI residents and to supervise employees as part of their psych tech and other

duties. And, beyond what was required of the plaintiff in *Green*, Plaintiff here actually had a *duty*

to engage in some of the speech at issue. *See Rohrbough v. Univ. of Colorado Hosp. Auth.*, 596

17

F.3d 741, 746-47 (10th Cir. 2010) ("[S]peech pursuant to the employee's duty to report a particular activity is usually within that employee's official duties under *Garcetti/Pickering*."). For instance, if Plaintiff saw something unsafe, he had a duty to report it. His job description also included duties to ensure "adequate coverage for shifts in coordination with other supervisors"; to "[g]uide and direct staff to provide the highest quality of care to clients in residential services, ensuring safety and Residential Service to clients at all times"; and to "[e]nsure that Incident Reports" were "completed and reported" to his supervisor. Doc. 123-2 at 1 (job description). Thus, noting a shortage of staff, unsafe conduct by a night supervisor, and problems with psych tech staff administering medicine were not only directly related to his job, that speech concerned matters about which Plaintiff had a duty to report.

Tenth Circuit cases decided after *Green* further support a conclusion that Plaintiff's speech was made pursuant to his official duties. *Brammer-Hoelter v. Twin Peaks Charter Academy* arose after a group of teachers repeatedly met off campus to discuss various issues with the school. 492 F.3d 1192, 1199 (10th Cir. 2007). After the teachers lost their employment, they filed First Amendment retaliation claims. *Id*. at 1201. The Tenth Circuit concluded that most of the teachers' "complaints were made pursuant to Plaintiffs' inherent duty as teachers to ensure they had adequate materials to educate their students. Consequently, statements regarding all of these and similar matters were made pursuant to Plaintiffs' official duties and could be freely regulated by the Academy." *Id.* at 1204. The Tenth Circuit did, however, reverse in part the district court's grant of summary judgment. It concluded that the district court should have allowed the teachers to go forward with claims related to issues about which they "had no supervisory responsibility and no duty to report with regard to any of the problems being

discussed." *Id*. at 1205.[6] In so ruling, the Tenth Circuit noted that the teachers' discussions "occurred after hours and outside of the Academy" and "included ordinary citizens and parents who were not employed by the Academy." *Id*. These same factors do not exist in the present case. In addition to having a duty to report, Plaintiff had supervisory responsibility over the relevant aspects of the hospital his complaints concerned, his speech concerned only patients of the hospital, did not include communications with individuals outside the hospital, and was directed to his supervisors at work.

Finally, the Court considers *Rohrbough v. University of Colorado Hospital Authority*, 596 F.3d 741 (10th Cir. 2010). Plaintiff Rohrbough worked for the defendant hospital as a "Transplant Coordinator." *Id*. at 743. Rohrbough was concerned about patient care due to what she perceived to be a "staffing crisis" that affected the quality of patient care by causing labs and other medical tests to be performed "extremely late" and charts not to be reviewed in a timely fashion. *Id*. Rohrbough raised her concerns with other nurses and her day-to-day supervisor; then her manager; then the director of the Heart Transplant Unit; then the vice president of patient

---

[6] Three years later, however, the Tenth Circuit affirmed the district court's decision to grant summary judgment on the second prong of qualified immunity. It wrote:

> a reasonable administrator could have concluded from our preexisting precedent that each meeting by school employees to discuss various school-related matters would be considered a "single instance of speech" and should be analyzed as a whole to determine whether it was protected by the First Amendment. Further, because the vast majority of speech that occurred at each meeting was unprotected speech relating to personal disputes with the school's administration and other matters of solely internal significance, we conclude controlling precedent would not have put a reasonable administrator on notice that the speech at each meeting, viewed in the aggregate, was protected by the First Amendment. We therefore hold Dr. Marlatt is entitled to qualified immunity because the protected nature of Plaintiffs' speech was not clearly established at the time she took the alleged retaliatory actions.

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) (footnote omitted).

services and the hospital's chief nursing officer; then the executive vice president; and finally the president of the hospital. *Id.* Risk Management informed her of the hospital's incident reporting system and instructed her to create incident reports covering the instances of substandard care she observed. *Id.* at 744. "Indeed, Hospital policies required all employees to write incident reports whenever they encountered unsafe conditions, errors, and near misses." *Id.* After meeting with Risk Management, Rohrbough composed eleven such reports. *Id.*

Rohrbough also learned of a possible heart transplant misallocation and cover-up at the Hospital. *Id.* She reported information regarding this alleged misallocation and cover-up to United Network for Organ Sharing ("UNOS"), an entity established by Congress to administer organ transplants. *Id.* As Transplant Coordinator, Rohrbough was responsible for contacting UNOS to place patients on transplant lists, removing patients from transplants lists, and providing information about a particular transplant. *Id.* Rohrbough called UNOS because she feared that the hospital was not going to be truthful in a report to UNOS. *Id.* After all this, Rohrbough received a negative performance evaluation, was placed on administrative leave, and eventually terminated. *Id.*

The Tenth Circuit stated that its "precedents since *Garcetti* have taken a 'broad' view of the meaning of speech that is 'pursuant' to an employee's 'official duties.'" *Id.* at 746 (quoting *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008)). "In general, the court has focused on whether the speech activity stemmed from and was of the type that the employee was paid to do, and has highlighted that the ultimate question in determining whether speech falls within an employee's official duties is whether the employee speaks as a citizen or instead as a government employee." *Id.* (cleaned up). "[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties."

*Id.* at 747. Likewise, as noted above, speech pursuant to the employee's duty to report a particular activity is usually within that employee's official duties. *Id.* at 746. In light of this standard, the Tenth Circuit had no trouble concluding that Rohrbough's "communications with other Hospital employees regarding the alleged staffing crisis, the alleged instances of substandard care, and the alleged heart misallocation all fall squarely within the scope of her official duties." *Id.* at 748.

In reaching this decision, the Tenth Circuit acknowledged *Brammer-Hoelter* and its statement that "a government employee's speech regarding staffing, although work-related, may fall outside the employee's official duties." *Id.* (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204-05 (10th Cir. 2007)). Nonetheless, it noted that the protected speech in *Brammer-Hoelter* was not made to supervisors; occurred after hours in groups including ordinary citizens and parents and concerned aspects of school administration. *Id.* And the plaintiffs had no supervisory responsibility over budgeting and no duty to report issues with staffing levels. *Id.* In contrast, "Rohrbough spoke only to Hospital employees and only about matters within the scope of her duties as a nurse and Transplant Coordinator." *Id.* In other words, the Tenth Circuit in *Rohrbough* distinguished *Brammer-Hoelter* for the same reasons this Court has distinguished Plaintiff's speech from that at issue in *Brammer-Hoelter*.

The Tenth Circuit also rejected Rohrbough's argument that the incident reports constituted speech outside of her employment because "drafting them was not something she was 'actually expected to do.'" *Id.* Her supervisors did not instruct her to do them and other nurses did not do them. *Id.* at 749. The Tenth Circuit explained that "employee speech not explicitly required as part of an employee's day-to-day job may nevertheless fall within the scope of that employee's official duties." *Id.* (internal quotation marks and alterations omitted).

The court held that "Rohrbough's Occurrence Reports were . . . made pursuant to her duties as Transplant Coordinator." *Id.* "Her reports documented the eleven instances of substandard care she observed *while fulfilling her job responsibilities*." *Id.* (emphasis added). Similarly, "Rohrbough's communications with other Hospital employees regarding the alleged heart misallocation and UNOS cover-up fall within the scope of her official duties." *Id.* at 750. "The undisputed facts demonstrate Rohrbough's responsibilities included contacting UNOS to list a patient for an organ transplant and to change a patient's status." *Id.* "Her internal discussions about these duties certainly stemmed from and were the type of activities that she was paid to do." *Id.* (internal quotation marks omitted). Using *Rohrbough* as a guidepost, it is clear that *even if* Plaintiff provided evidence that he was not explicitly required "to raise the alarm that BHI was placing people in harm's way," Doc. 130 at 23, Plaintiff's speech nonetheless fell within the scope of his official duties.

Also like the plaintiff in *Rohrbough*, Plaintiff here made complaints to his supervisors about staffing issues in his unit and the adverse consequences those issues were having on patient care (patient safety issues during the day, specific night shift safety incidents, and patients not being competent to self-administer mediations). The undisputed evidence is that his official job duties included observing and caring for residents, ensuring patients' safety and welfare, and supervising employees; and that his responsibilities included reporting unsafe conditions generally, and writing specific incident reports to his supervisors. His complaints to his supervisors or coworkers are all clearly pursuant to his official duties under *Rohrbough*.

Plaintiff's argument that he was motivated to speak about how "Defendants were endangering the safety of patients who were unable to care for themselves," Doc. 130 at 24, is beside the point. That argument bears on the second prong of the *Garcetti/Pickering* test

(whether the speech was on a matter of public concern) not the first prong (whether the speech was pursuant to official duties). The plaintiffs in *Green* and *Rohrbough* also spoke about matters of public concern, but this fact similarly failed to support their First Amendment retaliation claims. *Rohrbough*, 596 F.3d at 743 (Rohrbough wanted "the patient care issues that were causing patient negative outcomes to be addressed"); *Green*, 472 F.3d at 801 (notable First Amendment precedents in this area "also involved employees trying to focus attention on apparently misguided actions or improper situations. Nonetheless, their conduct was not protectable under the First Amendment."). Moreover, in *Garcetti* the Supreme Court cautioned against "judicial oversight of communications between and among government employees and their superiors in the course of official business." 547 U.S. at 411. Plaintiff's speech was made pursuant to his official duties and it is not this Court's role to oversee speech between Plaintiff and his supervisors. Tenth Circuit and United States Supreme Court precedent compels the Court to conclude, as a matter of law, that Plaintiff's First Amendment retaliation claims fails because the speech at issue was made pursuant to Plaintiff's official duties.

B.      Lawsuit support

Under the second category of Plaintiff's alleged protected speech, Plaintiff argues he engaged in "protected expressive activity specifically by speaking in support of his partner in her successful discrimination lawsuit against BHI; supporting his partner as she prosecuted that action[; and] by attending hearings and a mediation with her." Doc. 130 at 22. Defendants argue that "supporting his companion, Patricia Vigil, in her private lawsuit against the DOH, through attending her deposition, a mediation and other proceedings as well as serving a subpoena" is neither "protected speech," nor conduct that can support a free association claim. Doc. 123 at 23.

1.    Expressive Conduct

In general, the First Amendment protects speech, not conduct. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Attending a deposition, a mediation, and other proceedings, as well as serving a subpoena, is conduct—not speech.[7] Nonetheless, certain "conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* (internal quotation marks omitted). This is the doctrine of "expressive conduct." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 65-66 (2006). But the Supreme Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* (internal quotation marks omitted). Instead, the Court has "extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 66. In order for conduct to constitute "expressive conduct" warranting First Amendment protection, courts have "asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404.

Here, Plaintiff argues that his support for his "domestic partner, who was alleging discrimination against BHI employees[,] is the same as accusing those employees of discrimination." Doc. 130 at 22. But this is merely argument in a brief. Plaintiff offers no *evidence* that he intended to convey an anti-discrimination message with his attendance at a deposition and mediation, or that the Defendants were likely to have understood his presence as such. Compounding this failure to produce any evidence on the topic, Plaintiff cites no law and develops no argument governing the line between unprotected conduct, expressive conduct, and

---

[7] Plaintiff testified that "I didn't participate with her. I just was there with her. I didn't open my mouth and tell anybody nothing bad or good or—I had nothing to do there. You know? I just went with her . . . ." Doc. 130-6 at 7 (Plf's dep. at 92:7-10).

speech. Plaintiff does not cite any legal authority for the contention that sitting in on a deposition is the legal equivalent of speaking out against discrimination. The Court is not otherwise aware of any such authority. The Court therefore rejects Plaintiff's "expressive conduct" argument.[8]

 2.  Speech

In his response, Plaintiff also argues that he engaged in literal speech—"speaking in support of his partner." Doc. 130 at 22. Defendants disagree. As evidence in support of their argument, Defendants cite Plaintiff's interrogatory answers, which reference only conduct (not speech) in support of his partner's lawsuit. Doc. 123 at 23; Doc. 123-13 at 6. The Court agrees with Defendants that Plaintiff's interrogatory answers do not describe any speech on behalf of his partner. The Court disagrees with Defendants, however, that their interrogatory requested Plaintiff to provide all such information. *Id.* at 4-5 (interrogatory asking Plaintiff to describe with particularity any instances in which you "specifically complained to NMBHI employees, including but not limited to Defendants Frances Tweed, Corrine Dominguez, Antonio Coca, and/or Joe Chavez that patients were suffering as a result of placing patients who had extremely limited cognitive skills into placements designed for patients who were able to take care of themselves."). Because Defendants did not specifically request Plaintiff to provide all instances in which he spoke in support of his partner, the absence of such information in Plaintiff's interrogatory response is unremarkable and cannot be held against Plaintiff.

That Defendants did not request Plaintiff to provide such evidence during discovery, however, does not relieve Plaintiff of his obligation to produce such evidence in response to

---

[8] Plaintiff does not argue that either his motivation or his conduct amounts to rendering assistance in litigation vindicating civil rights. *See Owens v. Rush*, 654 F.2d 1370, 1379 (10th Cir. 1981) (recognizing such claims); *Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1550-51 (10th Cir. 1989).

Defendants' motion for summary judgment. At summary judgment, Plaintiff's burden is to come forward with evidence supporting his claims; he cannot rest on bare factual allegations contained in the pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (Defendants demonstrate an entitlement to summary judgment simply by pointing to the absence of evidence to support a claim).

Plaintiff's complaint alleges he "spoke out about the abuse that his longtime partner suffered in order to prevent it from continuing to occur to her and to other employees." Doc. 38 ¶ 122. In his brief, he contends that "[d]uring Patricia's case, Mr. Vigil openly supported Patricia" and argues that "[s]peaking against the perpetrators of that discrimination falls soundly within the rubric of protected speech." Doc. 130 at 4, 23. But the evidence he cites in support of these contentions on summary judgment does not match this description. Plaintiff cites his deposition testimony, which establishes that:

> [Defendants Antonio Coca and Joe Chavez] had to go there [in my office] on various occasions all the time, and . . . I would stay there and talk to them quite a bit about—complain to them about what was happening, you know, and—about [Patricia]. . . . I talk about Patricia. I tell them that she was having it hard on her. It was hard on the family and stuff like that.

Doc. 130 at 4 (citing Doc. 130-6 at 2 (Plf's dep. at 15-19)). Because the evidence does not support Plaintiff's contentions that he engaged in speech openly supporting his partner in opposition to abuse or discrimination, the Court declines to consider these arguments for purposes of summary judgment.[9] The Court therefore finds Defendants are entitled to summary judgment on the contention that Plaintiff "spoke out" in support of his partner.

---

[9] Although the statements as characterized in the brief—speaking out "openly" against abuse and discrimination—might be on a matter of public concern, Plaintiff's testimony describing only speech about how the matter affected his family is likely not.

**II.      Whether The Law Is Clearly Established**

Given these conclusions, Plaintiff's claim necessarily also fails at the second prong of the qualified immunity analysis. The above Supreme Court and Tenth Circuit precedent does not place every reasonable hospital supervisor on notice that: (1) under the first category, Plaintiff's speech did not qualify as non-protected speech made pursuant to his official duties; and (2) under the second category, Plaintiff's conduct was protected under the First Amendment. Nor does Plaintiff cite any other case that does so.

Plaintiff cannot rely on general statements such as "it is clearly established that a public employer cannot retaliate against an employee for exercising their First Amendment right to free speech" or "the First Amendment protects a public employee's right to speak as a citizen addressing matters of public concern." *Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018) (alterations omitted). Instead, for Plaintiff "to meet his burden, the clearly established law must be particularized to the facts of the case." *Id.* (internal quotation marks omitted). The Tenth Circuit specifically rejected the notion "that the first step of *Garcetti/Pickering* warrants different treatment than other qualified immunity cases because of its focus on the plaintiff-employee's speech as opposed to the defendant-official's conduct." *Id.* at 951. The question remains what a reasonable official would have understood. *Id.*

Plaintiff's burden on the second prong is not necessarily to "cite a case directly on point." *Id.* at 949 (internal quotation marks omitted). But he must show the law would have been clear to a reasonable supervisor in Defendants' position that their conduct was unlawful in the situation. *Id.* The key question is whether Defendants reasonably could have believed, at the time they allegedly retaliated against Plaintiff, that his complaints about patient safety and overstaffing in his unit (Plaintiff's first category of alleged speech) and his support of Ms. Vigil's lawsuit (Plaintiff's second category of alleged speech) were not First-Amendment protected speech.

27

Plaintiff here has not shown that "such a belief was unreasonable based on then-existing law" or that it would have been "beyond debate" to a reasonable official that Plaintiff engaged in First Amendment protected speech. Defendants are therefore entitled to qualified immunity.

## **CONCLUSION**

The Court GRANTS Defendants' Motion For Summary Judgment Based On Qualified Immunity. Doc. 123. The Court dismisses Count V of the Second Amended Complaint and will enter final judgment contemporaneously.

SO ORDERED.

_____
STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by consent